Erik Petersen (Wyo. Bar No. 7-5608)
Senior Assistant Attorney General
Elizabeth Morrisseau (Wyo. Bar No. 7-5307)
Assistant Attorney General
Wyoming Attorney General's Office
2320 Capitol Avenue
Cheyenne, WY 82002
Ph: (307) 777-6946
erik.petersen@wyo.gov
elizabeth.morrisseau@wyo.gov
*Attorneys for Petitioner State of Wyoming*

Brandon L. Jensen (Wyo. Bar No. 6-3464)
Budd-Falen Law Offices LLC
300 East 18th Street
Post Office Box 346
Cheyenne, Wyoming 82003-0346
Ph: (307) 632-5105
brandon@buddfalen.com

Timothy C. Fox, Montana Attorney General
Alan L. Joscelyn, Chief Deputy Attorney General
Tommy H. Butler, Deputy Attorney General
Montana Dept. of Justice
215 North Sanders
Post Office Box 201401
Helena, Montana  59620-1401
Ph: (406) 444-0662
timothyfox@mt.gov
alanjoscelyn@mt.gov
tommybutler@mt.gov
*Attorneys for Petitioner State of Montana*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| STATE OF WYOMING, STATE OF MONTANA, | ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) | Civil No. 16-CV-285-S |
| UNITED STATES DEPARTMENT OF THE INTERIOR; SALLY JEWELL, in her official capacity as Secretary of the Interior; UNITED STATES BUREAU OF LAND MANAGEMENT; and NEIL KORNZE, in his official capacity as Director of the Bureau of Land Management, | ) ) ) ) ) ) ) ) | |
| Respondents. | ) ) | |

---

## MEMORANDUM IN SUPPORT OF WYOMING AND MONTANA'S MOTION FOR PRELIMINARY INJUNCTION

---

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................i

INTRODUCTION ....................................................................................................1

BACKGROUND ......................................................................................................1

    I.    Air Emissions Associated with Oil and Gas Production ................................1

    II.   The EPA's Regulation of Air Emissions from Oil and Gas Production ......................2

    III.  Wyoming's History of Regulating Air Emissions from Oil and Gas Production .................................................................................................5

        A.  Resource Conservation .................................................................6

        B.  Air Quality Control ......................................................................7

    IV.  The Bureau's Venting and Flaring Rule .....................................................9

ARGUMENT ........................................................................................................11

    I.    Standard for granting an preliminary injunction ....................................11

    II.   The Court should issue a preliminary injunction to maintain the status quo ............11

        A.  Wyoming and Montana will likely succeed on the merits of their Petition ........11

           1.  The Bureau lacks statutory authority to promulgate the Venting and Flaring Rule .....................................................................12

               a.   The Bureau may not step into the EPA's shoes and promulgate performance standards for existing sources of oil and gas production ...........................................................12

               b.   FLPMA does not authorize the Bureau to regulate non-methane air emissions .......................................................14

               c.   The MLA does not authorize the Bureau to regulate all emissions streams, only methane. ....................................15

           2.  The Venting and Flaring Rule is arbitrary and capricious ..........................17

               a.    The Bureau arbitrarily assumed that all emission streams contain sufficient methane to flare rather then vent ..........................17

i

b.    The Bureau arbitrarily failed to consider the costs of the Venting and Flaring Rule by double-counting the benefits of reducing already-reduced emissions and by failing to consider the costs of increased flaring ............................................................18

B.  Irreparable harm to the States will occur if the Court does not grant a preliminary injunction ........................................................................................19

C.  The balance of equities favors Wyoming and Montana......................................22

D.  Granting a preliminary injunction is in the public interest..................................24

CONCLUSION..................................................................................................................................25

## INTRODUCTION

Under the Clean Air Act, the United States Environmental Protection Agency (EPA) and the states have the responsibility to regulate industrial sources of air pollution. Pursuant to that and other authorities, both Wyoming and Montana have developed comprehensive programs for regulating oil and gas production, for both resource conservation and air quality control purposes. The Wyoming Department of Environmental Quality, Air Quality Division (Division) leads the nation in developing effective air pollution control requirements for oil and gas production facilities. Now, the Bureau of Land Management (Bureau), an agency with no authority to regulate air pollution, has promulgated a so-called waste prevention rule that will interfere with Wyoming's longstanding efforts to control the impact of oil and gas production on local, regional, and national air quality. Waste Prevention, Production Subject to Royalties, and Resource Conservation, 81 Fed. Reg. 83008 (Nov. 18, 2016) (Venting and Flaring Rule).

Wyoming and Montana request that this Court enjoin the Bureau's Venting and Flaring Rule during the pendency of this litigation. The states are entitled to a preliminary injunction because their right to relief is clear and unequivocal and in the public interest. This rule exceeds the Bureau's statutory authority, and if it goes into effect next month, it will cause irreparable harm to Wyoming and Montana's sovereignty by undermining the states' air quality control programs and the states' ability to regulate the production of state minerals.

## BACKGROUND

### I.   Air Emissions Associated with Oil and Gas Production

A wide variety of chemical compounds are released to the atmosphere during oil and gas production, through both controlled and uncontrolled processes. Leaking or malfunctioning equipment results in uncontrolled emissions. Emissions also occur when operators proactively

1

vent or flare gas that would otherwise remain inside piping, equipment, and tanks.[1] Venting is the controlled release of gases into the atmosphere, such as opening a valve on a tank that contains volatile gases. Flaring is the controlled burning of emission streams through devices called flares or combustors. Flaring can only occur when an emission stream contains enough flammable gas to burn on its own or if operators inject additional flammable gas, such as propane, into the emission stream entering the combustor. Operators may release emissions for safety reasons because excessive pressure buildup can cause explosions. Operators may also vent or flare otherwise saleable gas in the absence of infrastructure to transport the gas to market.

Emissions that occur through leaking and venting are transformed into other emissions when flared. For air quality control agencies, the choice between venting or flaring is unrelated to minimizing air pollution, instead it presents an opportunity to choose between different general sets of pollutants, based on comparative local and regional air quality concerns. (Vehr Aff. at ¶ 13); (*Id.* at Ex. A-21). Although emission streams are different, air pollution control techniques generally do not differentiate between chemical compounds, so measures to reduce emissions of volatile organic compounds will also reduce leaks of methane.

