# EXHIBIT 14

## DECLARATION OF JAMES MURPHY

I, James Murphy, declare as follows:

1. I am Senior Counsel for the National Wildlife Federation's Climate and Energy Program.  The National Wildlife Federation is one of America's leading conservation organizations, working to inspire Americans to protect wildlife in a rapidly changing world.  The National Wildlife Federation has affiliates in fifty states and territories, including affiliates in many states that have public and tribal lands where oil and gas development occurs.  The National Wildlife Federation and its affiliates have a long-standing history working to protect wildlife on public lands and to protect public lands for use, enjoyment and recreation by our members, including working to protect these interests from threats posed by energy development on public lands.

2. The Bureau of Land Management's (BLM) new methane waste prevention rule represents a significant step forward in addressing the rampant waste of methane from oil and gas operations on public and tribal lands. The rule is a much-needed update to waste guidance that was adopted 36 years ago.

3. The updated rule will better protect the interests of National Wildlife Federation and its members, as well as the interests of our affiliates and their members, who frequently use and rely on public lands to enjoy wildlife, outdoor recreation and similar activities.  The National Wildlife Federation has members that live in the states where oil and gas is currently being developed, or may be developed in the future on federal public lands, including 13,709 members in Colorado, 4,944 members in New Mexico, 1,327 members in Wyoming, 2,629 members in Montana, and 1,003 members in North Dakota.

4. Numerous members of the National Wildlife Federation and our affiliates recreate on public lands near where oil and gas development is occurring or has been proposed or reside in close proximity to federal lands where oil and gas development has been proposed.

5. BLM's new methane waste rule will require or incentivize oil and gas operators to take measures to reduce natural gas waste from BLM-administered mineral leases. The Rule's reductions in venting, leaking, and flaring will decrease volatile organic compound emissions that contribute to the formation of ozone. Ozone contributes to asthma, emergency room visits, and premature mortality, and its reduction will improve the health of the National Wildlife Federation's and our affiliates' members and also likely improve the health and vitality of the wildlife that our members hunt, watch, observe and enjoy.

6. In addition to reducing the risk to the health of our members, the Rule will also protect and enhance plant life. Ozone also inhibits vegetation growth. Healthy vegetation is essential for healthy wildlife and for healthy ecosystems that our members enjoy for hiking, hunting, camping, wildlife observation and other recreation.

7. The Rule will also decrease emissions of hazardous air pollutants, including carcinogens like benzene, and particulate matter and nitrogen oxides, providing additional health benefits to the National Wildlife Federation's and its affiliates' members, wildlife and local ecosystems.

8. Reduced venting and flaring as a result of the Rule will also improve visibility by reducing ozone, nitrogen oxides, and particulate matter emissions, improving recreational opportunities for the National Wildlife Federation's and its affiliates' members. Likewise, flaring reductions will benefit the National Wildlife Federation's and its affiliates' members who

experience noisy and unsightly flares throughout the day and night near their homes or in the areas where they enjoy recreating or wildlife based activities.

9. The Rule will also provide royalties, some of which are allocated to states to spend in areas economically impacted by mineral development or to help enhance wildlife habitat and ecosystem health. The National Wildlife Federation's and its affiliates' members live in areas that are impacted by oil and gas development and will benefit from these expenditures in their communities.

10. If the Rule is struck down, the aforementioned benefits will be lost. The National Wildlife Federation's and its affiliates' members would face increased health risks posed by ozone, hazardous air pollutants, and particulate matter. Damage from these pollutants to the landscape and the environment also would harm wildlife and would diminish those members' enjoyment from wildlife related activities and recreating on federal public lands. The National Wildlife Federation's and its affiliates' members will lose the increased royalties paid under the Rule that would benefit their communities and wildlife.

11. While the Rule is an improvement over the status quo, it does have shortcomings, and therefore the National Wildlife Federation does not believe that BLM can adequately represent the interests of our and our affiliates' members. For example, the rule permits flaring across a wide range of oil and gas operations, even though flaring contributes to climate change and acid rain and is an unsightly source of noise and light pollution. The Rule also fails to include consideration of social costs in the benefit-cost test that appears throughout the Rule that provides alternative limits to waste prevention measures. This is despite the fact that the oil and gas resource is a public trust resource managed for the benefit of all Americans.

