Wayne Stenehjem (admitted *pro hac vice*)
Attorney General
David Garner (admitted *pro hac vice*)
Hope Hogan (admitted *pro hac vice*)
Assistant Attorneys General
500 N. 9th Street
Bismarck, ND 58501
Phone: (701) 328-2925
ndag@nd.gov

Paul M. Seby (admitted *pro hac vice*)        Robert J. Walker (Wyo. Bar No. 7-4715)
Special Assistant Attorney General            Hickey & Evans, LLP
Greenberg Traurig, LLP                        1800 Carey Street, Suite 700
1200 17th Street, Suite 2400                  Cheyenne, WY 82003
Denver, CO 80202                              Phone: (307) 634-1525
Phone: (303) 572-6584                         Fax: (307) 638-7335
Fax: (303) 572-6540                           rwalker@hickeyevans.com
sebyp@gtlaw.com

*Counsel for Petitioner-Intervenor State of North Dakota*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| STATE OF WYOMING,<br>STATE OF MONTANA, and<br>STATE OF NORTH DAKOTA,<br><br>    Petitioners,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>THE INTERIOR; SALLY JEWELL, in her<br>official capacity as Secretary of the Interior;<br>UNITED STATES BUREAU OF LAND<br>MANAGEMENT; and NEIL KORNZE, in<br>his official capacity as Director of the<br>Bureau of Land Management,<br><br>    Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 16-cv-00285-SWS |

---

## MEMORANDUM IN SUPPORT OF NORTH DAKOTA'S MOTION FOR PRELIMINARY INJUNCTION

---

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ............................................................................................... 2

    A.    The Requirements of the Final Rule ..................................................... 2

    B.    The Scope of the Final Rule................................................................ 4

STANDARD OF REVIEW .................................................................................. 5

ARGUMENT ..................................................................................................... 6

    A.    North Dakota will suffer irreparable harm if the Final Rule is not enjoined before it goes into effect on January 17, 2017. ..................................... 6

        1.    North Dakota will suffer irreparable injury to its sovereign interests in regulating oil and gas development within its borders............. 6

        2.    The variance provisions in the BLM Rule do not cure BLM's interference with North Dakota's sovereign governance.......................... 8

        3.    North Dakota will suffer irreparable injury to its sovereign interests in regulating air quality within its borders.................................. 9

        4.    North Dakota will suffer irreparable harm to its economic interests........ 11

    B.    The Balance of Harms Weighs in Favor of North Dakota................................... 15

    C.    North Dakota has a Reasonable Likelihood of Success on the Merits. ................ 16

        1.    BLM has no statutory authority to regulate state and private land and mineral interests or to promulgate the air quality regulations........... 16

        2.    BLM has no statutory authority to issue air quality regulations.............. 21

        3.    The Final Rule is arbitrary and capricious because its costs outweigh the market value of the royalties the federal government would obtain.................................................................................. 23

CONCLUSION.................................................................................................... 25

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Am. Bar Ass'n v. FTC*,
    430 F.3d 457 (D.C. Cir. 2005) ........................................................................18

*BCCA Appeal Group v. E.P.A.*,
    355 F.3d 817 (5th Cir. 2003) ..........................................................................22

*Bell v. Cheswick Generating Station*,
    734 F.3d 188 (3d Cir. 2013) ............................................................................21

*Chamber of Commerce of U.S. v. NLRB*,
    721 F.3d 152 (4th Cir. 2013) ..........................................................................18

*Chamber of Commerce v. Edmondson*,
    594 F.3d 742 (10th Cir. 2010) ........................................................................14

*Crowe & Dunley, P.C. v. Stidham*,
    640 F.3d 1140 (10th Cir. 2011) ......................................................................11

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016) ....................................................................................19

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) .........................................................................................17

*Gen. Motors Corp. v. United States*,
    496 U.S. 530 (1990) .........................................................................................22

*Geosearch, Inc. v. Andrus*,
    508 F. Supp. 839 (D. Wyo. 1981) ....................................................................17

*Gonzales v. Orego*n,
    546 U.S. 243 (2006) .........................................................................................21

*Iowa Utils. Bd. v. FCC*,
    109 F.3d 418 (8th Cir. 1996) ..........................................................................14

*Kansas v. United States*,
    249 F.3d 12138 (10th Cir. 2001) ..............................................................6, 8, 15

*Kikumura v. Hurley*,
    242 F.3d 950 (10th Cir. 2001) ........................................................................15

*Michigan v. E.P.A.*,
    268 F.3d 1075 (D.C. Cir. 2001) ......................................................................22

*National Cable & Telecommunications Assn. v. Brand X Internet Services*,
    545 U.S. 967 (2005) .........................................................................................19

*Norfolk Energy, Inc. v. Hodel*,
    898 F.2d 1435 (9th Cir. 1990) ........................................................................20

*North Dakota, et al. v. EPA,*
No. 16-1242 (D.C. Cir. 2016) ........................................................3, 22

*Oklahoma ex rel. Oklahoma Tax Comm'n v. Int'l Registration Plan, Inc.,*
264 F. Supp. 2d 990 (W.D. Okla. 2003) ........................................11, 13

*Olenhouse v. Commodity Credit Corp.,*
42 F.3d 1560 (10th Cir. 1994) ...............................................................16

*Planned Parenthood Ass'n of Utah v. Herbert,*
828 F.3d 1245 (10th Cir. 2016) .............................................................16

*RoDa Drilling Co. v. Siegal,*
552 F.3d 1203 (10th Cir. 2009) ...............................................................6

*Sierra Club v. EPA,*
311 F.3d 853 (7th Cir. 2002) .................................................................18

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs,*
531 U.S. 159 (2001) ................................................................................17

*United States v. Mead Corp.,*
533 U.S. 218 (2001) ................................................................................21

*United States v. Minnkota Power Coop., Inc.,*
831 F. Supp. 2d 1109 (D.N.D. 2011) ....................................................10

*Univ. of Tex. v. Camenisch,*
451 U.S. 390 (1981) ..................................................................................5

*Utility Air Regulatory Group v. EPA,*
134 S. Ct. 2427 (2014) ..............................................................17, 19, 20

*Vogel v. Marathon Oil Co.,*
2016 ND 104 (N.D. May 16, 2016) ..........................................................7

*Winter v. Nat. Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ......................................................................................6

*Wyoming v. U.S. Dep't of the Interior,*
136 F. Supp. 3d 1317 (D. Wyo. 2015) ..................................................16

