**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| STATE OF WYOMING,<br>STATE OF MONTANA, and<br>STATE OF NORTH DAKOTA,<br><br>    Petitioners,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>THE INTERIOR; SALLY JEWELL, in her<br>official capacity as Secretary of the Interior;<br>UNITED STATES BUREAU OF LAND<br>MANAGEMENT; and NEIL KORNZE, in<br>his official capacity as Director of the<br>Bureau of Land Management,<br><br>    Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 16-cv-00285-SWS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DECLARATION OF LYNN D. HELMS IN SUPPORT OF STATE OF NORTH DAKOTA'S MOTION FOR PRELIMINARY INJUNCTION**

I, Lynn D. Helms, state and declare as follows:

1. I am over 21 years of age and am fully competent and duly authorized to make this Declaration. The facts contained in this Declaration are based on my personal knowledge and are true and correct.

2. I am employed as the Director of the North Dakota Industrial Commission ("NDIC") Department of Mineral Resources ("DMR"). I have been employed by NDIC since July 20, 1998, and I have continuously served as the Director of DMR since July 1, 2005.

3. The North Dakota Legislature declared it the public's interest "to foster, to encourage, and to promote the development, production, and utilization of natural resources of oil and gas in the state in such a manner as will prevent waste; to authorize and to provide for the operation and development of oil and gas properties in such a manner that a greater ultimate

recovery of oil and gas be had and that the correlative rights of all owners be fully protected; and to encourage and to authorize cycling, recycling, pressure maintenance, and secondary recovery operations in order that the greatest possible economic recovery of oil and gas be obtained within the state to the end that the landowners, the royalty owners, the producers, and the general public realize and enjoy the greatest possible good from these vital natural resources." N.D. Cent. Code § 38-08-01.

4. The NDIC has continuing jurisdiction and authority over all persons and property, public and private, as necessary to control the oil and gas resources of the state. N.D. Cent. Code § 38-08-04. The NDIC regulates all operations for the production of oil or gas. N.D. Cent. Code § 38-08-04(2).

5. The DMR's Oil and Gas Division has jurisdiction to administer North Dakota's comprehensive oil and gas regulations, found at North Dakota Administrative Code Chapter 43-02-03. These regulations include regulation of drilling, producing, and plugging of wells; the restoration of drilling and production sites; the perforating and chemical treatment of wells, including hydraulic fracturing; the spacing of wells; operations to increase ultimate recovery, such as cycling of gas; the maintenance of pressure and the introduction of gas, water, and/or other substances into producing formations; the disposal of saltwater and oil field wastes through the North Dakota Underground Injection Control ("UIC") Program; and all other operations for the production of oil and gas.

6. As Director of the DMR, I manage and direct all responsibilities of the Oil and Gas Division and the DMR Geological Survey. These responsibilities include administration of the North Dakota Hydraulic Fracturing Program and the North Dakota UIC Program. These responsibilities also include regulation of the drilling, producing, and plugging of wells; the restoration of drilling and production sites; the shooting and chemical treatment of wells,

including hydraulic fracturing; the spacing of wells; operations to increase ultimate recovery such as cycling of gas, the maintenance of pressure, and the introduction of gas, water, or other substances into producing formations; disposal of saltwater and oil field wastes through the North Dakota UIC Program; and all other operations for the production of oil and gas.

7. In my current position, I am familiar with the Final Rule promulgated by the Bureau of Land Management ("BLM") entitled "Waste Prevention, Production Subject to Royalties, and Resources Conservation: Final Rule," 81 Fed. Reg. 83,008 (Nov. 18, 2016) ("Final Rule"). North Dakota participated in the BLM rulemaking by submitting comments on the proposed rule. In addition, North Dakota challenged the EPA final rule establishing New Source Performance Standards for methane emissions at oil and natural gas facilities, which is intimately related to this Final Rule. *See North Dakota, et al. v. EPA*, No. 16-1242 (D.C. Cir. 2016). The Final Rule interferes with the State of North Dakota's regulation of oil and gas, and will impair and impede on oil and gas production in North Dakota. North Dakota's regulatory role and authorities are also diminished and displaced by the Final Rule.

## Oil and Gas Production in North Dakota

8. The State of North Dakota is ranked second in the United States among all states in the production of oil and gas. North Dakota produces approximately 350 million barrels of oil per year and 400 billion cubic feet of natural gas per year.

9. One-sixth of the oil production in North Dakota is from Indian lands and another five percent of oil production within the State is from federal lands.

