## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| STATE OF WYOMING, STATE OF MONTANA, and STATE OF NORTH DAKOTA,<br><br>     Petitioners,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; SALLY JEWELL, in her official capacity as Secretary of the Interior; UNITED STATES BUREAU OF LAND MANAGEMENT; and NEIL KORNZE, in his official capacity as Director of the Bureau of Land Management,<br><br>     Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Case No. 16-cv-00285-SWS |

---

### DECLARATION OF L. DAVID GLATT IN SUPPORT OF STATE OF NORTH DAKOTA'S MOTION FOR PRELIMINARY INJUNCTION

---

I, L. David Glatt, state and declare as follows:

1.      My name is L. David Glatt.  I am over 21 years of age and am fully competent and duly authorized to make this Declaration.  The facts contained in this Declaration are based on my personal knowledge and are true and correct.

2.      I am employed as the Chief of the Environmental Health Section ("EHS") of the North Dakota Department of Health ("NDDH" or "Department").  I have been employed by the NDDH since 1983, and I have continuously served as the Chief of the EHS since 2004.  I have a bachelor's degree in biology and a master's degree in environmental engineering from North Dakota State University.

3.      As Chief of the EHS of the NDDH, I oversee and implement the EHS's functions and responsibilities, which include coordinating communications with the EPA regarding State programs and related environmental issues, monitoring and enforcing compliance with state and federal environmental laws and regulations; and carrying out environmental laboratory analyses.

4.      In my current position, I am familiar with the Final Rule promulgated by the Bureau of Land Management ("BLM") entitled "Waste Prevention, Production Subject to Royalties, and Resources Conservation: Final Rule," 81 Fed. Reg. 83008 (Nov. 18, 2016) ("Final Rule). North Dakota participated in the BLM rulemaking by submitting comments on the proposed rule. In addition, North Dakota challenged the EPA final rule establishing New Source Performance Standards for methane emissions at oil and natural gas facilities, *see North Dakota, et al. v. EPA*, No. 16-1242 (D.C. Cir. 2016), which, as the BLM acknowledges, is intimately linked to the Final Rule. My conclusion is that the Final Rule harms the State of North Dakota by interfering with and displacing the Department's regulation of air emissions, as delegated to it by Congress and the EPA.

### Background on the NDDH and its Regulation of Air Quality

5.      The federal Clean Air Act ("CAA") declares that "[a]ir pollution control at its source is the primary responsibility of State and local governments." 42 U.S.C. § 7401(a)(3).

6.      In accordance with that important goal, the State of North Dakota, through the NDDH, has exercised air quality primacy since 1970, when it first enacted its comprehensive air quality program, *see* N.D. Cent. Code §§ 23-25-1 *et seq.*, and North Dakota implemented its first EPA-approved State Implementation Plan in 1972. Under its rightfully delegated authority, the NDDH administers, implements, and enforces the federal CAA, 42 U.S.C. §§ 7401 *et seq.*, as amended, in the State of North Dakota.

7.      The NDDH implements and enforces the State's various environmental regulatory programs, including federal CAA programs to implement the New Source Performance Standards ("NSPS"). *See e.g.*, N.D. Cent. Code § 23-25-03. The Department also oversees State permitting programs for stationary sources under Titles I and V of the CAA. *See Id.* § 23-25-04.1. Additionally, the Department develops and administers state implementation plans ("SIPs") for National Ambient Air Quality Standards ("NAAQS"), *see id.* § 23-25-03.6, and is the technical expert agency that makes all best available control technology ("BACT") determinations under the CAA's New Source Review provisions. *See id.* § 23-25-01.1; *see also, United States v. Minnkota Power Coop., Inc.*, 831 F. Supp. 2d 1109, 1127 (D.N.D. 2011) (upholding a BACT determination by the Department for lignite-fueled EGUs for nitrogen-oxide emissions based upon detailed consideration of the unique characteristics of North Dakota lignite coal).