## II.     The EPA's Regulation of Air Emissions from Oil and Gas Production

Congress explicitly delegated authority to the states and the EPA to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and productive capacity of its population." 42 U.S.C. § 7401(b)(l). Among other things, the EPA is responsible for setting health-based ambient air quality standards for six criteria pollutants,

---

[1] "Flaring and venting in the oil & natural gas exploration & production industry: An overview of purpose, quantities, issues, practices and trends," International Association of Oil and Gas Producers (January 2000), at 1, available at http://www.ogp.org.uk/pubs/288.pdf (last visited Aug. 19, 2016). "It is not uncommon for courts to take judicial notice of factual information found on the world wide web." *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007).

including ozone and nitrogen oxides. 42 U.S.C. § 7408. Following the EPA's determination of ambient air quality standards, each state is required to develop a state implementation plan, which is a collection of laws, regulations, and other enforceable mechanisms to control emissions of specific pollutants from in-state sources. *Train v. Natural Res. Def. Council,* 421 U.S. 60, 79 (1975), 42 U.S.C. § 7410. The EPA must approve each state implementation plan if it contains certain minimum requirements, which effectively converts the contents of the state implementation plan into federal law, enforceable by the state, the EPA, or a private citizen. *Espinosa v. Roswell Tower, Inc.,* 32 F.3d 491, 492 (10th Cir. 1994) ("The state implementation plan has the force and effect of federal law[.]"); 42 U.S.C. §§ 7413(b)(1) and 7604.  Congress thus established a process by which the EPA sets certain standards, each state uses localized knowledge to develop appropriate control regimes, and the EPA strengthens those air pollution control regimes by making them federally enforceable.

In addition to serving in this cooperative leadership role to safeguard national ambient air quality, the EPA is also responsible for developing standards of performance for specified categories of sources that the agency has determined should be regulated to protect the public health. 42 U.S.C. § 7411(b)(1)(A). The Clean Air Act defines "standards of performance" as "standard[s] for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality healthy and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated." *Id.* at § 7411(a). In making the determination whether a system of emission reduction has been adequately demonstrated, the EPA will look to controls required by states to establish a national floor for controls, *see infra* at III.b. *See also Sierra Club v. Costle,* 657 F.2d

298 (D.C. Cir. 1981). Thus, new source performance standards may be less stringent than state regulations. (Potter. Aff. at ¶ 14).

The EPA has clear authority to regulate air emissions from oil and gas production under this statutory provision. The Clean Air Act establishes a three-step process whereby the EPA first lists a source category, then develops new source performance standards for the listed source category, then develops a procedure, similar to the state implementation plan process for ensuring national ambient air quality, for states to follow in developing plans to control emissions from existing sources. 42 U.S.C. §§ 7411(b)(1)(A), (b), and (d)(1). Even before the EPA begins the third step, states may request concurrent enforcement authority over the new source performance standards. *Id.* at § 7411(c). No part of this statutory framework allows the Bureau to sidestep the EPA and develop its own regulations for existing sources.

The EPA is currently in the third step of this statutory process, having recently announced that the agency was seeking information about "monitoring, detection of fugitive emissions, and alternative approaches in the oil and natural gas section." Oil and Natural Gas Sector; Request for Information, Emerging Technologies, 81 Fed. Reg. 46670 (July 18, 2016). This request is a predicate to the EPA's eventual issuance of a regulation to limit air pollutants, including methane, from existing sources in the oil and natural gas extraction industry.[2]

Although the agency had the authority to do so much earlier, the EPA did not regulate emissions from new oil and gas production facilities until 2012,[3] basing its standards largely on

---

[2] https://www.epa.gov/controlling-air-pollution-oil-and-natural-gas-industry/actions-and-notices-about-oil-and-natural-gas#info (last visited Nov. 28, 2016) (recognizing that the information request will lead to regulation of existing sources).

[3] The EPA first listed crude oil and natural gas production in 1979, but the initial new source performance standards, issued in 1985, applied to downstream sources, not to individual well

the work of regulators in Wyoming and Colorado. Oil and Gas Natural Sector: New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants Reviews; Final Rule, 77 Fed. Reg. 49490 (Aug. 16, 2012); *Out in Front? State and Federal Regulation of Air Pollution Emissions from Oil and Gas Production Activities in the Western United States.* 55 Nat. Resources J. 1 (Fall 2014) ("The [EPA] did not adopt emission standards for most oil and gas production activities until 2012, when it relied on Colorado and Wyoming as proving grounds for control technology."). Most recently, the EPA updated those standards to also control emissions of methane, in addition to volatile organic compounds and sulfur dioxide. Oil and Natural Gas Sector; Emission Standards for New, Reconstructed, and Modified Sources; Final Rule, 81 Fed. Reg. 35824 (June 3, 2016).  Among other things, the updated regulations restrict and regulate an operator's ability to vent or flare methane. *See id.* at 35825. This regulatory update was part of the President's "Climate Action Plan: Strategy to Reduce Methane Emissions." *Id.* at 35830. Wyoming recently adopted these standards into the Wyoming Air Quality Standards and Regulations, and expects that the EPA will shortly delegate enforcement authority to Wyoming over those standards. *Rules Wyo. Dep't of Envtl. Quality, Air Quality*, ch. 5, § 2, available at <u>https://rules.wyo.gov/</u> (last visited Nov. 28, 2016).

In short, the EPA is in the process of comprehensively regulating air pollution associated with oil and natural gas production.

### III.    Wyoming's History of Regulating Air Emissions from Oil and Gas Production

Wyoming has long regulated oil and gas production, with separate agencies focused on resource conservation and air quality management. This comprehensive approach allows Wyoming to both protect the airshed and maximize the return of royalties.

---

sites. Priority List and Additions to the List of Categories of Stationary Sources 44 Fed. Reg. 49222 (Aug. 21, 1979); 40 C.F.R. § 60, subparts KKK and LLL.