12. Another shortcoming is that the Rule allows BLM to issue variances exempting oil and gas operations on federal leases across an entire state or tribal reservation from specific provisions of the Rule. This provision creates the potential for abuse and the dilution of the Rule's protections. If abuse of the variance provision occurs, it would undercut the Rule's benefit to our members.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on November 30, 2016.

James Murphy
Senior Counsel
The National Wildlife Federation

4

# EXHIBIT 15

## DECLARATION OF ANNE HEDGES

I, Anne Hedges, declare as follows:

1. I am Deputy Director for the Montana Environmental Information Center (MEIC).

2. While the Bureau of Land Management's (BLM) new methane waste prevention rule is not perfect, it represents a significant step forward in addressing the rampant waste of methane from oil and gas operations on public and tribal lands. The rule is a much-needed update to waste guidance that was adopted 36 years ago.

3. Montana Environmental Information Center (MEIC) is a nonprofit organization founded in 1973 with approximately 5,000 members and supporters throughout the United States and the State of Montana. MEIC is dedicated to the preservation and enhancement of the natural resources and natural environment of Montana and to the gathering and disseminating of information concerning the protection and preservation of the human environment through education of its members and the general public concerning their rights and obligations under local, state, and federal environmental protection laws and regulations. MEIC is also dedicated to assuring that federal officials comply with and fully uphold the laws of the United States that are designed to protect the environment from pollution. MEIC and its members have intensive, long-standing recreational, aesthetic, scientific, professional, and spiritual interests in the responsible production and use of energy, the reduction of GHG pollution as a means to ameliorate our climate crisis, and the land, air, water, and communities impacted by fossil fuel

1

development. The updated rule will better protect the interests of MEIC and its members. MEIC members live where oil and gas is currently being developed, or may be developed in the future on federal public lands. MEIC brings this action on its own behalf and on behalf of its members.

4. Numerous MEIC members recreate on public lands near where oil and gas development is occurring or has been proposed. Other members reside on "split estate" lands where the federal government owns the minerals underlying the property, or they live in close proximity to federal lands where oil and gas development has been proposed.

5. BLM's new methane waste rule will require or incentivize oil and gas operators to take measures to reduce natural gas waste from BLM-administered mineral leases. The Rule's reductions in venting, leaking, and flaring will decrease volatile organic compound emissions that contribute to the formation of ozone. Ozone contributes to asthma, emergency room visits, and premature mortality, and its reduction will improve the health of MEIC's members.

6. In addition to reducing the risk to the health of our members, the Rule will also protect and enhance plant life. Ozone also inhibits vegetation growth. Reduced ozone levels as a result of the Rule's limits and incentives will benefit MEIC's members who farm and ranch, as well as protect local ecosystems that our members enjoy for hiking, camping, and other recreation.

7. The Rule will also decrease emissions of hazardous air pollutants, including carcinogens like benzene, and particulate matter and nitrogen oxides, providing additional health benefits to MEIC's members and local ecosystems.

2

8. Reduced venting and flaring as a result of the Rule will also improve visibility by reducing ozone, nitrogen oxides, and particulate matter emissions, improving recreational opportunities for MEIC's members.  Likewise, flaring reductions will benefit MEIC's members who experience noisy and unsightly flares throughout the day and night near their homes or in the areas where they enjoy recreating.

9. The Rule will also provide royalties, some of which are allocated to states to spend in areas economically impacted by mineral development. MEIC's members live in areas that are impacted by oil and gas development and will benefit from these expenditures in their communities.

10. If the Rule is struck down, the aforementioned benefits will be lost. MEIC's members would face increased health risks posed by ozone, hazardous air pollutants, and particulate matter. Damage from these pollutants to the landscape and the environment also would diminish those members' enjoyment from recreating on federal public lands. MEIC's members will lose the increased royalties paid under the Rule that would benefit their communities.

11. While the Rule is an improvement over the status quo, it does have shortcomings, and therefore MEIC's does not believe that BLM can adequately represent the interests of our members. For example, the rule permits flaring across a wide range of oil and gas operations, even though flaring contributes to climate change and acid rain and is an unsightly source of noise and light pollution. The Rule also fails to include consideration of social costs in the benefit-cost test that appears throughout the Rule that provides alternative limits to waste prevention measures.