**Statutes**

5 U.S.C. § 702 .............................................................................................14

5 U.S.C. § 706(2)(A) .................................................................................1, 16

30 U.S.C. § 189 ............................................................................................17

30 U.S.C. § 1702 ..........................................................................................17

42 U.S.C. § 7401(a)(3) .................................................................................22

42 U.S.C. § 7407(a) ................................................................................21, 22

42 U.S.C. § 7410 ..........................................................................................22

43 U.S.C. § 1733 .............................................................................................17

N.D. Cent. Code § 23-25-03 .............................................................................10

N.D. Cent. Code § 23-25-03.6 ..........................................................................10

N.D. Cent. Code § 23-25-04.1 ..........................................................................10

N.D. Cent. Code § 38-08-01 ...............................................................................7

N.D. Cent. Code § 38-08-06.4 ............................................................................7

N.D. Cent. Code § 38-08-06.4(6) ........................................................................8

**Rules**

Fed. R. Civ. P. 65 ...............................................................................................1

**Regulations**

43 C.F.R. § 3103.3-1 .........................................................................................20

43 C.F.R. § 3161.1(a) ........................................................................................19

43 C.F.R. § 3161.1(b) ........................................................................................19

43 C.F.R. § 3179.8 ...............................................................................................3

43 C.F.R. § 3179.201 .........................................................................................21

43 C.F.R. § 3179.203 .........................................................................................22

43 C.F.R. § 3179.401 ...........................................................................................3

43 C.F.R. § 3179.401(a)(iv) .................................................................................8

43 C.F.R. § 3179.401(b) .......................................................................................9

49 Fed. Reg. 37,357 ..........................................................................................19

80 Fed. Reg. 83,018 .............................................................................................3

81 Fed. Reg. 35,823 .............................................................................................3

81 Fed. Reg. 83,008 .............................................................................................1

81 Fed. Reg. 83,009 ...........................................................................................23

81 Fed. Reg. 83,013 ...........................................................................................23

81 Fed. Reg. 83,013–14 ................................................................................1, 23

81 Fed. Reg. 83,014 ....................................................................15, 23, 24, 25

81 Fed. Reg. 83,015 .....................................................................................5, 22

81 Fed. Reg. 83,017 .............................................................................................3

81 Fed. Reg. 83,018 ...........................................................................................15

81 Fed. Reg. 83,023 .........................................................................................3, 8

81 Fed. Reg. 83,033 ....................................................................................................20

81 Fed. Reg. 83,035 ..................................................................................................5, 8

81 Fed. Reg. 83,039 ................................................................................................5, 20

81 Fed. Reg. 83,077–83,089 ........................................................................................2

81 Fed. Reg. 83,078 ..................................................................................................3, 4

81 Fed. Reg. 83,079 ......................................................................................................7

N.D. Admin. Code § 23-25-01 ....................................................................................9

N.D. Admin. Code § 33-15-14 ..................................................................................11

N.D. Admin. Code § 43-02-03 ....................................................................................7

N.D. Admin. Code § 43-02-03-01.49 ..........................................................................4

N.D. Admin. Code § 43-02-03-60.2 ............................................................................8

**Other Authorities**

NDIC Order 24665 Policy/Guidance Version 102215, adopted pursuant to NDIC
    Order 24665 ..............................................................................................................4

Office of the State Tax Comm'r, 52nd Biennial Report (2015) ................................12

Regulatory Impact Analysis for: Revisions to 43 C.F.R. § 3100 (Onshore Oil and
    Gas Leasing) and 43 CFR 3600 (Onshore Oil and Gas Operations) Additions
    of 43 C.F.R. 3178 (Royalty-Free Use of Lease Production) and 43 C.F.R.
    3179 (Waste Prevention and Resource Conservation), available at
    https://www.blm.gov/style/medialib/blm/wo/Communications_Directorate/pu
    blic_affairs/news_release_attachments.Par.11216.File.dat/VF%20Regulatory
    %20Impact%20Analysis.pdf ...................................................................................24

Pursuant to Federal Rule of Civil Procedure 65, the State of North Dakota respectfully requests the Court issue an order enjoining the November 18, 2016 final rule of the Department of the Interior's Bureau of Land Management ("BLM") entitled "Waste Prevention, Production Subject to Royalties, and Resources Conservation: Final Rule," 81 Fed. Reg. 83,008 (Nov. 18, 2016) ("Final Rule").

## INTRODUCTION

The Final Rule runs roughshod over North Dakota's sovereign interests in administering its distinct regulatory programs governing oil and gas production and air quality within its borders and, unless enjoined, will frustrate and impede North Dakota's several sovereign interests in administering its distinct oil and gas program, its air quality program, and the orderly development of North Dakota's natural resources. The Final Rule will irreparably harm North Dakota's interests by transferring regulatory authority and enforcement powers over almost half of the oil and gas units in North Dakota from the North Dakota Industrial Commission ("NDIC") to the BLM. Virtually none of the affected units within North Dakota are on federal land.

There is a substantial likelihood that North Dakota will succeed on the merits because the Final Rule is "arbitrary, capricious, and . . . not in accordance with law." 5 U.S.C. § 706(2)(A). In the Final Rule, the BLM seeks to extend its authority far beyond the authority delegated to it in the statutes it relies on and in contradiction to its longstanding understanding of its own jurisdiction and historic practice. Moreover, even under the BLM's own calculations, the costs imposed by the Final Rule will be $110–279 million per year, while the "waste" that is prevented will only result in additional royalties of $3–10 million per year, a tenth of the cost of the Final Rule. 81 Fed. Reg. at 83,013–14.

The Final Rule is set to go into effect on January 17, 2017. In light of the significant sovereign state interests at stake in this litigation, North Dakota—along with the States of

Wyoming and Montana (collectively, "State Petitioners")—sent a letter to the Secretary of Interior and Director of the BLM on December 2, 2016, asking the agency to delay implementation of the Final Rule until the validity of the Rule could be adjudicated by this Court. *See* Exhibit A, December 2, 2016 Letter from State Petitioners to the Secretary of Interior. State Petitioners have not received a response, but North Dakota is hopeful that the Department of Interior and BLM will appreciate and acknowledge the Final Rule's significant adverse effect on state sovereignty and economic interests. Given that the Final Rule is set to go into effect in little over a month, North Dakota is compelled to seek a preliminary injunction to halt the implementation of the Final Rule until this Court has an opportunity to resolve North Dakota's pending petition for review.

## BACKGROUND

### A.    The Requirements of the Final Rule

The Final Rule is the BLM's first foray into the business of promulgating and enforcing air quality regulations, in direct competition with state programs and with the U.S. Environmental Protection Agency ("EPA"). The BLM imposes these air quality regulations not only on federal and tribal land, but also on any private or state land where the federal government holds a split-estate interest, however minimal. The Final Rule fills thirteen small-print, single-spaced pages of the Federal Register, 81 Fed. Reg. 83,077–89, with an additional seventy pages or so of summary and explanation, but the regulations it imposes can be divided into three categories.