10. North Dakota has at least 2,832 spacing units with well bores that contain federal minerals. The Final Rule will apply to each of these spacing units. Thirty-two percent of the Bakken spacing units contain federal minerals and will have at least one well impacted by the Final Rule.

11. Over the next 20 years, working interest owners of North Dakota oil and gas leases plan to increase the drilling density from one well per spacing unit to as many as 32 wells to recover incremental oil and gas.

12. North Dakota has a unique history of land ownership that has resulted in a significant portion of North Dakota consisting of split-estate lands that will be adversely affected by the Final Rule. Unlike many western states that contain large blocks of unified federal surface and mineral interest ownership, the surface and mineral estates in North Dakota were at one time more than 97% private and state owned as a result of the railroad and homestead acts of the late 1800s. However, during the depression and drought years of the 1930s, numerous small tracts in North Dakota went through foreclosure. The federal government—through the Federal Land Bank and Bankhead Jones Act—foreclosed on many farms, taking ownership of both the mineral and surface estates. Many of those surface estates were later sold to private parties, but some or all of the mineral estates were retained by the federal government. This resulted in a very large number of small, federally-owned mineral estate tracts scattered throughout western North Dakota.

13. Those federal mineral estates impact more than 30% of the oil and gas spacing units established for development in North Dakota—all of which will be subject to this Final Rule. The enormous amount of split-estate lands affected by the Final Rule can be seen on the attached map, *see* Exhibit 1, by comparing federal surface management/ownership (crosshatched areas), to the federal mineral ownership (red areas) within well spacing units (gray areas), to the private- and state-mineral ownership (uncolored areas) in the area around the confluence of the Yellowstone and Missouri Rivers in Williams and McKenzie counties. Using the attached hypothetical spacing unit (Exhibit 2) to illustrate, the Final Rule imposes federal requirements and permitting timelines on all owners in the spacing unit. This prevents the NDIC from

regulating the orderly development of the spacing unit for prevention of waste and from pooling and protecting the correlative rights of the various owners in the spacing units.

14. Due to North Dakota's unique history of land ownership discussed above, it is typical for oil and gas spacing units in North Dakota to consist of a combination of federal, state, and private mineral ownership. A diagram of a hypothetical spacing unit with private, state, and federal mineral ownership is attached as Exhibit 2. Even in circumstances where the federal mineral ownership is small relative to other mineral ownership interests within the spacing unit, all the oil and gas operators within the unit must, as a practical matter, conduct operations in accordance with the rules and guidelines pertaining to the development of federal minerals. The Final Rule will subject operators of wells that develop private and state minerals within the communitized spacing unit to federal permitting, waste minimization plan, gas capture, gas venting, and production restriction rules and requirements.

15. In order to comply with the additional obligations imposed by the Final Rule, operations on spacing units that contain federal minerals will be substantially delayed, as discussed below. In the context of shared development within a spacing unit, this delay adversely affects the development of all minerals within the unit, including state and private oil and gas minerals. This delay substantially frustrates North Dakota's efforts to produce nonfederal minerals within a spacing unit. N.D. Cent. Code § 38-08-01 requires the NDIC to support the development, production, and utilization of oil and gas while preventing waste of these resources and protecting the correlative rights of all owners. Therefore, the Final Rule impedes on the NDIC's ability to perform its function.

16. In North Dakota, there are a few large blocks of federal mineral ownership or trust responsibility where the federal government manages the surface estate through the U.S. Forest Service or Bureau of Indian Affairs. These are on the Dakota Prairie Grasslands in

southern McKenzie and northern Billings Country as well as on the Fort Berthold Indian Reservation. *See* Exhibit 1. However, even within those areas, the State of North Dakota owns all water rights, and federal mineral ownership is interspersed with a "checkerboard" of private and state mineral or surface ownership. Therefore, virtually all federal management of North Dakota's oil and gas producing region consists of some form of split estate.

17. In order to provide the taxation and regulatory certainty required for long-term oil and gas investment on Fort Berthold Indian Reservation, the three affiliated Tribes and the State of North Dakota entered into a tax and regulatory agreement in 2008, which was amended in 2013. Under the 2008 agreement, the State provided the same oil and gas regulation as it had traditionally provided on private, state and other federal lands in North Dakota. The regulation included well spacing, well permitting, inspection, and enforcement. Under the 2013 agreement, North Dakota has shared jurisdiction with Tribe and federal authorities in those areas. The Final Rule displaces the State and Tribe from exercising their regulatory roles under the agreement by assigning final approval of drilling permits, waste prevention, and variances on any well that penetrates private, state, federal, or trust minerals committed to a federal CA to the sole authority of the BLM Authorized Officer.