8.      North Dakota has for decades been aggressive in achieving the first stated purpose of the CAA: "to protect and enhance the quality of the Nation's air resources so as to protect the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7410(b)(1).

### The NDDH's Regulation of Venting and Flaring

9.      Venting and flaring emissions at oil and gas production facilities are subject to regulation under the North Dakota's air pollution control laws and regulations. *See* N.D. Cent. Code §§ 23-25 *et seq.*; N.D. Admin Code 33-15 *et seq.*

10.     Venting and flaring activities at oil and gas production facilities create emissions of Volatile Organic Compounds ("VOCs"), carbon monoxide, and nitrogen dioxide, all of which are regulated pollutants under North Dakota's air quality regulations. Since 1970, the NDDH has implemented North Dakota's Air Pollution Control laws and regulations, which includes

regulation of stationary sources that directly emit—or have the potential to emit—100 tons per year or more of any air contaminant subject to regulation.   The NDDH's permitting requirements, which apply to all new and modified oil and gas production facilities, are found in N.D. Admin Code § 33-15-14.

11.   The NDDH is the technical expert agency that makes all best available control technology ("BACT") determinations under the CAA's New Source Review provisions regarding air emissions at oil and gas production facilities.   *See* N.D. Cent. Code § 23-25-01.1; *see also, Minnkota Power*, 831 F. Supp. 2d at 1127.

12.   The NDDH has evaluated the Final Rule and finds that the Final Rule improperly regulates air emissions and grants the BLM regulatory authority to establish air quality control methods that conflict with those already established by EPA and the State of North Dakota under the Clean Air Act.   In doing so, the Final Rule interferes with the Department's air quality regulatory program, displaces North Dakota's proper authority over sources of air emissions within its borders, and conflicts with North Dakota's authority to develop and administer its SIPs.

**The Final Rule Harms the State of North Dakota and its Comprehensive Air Program**

13.   North Dakota's air pollution control laws and regulations establish conditions of operation to ensure compliance with air quality rules, regulations, and emission requirements. After an air permit is issued to a source, the operator of that source is held to the state- and federally-enforceable conditions of operation established in the permit.   The NDDH's EPA-approved New Source Review program has always considered EPA and North Dakota air quality requirements when reviewing permit applications, drafting proposed permit conditions, and

ultimately issuing permits to sources.  Prior to the Final Rule, the NDDH did not consider *any* BLM air quality regulations because the BLM does not have authority to regulate air quality.

14.     By imposing requirements that are additional to, duplicative of, and conflicting with North Dakota's air quality program, the Final Rule creates confusion—both at the State level as well as among the sources—as to who the proper regulatory authority is.  This disrupts the entire North Dakota air quality program and interferes with North Dakota's "primary responsibility" to control air pollution, not just at oil and gas production facilities, but at all sources it regulates under its delegated authority. *See* 42 U.S.C. § 7401(a)(3).

15.     Moreover, by unlawfully imposing a third-party regulator of air emissions, the Final Rule interferes with the practical, carefully-developed partnership between North Dakota and the EPA, which was established through the CAA's framework of cooperative federalism, and has flourished over the last five decades.

16.     The NDDH now must consider BLM air-quality requirements when reviewing permit applications, drafting proposed permit conditions, and ultimately issuing permits to sources, particularly if it wishes to be eligible for a variance so that State laws apply.  This will require an additional expenditure of time and resources as part of the NDDH's BACT determinations of whether oil and gas production facilities are regulated, in whole or part, under the Final Rule.  As a result, the Final Rule effectively eliminates North Dakota's ability to exercise its prowess and authority to consider crucial air quality factors in the BACT process, such as control technologies and costs.  These are considerations that the NDDH has the proper expertise and authority to take into account.  The Final Rule interferes with and diminishes that authority.