A.     **Resource Conservation**

Wyoming law prohibits the waste of methane, which includes unnecessarily flaring gas. Wyo. Stat. Ann. §§ 30-5-101(a)(i)(G) and -102. The Wyoming Oil and Gas Conservation Commission (Commission) limits the amount of methane that an owner or operator can vent or flare from a producing well and has done so for over forty years. (Watson Aff. at ¶ 5). The Commission recently updated its flaring and venting regulations to reduce waste of state minerals, carefully crafting the regulations with a nuanced understanding of developing and testing tight formation wells, which comprise the majority of new wells in Wyoming. (*Id.* at ¶¶ 7, 11, 12). These regulations apply on all lands in Wyoming, except for tribal lands. (*Id.* at ¶ 19). This includes wells that extract federal minerals, which is the majority of gas wells and the greater half of oil wells. (*Id.* at ¶ 19). Montana also regulates venting and flaring. *Rules Mont. Dep't Natural Res. and Conserv.,* ch. 36.22 §§ 1216-1221, available at http://www.mtrules.org/ (last visited Nov. 28, 2016).

Much oil and gas development in Wyoming involves mixed federal, private, and state minerals. The majority of new horizontal development in Wyoming occurs in the Powder River Basin, in large spacing units that often include federal, state, and private minerals. (Watson Aff. at ¶ 23). These spacing units, memorialized through communitization agreements, exist for industrial planning convenience and to ensure adequate royalty accounting. (*Id.*); *see also* 43 C.F.R. § 3217.11.

The Commission does not regulate air pollution, but the Commission's rules directly reference the parallel requirements set by the Division. (*Id.* at ¶ 12); *Rules Wyo. Oil and Gas Cons. Comm'n,* ch. 3, § 39(a) ("[V]enting and flaring…shall be conducted in compliance with Wyoming Department of Environmental Quality Air Quality Rules."). Historically, the Bureau

has taken a similar approach to air pollution control by providing both general and specific references to the Division's permitting program and its primary role in avoiding undue degradation of air quality. *See, e.g.,* 43 C.F.R. § 3809.420(b)(4); (Vehr Aff., A-23).

**B.      Air Quality Control**

The Division regulates air pollution associated with oil and gas production, including emissions released to the atmosphere through leaking, venting, and flaring. (Vehr Aff. at ¶ 13). The Division primarily does this through a permitting program. This regulatory program has been federally enforceable since 1974, when the EPA first approved the program into Wyoming's state implementation plan to control emissions of nitrogen oxides and ozone precursors. *Rules Wyo. Dep't of Envtl. Quality, Air Quality*, ch. 6, § 2; 40 C.F.R. § 52.2620, subpart ZZ; (Vehr Aff. at ¶ 12). Similarly, Montana's oil and gas permitting program is included in its state implementation plan. *Rules Mont. Dep't of Envtl. Quality, Air Quality,* ch. 17.8, §§ 1601-1606 and 1710-1713; 40 C.F.R. § 52.1370, subpart BB. The Division also recently promulgated regulations to control emissions of ozone precursors from existing oil and gas production facilities in the Upper Green River Basin. *Rules Wyo. Dep't of Envtl. Quality, Air Quality*, ch. 6, § 13 (Potter Aff. at ¶ 10).

Under the Division's federally enforceable permitting program, owners and operators must use the best available control technology (BACT) at all minor sources. BACT is an individualized approach to permitting that enables air pollution control agencies to make specific control determinations based on a dollar per ton basis, taking "into account energy, environmental, and economic impacts and other costs associated with application of alternative control systems." David G. Hawkins, Assistant Administrator for EPA Air, Noise, and Radiation (January    4,    1979),    available    at    https://www.epa.gov/sites/production/files/2015-

7

07/documents/bactupsd.pdf (last visited Nov. 28, 2016); *see also* 42 U.S.C. § 7479(3); *Rules Wyo. Dep't of Envtl. Quality, Air Quality*, ch. 6, § 2(c)(v); (Vehr Aff. at ¶¶ 14-18); (Potter Aff. at ¶ 12). The Division's approach to BACT considers applicable federal regulations to avoid redundancy. (Vehr Aff. at ¶¶ 23-24); (Potter Aff. at ¶ 11). Similarly, the EPA analyzes state approaches to BACT when it issues and revises performance standards. (Vehr Aff. at ¶ 14).

The Division previously issued and frequently revises an interpretive policy that describes presumptive BACT for minor oil and gas production facilities, to allow operators to construct or modify before obtaining air quality permits. Wyo. Stat. Ann. § 35-11-801(e); Oil and Gas Production Facilities Chapter 6, Section 2 Permitting Guidance, last revised May 2016 ("Guidance," Ex. B to Vehr Aff.); (Potter Aff. at ¶ 8) (Vehr Aff. at ¶¶ 14-18). The EPA relied on this non-binding interpretive Guidance, and the knowledge of the permit writers who created it, when that agency began regulating air emissions from oil and gas production facilities. (Potter Aff. at ¶ 15); (Vehr Aff. at ¶ 19). Requirements in the Venting and Flaring Rule also derive from this Guidance, the Bureau's ignorance of the Guidance notwithstanding. (Vehr Aff. at ¶¶ 20-22); *Compare, e.g.,* 43 C.F.R. § 3179.204 *with* Vehr Aff., Ex. B-1 to B-16 (both sections require analogous best management practices and recordkeeping for downhole well maintenance and liquids unloading).

In sum, Wyoming actively and expansively regulates air emissions from oil and natural gas production. The Commission regulates waste and resource conservation issues, while the Division regulates air pollution through a permitting program that is enforceable as federal law. The efforts of these two agencies complement one another, rather than creating unnecessary and counterproductive overlap.

**IV.     The Bureau's Venting and Flaring Rule**

Now, despite these extensive state and federal air quality regulations, developed over time, through thoughtful scientific engagement, the Bureau has decided to take charge of air pollution by promulgating a rule that, at best, duplicates, and at worst, undermines, the agencies tasked by Congress with regulating air quality. The Bureau erroneously claims that, "[N]o State has established a comprehensive set of requirements addressing…flaring, venting, and leaks." Waste Prevention, Production Subject to Royalties, and Resource Conservation; Proposed Rule, 81 Fed. Reg. 6616, 6618 (Feb. 8, 2016). This is not true. Wyoming has a comprehensive program of resource conservation and air quality control, which the Bureau still fails to acknowledge. 81 Fed. Reg. at 6634 (summary of Wyoming regulations only refers to recent existing source rule and disregards state implementation plan); (Potter Aff. at ¶ 10).