This is despite the fact that the oil and gas resource is a public trust resource managed for the benefit of all Americans.

12. Another shortcoming is that the Rule allows BLM to issue variances exempting oil and gas operations on federal leases across an entire state or tribal reservation from specific provisions of the Rule. This provision creates the potential for abuse and the dilution of the Rule's protections. If abuse of the variance provision occurs, it would undercut the Rule's benefit to our members.

13. I am aware that several states and industry trade groups have sued BLM, seeking to have the Waste Prevention Rule vacated by a court. I am also aware that the industry trade groups are asking the court to enjoin (i.e., prohibit the enforcement of) the Rule pending the outcome of their lawsuit. An injunction prohibiting the enforcement of the Rule would be contrary to the public interest. The benefits to the public of reducing methane emissions through compliance with the rule can be monetized. These monetary benefits are based on estimates of the social cost of carbon and methane that have been developed by the Interagency Working Group on Social Cost of Carbon and recent work on the social cost of methane. Given limitations in the models used to derive these estimates, such as the exclusion of catastrophic impacts and other unqualified damages, these model are likely to underestimate the benefits of avoiding methane emissions. On the basis of the social cost of methane and other conservative assumptions, the BLM estimates that the rule's net benefits could range from $46 to $204 million per year. These figures incorporate both the social benefits of reducing methane emissions and additional revenues for operators from sale of recovered natural gas. If the Waste

Prevention Rule is enjoined, these benefits, including significant social benefits, would be lost.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on November 28, 2016.

Anne Hedges
Deputy Director
Montana Environmental Information Center

# EXHIBIT 16

## DECLARATION OF NATASHA LEGER

I, Natasha Leger, declare as follows:

1. I am Interim Executive Director for Citizens for a Healthy Community (CHC), a grassroots 501(c)(3) nonprofit organization of more than 450 members dedicated to protecting the Delta County region of Southwest Colorado from the impacts of oil and gas development.

2. While the Bureau of Land Management's (BLM) new methane waste prevention rule is not perfect, it represents a significant step forward in addressing the rampant waste of methane from oil and gas operations on public and tribal lands. The rule is a much-needed update to waste guidance that was adopted 36 years ago.

3. The updated rule will better protect the interests of CHC and its members. CHC members live in, or have second homes in Delta County, Colorado where oil and gas is currently being developed, or may be developed in the future on federal public lands within the County or surrounding it.  CHC's members include 294 members in Colorado, 4 members in New Mexico, 1 member in Utah, and 1 member in Wyoming.

4. Numerous CHC members recreate on public lands near where oil and gas development is occurring or has been proposed. Other members reside on "split estate" lands where the federal government owns the minerals underlying the property, or they live in close proximity to federal lands where oil and gas development has been proposed. Hundreds of proposed wells on existing BLM leases near where CHC members live or recreate are at various application permit stages.

5. BLM's new methane waste rule will require or incentivize oil and gas operators to take measures to reduce natural gas waste from BLM-administered mineral leases. The Rule's

1

reductions in venting, leaking, and flaring will decrease volatile organic compound emissions that contribute to the formation of ozone. Ozone contributes to asthma, emergency room visits, and premature mortality, and its reduction will improve the health of CHC's members.

6. In addition to reducing the risk to the health of our members, the Rule will also protect and enhance plant life. Delta County's economy is primarily based on agriculture, tourism, and recreation. Ozone inhibits vegetation growth. Reduced ozone levels as a result of the Rule's limits and incentives will benefit CHC's members who farm, ranch, and hunt, as well as protect local ecosystems that our members enjoy for hiking, camping, and other recreation.

7. The Rule will also decrease emissions of hazardous air pollutants, including carcinogens like benzene, and particulate matter and nitrogen oxides, providing additional health benefits to CHC's members and local ecosystems.

8. Reduced venting and flaring as a result of the Rule will also improve visibility by reducing ozone, nitrogen oxides, and particulate matter emissions, improving recreational opportunities for CHC members.  Likewise, flaring reductions will benefit CHC members who experience noisy and unsightly flares throughout the day and night near their homes or in the areas where they enjoy recreating.