First, the Final Rule imposes detailed air emissons restrictions on the venting and flaring of natural gas that are otherwise generally issued and administered by the states and EPA under the Clean Air Act ("CAA"), including mandatory monitoring systems, detailed equipment specifications, a prohibition on venting, and a gas capture requirement that is modeled off North

Dakota law but is arbitrarily phased in on a completely different schedule that disrupts North Dakota's regulatory requirements. 81 Fed. Reg. at 83,023; Exhibit B, Declaration of Lynn D. Helms, Director, North Dakota Industrial Commission ("Helms Decl."), ¶ 23. The BLM's decision that it needed to promulgate these regulations is odd, since venting and flaring are already subject to comprehensive state regulations and EPA recently adopted regulations under the CAA which cover *exactly* the same activity, "emissions of methane and VOCs from new, modified and reconstructed oil and gas wells and production equipment," 81 Fed. Reg. at 83,017 (referencing the EPA final rule, "Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources; Final Rule," 81 Fed. Reg. 35,823 (June 3, 2016) ("Methane Rule")); *see North Dakota, et al. v. EPA*, No. 16-1242 (D.C. Cir. 2016) (pending action for judicial review of the Methane Rule). Even the BLM admits that the Final Rule is largely redundant with existing state regulatory regimes. *Id*. at 83,018. Complying with this third, unwarranted layer of regulation is particularly harmful, imposing costs that will adversely affect North Dakota's revenues and economy.

The Final Rule requires, among other things, new federal permits and permissions, *see e.g.* 43 C.F.R. §§ 3179.8 and 3179.401, which is a substantial impediment to oil and gas development in North Dakota, given both the inability of the BLM to process permits and sundry notices promptly and the BLM's already huge administrative backlog. Helms Decl. ¶¶ 28–30. The administrative burden imposed by the Final Rule will exacerbate the problem and frustrate North Dakota's development of its oil and natural gas resources.

Second, the Final Rule requires extensive new paperwork to be submitted with the Application for Permit to Drill ("APD"). 81 Fed. Reg. at 83,078. Each applicant must file a "Waste Management Plan" which includes a long and detailed list of required paperwork, all of

which must be approved by the BLM before an APD will be granted.  81 Fed. Reg. at 83,078.

The BLM's current processing time for APDs in North Dakota ranges from six to nine months,

Helms Dec. ¶ 25, while the State processes the equivalent application in an average of 23 days.

*Id.*  North Dakota currently requires all operators—federal, private and Tribal—to prepare a Gas

Capture Plan with content that is similar, but not identical, to the BLM's Waste Management

Plan, and, unlike the BLM, requires operators to review and update their Plan and perform under

that Plan annually and submit a report to the NDIC.  *See* NDIC Order 24665 Policy/Guidance

Version 102215, adopted pursuant to NDIC Order 24665, *see also* Helms. Decl. ¶ 23.  These

state requirements do not impede oil and gas development because the State is able to process

and approve them within weeks rather than months or years.  *Id*. at 25.

Finally, the Final Rule redefines the royalty obligations of lessees to charge royalties on a

broader range of natural gas that is lost during operations.  81 Fed. Reg. at 83,079–80.

**B.      The Scope of the Final Rule**

In North Dakota, the Final Rule will operate primarily on private and state lands,

encompassing more than 30% of the communitized spacing units in the State.  Helms Decl. ¶¶

12–13.[1]  North Dakota has a unique land composition and split-estate configuration that results

in a typical oil and gas spacing unit consisting of a combination of federal, State, and private

mineral ownership.  Only five percent of North Dakota oil and gas production is from federal

lands.  *Id*. ¶ 9.  Even the handful of large tracks of federal mineral ownership or trust

responsibility, the Dakota Prairie Grasslands and the Fort Berthold Indian Reservation, are

interspersed with a checkerboard of private and state ownership.  *Id.* ¶ 16.  North Dakota oil and

---

[1] A "spacing unit" is "the area in each pool which is assigned to a well for drilling, producing, and proration purposes in accordance with the [NDIC]'s rules or orders."  N.D. Admin. Code § 43-02-03-01.49.

gas regulation also applies on the Fort Berthold Indian Reservation pursuant to a 2008 agreement with the Tribe, and is jointly administered by the State, Tribe, and federal government. *Id*. ¶ 17.

Even in such circumstances where the federal mineral ownership is small relative to other mineral ownership interests within the spacing unit, *all* the oil and gas operators within the unit will be subject to the Final Rule. 81 Fed. Reg. at 83,039. The BLM made the deliberate choice to impose these regulations on *all* mineral interests that have been unitized or communitized with a federal mineral interest, however small the federal interest may be: "While the BLM agrees that the regulation of State and private minerals is under the jurisdiction of the States, the BLM does not agree that States' jurisdiction over State and private minerals precludes the BLM from promulgating a waste prevention regulation that has incidental impacts on State and private minerals unitized or communitized with Federal or Indian minerals." 81 Fed. Reg. at 83,039. The regulation of State and private property interests is hardly "incidental," however; the BLM estimates that 75.2% of vented and flared gas it seeks to regulate came from mixed ownership wells. 81 Fed. Reg. at 83,015. The Final Rule displaces North Dakota from its role as primary regulator and instead places some or all of that authority in the hands of the BLM.

Even where North Dakota is allowed to continue enforcing its own laws, those laws must give way to the Final Rule when they conflict, and the BLM reserves the right to bring its own enforcement actions, 81 Fed. Reg. at 83,035, preventing North Dakota from effectively working with operators to resolve violations when it has no authority to bind the BLM to a settlement.

## STANDARD OF REVIEW

Preliminary injunctions are intended to "preserve the relative position of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of

equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "A plaintiff satisfies the irreparable harm requirement by demonstrating a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009). Those elements are fully satisfied here.

## ARGUMENT

**A. North Dakota will suffer irreparable harm if the Final Rule is not enjoined before it goes into effect on January 17, 2017.**

North Dakota's irreparable harm in this case rests on three independent bases: (1) the Final Rule deprives North Dakota of its sovereign authority, interests, and policies—and deprivation of these interests during the pendency of this action is irreparable; (2) North Dakota will suffer irreparable economic loss because the Final Rule will immediately harm the State's budget by depressing oil and gas production and associated tax revenues; and (3) even if it is successful on the merits of its challenge to the BLM Rule, North Dakota will not be able to recover economic damages from the federal government to compensate the State for its loss of revenue during the pendency of this action.