18. Given North Dakota's unique land ownership situation, the Final Rule will have far-reaching adverse impacts on North Dakota's ability to administer its oil and gas regulatory program.

### Impact of the Final Rule on North Dakota's Regulatory Program

19. The NDIC has regulated the flaring of gas for more than three decades under N.D. Cent. Code. 38-08-06.4, the rules promulgated thereunder, and commission orders issued under that authority.

20. The Final Rule applies to, *inter alia*, "State or private tracts in a federally approved unit or communitization agreement." 43 C.F.R. § 3178.2(4). Given North Dakota's unusual land ownership and split-estate situation, the Final Rule therefore displaces State authority over a significant number of oil and gas units in the State, along with the State and private tracts therein.

21. Several provisions of the Final Rule impose restrictions that overlap with—and are different than—North Dakota's oil and gas statutes and regulatory programs. This displaces North Dakota laws and regulations. Such differences will cause delays in the orderly development of oil and gas resources in North Dakota.

22. The Final Rule's venting exceptions are in conflict with North Dakota laws and regulations, which were designed to be protective of North Dakota's natural resources and developed in consideration of North Dakota's unique geographic, geologic, and ecologic occurrences within its borders. While the Final Rule allows venting in certain specified circumstances, North Dakota regulations do not allow explicit exceptions but instead authorize the NDIC to grant exceptions upon application and after notice and comment. *See* N.D. Cent. Code § 38-08-06.4(6); *see also* N.D. Admin. Code § 43-02-03-60.2. It is likely, therefore, that exceptions granted by the BLM will preempt the NDIC's ability to administer its oil and gas regulatory program.

23. Furthermore, the NDIC has implemented flaring reduction goals, which utilize declining allowable flared percentages of 20% beginning April 1, 2016; 15% beginning November 1, 2016; 12% beginning November 1, 2018; and 7–9% thereafter. *See* N.D. Indus. Comm'n Order 24665 Policy/Guidance Ver. 102215 (2014).[1] The Final Rule is duplicative and inconsistent with these goals, and the Final Rule duplicates North Dakota's requirement for gas

---

[1] Available at https://www.dmr.nd.gov/oilgas/GuidancePolicyNorthDakotaIndustrialCommissionorder24665.pdf.

7

capture plans, *see id.*, but the required information is not consistent with North Dakota's requirements. This duplication and inconsistency creates a direct conflict with North Dakota's ability to administer its oil and gas regulatory program.

24. The Final Rule provides in section 3179.401 for North Dakota or Tribes to apply for variances from any provision(s) of the Final Rule, requiring demonstration to the BLM's satisfaction that the North Dakota or Tribal Program are at least as protective as the corresponding provision(s) of the Final Rule. *See* 43 C.F.R. § 3179.401. An operator may request that the BLM establish an alternative capture target under section § 3179.8 if certain conditions are met to the BLM's satisfaction. *See* 43 C.F.R. § 3179.8. This is unduly burdensome on the State, Tribes, and operators alike, and it diminishes and displaces North Dakota's regulatory role and traditional authority and expertise over its own oil and gas resources.

25. The Final Rule will cause delays in operator's abilities to conduct oil and gas production in North Dakota. In my observation, operators applying for drilling permits generally wait between six and nine months for approval of an application for permit to drill from the BLM. Operators applying for drilling permits in 2016 waited an average of 23 days for State approval of an application to drill in North Dakota. By imposing additional permitting requirements, BLM will frustrate and interfere with North Dakota's regulatory role and authority.

26. The imposition of the additional regulatory requirements under the Final Rule also threatens the extent and amounts of royalties to be paid to mineral owners and the taxes paid to the State of North Dakota. While federal minerals in many states occur in large contiguous blocks of federal minerals, in North Dakota small tracts of federal minerals are interspersed with State- and privately-owned minerals. If permitting is delayed because one or more wells penetrate federal minerals, then development of all wells on the entire multi-well pad will be

delayed. North Dakota's federal minerals would therefore not be protected from drainage and correlative rights of North Dakota's mineral owners would not be protected.