17.     Additionally, the Final Rule interferes with the NDDH's development of permit conditions.  For example, the NDDH will now be required to evaluate the Final Rule's record-keeping and reporting requirements when reviewing permit applications, drafting proposed permit conditions, and ultimately issuing permits to sources.  This will require an additional expenditure of time and resources as part of the NDDH's permitting process.  As a result, the Final Rule effectively eliminates North Dakota's ability to exercise its prowess and authority to consider crucial air quality factors in the permitting process.  These are considerations that the NDDH has the proper expertise and authority to take into account.  The Final Rule interferes with and diminishes that authority.  In addition, from a practical standpoint, the Final Rule will harm the NDDH's ability to timely review, consider, and issue air quality permits for oil and gas production facilities located under federal leases or that involve federal minerals.

18.     The Final Rule is unnecessarily additive to the NDDH's air-quality regulations.  The NDDH must now expend time and resources to master and administer another, duplicative set of regulations on top of the standards it already administers.  The NDDH will have to allocate resources to work with a third-party agency, after investing decades in cultivating a partnership with EPA.  This will harm the NDDH's efficient administration of its permitting, source status characterization, and the enforcement decisions and prosecutorial discretion over which it has proper authority and expertise.

19.     The Final Rule applies to "State or private tracts in a federally approved unit or communitization agreement." 81 Fed. Reg. 83,079.  This severely prejudices the State of North Dakota, where it is typical for oil and gas spacing units to consist of a combination of federal, state, and private mineral ownership.  Because of North Dakota's unusual land ownership and split estate situation, the Final Rule interferes with and diminishes State authority over a

6

significant number of oil and gas units in the State, along with the State and private tracts therein. The Final Rule interferes with the Department's regulation of air emissions from these traditionally State-regulated sources. In doing so, the BLM is imposing air quality requirements on sources otherwise regulated by the State, fundamentally diminishing the State's ability to do so.

20.    By regulating air emissions from oil and gas production facilities, the BLM is improperly becoming a regulator of air emissions—displacing a traditionally and statutory role held by the States—and exercising authority over that which it has no technical or legal expertise. In North Dakota, the NDDH is charged with implementing and regulating State and federal air quality programs, as stated above, while the Public Service Commission is charged with regulating electricity. Moreover, the North Dakota Industrial Commission is statutorily charged with researching, development, and advancing oil and gas production in the State of North Dakota. In promulgating a Final Rule that restricts air pollutant emissions from oil and gas facilities, BLM is not only going beyond its scope as a federal regulatory agency—it is improperly usurping the Department's air regulatory, permitting, and enforcement functions.

21.    The BLM's attempt to regulate air emissions from the oil and gas industry circumvents the comprehensive and well-established regulatory regime of the EPA and the States. The EPA has been tasked with developing NAAQS for identified pollutants. 42 U.S.C. § 7409. Once NAAQS are established, States identify areas where NAAQS are in compliance and where they are not. States then develop SIPs to ensure areas continue to attain the NAAQS, or to provide for appropriate steps to come into NAAQS compliance. 42 U.S.C. § 7409. States are left with the discretion and ability to decide who they will regulate and what regulations they will impose, and States are left to consider a wide variety of factors when drafting SIPs, including

impacts on the industries most vital to their economies, as well as impacts on the local environment.  As a result, States are in the best position to know what regulations will work best for their citizens, industries, environments, and economies.  The Final Rule is an end-run on this fundamental process, and it leaves North Dakota with little to say in regulating air emissions from an industry—the oil and gas industry—that it knows best.

    Executed on December ___5___, 2016.

                                                L. David Glatt

    The foregoing Declaration of L. David Glatt was subscribed and sworn before me by L. David Glatt on December ___5___, 2016.

SHERRI A. JAHRAUS
Notary Public
State of North Dakota
My Commission Expires Oct. 18, 2020

Witness my hand and official seal.

Sheri A. Jahraus
Notary Public

My commission expires: _10-18-2020_