The Bureau designed the Venting and Flaring Rule for two reasons: (1) to reduce the waste of methane from oil and natural gas production activities on federal and Indian land; and (2) to regulate air quality by controlling emissions from existing sources. 81 Fed. Reg. at 83009. Some requirements in the rule appear to derive from the Bureau's statutory role as a land management agency, such as clarifying royalty provisions,[4] requiring operators to submit gas capture plans to accompany initial applications to drill, and clarifying when gas is considered unavoidably lost for the purposes of calculating royalties. 81 Fed. Reg. at 83021.

However, the bulk of the Venting and Flaring Rule regulates air pollution. The rule adopts a preference for flaring over venting, which is not a waste minimization requirement since it merely selects one method of waste over another. *Id.* The rule also requires green completions for well drilling and completions operations, similar to requirements in Wyoming's Guidance,

---

[4] Wyoming and Montana do not challenge issues related to royalties in the instant suit.

which were then adopted into the EPA's new source performance standards. *Compare* 81 Fed. Reg. at 83084 *with* Vehr Aff., Ex. B-12 *and* 40 C.F.R. § 60.5375a(f). The rule also establishes leak detection and repair requirements, consistent with the EPA's new source performance standards. *Compare* 81 Fed. Reg. at 83011 *with* 40 C.F.R. § 60.5397a. Finally, the rule establishes emission controls for pneumatic controllers, pneumatic diaphragm pumps, and storage vessels. 81 Fed. Reg at 83085-83086. The regulatory requirements for these types of equipment explicitly reference the EPA's new source performance standards in the associated applicability sections. *Id.* ("[Equipment is subject to this section if it "[i]s not subject to any of the requirements of 40 CFR part 60, subpart OOOO or OOOOa, but would be subject to one of those subparts if it were a new, modified, or reconstructed source."). Thus, the rule indicates that the Bureau relied heavily on advances in air pollution control technology, driven in part by Wyoming's efforts to regulate air quality and minimize waste of state resources. (Vehr Aff. at ¶¶ 20-21).

The Bureau relied upon a number of statutes to promulgate the Venting and Flaring Rule, but the ultimate source of the agency's alleged statutory authority derives from the Mineral Leasing Act of 1920 (MLA), 30 U.S.C. § 181–287, and the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1701 through 84. *See* 81 Fed. Reg. at 83009. The rule is effective on January 1, 2017, absent action by this Court. 81 Fed. Reg. at 83008.

## ARGUMENT

### I.      Standard for granting a preliminary injunction.

The Federal Rules of Civil Procedure empower this Court to grant a preliminary injunction in this matter.[5] Fed. R. Civ. P. 65(a). The purpose of a preliminary injunction "'is merely to preserve the relative positions of the parties until a trial on the merits can be held.'" *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (quoting *Univ. of Tex. v. Camenisch¸* 451 U.S. 390, 395 (1981)). To grant a preliminary injunction, the Court must find that: (1) the movant is likely to succeed on the merits; (2) the movant is likely to suffer irreparable harm without preliminary relief; (3) the balance of equities favors the movant; and (4) the injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20-21 (2008). To make this showing, the movant must demonstrate that the right to relief is clear and unequivocal. *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 698 F.3d 1295, 1301 (10th Cir. 2012).

### II.     The Court should issue a preliminary injunction to maintain the status quo.

#### A.      Wyoming and Montana will likely succeed on the merits of their Petition.

When considering the legality of an agency action, "the essential function of judicial review is a determination of: (1) whether the agency acted within the scope of its authority; (2) whether the agency complied with prescribed procedures; and (3) whether the action is otherwise arbitrary, capricious or an abuse of discretion." *Olenhouse v. Commodity Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994) (citation omitted). With regard to the first element, "[d]etermination of

---

[5] Petitioners request that no injunctive bond or surety be required pursuant to Fed. R. Civ. P. 65(c). *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461 (10th Cir. 1987) (instructing district courts to use discretion if "there is an absence of proof showing a likelihood of harm"). As discussed below, no harm will come to the Bureau should this Court enter a preliminary injunction against the Venting and Flaring Rule.

whether the agency acted within the scope of its authority requires a delineation of the scope of the agency's authority and discretion, and consideration of whether on the facts, the agency's action can reasonably be said to be within that range." *Id*. With regard to the third element, a court must ascertain "whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Id*. Agency action is arbitrary if not supported by "substantial evidence" in the administrative record. *Id*. at 1575.

Wyoming and Montana are likely to succeed on the merits of this case. First, the Bureau acted outside the scope of its authority when the agency promulgated the Venting and Flaring Rule. Second, the Bureau acted arbitrarily when the agency failed to articulate a rational connection between the facts found and the decision made. Accordingly, Wyoming and Montana are likely to succeed on the merits of their Petition for Review, and this Court should grant the motion for a preliminary injunction.

### 1. The Bureau lacks statutory authority to promulgate the Venting and Flaring Rule.

The Bureau acted outside the scope of its authority when the agency promulgated the Venting and Flaring Rule because: (1) the Clean Air Act does not allow the Bureau to regulate emissions from existing sources; (2) FLPMA does not authorize the Bureau to regulate air quality; and (3) the MLA does not authorize the Bureau to regulate all emission streams regardless of methane content.

### a. The Bureau may not step into the EPA's shoes and promulgate performance standards for existing sources of oil and gas production.

The Bureau "may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law." *Wyoming v. Dept. of the Interior*, No. 15-cv-043, 2016 WL 3509415, *1 (D. Wyo. June 21, 2016) (internal citations omitted). Put

another way, the Bureau may not exercise authority that Congress has unambiguously delegated to another federal agency. This is true, "regardless of how serious the problem an administrative agency seeks to address." *Id.* (internal citations omitted). Here, Congress explicitly delegated authority to the states and the EPA to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and productive capacity of its population" 42 U.S.C. § 7401(b)(l). By contrast, Congress established the Bureau as the federal agency responsible for managing public land. In promulgating the Venting and Flaring Rule, the Bureau overstepped its authority and intruded upon an area squarely in the province of a different federal agency, the EPA.