9. The Rule will also provide royalties, some of which are allocated to states to spend in areas economically impacted by mineral development. CHC members live in areas that are or will be impacted by oil and gas development and will benefit from these expenditures in their communities.

10. If the Rule is struck down, the aforementioned benefits will be lost. CHC's members would face increased health risks posed by ozone, hazardous air pollutants, and particulate matter. Damage from these pollutants to the landscape and the environment also would diminish those members' enjoyment from recreating on federal public lands. CHC members will lose the increased royalties paid under the Rule that would benefit their communities. In addition, CHC members who are farmers and ranchers would have their livelihoods adversely impacted due to reduced vegetative growth of crops and vegetation for cattle, goats, and sheep grazing on pasture, and grazing allotments.

11. While the Rule is an improvement over the status quo, it does have shortcomings, and therefore CHC does not believe that BLM can adequately represent the interests of our members. For example, the rule permits flaring across a wide range of oil and gas operations, even though flaring contributes to climate change and acid rain and is an unsightly source of noise and light pollution. The Rule does not consider pipeline safety and integrity management to prevent pipeline leaks, especially on unregulated rural gas gathering pipelines. The Rule also fails to include consideration of social costs in the benefit-cost test that appears throughout the Rule that provides alternative limits to waste prevention measures. This is despite the fact that the oil and gas resource is a public trust resource managed for the benefit of all Americans.

12. Another shortcoming is that the Rule allows BLM to issue variances exempting oil and gas operations on federal leases across an entire state or tribal reservation from specific provisions of the Rule. This provision creates the potential for abuse and the dilution of the Rule's protections. If abuse of the variance provision occurs, it would undercut the Rule's benefit to our members.

13. I am aware that several states and industry trade groups have sued BLM, seeking to have the Waste Prevention Rule vacated by a court. I am also aware that the industry trade groups are asking the court to enjoin (i.e., prohibit the enforcement of) the Rule pending the outcome of their lawsuit. An injunction prohibiting the enforcement of the Rule would be contrary to the public interest. The benefits to the public of reducing methane emissions through compliance with the Rule can be monetized. These monetary benefits are based on estimates of the social cost of carbon and methane that have been developed by the Interagency Working Group on Social Cost of Carbon and recent work on the social cost of methane. Given limitations in the models used to derive these estimates, such as the exclusion of catastrophic impacts and other unqualified damages, these models are likely to underestimate the benefits of avoiding methane emissions. On the basis of the social cost of methane and other conservative assumptions, the BLM estimates that the Rule's net benefits could range from $46 to $204 million per year. These figures incorporate both the social benefits of reducing methane emissions and additional revenues for operators from sale of recovered natural gas. If the Waste Prevention Rule is enjoined, these benefits, including significant social benefits stemming from methane waste capture from the 146 wells contemplated by the Bull Mountain Master Development Plan, would be lost.

14. The Rule has numerous other social benefits in addition to the social benefits of reducing climate change impacts, such as the reduction of volatile organic compounds and therefore the reduction of ozone. Ozone reductions provide numerous public health benefits. For example, a 2012 study found that annual numbers of avoided ozone-related premature deaths would range from 1,410 to 2,480 at 75 ppb to 2,450 to 4,130 at 70 ppb, and 5,210

4

to 7,990 at 60 ppb. Jesse D. Berman et al., Health Benefits from Large-Scale Ozone

Reduction in the United States. Environ Health Perspect 120:1404–1410. In October of

2015, EPA revised the health-based ambient air quality standard for ozone pollution to 70

parts per billion. Many CHC members recreate in areas that have ozone levels above 70

parts per billion, for example near the Bull Mountain project area in Gunnison County,

where the BLM acknowledges areas with ozone concentrations in the range of 70-76 ppb.

The Berman study also found that in the data years of 2005, 2006, and 2007, acute

respiratory symptoms would have been reduced by 3 million cases and school-loss days

by 1 million cases annually if only the then-current 75-ppb standard had been attained. *Id.*

If the Waste Prevention Rule is enjoined, public health benefits of reduced ozone

formation, including to farmers and ranchers, will be lost.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and

correct to the best of my knowledge.


Executed on November 29, 2016.


Natasha Léger

Interim Executive Director, Citizens for a Healthy

Community


5