**1. North Dakota will suffer irreparable injury to its sovereign interests in regulating oil and gas development within its borders.**

It is well-established in the Tenth Circuit that a federal agency's temporary infringement on a state's sovereignty constitutes irreparable harm. *Kansas v. United States*, 249 F.3d 1213, 1227–28 (10th Cir. 2001). When a federal agency's decision places a state's "sovereign interests and public policies at stake, [the Tenth Circuit] deem[s] the harm the State stands to suffer irreparable if deprived of those interests without first having a full and fair opportunity to be heard on the merits." *Id.* at 1227.

It is policy of North Dakota "to foster, to encourage, and to promote the development, production, and utilization of natural resources of oil and gas in the state *in such a manner as will prevent waste*; to authorize and to provide for the operation and development of oil and gas properties in such a manner that a greater ultimate recovery of oil and gas be had and that the correlative rights of all owners be fully protected; and to encourage and to authorize cycling, recycling, pressure maintenance, and secondary recovery operations in order that the greatest possible economic recovery of oil and gas be obtained within the state to the end that the landowners, the royalty owners, the producers, and the general public realize and enjoy the greatest possible good from these vital natural resources." N.D. Cent. Code § 38-08-01 (emphasis added). The BLM has arrogated for itself the right to balance these policies, both on federal lands and on State and private lands where the federal government has a minimal interest.

North Dakota has its own comprehensive oil and gas regulations, administered by the NDIC. N.D. Admin. Code Ch. 43-02-03. As part of its laws and regulations governing oil and gas production in the State, North Dakota implements its own stringent venting and flaring restrictions on oil and gas production operators. Helms Decl. ¶ 19; *see* N.D. Cent. Code § 38-08-06.4; *see also Vogel v. Marathon Oil Co.*, 2016 ND 104 (N.D. May 16, 2016) (describing North Dakota's "comprehensive regulatory scheme" for venting and flaring under the authority of the NDIC). Because the Final Rule applies to "State or private tracts in a federally approved unit or communitization agreement," 81 Fed. Reg. at 83,079, and because of North Dakota's unique split-estate situation, the Final Rule interferes with and diminishes State authority over a significant number of oil and gas units in the State, along with the State and private tracts located therein. Helms Decl. ¶¶ 18, 20.

The provisions of the Final Rule directly conflict with current North Dakota law and regulation. *Id*. ¶¶ 22–23. For example, the NDIC has implemented gas capture regulations, which utilize declining allowable flared percentages. *See id*. ¶ 23. The BLM modeled its own targets off the North Dakota system, 81 Fed. Reg. 83,023, but prepared an entirely different schedule with different percentages and different dates. Helms Decl. ¶ 23. The two sets of rules also have different approaches to when venting may be allowed. *Id*. ¶ 22. While the Final Rule allows venting in certain specified circumstances, North Dakota regulations do not, except when authorized by the NDIC upon application and after notice and comment. *See* N.D. Cent. Code § 38-08-06.4(6); *see also* N.D. Admin. Code § 43-02-03-60.2. Such conflicts unquestionably put the State's "sovereign interests and public policies at stake." *Kansas*, 249 F.3d at 1127.

**2. The variance provisions in the BLM Rule do not cure BLM's interference with North Dakota's sovereign governance.**

The BLM recognizes the federalism problems created by the Final Rule, but the discretionary variance procedure the BLM adopted is completely inadequate to address it. *See* 81 Fed. Reg. at 83,035. Under the Final Rule, a state must seek and obtain BLM approval for a variance by demonstrating that its own regulations are "equally or more effective," *id*, but this does not ameliorate the interference with North Dakota's sovereign interests and authority.

First, the variance provision places the burden on North Dakota to "[d]emonstrate how the State, local, or tribal regulation(s) perform at least equally well in terms of reducing waste of oil and gas, reducing environmental impacts from venting and or flaring of gas, and ensuring the safe and responsible production of oil and gas, compared to the particular provision(s) from which the State or Tribe is requesting the variance." 43 C.F.R. § 3179.401(a)(iv). Second, the BLM "may approve the request for a variance, or approve it with one or more conditions, only if

the BLM determines that the State, local or tribal regulation(s) or rule(s) would perform at least equally well." *Id.* at § 3179.401(b).

Instead of the BLM being required to comply with North Dakota regulations—as is the case right now—the variance requirement forces North Dakota to comply with BLM regulations. The variance provision offers no deference to North Dakota regarding the appropriate type and level of protection necessary, and there is no option allowing North Dakota to demonstrate that its rules are superior to the Final Rule's for the context of that State. Nor is there a mechanism for North Dakota to administer all or part of any aspect of the Final Rule.

By requiring North Dakota to meet the BLM's regulations, the variance provision fails to mitigate the Final Rule's encroachment on North Dakota's sovereign authority. Rather than improve consultation and coordination with the states, the BLM presumes authority to evaluate and pass judgment on the adequacy of North Dakota's regulations.

Even where the BLM does grant variances, it retains the right to bring enforcement actions, including enforcement actions against operators on private mineral leases that have been unitized with a unit that has only a small federal interest. *Id.* This strips the State of its authority to exercise prosecutorial discretion and to focus enforcement on its key priorities, an important aspect of sovereign government power. Moreover, it is a significant impediment to the State's operations because, in practice, operators are much more reluctant to work with state officials to resolve violations when they are faced with the prospect of a federal enforcement action. The power to reach a full and final settlement is vital to obtaining voluntary cooperation.

### 3. North Dakota will suffer irreparable injury to its sovereign interests in regulating air quality within its borders.

The North Dakota Department of Health ("NDDH") has jurisdiction to administer North Dakota's comprehensive and robust air-quality programs, which include N.D. Admin. Code §

23-25-01 *et seq.*, and federal CAA programs to implement the New Source Performance Standards, s*ee e.g.*, N.D. Cent. Code § 23-25-03; State permitting programs for stationary sources under Titles I and V of the CAA, s*ee id.* § 23-25-04.1; State Implementation Plans ("SIPs") for National Ambient Air Quality Standards ("NAAQS"), *see id.* § 23-25-03.6; *see also, United States v. Minnkota Power Coop., Inc.*, 831 F. Supp. 2d 1109, 1127 (D.N.D. 2011). Exhibit C, Declaration of L. David Glatt, Chief of the Environmental Health Section of the North Dakota Department of Health ("Glatt Decl."), ¶ 7. In particular, "the State of North Dakota exercised its authority to [make technology determinations] in accordance with the Clean Air Act," and when EPA disagrees there is a formal dispute resolution process which places on EPA the burden of proving that North Dakota's determinations are arbitrary and capricious, while the Final Rule dictates the control technologies to be used without consideration of state policy. *Minnkota Power Co-op., Inc.*, 831 F. Supp. 2d at1129; *see* Glatt Decl. ¶¶ 7, 11. Under the CAA regime, states may exercise genuine policy discretion in determining how best to meet the NAAQS, not merely add additional regulations on top of the regulations already imposed by a federal agency.