27. Each year, North Dakota collects more than $90 million in royalties from the production of oil and gas on federal and Indian lands. Based on oil price projections from the Energy Information Agency, over the next 30 years North Dakota anticipates the collection of more than $6 billion in royalties from federal and Indian lands. The use of the 30-year projection represents the anticipated life of the resource as it is known today.

28. Given my experience and knowledge of North Dakota's oil and gas permitting procedures and understanding of current timelines for permitting oil and gas wells on both federal and non-federal lands, I estimate that compliance with the Final Rule will delay oil and gas development in North Dakota by forcing operators on federal and Indian lands to undertake additional compliance obligations. This delay will result from the need for operators to file waste minimization plans on more than 900 wells already permitted by the NDIC and on an additional 100 to 250 wells per month over the next 10 to 12 years.

29. Based on my understanding of BLM's current drilling permit approval times, and the fact that more permits will have to be re-processed than BLM approved in fiscal year 2015, implementation of the Final Rule will result in a delay of more than six months for every future oil and gas well drilled within a spacing unit that contains federal or Indian minerals in North Dakota. This nearly doubles the permitting time for these wells.

30. This delay will result in approximately one-half the rate of development and, in turn, result in decreased royalties and taxes in the amount of $150 million in the current fiscal year (2017), which runs from July 1, 2016 through June 30, 2017, anticipated loss of royalties and taxes to North Dakota of $550 million over the next biennium, and $18 billion over the next 30 years. This estimate takes into account North Dakota's oil extraction tax.

31. Because North Dakota operates on a biennial budget, a single year of decreased revenue at the beginning of the biennium adversely impacts revenue for both fiscal years in that biennium. Likewise, because the state budget for the next biennium relies heavily on actual revenue from the previous biennium, decreased revenue in one year can adversely impact budget projections and corresponding appropriations for four years or more. As such, the decrease in revenue in the current fiscal year will in turn diminish North Dakota's revenue and appropriations for many succeeding years. Because royalty revenue funds are shared with the counties in North Dakota, any decrease in royalty revenue will adversely affect critical funding sources for public services such as health districts, emergency management, human services, roads, schools, and law enforcement.

32. In addition, I estimate that a number of oil and gas operators in North Dakota will be forced to refocus their planned drilling activities to spacing units that do not contain federal lands rather than confront the possibility that BLM will restrict production on new wells under section 3179.11 of the Final Rule. There are currently 20 companies with significant oil and gas operations on federal and Indian lands in North Dakota. The shifting of capital investment to State and private lands and delay or loss of full development on federal and Indian lands will result in significant loss of oil and gas resources and associated revenues estimated at more than $1 billion over the next two to five years.

33. The displacement of numerous oil and gas operations due to implementation of the Final Rule will also result in the loss of employment. It is estimated that North Dakota will lose more than 1,000 jobs from the relocation of oil and gas operations due to the implementation of the Final Rule. This estimate was derived from a study done by the North Dakota Department of Mineral Resources in conjunction with North Dakota State University Department of Agribusiness and Applied Economics, and the Vision West project. This study

looked at the average number of jobs per drilling rig and producing well in North Dakota, and how many of those jobs would be lost as a result of the Final Rule.

34. The Final Rule's flaring restrictions represent an unforeseeable departure from the Proposed Rule. The Final Rule imposes a 2-step restriction on flaring. The Final Rule imposes a so-called "monthly capture target," which starts at 85% beginning 2018 and ratchets up over time, eventually imposing a "capture target" of 98% beginning in 2026. Despite calling them "targets," these rates are mandatory for compliance with the Final Rule. Second, the Final Rule imposes a so-called "monthly flaring allowable," which is factored in to calculate the monthly capture percentage. The "monthly flaring allowable" decreases over time, eventually reducing to an incredibly low 750 Mcf beginning in 2025. This formula is a significant departure from what was offered in the Proposed Rule, which set simple numerical limits on per-well flaring volumes. The NDIC was not notified that this was a foreseeable change; therefore, the NDIC was deprived of the ability to provide meaningfully comment.

35. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 5-th, 2016.

Lynn D. Helms

The foregoing Declaration of Lynn D. Helms was subscribed and sworn before me by Lynn D. Helms on December 5th, 2016.

Witness my hand and official seal.

Notary Public

My commission expires: Sept. 20, 2019

DERRICK BECKER
Notary Public
State of North Dakota
My Commission Expires Sept. 20, 2019



Northwest North Dakota Federal Minerals and Affected Drilling/Spacing Units

# T155N, R100W Sections 4 and 9