The Bureau may not promulgate a rule with no authority to do so, particularly so when the agency with that rulemaking authority in the process of developing regulations in accord with Congressional mandate. *Wyoming,* 2016 WL 3509415, *4. With the Venting and Flaring Rule, the Bureau seeks to cloak all oil and gas production involving any federal minerals under the Bureau's one-size-fits-all existing source performance standards, without considering the statutory factors the EPA is bound to consider, and without allowing states to develop implementation plans that consider the remaining useful life of facilities. In so doing, the Bureau disregards the careful framework delineated in the Clean Air Act. 42 U.S.C. § 7411(c) and (d).

The Bureau justifies acting outside of its statutory authority as a natural outcome of "overlapping authority" and "complimentary goals." 81 Fed. Reg. at 83010. However, the area of overlap is small, and does not encompass the breadth of requirements in this rule. (Vehr Aff., Ex. A-23 to A-24). The Bureau could have imposed a compensatory royalty for emissions that waste methane, but the Bureau may not regulate such emissions as an air pollutant. The Bureau now asserts that, as a land management agency, it may promulgate air quality regulations if the EPA,

13

the federal agency tasked by Congress with doing that exact thing, is acting too slowly, or without the land management agency's preferred predetermined outcome. 81 Fed. Reg. at 83019. This is not how the Clean Air Act works. Congress did not authorize the Bureau to promulgate rules on behalf of the EPA, and the Bureau may not bootstrap this authority from the actual, but small, overlap between waste minimization and air quality control. *Wyoming,* 2016 WL 3509415, *4 (internal citations omitted).

### b. FLPMA does not authorize the Bureau to regulate non-methane air emissions.

The Federal Land Policy Management Act provides a "comprehensive statement of congressional policies concerning the management of public lands" owned by the United States and under the Bureau's management. *Id.,* at *1 (internal citations omitted). Through this Act, Congress authorized the Bureau to manage public lands for multiple uses and sustained yield of natural resources, through a routine process of planning and inventorying public land and its uses that must consider "the long-term needs of future generations for renewable and nonrenewable resources," 43 U.S.C. §§ 1702(c), (h), 1711-12. FLPMA "represents an attempt by Congress to balance the use of the public lands by interests as diverse as the lands themselves." *Rocky Mtn. Oil and Gas Ass'n v. Watt,* 696 F.2d 734, 738-39 (10th Cir. 1982). Towards this general purpose, Congress authorized the Bureau to "prevent unnecessary or undue degradation of the lands" and to promulgate regulations necessary to achieve FLPMA's goals. 43 U.S.C. §§ 1732(b), 1733(a), 1740.

Nothing in FLPMA empowers the Bureau to regulate air quality. 43 U.S.C. § 1702(c), (h). That responsibility belongs to state air pollution control agencies and the EPA. 42 U.S.C. § 7401(a)(3). FLPMA merely requires the Bureau to require compliance with applicable air pollution control laws. *Id.* at § 1712(c)(8). It does not authorize the Bureau to

create its own air pollution regulations. (Potter Aff., Ex. B-1) ("It has been administratively determined that BLM does not have the authority to regulate air quality. That authority rests with the Wyoming Department of Environmental Quality."). Further, the agency's own regulations direct all mineral operators on federal lands, including oil and gas operators, to "comply with applicable Federal and state air quality standards, including the Clean Air Act." 43 C.F.R. § 3809.420(b)(4). Historically, the Bureau has fostered this compliance by including the Division's phone number in approvals of applications to drill on federal land in Wyoming. (Vehr Aff., Ex. A-23).

In sum, because FLPMA does not authorize the Bureau to regulate the air quality impacts associated with oil and natural gas extraction, the Venting and Flaring Rule exceeds the Bureau's statutory authority.

### c. The MLA does not authorize the Bureau to regulate all emissions streams, only methane.

The MLA and associated federal mineral leasing statutes "create a program for leasing mineral deposits on federal land." *Wyoming,* 2016 WL 3509415, *5 (internal citations omitted). "The purpose of the Act is to promote the orderly development of oil and gas deposits in publicly owned lands of the United States through private enterprise." *Geosearch, Inc. v. Andrus,* 508 F. Supp 839, 842 (D. Wyo. 1981) (internal citations omitted). The MLA establishes terms for leasing oil and gas minerals on public lands and prohibits leasing on wilderness lands. 30 U.S.C. §§ 226(d), (e), 226-3. The Act authorizes the Secretary of Interior to lease all other public lands for oil and gas development, regulate surface-disturbing activities, and establish cooperative development plans to conserve oil and gas resources. *Id.* §§ 223, 226(a), (g), and (m). "Nothing in the [MLA and related Acts] specifically indicates that Congress has undertaken to reserve unto itself exclusive control over federal lands leased for oil and gas development to

the exclusion of the States." *Texas Oil and Gas Corp. v. Phillips Petroleum Co.*, 277 F. Supp. 366, 369 (1967).

The Bureau asserts that the MLA provides the agency with the statutory authority necessary to regulate all air emissions from venting, flaring, or leaks that result from the extraction of oil and natural gas from federal leases and communitized state and private leases. 81 Fed. Reg. at 83019. The agency's justification is rooted in the assumption that all air emissions associated with the extraction of oil and natural gas include meaningful amounts of methane. And because the MLA empowers the agency to prevent the waste of methane on federal land, the Bureau believes that the MLA authorizes the agency to regulate all air emissions from these sources as a result.

But this exercise of supposed authority incorrectly assumes that all air emissions that result from the extraction of oil and natural gas will include meaningful amounts of methane. That is not accurate. For example, enhanced oil recovery wells often have emission streams that are mostly carbon dioxide. (Potter Aff. at ¶ 13). As another example, the Wyoming well that vented the largest quantity of gas in 2015 was venting a stream of gas that was 98% nitrogen. (Vehr Aff., Ex, A-20). As a result, the Bureau incorrectly relied upon the MLA as authorization to promulgate the Venting and Flaring Rule.