Venting and flaring emissions at oil and gas production facilities are subject to regulation under the North Dakota's air pollution control laws and regulations. Glatt Decl. ¶¶ 9–10. Venting and flaring activities create emissions of Volatile Organic Compounds ("VOCs")*,* carbon monoxide, and nitrogen dioxide, all of which are regulated pollutants under North Dakota's air quality regulations. Since 1970, the NDDH has administered North Dakota's air quality laws and regulations, which includes regulation of stationary sources that directly emit— or have the potential to emit—100 tons per year or more of any air contaminant subject to

regulation. North Dakota's permitting requirements apply to all new and modified oil and gas production facilities. N.D. Admin Code § 33-15-14; Glatt Decl. ¶ 10.

North Dakota has exercised its air-regulating primacy for five decades and by delegation from EPA has carried out EPA's direct implementation role of permitting and enforcement. Glatt Decl. ¶¶ 14–21. The Final Rule directly regulates venting and flaring at oil and gas production facilities, and thus directly impinges on North Dakota's primary, delegated authority to administer such regulations.

### 4. North Dakota will suffer irreparable harm to its economic interests.

Oil and gas extraction and related industries have provided significant economic opportunities to the citizens of North Dakota, as well as significant tax revenue for the State economy, which will be impaired if the Final Rule is allowed to go into effect. There is no possibility of money damages from the BLM to compensate North Dakota for its lost revenue or North Dakota's citizens for their lost jobs and opportunities.

While economic loss—on its own—does not ordinarily constitute irreparable harm because such losses may be later recovered through money damages, *Crowe & Dunley, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011), this rule does not apply to a state alleging economic harm because "such a stringent test could never be met." *Oklahoma ex rel. Oklahoma Tax Comm'n v. Int'l Registration Plan, Inc.*, 264 F. Supp. 2d 990, 996 (W.D. Okla. 2003). When a state alleges economic harm occasioned from the loss of tax or royalty income, the appropriate test is "whether the financial loss is temporary or not." *Id*. The unique economic hardship results because a state's revenue shortfalls "impact not only the funds available to spend in that year but also impact the amount budgeted in future years" and "[t]he impact on critical state services from any significant revenue shortfall may thus have a pervasive impact spreading over several years." *Id*.

North Dakota collected $6,048,792,082 in oil and gas taxes in the years 2013–2015, and $4,068,542,204 in the years 2011–2013. Office of the State Tax Comm'r, 52nd Biennial Report at 16 (2015). This represents more than half of the total net collections. *Id*. Increased sales tax, income tax, and other taxes during that period were also driven by the oil and gas boom and strong local economy. *Id*. Under the North Dakota Constitution, 30 percent of this revenue is deposited in a "rainy day" fund, the Legacy Fund, $1.860 billion in the 2013-15 biennium. *Id*. at 23. The imposition of the additional regulatory requirements under the Final Rule also threatens the extent and amounts of royalties to be paid to mineral owners and diminishes the revenue the State receives from its oil and gas industry. Helms Decl. ¶¶ 26–27.

The Final Rule threatens to damage the oil and gas industry, and therefore the economy of North Dakota and its revenue base, in several ways. First and most straightforwardly, it imposes numerous expensive equipment requirements that conflict with state law and EPA regulation. Even where the BLM's requirements are not more restrictive, the additive compliance with a third set of regulations on the same topic is time consuming and expensive.

Second, it will increase the already unmanageable permitting delays for oil and gas leases on federal and tribal lands. Helms Decl. ¶¶ 28–30. Each year, North Dakota collects more than $90 million in royalties from the production of oil and gas on federal and Indian lands. *Id*. ¶ 27. Based on oil price projections from the Energy Information Agency, over the next 30 years North Dakota anticipates the collection of more than $6 billion in royalties from federal and Indian lands. *Id*. Lengthy and unpredictable permitting times delay this revenue and often dissuade prospective operators from attempting to drill at all. The imposition of the additional regulatory requirements under the Final Rule threatens the extent and amounts of royalties to be paid to mineral owners and the taxes paid to the State of North Dakota. *Id*. ¶ 26. This lost

revenue will not be limited to federal and tribal leases, however. If permitting is delayed because one or more wells penetrate federal minerals, then development of all wells on the entire multi-well pad will be delayed. *Id*.

Compliance with the Final Rule will delay oil and gas development in North Dakota by forcing operators on federal and Indian lands to undertake additional compliance obligations. This delay will result from the need for operators to file waste minimization plans on more than 900 wells already permitted by the NDIC and on an additional 100 to 250 wells per month over the next 10 to 12 years. *Id*. ¶ 28. This delay will result in approximately one-half the rate of development and, in turn, result in decreased royalties and taxes in the amount of $150 million in the current fiscal year (2017), which runs from July 1, 2016 through June 30, 2017. *Id*. ¶ 30. The anticipated loss in royalties and taxes to North Dakota is estimated to be $550 million over the next biennium and $18 billion over the next 30 years. *Id*. Because royalty revenue funds are shared with the counties in North Dakota, any decrease in royalty revenue will adversely affect critical funding sources for public services such as health districts, emergency management, human services, roads, schools, and law enforcement. *Id.* ¶ 31. As a result, like the court's finding in *Oklahoma Tax Commission*, North Dakota will suffer unique economic harm because the tremendous losses of revenue from taxes and royalties will directly impact funding for the provision of "critical state services." 264 F. Supp. 2d at 997.

In addition, oil and gas operators in North Dakota will be forced to refocus their planned drilling activities to spacing units that do not contain federal lands rather than confront the possibility that the BLM will restrict production on new wells under section 3179.11 of the Final Rule. Helms Decl. ¶ 32. There are currently 20 companies with significant oil and gas operations on federal and Indian lands in North Dakota. *Id*. The shifting of capital investment to

State and private lands and delay or loss of full development on federal and Indian lands will result in significant loss of oil and gas resources and associated revenues estimated at more than $1 billion over the next two to five years. *Id.*

The displacement of numerous oil and gas operations due to implementation of the Final Rule will also result in the loss of employment. *Id.* ¶ 33. It is estimated that North Dakota will lose more than 1,000 jobs from the relocation of oil and gas operations due to the implementation of the Final Rule. *Id.* This estimate was derived from a study done by the North Dakota Department of Mineral Resources in conjunction with North Dakota State University Department of Agribusiness and Applied Economics, and the Vision West project. *Id.* This study looked at the average number of jobs per drilling rig and producing well in North Dakota, and how many of those jobs would be lost as a result of the Final Rule. *Id.*

These costs will begin to accrue as soon as the Final Rule goes into effect, or earlier as operators seek to come into compliance or evaluate the economics of potential new development. No compensation from the BLM can be obtained for these losses. The threat of unrecoverable economic losses is sufficient to warrant the issuance of a preliminary injunction. *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996) ("threat of unrecoverable economic loss, however, does qualify as irreparable harm"). North Dakota's challenge to the Final Rule is brought under the APA, which allows a party to challenge final agency action and seek "relief other than money damages." 5 U.S.C. § 702. Because the APA does not afford North Dakota—or any other petitioner—a mechanism for recovering economic damages caused by the BLM Rule following a successful adjudication of the merits of petitioners' claims, those damages are considered to be "irreparable" as a matter of law. *Chamber of Commerce v. Edmondson*, 594

F.3d 742, 770–71 (10th Cir. 2010) ("[i]mposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury").