Even if all of the affected emissions streams were mostly methane, the Venting and Flaring rule is still fundamentally an air quality rule, not a waste conservation rule. The Venting and Flaring Rule requires owners and operators to flare, instead of vent, emission streams. This requirement mandates one type of waste over another. Choosing flaring over venting derives from a tunnel vision focus on transforming methane into other air pollutants; it is not a waste minimization technique. This is true even though the Bureau has included in the final rule a

16

complex averaging system that the Bureau believes transforms the act of flaring into a "waste prevention" mechanism. 81 Fed. Reg. at 83037.

The Bureau further asserts that the MLA's surface protection provisions authorize the agency to promulgate the Venting and Flaring Rule. However, this Court has already explained to the Bureau that this provision of the MLA "does not reflect a grant to the BLM of broad authority to regulate for the protection of the environment." *Wyoming*, 2016 WL 3509415, *7.

### 2.   The Venting and Flaring Rule is arbitrary and capricious.

Even if the Bureau had authority to promulgate the Venting and Flaring Rule, the rule would be arbitrary and capricious. "The duty of a court reviewing agency action under the 'arbitrary or capricious' standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Olenhouse*, 42 F.3d at 1574 (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983)). In promulgating the Venting and Flaring Rule, the Bureau failed to meet this standard.

### a.   The Bureau arbitrarily assumed that all emission streams contain sufficient methane to flare rather than vent.

The Venting and Flaring Rule incorrectly assumes that all air emission streams will contain sufficient methane to use flaring rather than venting. This assumption is flawed and arbitrary. Air emissions from the oil and gas production facilities contain a wide array of chemicals and chemical compounds. (Vehr Aff., Ex. A-20). The only way to determine what is contained in any given air emission stream is to perform a chemical analysis of the emission stream itself. (*Id*.) In the absence of stream-specific chemical analyses, which the Division reviews through its source-specific permitting process, the Bureau is left to make unsupported assumptions about what a particular source is emitting. (*Id*.). This has significant implications as to whether a specified control technology is applied for the purpose of improving air quality, for

avoiding waste of saleable natural gas, or whether it will have the perverse effect of increasing air emissions. (*See, e.g., id.* at A-21 (discussion of air pollution associated with flaring sour gas)). In promulgating the Venting and Flaring Rule, the Bureau assumed, without analysis, that there are sufficient amounts of methane in all emission streams to justify invoking the anti-waste provisions of the MLA. This assumption is flawed, and the agency's reliance on the MLA is misplaced as a result.

For example, the well that vented the greatest quantity of air pollutants in Wyoming in 2014 vented a stream of 98.5 percent nitrogen and only 1-2 percent methane. *Id.* The Venting and Flaring Rule would require the operator of this well to flare the emission stream rather than vent it. But the only way to accomplish that would be to add more methane, or another flammable gas, to the waste stream. This would in turn waste more methane and result in more air pollution in the form of nitrogen oxides. (Potter Aff. at 16). In short, the Venting and Flaring Rule works directly against the stated goals that purportedly justify its promulgation – the prevention of waste. The Venting and Flaring Rule is quintessentially arbitrary and capricious.

> **b. The Bureau arbitrarily failed to consider the costs of the Venting and Flaring Rule by double-counting the benefits of reducing already-reduced emissions and by failing to consider the costs of increased flaring.**

The Bureau asserted in its Federal Register notice that the Venting and Flaring Rule will result in significant net benefits, based on the agency's calculations of the cost and benefits of compliance. 81 Fed. Reg. at 83014. To its credit, the Bureau admitted that, to the extent that operators are already voluntarily capturing salable gas, its net benefit analysis "overestimates the likely impacts of the rule." *Id.* at 83013; Regulatory Impact Analysis (Jan. 14, 2016), pp. 6 and 42. But the Bureau did not acknowledge that it included as a benefit the reduction of emissions that are already reduced under state air quality permitting programs. For example, the Division

has established control requirements for storage vessels and pneumatic controllers for a period of years. Yet the Bureau's regulatory analysis only discussed Wyoming's most recent regulation, directed at combating ozone formation in the Upper Green River Basin. (Potter Aff. at ¶ 10); Regulatory Impact Analysis, p. 24. The Bureau claimed that controlling emissions from storage vessels will result in an annual $8 – 10 million in benefits, but these numbers take credit for emissions reductions that have already occurred. Thus, the Bureau's failure to fully consider Wyoming's permitting program caused the agency to overestimate the benefits of applying the Venting and Flaring Rule in Wyoming.

Additionally, the Bureau did not account for the negative social costs associated with additional flaring. Nor did the Bureau account for potential increases in regional ozone formation in areas, similar to the Upper Green River Basin, where increased production of nitrogen oxides from flaring can trigger the formation of ground-level ozone. (Potter Aff. at ¶ 16). The Bureau's tunnel vision focus on the costs of international air pollution, 81 Fed. Reg. at 83014, which not even the EPA is authorized to regulate, led the agency to ignore costs of increased regional air pollution. In short, the Bureau's claims of significant net benefits associated with this rule are a result of the agency's willful ignorance of status quo emissions controls along with the agency's willingness to ignore the negative social costs of increased flaring. Thus, the Venting and Flaring Rule is arbitrary and capricious.

### B.   Irreparable harm to the States will occur if the Court does not grant a preliminary injunction.

The States will suffer an irreparable injury if the Court does not issue a preliminary injunction. "Irreparable harm is, by definition, harm for which there can be no adequate remedy at law." *CBM Geosolutions, Inc., v. Gas Sensing Tech. Corp.*, 2009 WY 113, ¶ 10, 215 P.3d 1054, 1058 (Wyo. 2009). Harm to a party is generally considered to have no adequate remedy at

law if an award of damages would not rectify the harm. 11A Charles Alan Wright, Arthur R. Miller, Federal Practice & Procedure, Civil § 2944 (3d ed. 1998).