Because the State of North Dakota will suffer irreparable harm prior to receiving a "full and fair opportunity to be heard on the merits," it is imperative that this Court immediately issue a preliminary injunction prohibiting the implementation of the Final Rule until the merits of North Dakota's (and the other petitioners') Petitions are resolved. *Kansas*, 249 F.3d at 1227–28.

**B.      The Balance of Harms Weighs in Favor of North Dakota**

The key question in the balance of harms inquiry is whether "the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction." *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001). As discussed above, the implementation of the Final Rule will cause North Dakota tremendous harm to its sovereign interests, the interests of its citizens, and to the North Dakota treasury. In contrast with the considerable harm that will befall North Dakota if the Final Rule is implemented, the BLM will suffer no harm from preservation of the status quo until the resolution of Petitioners' claims on the merits.

Venting and flaring is already heavily regulated by North Dakota and other petitioners and by the EPA, and the BLM's new regulations are, at best, an incremental improvement. 81 Fed. Reg. at 83,018. Many requirements are completely redundant. *Id*; Glatt Decl. ¶ 18. Briefly delaying these BLM regulations will not cause any significant environmental harms. Nor is the BLM the federal agency that has been entrusted by Congress with the responsibility to regulate air quality in the first place, especially on private mineral leases on private land.

The lost royalties to the BLM from an injunction are miniscule. The BLM estimates that it will receive additional royalties of $3–10 million per year from the Final Rule, 81 Fed. Reg. 83,014, which is a drop in the bucket compared to the total royalties paid to the BLM for oil and gas leases. Even minor permitting delays or brief shutdowns could easily result in lost royalty

revenue greater than this amount.  And the BLM could use the extra implementation time to work on its current backlog of pending applications and notices so that it is ready to handle the new paperwork that will be generated by this rule.

**C.      North Dakota has a Reasonable Likelihood of Success on the Merits.**

North Dakota has a reasonable likelihood of succeeding on the merits because the Final Rule is "arbitrary, capricious, and . . . not in accordance with law."  5 U.S.C. § 706(2)(A).  "Although the courts use a bewildering variety of formulations of the need for showing some likelihood of success all courts agree that plaintiff must present a prima facie case but need not show a certainty of winning."  *Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1252 (10th Cir. 2016) (quotation omitted).   "[T]he essential function of judicial review is a determination of (1) whether the agency acted within the scope of its authority, (2) whether the agency complied with prescribed procedures, and (3) whether the action is otherwise arbitrary, capricious or an abuse of discretion."  *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994).

**1.      BLM has no statutory authority to regulate state and private land and mineral interests or to promulgate the air quality regulations.**

"Determination of whether the [BLM] acted within the scope of its authority requires a delineation of the scope of the agency's authority and discretion, and . . . whether on the facts, the agency's action can reasonably be said to be within that range."  *Wyoming v. U.S. Dep't of the Interior*, 136 F. Supp. 3d 1317, 1328 (D. Wyo. 2015) (citing *Olenhouse*, 42 F.3d at 1574).

The Final Rule far exceeds the BLM's delegated statutory authority to protect federal surfaces or lease federal minerals and impermissibly encroaches on North Dakota's primary authority to regulate oil and gas development within its boundaries and on the EPA and the State's primary authority to administer air quality regulations through the CAA.  As recognized

by the Supreme Court, states have "traditional and primary power over land and water use." *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001). Furthermore, when an agency seeks to "bring about an enormous and transformative expansion" in its authority to make "decisions of vast 'economic and political significance,'" it must point to a clear statement from Congress. *Utility Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2444 (2014) (citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)). Nothing approaches a clear statement from Congress that it intended the BLM to regulate state and private land and mineral interests or to promulgate the air quality regulations.

The BLM is the federal agency responsible for managing federal lands and minerals that do not fall under the responsibility of another agency, and Congress has delegated to the Secretary of Interior responsibility to "issue regulations necessary to implement the provisions of this Act *with respect to the management, use, and protection of the public lands.*" 43 U.S.C. § 1733 (emphasis added). The BLM has similar authority over federal minerals and may "prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of the [the MLA]," 30 U.S.C. § 189, which are "to promote the orderly development of oil and gas deposits in publicly owned lands of the United States through private enterprise." *Geosearch, Inc. v. Andrus*, 508 F. Supp. 839, 842 (D. Wyo. 1981). Federal lands include "all land and interests in land owned by the United States which are subject to the mineral leasing laws, including mineral resources or mineral estates reserved to the United States in the conveyance of a surface or nonmineral estate," 30 U.S.C. § 1702, but do not include private mineral estates. These statutes, and others cited by the BLM, do not grant it authority to impose environmental regulations on private property. The BLM is not a substitute

for the EPA (or the States), or a competitor with federal or state environmental regulators; instead, it has a different, important role as the manager of our public lands.

The absence of a statutory provision that says "the BLM is not a regulator of private land" does not mean that it has the discretion to assign itself that role. A court "[does] not presume a delegation of power [to an agency] simply from the absence of an express withholding of power[.]" *Chamber of Commerce of U.S. v. NLRB*, 721 F.3d 152, 160 (4th Cir. 2013). *See also Am. Bar Ass'n v. FTC*, 430 F.3d 457,468 (D.C. Cir. 2005) ("Plainly, if we were to presume a delegation of power from the absence of an express withholding of such power, agencies would enjoy virtually limitless hegemony,...") (internal quotation marks and citation omitted); S*ierra Club v. EPA*, 311 F.3d 853, 861 (7th Cir. 2002) ("Courts will not presume a delegation of power based solely on the fact that there is not an express withholding of such power.") (internal quotation marks and citation omitted).