Now, through the Venting and Flaring Rule, the Bureau seeks to establish overlapping and potentially conflicting regulations on the extraction of state minerals. Wyoming is likely to suffer economic harm when the Venting and Flaring Rule takes effect. (Hill Aff. at ¶ 4). Most significantly, this rule creates incentives for oil and gas producers to develop in states without significant federal land. (Watson Aff. at ¶ 20). Wyoming has already seen operators elect to exclude federal minerals from production in Wyoming due to delays caused by the Bureau. (*Id.* at ¶ 21). A conservative 10% delay in production would result in a loss of approximately $10 million in tax revenue. (Noble Aff. at ¶ 5); (Vehr Aff. at ¶ 30).

In addition to concrete economic harms, the Venting and Flaring Rule will irreparably harm the States' sovereignty. The moment the Venting and Flaring Rule goes into effect, the Bureau will infringe on Wyoming and Montana's sovereign interests because the states will no longer have sole authority to regulate production of state minerals within their borders. *See Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008). Thus, irreparable harm is not only likely to occur, it is certain to occur if the rules takes effect before the Court can decide this case on the merits. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (suggesting that a preliminary injunction is warranted only if injury would occur before a merits trial can take place).

In this case, the Venting and Flaring Rule intrudes upon the States' sovereign interest in, and public policies related to, the regulation of air emissions that result from the extraction of oil or natural gas. *See Wyoming ex rel. Crank*, 539 F.3d at 1242 ("States have a legally protected sovereign interest in 'the exercise of sovereign power over individuals and entities within the

20

relevant jurisdiction[, which] involves the power to create and enforce a legal code'"). Any action that deprives a state of its sovereign interests and public policies, without the state first receiving a full and fair opportunity to be heard on the merits, irreparably harms the state. *Kansas v. United States*, 249 F.3d 1213, 1227–28 (10th Cir. 2001).

The Venting and Flaring Rule will negatively impact the Division's ability to enforce its own permits and air quality regulations. Even if the Bureau determines that the Division's robust permitting system is equal to or better than its own rule, the Bureau, not the Division, would oversee the Division's own air quality permits. Thus, the Bureau, not the Division, would enforce state environmental law, including prosecuting and obtaining penalties from companies that violate those laws. This is an end run around Wyoming's State Constitution, which allocates fines and penalties to Wyoming public schools. Wyo. Const. art 7, § 5; *see also* Wyo. Stat. Ann. § 35-11-424(c). For example, from 2011-2015, the Division issued and settled 89 notices of violation against companies with federal wells, resulting in a total of $752,000 for the public schools. (Vehr Aff. at ¶ 32). During that same time period, the Division issued and settled 83 notices of violation against companies with state or private wells, resulting in a total of $906,079 for the public schools. (*Id.*). If the Venting and Flaring Rule went into effect, the Division would either be unable to collect such penalties, or would face increased opposition to settlement from companies facing liabilities for the same acts from both the Division and the Bureau. (*Id.* at ¶ 33).

Similarly, the Venting and Flaring Rule will interfere with the Commission's ability to regulate state minerals. (Watson Aff. at ¶ 22). The Bureau claims that the federal land management agency can regulate state minerals that are intermingled with federal minerals. 81 Fed. Reg. at 83039. But it may not. The Department of Interior may not promulgate rules that

21

"[a]ffect the rights of the States or other local authority to exercise any rights which they may have." *Texas Oil and Gas Corp. v. Phillips Petroleum Co.*, 277 F. Supp. 366, 370 (1967).

The Bureau's variance process included in its Venting and Flaring Rule would not mitigate these harms. If anything, it would exacerbate them. (Potter Aff. at ¶ 18); (Vehr Aff. at ¶ 32); (Watson Aff. at ¶ 18). The variance process would not allow states to maintain sovereignty. Rather, it is a mechanism through which the Bureau improperly seeks to grant itself authority to enforce state regulations. Wyoming recommended, and the Bureau declined to consider, an option less harmful to state sovereignty, similar to delegation under the Clean Air Act. (Vehr Aff., Ex. A-26).

Wyoming and Montana cannot seek money damages in this case. 5 U.S.C. § 702; *see also Lane v. Pena*, 518 U.S. 187, 196 (1996) (stating that in the Administrative Procedure Act, Congress waived its sovereign immunity for liability without waiving its immunity for monetary damages). As a result, the economic damages that the states will incur if this rule takes effect are irreparable. *Crowe & Dunlevy, P.C., v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011) (explaining that while economic harm is usually insufficient to constitute irreparable harm, "the imposition of money damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury") (internal citations omitted). The Court should enjoin the Venting and Flaring Rule during the pendency of this litigation to avoid these real and substantial harms.

> **C.** **The balance of equities favors Wyoming and Montana.**

When determining the balance of equities, this Court must compare the public interests involved "to determine on which side the risk of irreparable harm weighs most heavily." *Blum v. Caldwell*, 446 U.S. 1311, 1315 (1980). To prevail on this factor, the movant must show that the

threatened injury outweighs any potential injury to the non-moving party. *See O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 983 (10th Cir. 2004) (en banc). Here, the balance of harms weighs in favor of granting a preliminary injunction.

The Venting and Flaring Rule will alter the status quo by imposing another layer of regulations on the oil and gas extraction industry. A preliminary injunction pending the outcome of the Petition for Review will maintain the status quo. *O Centro*, 389 F.3d at 1013 (McConnell concurrence) (defining status quo as "the last peaceable uncontested status existing between the parties before the dispute developed." (citation and quotation omitted)). The Court typically favors restoring and maintaining the status quo during the pendency of litigation. *Cf. id.* at 975 (en banc) (disfavoring preliminary injunctions that alter the status quo).

Without a preliminary injunction, Wyoming and Montana will suffer immediate sovereign and economic harms. By contrast, the Bureau will experience no actual harm and will likely save taxpayer money by not implementing an illegal program. Because the Bureau does not currently regulate air quality on public lands, an injunction would prevent the Bureau from implementing the new permitting regime at taxpayer expense. *Cf.* 80 Fed. Reg. at 16128 *with O Centro*, 389 F.3d at 978 (Murphy concurrence) ("Any injury resulting from a preliminary injunction that merely preserves the status quo is not judicially inflicted injury."). Additionally, there is minimal risk to the environment should this Court temporarily enjoin the Venting and Flaring Rule because the states already have comprehensive programs regulating oil and gas production facilities for resource conservation and air quality.