The BLM applies the Final Rule to split estates and private interests that have been unitized or communitized with federal minerals, but historically the BLM had taken the position that it has no general authority to regulate private parcels that are have been unitized or communitized with federal or tribal mineral interests, except for the authority that is expressly granted to it by contract in the unitization agreement signed by the owners or to the extent that this authority is directly relevant to its proprietary interests. In 1984, in the preamble to a regulation that establishes the scope of the BLM mineral leasing regulations, the agency wrote:

> Since all committed leases within a communitized area or unit participating area share in the total production from the unitized tract or participating area regardless of the ownership of the mineral estate where the wells are located, [BLM] must have some limited authority to obtain needed data and to inspect [nonfederal] and non-Indian sites to assure that the Federal and Indian interests are protected. This limited authority is spelled out in the formal agreement, i.e., unit, communitization, or gas storage. ***If the agreement fails to provide such limited authority to the Bureau, . . . these regulations do not apply to operations on private or State lands***.

49 Fed. Reg. 37,357 (1984) (emphasis added). It is clear from the language of this preamble that the BLM was describing how it understood an existing limitation on its jurisdiction. The BLM has since expanded this more limited understanding of its jurisdiction to encompass a limited subset of regulations that it will apply to state or privately owned mineral interests, but all of those regulations reasonably relate to the BLM's interests as a part-owner and are not attempts to replace the states as general regulators. *Compare* 43 C.F.R. § 3161.1(a) ("All operations conducted on a Federal or Indian oil and gas lease by the operator are subject to the regulations in this part.") *with* 43 C.F.R. § 3161.1(b) ("Regulations in this part relating to site security, measurement, reporting of production and operations, and assessments or penalties for noncompliance with such requirements are applicable to all wells and facilities on State or privately-owned mineral lands committed to a unit or communitization agreement which affects Federal or Indian interests, notwithstanding any provision of a unit or communitization agreement to the contrary.").

When changing agency policy, "the agency must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy,' [and] must also be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016), quoting *National Cable & Telecommunications Assn. v. Brand X Internet Services*, 545 U.S. 967, 981–982 (2005). And "[w]hen an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, the Court typically greets its announcement with a measure of skepticism." *Utility Air Regulatory Group*, 134 S. Ct. at 2444 (quotation omitted). The division of regulatory authority between the states and the BLM under the MLA and related statutes has been a longstanding, generally accepted understanding for

decades, and the BLM's recent foray into the regulation of private lands should be "greet[ed] with a measure of skepticism." *Id.*[2]

When considering and adopting the Final Rule, the BLM acknowledged that it is the states, not the BLM that are the regulators of oil and gas developments on private land, but decided to apply its new regulations anyway: "While the BLM agrees that the regulation of State and private minerals is under the jurisdiction of the States, the BLM does not agree that States' jurisdiction over State and private minerals precludes the BLM from promulgating a waste prevention regulation that has incidental impacts on State and private minerals unitized or communitized with [f]ederal or Indian minerals." 81 Fed. Reg. at 83,039. But the BLM does not seek to impose "incidental impacts," on private owners, it plans to impose regulations on them and punish them if they do not comply.

The BLM argues that imposing these regulations is permissible because their purpose is to prevent waste of federal oil and gas. 81 Fed. Reg. at 83,033. However, the Final Rule largely does not prevent waste but instead regulates how it should be handled—for example, flaring rather than venting. Even where the Final Rule does prevent waste, it imposes expenses and compliance obligations that are wildly out of proportion to the market value of the federal gas being lost, especially on units where the federal interest is a tiny percentage of the total. At most, this argument would justify the provisions imposing royalties for lost natural gas, royalties that would only apply up to the percentage interest actually held by the United States. 43 C.F.R.

_____

[2] In *Norfolk Energy, Inc. v. Hodel*, 898 F.2d 1435, 1440 (9th Cir. 1990) the Ninth Circuit held that "BLM now has authority to regulate nonfederal and non-Indian lands in federally approved oil and gas units, regardless of the language of the unit agreements." This decision came before the cases cited above which require a stronger showing when an agency breaks from long tradition, and its reasoning was based on an almost boundless deference to the agency that is at odds with current law.

§ 3103.3-1 ("Royalty on production will be payable only on the mineral interest owned by the United States.")

## 2. BLM has no statutory authority to issue air quality regulations.

When Congress enacted the CAA, it established a comprehensive system for regulating air quality. *Bell v. Cheswick Generating Station*, 734 F.3d 188, 190 (3d Cir. 2013). "Congress enacted the law in response to evidence of the increasing amount of air pollution," but chose to design an air pollution control regime that preserved for the states their central role in regulating their own air quality. *Id.* The CAA provides that "[e]ach State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State." 42 U.S.C. § 7407(a). "Thus, it employs a 'cooperative federalism' structure under which the federal government develops baseline standards that the states individually implement and enforce. *Bell*, 734 F.3d at 190. By promulgating the Final Rule under irrelevant general statutes that deal with federal lands and mineral leasing, rather than the CAA, the BLM attempts to free itself from the detailed legal requirements imposed by Congress and seizes powers and responsibilities that were formally delegated to or reserved for the states.

Because Congress so clearly delegated the authority to administer the CAA and regulate air quality and emissions to the EPA and the states, BLM is not entitled to *Chevron* deference when it steps into that area. "Deference in accordance with *Chevron* . . . is warranted only 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" *Gonzales v. Oregon*, 546 U.S. 243, 255–56 (2006), quoting *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001). Although parts of the Final Rule, such as the provisions governing royalties, do fall within the BLM's delegated powers, others, such as the "equipment requirements for pneumatic controllers" 43 C.F.R. § 3179.201, or whether "the

storage vessel has the potential for VOC emissions equal to or greater than 6 tpy based on the maximum average daily throughput for a 30-day period of production," 43 C.F.R. § 3179.203, were unambiguously delegated elsewhere—*not* to the BLM.

The CAA made the States and *EPA* "partners in the struggle against air pollution." *Gen. Motors Corp. v. United States*, 496 U.S. 530, 532 (1990). As to stationary sources of emissions, the CAA contains several programs under which EPA sets standards, such as for the concentration of certain pollutants in ambient air, which are then implemented and administered by the states through SIPs prepared by the states. *See generally* 42 U.S.C. § 7410. In this "experiment in cooperative federalism," *Michigan v. E.P.A.*, 268 F.3d 1075, 1083 (D.C. Cir. 2001), the CAA establishes that improvement of the nation's air quality will be pursued "through state and federal regulation," *BCCA Appeal Group v. E.P.A.*, 355 F.3d 817, 821-22 (5th Cir. 2003); *see also* 42 U.S.C. § 7401(a)(3) ("air pollution prevention . . . and air pollution control at its source *is the primary responsibility of States and local governments*" (emphasis added); and 42 U.S.C. § 7407(a) ("Each State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State. . . .").