For these reasons, the balance of equities supports granting a preliminary injunction.

**D.      Granting a preliminary injunction is in the public interest.**

Preventing the Venting and Flaring Rule from taking effect is in the public interest. In this context, the term "public interest" encompasses any matter of public policy potentially affected by the issuance of an injunction. *See, e.g.*, *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958).

First, issuing an injunction to preserve the status quo will serve the public interest by preventing the Bureau from unnecessarily expending federal dollars to implement a rule that is likely to be invalidated after a full hearing. *See James River Flood Control Ass'n v. Watt*, 680 F.2d 543, 544 (8th Cir. 1982) (avoiding unnecessary expenditures from the public treasury serves the public interest). Should the Venting and Flaring Rule take effect, the Bureau will need to immediately expend resources to, among other things, increase enforcement oversight of new regulatory requirements and process new forms of paperwork.

Second, issuance of a preliminary injunction will not harm the public interest in a clean environment because Wyoming and Montana already regulate emissions from oil and gas production. Wyoming has an aggressive minor source permitting program that ensures effective and economic control of emissions from the oil and gas sector. Additionally, Wyoming's air quality program has a holistic understanding of regulating air emissions across all sectors. Unlike the Bureau's bull in a china shop approach to air quality, Wyoming's air pollution control program carefully considers the costs of possible controls, including related increases in other types of pollution. Thus, the public's interest would not be harmed by preventing the Venting and Flaring Rule from taking effect until this litigation is concluded.

Third, a preliminary injunction would foster the public's interest in flexible and responsive government. The Commission is more efficient at processing applications to drill than

the Bureau, and any efforts to enforce the Venting and Flaring Rule will result in slower application processing. (Watson Aff. at ¶¶ 13, 16, 21). Thus, during the pendency of this litigation, the public interest in responsive government would favor a preliminary injunction.

Finally, a preliminary injunction would not result in additional waste of federal minerals. The Commission already has flaring limits in place, applicable to state, federal, and private minerals, that are equal to those established by the Venting and Flaring Rule. Any more stringent flaring limitations established under the capture target component of the Venting and Flaring Rule do not come into effect for many years, so to the extent that the Venting and Flaring Rule establishes more stringent flaring limits, they would not be effective until well after this litigation is concluded.

## CONCLUSION

For the foregoing reasons, Wyoming and Montana request that the Court enter an order enjoining the Venting and Flaring Rule during the pendency of this litigation.

Submitted this 28th day of November, 2016.

FOR THE STATE OF WYOMING

/s Elizabeth Morrisseau
Erik Petersen, Wyo. Bar No. 7-5608
Senior Assistant Attorney General
Elizabeth Morrisseau, Wyo. Bar No. 7-5307
Assistant Attorney General
Wyoming Attorney General's Office
2320 Capitol Ave.
Cheyenne, Wyoming 82002
(307) 777-6946
erik.petersen@wyo.gov
elizabeth.morrisseau@wyo.gov

*Attorneys for Petitioner State of Wyoming*

FOR THE STATE OF MONTANA

*/s/ Brandon Jensen*
Brandon L. Jensen (Wyo. Bar No. 6-3464)
Budd-Falen Law Offices, LLC
300 East 18th Street
Post Office Box 346
Cheyenne, Wyoming 82003-0346
(307) 632-5105 Telephone
(307) 637-3891 Facsimile
brandon@buddfalen.com

Timothy C. Fox, Montana Attorney General
Alan L. Joscelyn, Chief Deputy Attorney General
Tommy H. Butler, Deputy Attorney General
Montana Dept. of Justice
215 North Sanders
Post Office Box 201401
Helena, Montana  59620-1401
(406) 444-0662 Telephone
timothyfox@mt.gov
alanjoscelyn@mt.gov
tommybutler@mt.gov

*Attorneys for Petitioner State of Montana*

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of November, 2016, the foregoing **MEMORANDUM IN SUPPORT OF WYOMING AND MONTANA'S MOTION FOR PRELIMINARY INJUNCTION** was filed electronically with the Court, using the CM/ECF system, which caused the foregoing to be served electronically upon the following:

Clare M Boronow
United States Department of Justice
Environmental and Natural Resources Division
601 D Street NW
Washington, DC 20004
clare.boronow@usdoj.gov

Marissa A Piropato
United States Department of Justice
Environmental and Natural Resources Division
601 D Street NW
Washington, DC 20004
marissa.piropato@usdoj.gov

Tommy H Butler
Montana Department of Justice
215 North Sanders
PO Box 201401
Helena, MT 59620-1401
tommybutler@mt.gov

Timothy C Fox
Montana Department of Justice
215 North Sanders
PO Box 201401
Helena, MT 59620-1401
timfox@mt.gov

David P Garner
North Dakota Attorney General's Office
500 North 9th Street
Bismarck, ND 58501
dpgarner@nd.gov

Hope Hogan
North Dakota Attorney General's Office
500 North 9th Street
Bismarck, ND 58501
hhogan@nd.gov

Brandon Lee Jensen
Budd-Falen Law Offices
300 East 18th Street
P O Box 346
Cheyenne, WY 82003
brandon@buddfalen.com

Alan L Joscelyn
Montana Department of Justice
215 North Sanders
PO Box 201401
Helena, MT 59620-1401
alanjoscelyn@mt.gov

C Levi Martin
United States Attorney's Office
PO Box 668
Cheyenne, WY 82003-0668
Christopher.Martin@usdoj.gov

Wayne Stenehjem
North Dakota Attorney General's Office
500 North 9th Street
Bismarck, ND 58501
ndag@nd.gov

Paul M Seby
Greenberg Traurig LLP
1200 17th Street
Suite 2400
Denver, CO 80202
sebyp@gtlaw.com

Robert John Walker
Hickey & Evans
1800 Carey Avenue, Suite 700
PO Box 467
Cheyenne, WY 82003-0467
rwalker@hickeyevans.com

/s Erik Petersen
Senior Assistant Attorney General
Wyoming Attorney General's Office