The Final Rule, however, ignores North Dakota's extensive air quality regulations and instead applies BLM standards that were developed without considering the factors required by the CAA and without the formal participation of the states, except as ordinary commenting parties, in the rulemaking process. And 75.2% of the vented and flared gas the BLM seeks to regulate came from mixed ownership wells, not from the federal and tribal minerals that it is the BLM's responsibility to manage. 81 Fed. Reg. at 83,015.

The Final Rule upends the scheme developed by Congress for air quality regulation and will be a substantial impediment to North Dakota regulatory authority. Glatt Decl. ¶¶ 15, 18.

3. **The Final Rule is arbitrary and capricious because its costs outweigh the market value of the royalties the federal government would obtain.**

The BLM states that it seeks to achieve two basic purposes that it seeks to achieve through the Final Rule. First, it will "enhance our nation's nation gas supplies, boost royalty receipts for American taxpayers, tribes, and States," and second, it will "reduce environmental damage from venting, flaring, and leaks of gas." 81 Fed. Reg. at 83,009. The regulation of emissions, and emissions from private mineral interests on private land, fall outside the BLM's jurisdiction, and taken as a regulation of waste, the Final Rule is arbitrary and capricious because the market value of the wasted natural gas is extremely low relative to the cost of the Final Rule.

Even taking the BLM's numbers at face value, the costs of compliance will vastly outweigh the additional government revenue that will be collected. *Id*. at 83,013–14. The BLM estimates that it will receive additional royalties of $3-$10 million per year from the Final Rule, *id.* at 83,014, and the costs imposed by the Final Rule will be $110-$279 million per year, *id*. at 83,013. Thus, even using the BLM's numbers, the cost of compliance is at least ten times the potential government revenue. The actual market value of the natural gas that the Final Rule would preserve, and the additional royalties that will be collected by the government, is simply not very high, even under the BLM's exaggerated estimates, and the costs of compliance in terms of capital expenditure and time wasted complying with bureaucratic demands is very large. The total production in fiscal year 2015 on federal oil and tribal oil wells was valued at $20.9 billion, with $2.3 billion in royalties, *Id*. at 83,009. The "waste" of federal resources that is BLM's jurisdictional hook to apply this rule is completely *de minimus*.

The BLM's royalty estimates, on their face, are not plausible. First, nowhere in the Federal Register, in pages and pages of estimates and cost benefit analysis, does the BLM state the assumptions it is using regarding the price of natural gas, or attempt to analyze how this rule

might play out under a range of market scenarios—a striking omission. Instead the notice footnotes to a technical appendix. *See id*. at 83,014. The technical appendix evaluates the values of natural gas prices at various discount rates, but not at different prices: instead it prefaces its discussion with a statement that "at a $4/Mcf price of natural gas, this volume has a sales value of . . . ."[3] In a different section of the report not referenced in the Federal Register, there is a discussion of projected natural gas prices: "Natural gas prices in 2015 have been among the lowest in recent years, ranging from $2.56/Mcf to $3.32/Mcf, though not as low as prices in the first half of 2012. At the time we prepared this analysis, the natural gas price was below $2.00/Mcf. The EIA's long-term price projections are $3.79/Mcf in 2015, $3.80/Mcf in 2016, $3.91/Mcf in 2017, $5.02/Mcf in 2020, $5.61/Mcf in 2025, and $5.85/Mcf in 2030, with an annual growth rate from 2013 to 2040 of 2.8%." *Id*. at 42. It is not entirely clear which numbers BLM is using, but it is clear that the BLM is relying for its purported royalty benefits on a belief that the natural gas prices will double in the near further—an assumption that the BLM does not go out of its way to highlight or discuss. The uncertainty about future prices should also be taken into account on the cost side, because improving gas capture depends in large part in midstream operators, not subject to the Final Rule, expanding their own pipeline infrastructure, which is much more likely to occur if prices recover, and the cost and availability of capital to operators for new equipment is highly dependent on the current price of oil and gas.

A second reason the royalty and production benefits are likely exaggerated is that maximizing royalties is the one area where the interest of private operators and the interests of

---

[3] Regulatory Impact Analysis for: Revisions to 43 C.F.R. § 3100 (Onshore Oil and Gas Leasing) and 43 CFR 3600 (Onshore Oil and Gas Operations) Additions of 43 C.F.R. 3178 (Royalty-Free Use of Lease Production) and 43 C.F.R. 3179 (Waste Prevention and Resource Conservation) at 3, available at https://www.blm.gov/style/medialib/blm/wo/Communications_ Directorate/public_affairs/news_release_attachments.Par.11216.File.dat/VF%20Regulatory%20I mpact%20Analysis.pdf.

the federal government are aligned.  If there are convenient and cost-effective mechanisms for capturing marketable natural gas that would otherwise be lost, then operators have every reason to adopt them.

To the extent that this Final Rule is based on the BLM's responsibility for preserving the public's natural gas resources, it is arbitrary and capricious because it imposes huge costs to save only a very small amount of revenue and because many of the provisions of the Final Rule do not accomplish this purpose at all.  If preserving royalty revenue were the BLM's aim, a more narrowly tailored regulation would better serve that purpose without the attendant problems and costs.

Virtually all of the purported benefits of the Final Rule are found in the emission reductions, which the BLM has no authority to impose, and especially no authority to impose on non-federal interests.  The BLM estimates that the total benefits from the Final Rule are $209–403 million per year.  *Id*. at 83,014.  Out of this, $189–247 million is attributable to the estimated social cost of reducing methane.  *Id*.  But the BLM has no authority to regulate methane emissions.

## CONCLUSION

For the reasons set forth herein, the State of North Dakota respectfully moves the Court to grant its Motion for Preliminary Injunction.

Respectfully submitted this 5th day of December, 2016.

/s/ *Paul M. Seby*
Paul M. Seby (admitted *pro hac vice*)
Special Assistant Attorney General
Greenberg Traurig, LLP
1200 17th Street, Suite 2400
Denver, CO 80202
Phone:  (303) 572-6584
Fax:  (303) 572-6540

sebyp@gtlaw.com

Wayne Stenehjem (admitted *pro hac vice*)
Attorney General
David Garner (admitted *pro hac vice*)
Hope Hogan (admitted *pro hac vice*)
Assistant Attorneys General
500 N. 9th Street Bismarck, ND 58501
Phone: (701) 328-2925
ndag@nd.gov

Robert J. Walker (Wyo. Bar No. 7-4715)
Hickey & Evans, LLP
1800 Carey Street, Suite 700
Cheyenne, WY 82003
Phone: (307) 634-1525
Fax: (307) 638-7335
rwalker@hickeyevans.com

**ATTORNEYS FOR PETITIONER-
INTERVENOR STATE OF NORTH DAKOTA**