Robin Cooley, CO Bar #31168 (*admitted pro hac vice*)
Michael S. Freeman, CO Bar #30007 (*admitted pro hac vice*)
Joel Minor, CO Bar #47822 (*admitted pro hac vice*)
Earthjustice
633 17th Street, Suite 1600
Denver, Colorado 80202
Phone: (303) 623-9466
rcooley@earthjustice.org
mfreeman@earthjustice.org
jminor@earthjustice.org

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | |
|---|---|
| STATE OF WYOMING, et al., | ) |
| | ) |
| Petitioners, | ) |
| | ) Civil Case No. 2:16-cv-00285-SWS [Lead] |
| v. | ) |
| | ) [Consolidated With 2:16-cv-00280-SWS] |
| UNITED STATES DEPARTMENT OF | ) |
| THE INTERIOR, et al., | ) Assigned: Hon. Scott W. Skavdahl |
| | ) |
| Respondents, | ) **CITIZEN GROUPS' RESPONSE TO** |
| | ) **MOTIONS FOR A PRELIMINARY** |
| and | ) **INJUNCTION** |
| | ) |
| WYOMING OUTDOOR COUNCIL, | ) |
| CENTER FOR BIOLOGICAL | ) |
| DIVERSITY, CITIZENS FOR A | ) |
| HEALTHY COMMUNITY, DINÉ | ) |
| CITIZENS AGAINST RUINING OUR | ) |
| ENVIRONMENT, ENVIRONMENTAL | ) |
| DEFENSE FUND, ENVIRONMENTAL | ) |
| LAW AND POLICY CENTER, | ) |
| MONTANA ENVIRONMENTAL | ) |
| INFORMATION CENTER, NATIONAL | ) |
| WILDLIFE FEDERATION, NATURAL | ) |
| RESOURCES DEFENSE COUNCIL, SAN | ) |
| JUAN CITIZENS ALLIANCE, SIERRA | ) |
| CLUB, THE WILDERNESS SOCIETY, | ) |
| WESTERN ORGANIZATION OF | ) |
| RESOURCE COUNCILS, WILDERNESS | ) |
| WORKSHOP, AND WILDEARTH | ) |
| GUARDIANS, | ) |
| | ) |
| Respondent-Intervenors. | ) |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ..................................................................................................................3

ARGUMENT .......................................................................................................................8

I.     Petitioners Are Unlikely to Succeed on the Merits......................................................8

    A.    BLM Has Specific Authority to Enact the Comprehensive Waste Prevention Rule Under the MLA ..........................................................................9

        1.    Congress directed BLM to regulate waste under the MLA ........................9

        2.    The Waste Prevention Rule represents a reasonable exercise of BLM's waste authority ..........................................................................11

        3.    Nothing in the MLA requires BLM to define waste based on a case-by-case analysis of the economic feasibility of waste prevention .............13

    B.    BLM's Explicit Authority Has Not Been Usurped by the Clean Air Act .............16

        1.    The Rule is not a "comprehensive air quality regulation."........................16

        2.    The Clean Air Act does not preclude BLM's authority to promulgate the Rule ..................................................................................19

    C.    BLM Has Explicit Authority to Consider Environmental Factors in Overseeing Operations on Public Lands..................................................................23

    D.    BLM May Regulate Communitized Land ..........................................................27

    E.    The Waste Prevention Rule Is Not Arbitrary and Capricious...............................29

II.    The Rule Will Not Irreparably Harm the State or Industry Petitioners ...........................32

    A.    Industry Petitioners Do Not Face Irreparable Economic Harm............................33

    B.    Industry Members Do Not Face Irreparable Harm from Disclosure of Confidential Business Information ........................................................................35

    C.    The States Have Not Shown that They Face Imminent Economic Harm from the Rule ..................................................................................37

    D.    The Rule Causes No "Sovereign Injury" to the States ..........................................42

III.     The Balance of Equities and Public Interest Weigh Decisively in Favor of
          Denying the Motions...................................................................................................... 46

IV.      The Court Should Not Enjoin Any Portion of the Rule that Is Severable .........................49

CONCLUSION..........................................................................................................................50

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Air Conditioning, Heating & Refrigeration Inst. v. City of Albuquerque*,
  Civ. No. 08-633, 2008 WL 5586316 (D.N.M. Oct. 3, 2008)....................................35

*A.O. Smith Corp. v. Fed. Trade Comm'n*,
  530 F.2d 515 (3d Cir. 1976)..................................................................................33, 35

*Arcadia, Ohio v. Ohio Power*,
  498 U.S. 73 (1990) ......................................................................................................20

*Arch Mineral Corp. v. Lujan*,
  911 F.2d 408 (10th Cir. 1990) ......................................................................................8

*Arias v. DynCorp*,
  752 F.3d 1011 (D.C. Cir. 2014)..................................................................................38

*Ariz. Pub. Serv. Co. v. EPA*,
  562 F.3d 1116 (10th Cir. 2009) ..................................................................................50

*Bell v. Cheswick Generating Station*,
  734 F.3d 188 (3d Cir. 2013)........................................................................................21

*Biodiversity Conservation All. v. Jiron*,
  762 F.3d 1036 (10th Cir. 2014) ..................................................................................12

*Boesche v. Udall*,
  373 U.S. 472 (1963)......................................................................................................8

*Cal. Coastal Comm'n v. Granite Rock*,
  480 U.S. 572 (1987)....................................................................................................45

*Chamber of Commerce of the U.S. v. Edmondson*,
  594 F.3d 742 (10th Cir. 2010) ..............................................................................34, 35

*Chapman v. El Paso Natural Gas Co.*,
  204 F.2d 46 (D.C. Cir. 1953)......................................................................................24

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984)....................................................................................................10

*City of Arlington, Tex. v. FCC*,
  133 S. Ct. 1863 (2013).................................................................................................10

*City of Oakland v. Fed. Housing Fin. Agency,*
　　716 F.3d 935 (6th Cir. 2013) ......................................................11

*ClearOne Commc'ns, Inc. v. Bowers,*
　　643 F.3d 735 (10th Cir. 2011) .....................................................49

*Coal. of Concerned Citizens to MakeArtSmart v. Fed. Transit Admin.,*
　　Civ. No. 16-252, 2016 U.S. Dist. LEXIS 102071 (D.N.M. July 29, 2016)............................29

*Copper Valley Machine Works, Inc. v. Andrus,*
　　653 F.2d 595 (D.C. Cir. 1981) .....................................................24

*Ctr. for Biological Diversity v. BLM,*
　　937 F. Supp. 2d 1140 (N.D. Cal. 2013) ......................................13

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.,*
　　538 F.3d 1172 (9th Cir. 2008) .....................................................19

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior,*
　　623 F.3d 633 (9th Cir. 2010) .......................................................25

*Decker v. Nw. Envtl. Def. Ctr.,*
　　133 S. Ct. 1326 (2013).................................................12, 15, 17

*Devon Energy Corp. v. Kempthorne,*
　　551 F.3d 1030 (D.C. Cir. 2008) ....................................................9

*Direct Mktg. Ass'n v. Huber,*
　　No. 10-cv-01546, 2011 WL 250556 (D. Colo. Jan. 26, 2011) ...............................35

*Entek GRB, LLC v. Stull Ranches, LLC,*
　　763 F.3d 1252 (10th Cir. 2014) ...................................................27

*ETSI Pipeline Project v. Missouri,*
　　484 U.S. 495 (1988)....................................................................22

*Exxon Corp. v. Lujan,*
　　970 F.2d 757 (10th Cir. 1992) ..................................................9, 13

*FCC v. Fox Television Stations, Inc.,*
　　556 U.S. 502 (2009)..............................................................15, 16

*FDA v. Brown & Williamson,*
　　529 U.S. 120 (2000)....................................................................23

*Forbes v. United States,*
　　125 F.2d 404 (9th Cir. 1942) .......................................................13

iv

*Freedom Holdings, Inc. v. Spitzer*,
    408 F.3d 112 (2d Cir. 2005)............................................................33

*Garrison v. Baker Hughes Oilfield Operations, Inc.*,
    287 F.3d 955 (10th Cir. 2002) ......................................................49

*Getty Oil Co. v. Clark*,
    614 F. Supp. 904 (D. Wyo. 1985)....................................................8

*Greater Yellowstone Coal. v. Flowers*,
    321 F.3d 1250 (10th Cir. 2003) ....................................35, 37, 46

*Hackwell v. United States*,
    491 F.3d 1229 (10th Cir. 2007) ....................................................14

*Halliburton, Inc. v. Admin. Review Bd.*,
    771 F.3d 254 (5th Cir. 2014) ....................................................10–11

*Harvey v. Udall*,
    384 F.2d 883 (10th Cir. 1967) ........................................................9

*Heideman v. S. Salt Lake City*,
    348 F.3d 1182 (10th Cir. 2003) ............................33, 35, 37, 39

*Helicopter Ass'n Int'l, Inc. v. Fed. Aviation Admin.*,
    722 F.3d 430 (D.C. Cir. 2013)......................................................24

*Hoyl v. Babbitt*,
    129 F.3d 1377 (10th Cir. 1997) ....................................................24

*Hunter v. FERC*,
    711 F.3d 155 (D.C. Cir. 2013).......................................................21

*Indep. Petroleum Ass'n of Am. v. DeWitt*,
    279 F.3d 1036 (D.C. Cir. 2002) ......................................................8

*In re Gledhill*,
    76 F.3d 1070 (10th Cir. 1996) ......................................................22

*In re Permanent Surface Mining Litig.*,
    653 F.2d 514 (D.C. Cir. 1981) (en banc) ....................................25

*Kansas v. United States*,
    249 F.3d 1213 (10th Cir. 2001) ....................................................43

*Kikumura v. Hurley*,
    242 F.3d 950 (10th Cir. 2001) ......................................................35

*Kleppe v. New Mexico*,
    426 U.S. 529 (1971).................................................................................42

*Manning v. United States*,
    146 F.3d 808 (10th Cir. 1998) ................................................................25

*Marathon Oil Co. v. Andrus*,
    452 F. Supp. 548 (D. Wyo. 1978).........................................................16

*Marsh v. Or. Natural Res. Council*,
    490 U.S. 360 (1989) ...............................................................................29

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)....................................................................2, 20, 48

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)...........................................................................49–50

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)................................................................................22

*Mylan Pharm., Inc. v. Shalala*,
    81 F. Supp. 2d 30 (D.D.C. 2000) ..........................................................33

*N. Arapaho Tribe v. Burwell*,
    No. 14-cv-247, 2015 WL 872190 (D. Wyo. Feb. 26, 2015)...................43

*Nat'l Cable & Telecomm. Assn., Inc. v. Gulf Power Co.*,
    534 U.S. 327 (2002)................................................................................22

*Nat'l Wildlife Fed'n v. Nat'l Park Serv.*,
    669 F. Supp. 384 (D. Wyo. 1987)..........................................................17

*Nat. Res. Def. Council v. Berklund*,
    458 F. Supp. 925 (D.D.C. 1978) ............................................................24

*N.M. ex rel. Richardson v. BLM*,
    565 F.3d 683 (10th Cir. 2009) ...............................................................25

*Norfolk Energy, Inc. v. Hodel*,
    898 F.2d 1435 (9th Cir. 1990) ...............................................................28

*Ohio Oil Co. v. Conway*,
    279 U.S. 813 (1929)................................................................................35

*Okla. ex rel. Okla. Tax Comm'n v. Int'l Registration Plan, Inc.*,
    264 F. Supp. 2d 990 (W.D. Okla. 2003)................................................35

vi

*Pennsylvania v. Kleppe*,
    533 F.2d 668 (D.C. Cir. 1976) ..................................................... 38

*POM Wonderful LLC v. Coca-Cola Co.*,
    134 S. Ct. 2228 (2014) .......................................................... 21, 22

*Proctor v. United Parcel Serv.*,
    502 F.3d 1200 (10th Cir. 2007) ................................................. 21

*San Juan Citizens All. v. Stiles*,
    654 F.3d 1038 (10th Cir. 2011) ................................................. 29

*Schrier v. Univ. of Colo.*,
    427 F.3d 1253 (10th Cir. 2005) ........................... 8, 33, 37, 38, 39

*Sierra Club v. Yeutter*,
    911 F.2d 1405 (10th Cir. 1990) ................................................. 29

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ................................................................... 38

*Toilet Goods Ass'n v. Gardner*,
    387 U.S. 158 (1967) ................................................................... 29

*United States v. Estate of Romani*,
    523 U.S. 517 (1998) ................................................................... 22

*Utah v. Babbitt*,
    137 F.3d 1193 (10th Cir. 1998) ................................................. 38

*Utah v. U.S. Dep't of Interior*,
    535 F.3d 1184 (10th Cir. 2008) ................................................. 25

*Utah Envtl. Cong. v. Russell*,
    518 F.3d 817 (10th Cir. 2008) ................................................... 29

*Utahns for Better Transp. v. U.S. Dep't of Transp.*,
    305 F.3d 1152 (10th Cir. 2002) ................................................. 29

*Ventura Cty. v. Gulf Oil Corp.*,
    601 F.2d 1080 (9th Cir. 1979) ............................................... 8, 42

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ................................................................... 46

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .................................................................. 8, 46

vii

*Wis. Gas. Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) ............................................................33

*Woods Petroleum Corp. v. U.S. Dep't of Interior*,
   18 F.3d 854 (10th Cir. 1994) ..............................................................26

*Wyo. ex rel. Crank v. United States*,
   539 F.3d 1236 (10th Cir. 2008) ...........................................................43

*Wyo. Farm Bureau Fed'n v. Babbit*,
   199 F.3d 1224 (10th Cir. 2000) ...........................................................11

*Wyoming v. U.S. Dep't of the Interior*,
   No. 2:15-cv-043-SWS, 2016 WL 3509415 (D. Wyo. June 21, 2016) ........................11, 23, 27

*Wyoming v. U.S. Department of Interior*,
   674 F.3d 1220 (10th Cir. 2012) ..................................................37, 38, 42

*Wyoming v. United States*,
   279 F.3d 1214 (10th Cir. 2002) ...........................................................42

*Zero Zone, Inc. v. U.S. Dep't of Energy*,
   832 F.3d 654 (7th Cir. 2016) ..........................................................19, 31

## Federal Statutes

7 U.S.C. § 2 ........................................................................................21

18 U.S.C. § 1905 ..................................................................................37

25 U.S.C. § 2103 ..................................................................................26

30 U.S.C. §§ 181–287 ..............................................................................1

30 U.S.C. § 187 ......................................................................10, 13, 18, 24

30 U.S.C. § 189 ..........................................................................10, 15, 24

30 U.S.C. § 191 ..................................................................................37

30 U.S.C. § 225 ......................................................................1, 8, 9, 15, 23

30 U.S.C. § 226 ...............................................................................1, 24

30 U.S.C. § 1721a ................................................................................33

43 U.S.C. §§ 1701–1787 ............................................................................9

43 U.S.C. § 1701 ...................................................................24

43 U.S.C. § 1702 ..............................................................24, 25

43 U.S.C. § 1712 ...................................................................26

43 U.S.C. §§ 1713–16 ..........................................................26

43 U.S.C. § 1732 ...................................................................25

43 U.S.C. § 1740 ...................................................................25

43 U.S.C. § 1761–71 ............................................................26

49 U.S.C. § 40103 ................................................................24

**Federal Regulations**

40 C.F.R. § 60.5395a ..............................................................7

43 C.F.R. § 2.26 ....................................................................36

43 C.F.R. §§ 2.26–2.36 ........................................................36

43 C.F.R. § 2.27 ....................................................................36

43 C.F.R. § 2.28 ....................................................................36

43 C.F.R. § 2.30-2.32 ...........................................................36

43 C.F.R. § 2.33 ....................................................................36

43 C.F.R. § 2.35 ....................................................................36

43 C.F.R. § 3105.2-2 .............................................................27

43 C.F.R. § 3160.0-5 .............................................................11

43 C.F.R. § 3161.1 ................................................................27

43 C.F.R. § 3161.2 ................................................................11

43 C.F.R. § 3162.3-1 ..............................................................7

43 C.F.R. § 3164.1 ................................................................28

43 C.F.R. § 3179.6 ....................................................... *passim*

43 C.F.R. § 3179.7 ................................................................................. *passim*

43 C.F.R. § 3179.12 ............................................................................... 44

43 C.F.R. § 3179.102 ............................................................................... 6

43 C.F.R § 3179.201 ............................................................................... 6, 34

43 C.F.R § 3179.202 ............................................................................... 5, 6, 34

43 C.F.R § 3179.203 ............................................................................... 5, 6, 7, 34

43 C.F.R. § 3179.301 ............................................................................... 6

43 C.F.R. §§ 3179.301–305 ...................................................................... 5, 12

43 C.F.R. § 3179.401 ............................................................................... 5, 44, 49

43 C.F.R. § 3186.1 ................................................................................. 28

## Federal Register

44 Fed. Reg. 76,600 (Dec. 27, 1979) ....................................................... 5, 12

55 Fed. Reg. 48,958 (Nov. 23, 1990) ....................................................... 25

72 Fed. Reg. 10,308 (March 7, 2007) ....................................................... 27

80 Fed. Reg. 65,292 (Oct. 26, 2015) ........................................................ 48

81 Fed. Reg. 6616 (Feb. 8, 2016) ............................................................ 4, 14

81 Fed. Reg. 83,008 (Nov. 18, 2016) ....................................................... *passim*

## Legislative History

H.R. Rep. No. 65-563 (1918) .................................................................. 14

H.R. Rep. No. 65-1138 (1919) ................................................................ 10

## State Statutes & Regulations

Colo. Code Regs. § 404-1:912 ................................................................ 18

Mont. Admin. R. 36.22.1220 .................................................................. 7

Mont. Admin. R. 36.22.1221 .................................................................. 6

N.D. Admin. Code § 43-02-03 ................................................................................44

N.D. Admin. Code § 43-02-03-07 ..........................................................................44

N.D. Cent. Code § 38-08-06.4 ...........................................................................6, 7

N.M. Admin. Code 19.15.18.12 ...............................................................................6

Utah Admin. Code R. 649-3-20 ...............................................................................6

Wyo. Admin. Code Oil Gen. Ch. 3 § 39 ..........................................................6, 7, 18

## Other Authorities

38 Am. Jur. 2d *Gas and Oil* § 152 ........................................................................28

BLM, Approved Applications for Permit to Drill – Not Drilled (Sept. 30, 2015),
https://www.blm.gov/style/medialib/blm/wo/MINERALS__REALTY__AND
_RESOURCE_PROTECTION_/energy/oil___gas_statistics/data_sets.Par.864
52.File.dat/AAPD%20Report%20(approved_apd_not_drilled_9_30_2014).pdf ...................41

BLM, Number of Well Bores Started (Spud) on Federal Lands,
https://www.blm.gov/style/medialib/blm/wo/
MINERALS__REALTY__AND_RESOURCE_PROTECTION_/energy/oil__
_gas_statistics/data_sets.Par.36209.File.dat/numberofwellboresstartspud.pdf ......................41

Bloomberg Markets, *Energy*, http://www.bloomberg.com/energy (last visited
Dec. 15, 2016) .......................................................................................................31

Comments of the W. Energy All., Dkt No. EPA-HQ-OAR-2016-0204-0049 (Aug.
2, 2016) ................................................................................................................16

Consolidated Br. of Pls.-Appellants, *Commerce of the U.S. v. Edmondson*, 2008
WL 4735384 (Oct. 14, 2008) .................................................................................34

Howard R. Williams & Charles J. Meyers, *Manual of Oil and Gas Terms* (Patrick
H. Martin & Bruce M. Kramer eds., 16th ed. 2015) ..........................................13–14

In re Bakken, Bakken/Three Forks, and/or Three Forks Pool Field Rules, Order
No. 24,665, Case No. 22,058 (N.D. Indus. Comm'n July 1, 2014),
www.dmr.nd.gov/oilgas/or24665.pdf .......................................................................7

Jody Freeman & Jim Rossi, *Agency Coordination in Shared Regulatory Space*,
125 Harv. L. Rev. 1131 (2012) ...............................................................................20

Model Form of a Federal Communitization Agreement, BLM Manual 3160-9,
www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/
policy/blm_handbook.Par.26234.File.dat/3160-9-
Communitization%20Manual.pdf .............................................................................................28

# INTRODUCTION

Natural gas wasted into the atmosphere from oil and gas development is energy that cannot be used by consumers and that cannot produce royalties. The Bureau of Land Management ("BLM") properly exercised its specific authority to "prevent waste" of natural gas by adopting a rule that requires companies to capture natural gas that they otherwise waste so that it can be put to use.

Adopted in response to multiple government reports condemning BLM's decades-long failure to update its waste standards in the face of new technologies and best practices, the Waste Prevention, Production Subject to Royalties, and Resource Conservation Rule ("Waste Prevention Rule" or "Rule"), 81 Fed. Reg. 83,008 (Nov. 18, 2016), aims to minimize waste of public and tribal resources. It does so by requiring operators developing federal and Indian leases to utilize available, cost-effective techniques to capture and control natural gas, the predominant component of which is methane. The Rule falls squarely within BLM's directive under the Mineral Leasing Act ("MLA"), 30 U.S.C. §§ 181–287, to ensure federal lessees "use *all* reasonable precautions to prevent waste of oil or gas developed in the land." *Id.* § 225 (emphasis added). And it updates the agency's royalty standards to secure a fair return from the development of public resources for the nation's taxpayers. *Id.* § 226(b)(1)(a). The Rule is firmly rooted in BLM's core statutory authorities and benefits the taxpayers that Congress empowered the agency to protect.

Petitioners now seek the extraordinary remedy of a preliminary injunction, but they do not demonstrate any of the required elements. Petitioners' legal arguments are based on the faulty premise that the Rule is a "comprehensive air quality regulation." It is not. In order to advance their fiction that BLM is regulating air quality foremost, Petitioners first put forth an overly narrow definition of waste—focused only on an *individual operator's* interests—that does

1

not comport with the statutory text or legislative history, which focus on the *public's* interests. They then lean heavily on the incorrect argument that there is no waste justification for flaring allowed under the Rule. To the contrary, the Rule's flaring allowances are an interim first step that will later permit greater capture of gas, the ultimate goal of the Rule.

After building up the straw man that the Rule is actually a comprehensive air quality regulation, Petitioners then attempt to knock it down by wrongly claiming that BLM's authority is so circumscribed that BLM cannot require waste control measures that also prevent air pollution. The fact that natural gas is a valuable national resource when used, but a powerful pollutant when wasted, does not strip BLM's authority. BLM's obligation to prevent waste and the Environmental Protection Agency's ("EPA") obligation to protect air quality "may overlap" but "there is no reason to think the two agencies cannot both administer their obligations and yet avoid inconsistency." *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007). Petitioners cite no statutory language or legal principle to support their contrary view of balkanized agency authority, which this Court should reject as out of step with reality and the law.

Petitioners similarly fail to demonstrate that the Rule will irreparably harm them. Ordinary compliance costs and vague, unsupported concerns about losing business to other states are insufficient. And Petitioners ignore the many public benefits that the Rule will deliver to the states and communities where oil and gas development occurs, including additional royalties, better air quality, relief from public nuisances, and reduced climate risks. Instead, they ask this Court to elevate their narrow private interests over the interests of the entire nation as a whole. Petitioners have not shown a "clear and unequivocal" right to relief, and this Court should deny their motions.

# BACKGROUND

*The Problem*.  In 2008 and 2010, the Government Accountability Office ("GAO")

identified a pervasive problem of preventable natural gas waste and associated air pollution on

public and tribal lands, and an outdated royalty system in need of "comprehensive

reassessment."  81 Fed. Reg. at 83,010; AR 2605–2705 (GAO reports).[1]  While BLM has long

controlled waste of public resources from public lands, its regulations addressing natural gas

waste and royalty payments had not been updated in over three decades.  *Id.* at 83,017.

Meanwhile, technology has advanced:  new drilling and gas capture technologies fundamentally

have changed both how much gas is wasted and how much can be captured and put to use.  *Id.*[2]

BLM estimates that more than 462 billion cubic feet ("Bcf") of publicly-owned natural

gas was vented or flared into the atmosphere by lessees on federal and Indian lands between

2009 and 2015—enough gas to serve about 6.2 million households for a year (every household in

Colorado, Montana, New Mexico, North Dakota, South Dakota, and Utah combined).  *Id.* at

83,015.  Numerous studies suggest the actual amount of gas lost on federal and Indian lands is

likely much higher.  *Id.* at 83,015–16.  This wasted gas leaks from valves, flanges, and other

components, and is vented from pneumatic devices and during well drilling and completion and

liquids unloading—sometimes by design, but also often due to improper functioning.  Much of

this wasted gas could be captured with proven technologies, *id*. at 83,009, 83,010–11, and doing

so would save millions of dollars in lost royalty revenues for the federal, State, and tribal

---

[1] "AR" refers to the Administrative Record that BLM lodged with the Court on December 7, 2016 (ECF 53).  All ECF citations are to lead case No. 2:16-cv-00285-SWS.

[2] The regulations define "capture" as "the physical containment of natural gas for transportation to market or productive use of natural gas."  81 Fed. Reg. at 83,081.

governments to use for public benefit.  *Id.* at 83,014; *see* Decl. of Sandra Ely ¶¶ 2–3, 9; Decl. of Gwen Lachelt ¶¶ 2, 6, 8; Decl. of Sarah Vogel ¶ 12.

BLM studied the issue, solicited input from States, tribes, companies, trade organizations, non-governmental organizations, and citizens (beginning with a series of public forums in the spring of 2014), and confirmed that large quantities of resources were being wasted and that current state and federal regulations were inadequate to solve the problem.  81 Fed. Reg. at 83,010; *see also infra* p. 6;  Ely Decl. ¶ 8; Decl. of Barbara Roberts ¶ 13; Vogel Decl. ¶¶ 9, 11.

*The Solution.*  To address unnecessary waste of public resources on public lands, on February 8, 2016, BLM proposed the Waste Prevention Rule.  81 Fed. Reg. 6616.  The agency received over 200,000 supportive comments, including from more than 65 local officials across the West.  *See, e.g.*, AR 741, 32,820–33,284, 86,220–141,685, 141,982–88, 142,001–91, 142,094–988 (supportive comments); 32,452–54, 34,247–59 (local officials).  BLM also received a number of comments from the oil and gas industry, and made substantial changes to the proposal to address industry's concerns, including granting additional compliance flexibility.  *E.g.,* 81 Fed. Reg. at 83,025.

The final Rule, issued in November 2016, creates a uniform set of requirements to prevent waste of public resources on public lands, filling in where uneven and insufficient state and federal standards fall short.  To that end, the Rule has three major requirements: (1) capturing gas that is currently vented, flared or leaked; (2) waste minimization planning; and (3) royalty payments on avoidably lost gas.  Each requirement is thoroughly justified.

*Capture.*  The Rule reduces waste by focusing on capturing and using publicly-owned gas.  *Id.* at 83,011 ("Increasing capture is the BLM's primary goal in imposing these waste prevention requirements.").  In some instances, gas capture is required and flaring is not

permitted. *See* 43 C.F.R. §§ 3179.301–305. In others, for example minimizing losses from pneumatic pumps and storage vessels, BLM first requires operators to capture gas and only permits flaring if an operator demonstrates that such capture is technically infeasible or unduly costly. *See, e.g.*, *id.* §§ 3179.203(c)(1), (c)(2) (storage vessels); 3179.202(c)(1)–(2), (d)(2) (pneumatic pumps). While the Rule permits some flaring, it requires such flaring to be phased out and replaced by increased capture, providing that lessees must capture 85% of the total volume of gas one year from its effective date, rising to 98% by 2026. *Id.* § 3179.7(b). Consistent with BLM's purpose to prevent waste, BLM's standards include exemptions if compliance would result in abandonment of significant resources in the ground. *Id.*

*Planning.* The Rule also requires lessees to submit an unenforceable Waste Minimization Plan with applications for permits to drill oil wells to ensure that lessees will make plans, prior to drilling, for capturing the gas they produce. *Id.*

*Royalties.* Finally, the Rule updates 37-year-old provisions in BLM's Notice to Lessees 4A, 44 Fed. Reg. 76,600, 76,600–01 (Dec. 27, 1979) ("NTL-4A"), to more specifically define when a loss of gas is considered "unavoidable" and therefore not subject to royalty payments. The update takes into account waste avoidance technologies and techniques that have become available in the last three decades. 81 Fed. Reg. at 83,017.

In crafting the Waste Prevention Rule, BLM was keenly aware of the other federal, State, and tribal regulation of the oil and gas industry, and endeavored to minimize regulatory overlap. *Id.* For example, where States or Tribes have adopted requirements that are at least as protective of public resources, the Rule allows them to apply for a variance, which would enable lessees to comply with those standards in lieu of the ones in the Rule. *Id.*; 43 C.F.R. § 3179.401. Moreover, to avoid redundancy, BLM exempts many new and modified sources from its

standards where those sources are otherwise subject to EPA requirements. 81 Fed. Reg. at 83,017; 43 C.F.R § 3179.203(a)(2) (exempting storage vessels subject to EPA regulations); *see also* 43 C.F.R. §§ 3179.102(b); 3179.201(a)(2); 3179.202(a)(2); 3179.301(j).

At the same time, BLM concluded that the existing State, tribal, and federal regulations were inadequate to meet the problem, including in petitioning States. *See* 81 Fed. Reg. at 6,634; Ely Decl. ¶ 8; Lachelt Decl. ¶ 7; Roberts Decl. ¶ 13; Vogel Decl. ¶¶ 9, 11.[3]  For example, venting is a major source of lost gas and a chief target of the Waste Prevention Rule. *See* 81 Fed. Reg. at 83,010 (operators on BLM-administered leases vented about 30 Bcf of natural gas in 2014). The Rule prohibits venting altogether, except in narrowly specified circumstances. 43 C.F.R. §§ 3179.6(a), 3179.4(a). In contrast, venting is allowed in many States, including Wyoming and Montana. Wyo. Admin. Code Oil Gen. Ch. 3 § 39(b)(iv)(B) (venting of 20 thousand cubic feet ("Mcf") per day per well permitted); Mont. Admin. R. 36.22.1221(1)–(3) (venting of 20 Mcf per day per well permitted up to 72 hours; exceptions may be granted); *see* Utah Admin. Code R. 649-3-20(1.1) (up to 1,800 Mcf per month may be vented per well); N.M. Admin. Code 19.15.18.12(A), (F) (venting allowed for 60 days from well completion).

And while North Dakota prohibits venting from oil wells that are producing both gas and oil, it allows flaring from such wells for at least a year. N.D. Cent. Code § 38-08-06.4. Flaring is also a major source of wasted gas, *see* 81 Fed. Reg. at 83,010 (operators flared at least 81 Bcf on BLM-administered leases in 2014), which the Rule limits by establishing capture targets that phase in from 2018–2026 ultimately requiring 98% capture of associated gas. *Id.* § 3179.7(b). By contrast, in addition to the one-year allowance, North Dakota allows flaring to persist after a

---

[3] Existing state regulations typically do not apply to Indian lands. 81 Fed. Reg. at 83,019; *see also* States Memo. 6.  According to North Dakota, the State has entered into an agreement with the tribe to apply state regulations on the Fort Berthold Indian Reservation. N.D. Memo. 4–5.

year if operators are granted a waiver, N.D. Cent. Code § 38-08-06.4(6), and there is evidence of such persistence. AR 34,633–40 (case examples); Vogel Decl. ¶¶ 8–11. Meanwhile, Montana and Wyoming allow significant flaring both through baseline flaring allowances, and by application to flare more. *See, e.g.*, Mont. Admin. R. 36.22.1220; Wyo. Admin. Code Oil Gen. Ch. 3 § 39(b)(iv)(A), (C).

Another major gap in state regulation is robust planning. Whereas the Rule requires pre-drilling planning for gas capture, 43 C.F.R. § 3162.3-1, of six Interior Western States analyzed in one report, only North Dakota requires drillers to submit comprehensive plans showing how they will get the natural gas they produce to market or use it to power their operations. In re Bakken, Bakken/Three Forks, and/or Three Forks Pool Field Rules, Order No. 24,665, Case No. 22,058 (N.D. Indus. Comm'n July 1, 2014), www.dmr.nd.gov/oilgas/or24665.pdf.

BLM found that existing federal regulations were likewise insufficient to address the problem of waste on federal and Indian lands. 81 Fed. Reg. at 83,010, 83,018. For example, many of EPA's requirements, such as those for storage tanks, allow compliance through *either* capture or flaring, with no future obligation to eliminate flaring if the operator selects this path. *See, e.g.*, 40 C.F.R. § 60.5395a. By contrast, the Waste Prevention Rule prioritizes capture. 43 C.F.R. §§ 3179.6(a) (venting required except in narrow circumstances), 3179.7(b) (phase-in capture requirements); 3179.203 (capture prioritized for vessel storage). EPA standards also take no steps to address other significant sources of waste (like the aforementioned flaring, as well as liquids unloading), do not require comprehensive waste minimization planning, and do not apply to existing operations, which are responsible for large quantities of wasted gas on federal lands. 81 Fed. Reg. at 83,018.

The Waste Prevention Rule aims to remedy these deficiencies in existing regulations that have led to significant and preventable waste of public resources on public lands, while affording States the flexibility to preserve existing state-level requirements where those will deliver the same or greater benefit.

## ARGUMENT

A preliminary injunction is an "extraordinary remedy," for which "the right to relief must be clear and unequivocal." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005). To obtain a preliminary injunction, Petitioners must demonstrate each of these four elements: (a) a likelihood of success on the merits; (b) that they are likely to suffer irreparable harm in the absence of injunctive relief; (c) that the balance of equities favors an injunction; and (d) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Here, Petitioners' requests fail under all four parts of the test.

## I. Petitioners Are Unlikely to Succeed on the Merits.

The Supreme Court has held that the MLA authorizes BLM to impose "exacting restrictions and continuing supervision" over oil and gas development on public lands, and to issue "rules and regulations governing in minute detail all facets of the working of the land." *Boesche v. Udall*, 373 U.S. 472, 477–78 (1963).[4] The MLA includes explicit authority to issue the Waste Prevention Rule—it requires BLM to "use all reasonable precautions to prevent waste of oil or gas" from federal lands, 30 U.S.C. § 225—and BLM reasonably exercised that authority

---

[4] *See also Arch Mineral Corp. v. Lujan*, 911 F.2d 408, 415 (10th Cir. 1990) (stating MLA § 189 includes a "broad grant of authority"); *see also Indep. Petroleum Ass'n of Am. v. DeWitt*, 279 F.3d 1036, 1039 (D.C. Cir. 2002) (recognizing that BLM has "sweeping authority" under the MLA); *Ventura Cty. v. Gulf Oil Corp.*, 601 F.2d 1080, 1083 (9th Cir. 1979), *aff'd*, 445 U.S. 947 (1980) (explaining that the MLA provides for "extensive regulation of oil exploration and drilling"); *Getty Oil Co. v. Clark*, 614 F. Supp. 904, 916 (D. Wyo. 1985) (recognizing that MLA § 189 "grants the Secretary broad powers and authority commensurate with the broad responsibilities imposed upon his office").

here.  BLM also has ample authority under the MLA and the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701–1787, to consider the environmental effects of the operations it oversees on public lands when developing a waste rule.  Petitioners' argument hinges on the faulty premise that BLM is attempting to usurp EPA's authority to regulate air quality.  Not so.  BLM's statutory obligations as a land and minerals manager are wholly distinct from those of EPA.  And nothing in the Clean Air Act prevents BLM from using tools similar to EPA in carrying out its mandate to prevent waste and protect federal lands.  Indeed, Congress has mandated that BLM impose *all* reasonable waste prevention measures, regardless of what form they take.

### A. BLM Has Specific Authority to Enact the Comprehensive Waste Prevention Rule Under the MLA.

#### 1. Congress directed BLM to regulate waste under the MLA.

Petitioners acknowledge that the MLA expressly authorizes BLM to regulate resource waste.  Indus. Memo. 28; States Memo. 15–16 ("[T]he MLA empowers the agency to prevent the waste of methane on federal land.").[5]  The MLA is intended "to promote wise development of natural resources . . . that 'belong' to the public."  *Devon Energy Corp. v. Kempthorne*, 551 F.3d 1030, 1033 (D.C. Cir. 2008) (quotations omitted); *see also Harvey v. Udall*, 384 F.2d 883, 885 (10th Cir. 1967) (explaining that the MLA's purpose is to provide for "the orderly development of the oil and gas deposits in the publicly owned lands of the United States" (quotations omitted)).  To that end, the MLA directs BLM to require lessees to "use *all* reasonable precautions to prevent waste of oil or gas."  30 U.S.C. § 225 (emphasis added).

_____

[5] While acknowledging BLM's authority to regulate methane emissions, State Petitioners make the entirely unsupported argument that BLM may not regulate any other emission streams. States Memo. 15.  The MLA clearly authorizes BLM to regulate all hydrocarbons—including methane, ethane, and propane—which are all valuable commodities.  *See Exxon Corp. v. Lujan*, 970 F.2d 757, 760, 763 (10th Cir. 1992).

Likewise, the MLA requires that each federal lease "shall contain provisions for the purpose of insuring the exercise of reasonable diligence, skill, and care in the operation of said property . . . and for the prevention of undue waste," as determined by BLM. *Id.* § 187. BLM is empowered to "prescribe necessary rules and regulations" and "do any and all things necessary" to carry out these purposes. *Id.* § 189.

The legislative history confirms Congress' intent to "reserve to the Government the right to supervise, control and regulate the . . . [development of public natural resources], and prevent monopoly and waste, and other lax methods that have grown up in the administration of our public land laws." H.R. Rep. No. 65-1138, at 19 (1919) (Conf. Rep.). Rather than leaving it to private actors to manage the exploitation of public resources, Congress explicitly gave BLM the responsibility of ensuring that public resources are developed in a manner that furthers the public interest, including the specific obligation to prevent waste.

Accordingly, as the plain language and legislative history make clear, the MLA unequivocally grants BLM specific authority—indeed, a duty—to prevent waste of publicly owned resources. *See City of Arlington, Tex. v. FCC*, 133 S. Ct. 1863, 1868 (2013) ("[If] Congress has directly spoken to the precise question at issue . . . that is the end of the matter.").[6] In fact, by requiring "all" reasonable measures to prevent waste, Congress emphasized it intended BLM to aggressively control waste. *See Halliburton, Inc. v. Admin. Review Bd.*, 771

---

[6] State Petitioners ignore the deference afforded agency decisions made under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Industry Petitioners and North Dakota attempt to side-step *Chevron* deference by incorrectly arguing that the Court "need not examine the Rule under *Chevron* . . . because Congress delegated no authority to BLM to issue the Rule." Indus. Memo. 27; *see* N.D. Memo. 21. However, even when the question is one of an agency's jurisdiction, and "even where concerns about agency self-aggrandizement are at their apogee"— as Petitioners wrongly assert is the case here—*Chevron* applies if the case "involves an administrative agency's construction of a statute that it administers." *City of Arlington,* 133 S. Ct. at 1867, 1870–75. Because BLM undoubtedly administers the MLA, including its mandate to prevent waste, *Chevron* deference applies.

F.3d 254, 266 (5th Cir. 2014) (ruling that statutory term "all relief necessary" authorized broad remedies against defendant because "we think Congress meant what it said. All means all." (internal quotation omitted)); *City of Oakland v. Fed. Housing Fin. Agency*, 716 F.3d 935, 940 (6th Cir. 2013) ("[A] straightforward reading of the statute leads to the unremarkable conclusion that when Congress said 'all taxation,' it meant *all* taxation."). Indeed, this Court has recognized BLM's explicit authority to prevent waste. *Wyoming v. U.S. Dep't of the Interior*, No. 2:15-cv-043-SWS, 2016 WL 3509415, at \*5 (D. Wyo. June 21, 2016).

### 2. The Waste Prevention Rule represents a reasonable exercise of BLM's waste authority.

Petitioners concede that "Congress did not define 'waste' in the MLA." Indus. Memo. 28. When a statute "does not define the relevant terms" it is an indication that Congress "deliberately left" the issue for the agency to resolve. *Wyo. Farm Bureau Fed'n v. Babbit*, 199 F.3d 1224, 1234 (10th Cir. 2000). BLM has long-standing regulations addressing waste of natural resources under the MLA. For example, BLM requires that lessees conduct operations "in a manner which . . . results in the maximum ultimate recovery of oil and gas with minimum waste." 43 C.F.R. § 3161.2. And BLM defines waste of oil and gas as:

> [A]ny act or failure to act by the operator that is not sanctioned by [BLM] as necessary for proper development and production and which results in: (1) reduction in the quantity or quality of oil and gas ultimately producible from a reservoir under prudent and proper operations; or (2) avoidable surface loss of oil or gas.

*Id.* § 3160.0-5; *see also id.* (defining "avoidably lost" to include the failure to "take all reasonable measures to prevent and/or control the loss of gas"). Petitioners do not challenge these regulations.

What Petitioners challenge is the narrow issue of how the Rule further defines when gas is "avoidably lost" within the meaning of the waste definition. Indus. Memo. 28. But a court

will defer to an agency's interpretation of its own regulation "unless that interpretation is 'plainly erroneous or inconsistent with the regulation.'" *Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1337 (2013) (quotation omitted); *accord Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1062 (10th Cir. 2014). Here, BLM's interpretation is eminently reasonable.

The Waste Prevention Rule modernizes the 37-year-old provisions contained in NTL-4A regarding when gas is avoidably lost—i.e., when reasonable precautions may prevent gas lost through venting, flaring, and leaking. 81 Fed. Reg. at 83,008. NTL-4A required operators to get approval from BLM on a case-by-case basis for venting and flaring. 44 Fed. Reg. at 76,600– 01. BLM reasonably determined that NTL-4A needed to be replaced for three primary reasons: (1) it did "not reflect modern technologies, practices, and understanding of the harms caused by venting, flaring, and leaks of gas," 81 Fed. Reg. at 83,015; (2) it was not "particularly effective in minimizing waste of public minerals," as demonstrated by the GAO reports and other studies, *id.* at 83,017; and (3) it was "subject to inconsistent application," *id.* at 83,038; *see* AR 2650.

The Waste Prevention Rule remedies these shortcomings by setting forth more explicitly the reasonable precautions necessary to prevent waste. *Id.* at 83,047 (noting the rule "enhance[s] clarity and consistency"). The Rule implements gas capture requirements that tighten over time and requires the use of available, low-cost technologies and best management practices, such as using infrared or other modern devices to detect leaking equipment on a regular schedule. *See* 43 C.F.R. §§ 3179.7, 3179.301–.305. The Rule also more clearly defines the circumstances under which gas is considered avoidably or unavoidably lost. *Id.* § 3179.4. BLM projects that the Rule will reduce venting by around 35% and reduce flaring by 49% (from 2014 rates)— saving enough natural gas to supply 740,000 households each year. AR 451. BLM also estimates the benefits of the Rule will outweigh its costs and that individual, small business

operators are likely to see profit margins reduced by no more than 0.15%, on average. AR452; 575–76. In light of the MLA's clear instructions to take *all* reasonable precautions to prevent waste and the clear record before BLM that there are low-cost options available to avoid existing waste, the Rule is fully supported and entitled to deference. *See, e.g.*, *Exxon Corp*, 970 F.2d at 763 (deferring under *Chevron* Step 2 to BLM's reasonable interpretation of term "natural gas" in the MLA).

Courts have recognized that BLM has authority to impose requirements similar to those contained in the Rule, which prevent waste of gas by limiting air emissions at the surface. *See, e.g., Ctr. for Biological Diversity v. BLM*, 937 F. Supp. 2d 1140, 1160–61 (N.D. Cal. 2013) (noting that technologies, including replacing wet seals on compressors with dry seals, "may certainly prevent waste"); *Forbes v. United States*, 125 F.2d 404, 409–10 (9th Cir. 1942) (rejecting challenge to well plugging and abandonment regulation intended, among other grounds, to prevent "gas and oil escap[ing] at the surface"). BLM's adoption of similar, reasonable waste prevention measures in the Rule should be upheld.[7]

### 3. Nothing in the MLA requires BLM to define waste based on a case-by-case analysis of the economic feasibility of waste prevention.

Industry Petitioners ignore the deference due BLM's interpretation of its own regulations and make the remarkable claim—citing to a 1971 Manual of Oil and Gas Terms published 50 years after Congress enacted the MLA—that "avoidably lost" can have only one meaning: "the preventable loss [of oil and gas] the value of which exceeds the cost of avoidance." Indus. Memo. 28–29 (quoting Howard R. Williams & Charles J. Meyers, *Manual of Oil and Gas Terms*

---

[7] In addition to minimizing waste, by updating standards that are over three decades old to require the use of widely available and cost effective technologies, the Waste Prevention Rule also "insure[s] the exercise of reasonable diligence, skill, and care in the operation" of public lands. *See* 30 U.S.C. § 187; 81 Fed. Reg. at 83,020.

1135 (Patrick H. Martin & Bruce M. Kramer eds., 16th ed. 2015)). Petitioners provide no

support for their position in the statute, legislative history, or case law. Indeed, Congress added

waste prevention language to the MLA with the "ultimate object of securing to the *consumer* the

various products at a reasonable price," not to protect the bottom line of operators. H.R. Rep.

No. 65-563, at 38 (1918) (emphasis added). As BLM explained in discussing venting and flaring

from oil wells in the proposed rule:

> A focus on oil development rather than gas capture may be a rational decision for
> an individual operator, but it does not account for the broader impacts of venting
> and flaring, including the costs to the public of losing gas that would otherwise be
> available for productive use, the loss of royalties that would otherwise be paid to
> States, tribes and the Federal Government on the lost gas, and the air pollution
> and other impacts of gas wasted through venting and flaring. . . . Thus, *a decision*
> *to vent or flare that may make sense to the individual operator may constitute an*
> *avoidable loss of gas and unreasonable waste* when considered from a broader
> perspective and across an entire field.

81 Fed. Reg. at 6,638 (emphasis added); *see also* 81 Fed. Reg. at 83,038. Thus, Petitioners

constrained definition of "avoidably lost" must be rejected as inconsistent with the structure and

purposes of the Act. *Hackwell v. United States*, 491 F.3d 1229, 1233 (10th Cir. 2007) (noting

that court can look to "statute's text, structure, purpose, [and] history" to determine Congress'

intent).[8]

Industry Petitioners also argue that the Rule's interpretation of "avoidably lost" is

impermissible because it includes situations deemed by Petitioners to be out of the operator's

control and therefore "unavoidable." Indus. Memo. 31. However, Industry Petitioners do not

---

[8] For this reason, Industry Petitioners' arguments about the "variety of circumstances [that] exist
in which the capture and marketing of gas is not economically feasible" are irrelevant. Indus.
Memo. 30–31. In addition, the one example provided where gas capture is supposedly
uneconomical—where an operator is bumped off a gathering system and must flare—ignores the
tremendous compliance flexibility provided in the Rule. *See infra* p. 15.

come close to meeting their high burden of showing that BLM's interpretation of "avoidably lost" "is 'plainly erroneous or inconsistent with the regulation.'" *Decker*, 133 S. Ct. at 1337 (quotation omitted). Petitioners point to a single example where an operator might be required to flare during third party maintenance. But the Rule provides ample flexibility to operators under these circumstances. Most notably, the Rule does not prohibit all flaring; it simply sets allowable levels of flaring that are reduced gradually over time. 43 C.F.R. § 3179.7(b). Additionally, in response to industry comments, the Rule allows for an operator to meet the monthly capture requirements at all of the wells on a lease, unit, or communitized area or, alternatively, by averaging all of an operator's wells in a county or state. *Id.* § 3179.7(c)(3); *see* 81 Fed. Reg. at 83,048. The Rule also provides an exception for *unscheduled* maintenance, 43 C.F.R. § 3179.6(b)(7); where maintenance is scheduled, an operator can plan and identify alternative capture approaches, temporarily reduce production, or shut in the well. *See* 81 Fed. Reg. at 83,048.[9]

Finally, Petitioners make the unsupported claim that BLM must conduct a case-by-case waste determination because that is what BLM previously did under NTL-4A. Indus. Memo. 30. But this flies in the face of the MLA's explicit grant of authority to "prescribe necessary and proper *rules and regulations* and to do *any and all things necessary* to carry out and accomplish the purposes" of the Act, including imposing "all reasonable waste precautions to prevent waste." 30 U.S.C. §§ 189, 225. Moreover, nothing prevents BLM from revising its approach as long as it provides a "reasoned explanation." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502,

_____

[9] State Petitioners argue that the Rule inappropriately applies to an unspecified number of wells that are venting carbon dioxide or nitrogen, which may require operators to add flammable gas in order to flare. States Memo. 16, 18. However, the Rule provides an exception from the flaring requirement "[w]hen flaring the gas is technically infeasible, such as when the gas is not readily combustible." 43 C.F.R. § 3179.6(b)(1).

516 (2009).[10]  Here, BLM determined that NTL-4A had been applied inconsistently and ineffectively and did not include current technologies and best management practices.  81 Fed. Reg. at 83,015, 83,017, 83,038.  This explanation is more than sufficient to support the Rule.

## B.     BLM's Explicit Authority Has Not Been Usurped by the Clean Air Act.

Petitioners' legal argument hinges on the faulty premise that BLM's Rule "establish[es] a comprehensive air quality scheme" and thereby unlawfully "intrude[s]" upon EPA's authority to regulate air emissions from the oil and gas industry.  Indus. Memo. 9; States Memo. 13.[11]  This argument is wrong factually and legally.

### 1.     The Rule is not a "comprehensive air quality regulation."

Petitioners' argument is wrong factually.  While under the Clean Air Act EPA sets national ambient air quality standards ("NAAQS") and utilizes a host of measures to prevent pollution throughout the nation, BLM's Waste Prevention Rule is far narrower.  It simply requires lessees seeking federal approval to exploit federal and tribal resources to prevent the waste of those resources and limit the impacts of their operations on federal and tribal lands.  And, consistent with its specific statutory authority, BLM's primary focus is on waste, not air quality.  81 Fed. Reg. at 83,015 ("The purpose of this rule is to reduce waste of natural gas

---

[10] Industry Petitioners cite *Marathon Oil Co. v. Andrus*, 452 F. Supp. 548 (D. Wyo. 1978), for the proposition that BLM cannot revise its interpretation of unavoidably lost.  Indus. Memo. 35–36.  Although *Marathon* indicates that royalties cannot be assessed on gas that is "unavoidably lost," it does not define that term.  *Marathon Oil*, 452 F. Supp. at 552–53.  To the extent that the case suggests that it is arbitrary for an agency to revise its interpretation of its own regulations, it is inconsistent with Supreme Court precedent.  *See Fox Television Stations*, 556 U.S. at 516.

[11] In this action, Petitioners extol EPA's comprehensive authority to regulate emissions from the oil and gas sector under section 111 of the Clean Air Act.  Indus. Memo. 16–20.  Remarkably, Western Energy Alliance has previously argued that "EPA does not have clear authority at this time to promulgate standards of performance . . . under section 111(d) because [oil and gas operations] are already regulated under" a different Clean Air Act section addressing air toxics, which does not regulate methane.  *See* Comments of the W. Energy All., Dkt No. EPA-HQ-OAR-2016-0204-0049 (Aug. 2, 2016).

owned by the American public and tribes.").[12]  BLM specifically adopted the Rule in response to

GAO reports and other studies documenting the *waste* of public resources.  *Id.* at 83,009–10; AR

2650.  Furthermore, the Rule's specific provisions demonstrate a focus on waste.  For example,

where BLM's efforts to prevent waste through venting, flaring, and leaking would cause the

operator to cease production and abandon significant recoverable oil reserves under the lease

(and thus potentially create greater waste of the resource), BLM will adjust the requirements or

create an exemption.  *Id.* at 83,011–12.  This provision reflects a choice focused on ensuring

production of the resource; it is not a choice that an agency focused on air quality would make.

   Petitioners point to two aspects of the Waste Prevention Rule that they contend "reveal[]

BLM's overarching intent to regulate air quality."  Indus. Memo. 6.  Neither persuades.

   First, Petitioners make the argument that one aspect of the Rule—its allowance of flaring

in some instances—shows that it is a comprehensive air quality scheme because burning gas

does not in and of itself reduce waste, although it has significant benefits for safety, public

health, and the climate.  *Id.*; States Memo. 16.  Petitioners are wrong:  BLM's regulations are

squarely aimed at capture.  As described above, BLM's regulations take a capture-first strategy

---

[12] Industry Petitioners suggest that BLM's motivations in adopting the Rule were other than preventing waste.  Indus. Memo. 6.  But this assertion is belied by the facts of the case, including the GAO reports documenting waste that led BLM to develop the rule in the first instance, BLM's stated purpose for the Rule, and very structure of the Rule itself.  Fundamentally, it is not the role of the court "to second guess the Secretary's motives."  *Nat'l Wildlife Fed'n v. Nat'l Park Serv.*, 669 F. Supp. 384, 388–89 (D. Wyo. 1987); *cf. Decker,* 133 S. Ct. at 1340 (Scalia, J., concurring in part and dissenting in part) ("The implied premise of this argument—that what we are looking for is the agency's *intent* in adopting the rule—is false.").

In the same vein, in an unusual filing updating their position on Citizen Groups' motion to intervene, the State of Wyoming suggests that Citizen Groups' motion bolsters an argument that BLM improperly promulgated an air pollution regulation.  ECF 55.  This does not follow.  Citizen Groups' legally cognizable interest in this litigation—including the financial, environmental and safety benefits that it brings to their members—does not shed any light on BLM's motivations for promulgating the Rule.  BLM's stated purpose does.

in which in some instances *only* capture is allowed, while in others operators must first capture gas and only if capture is technically infeasible, may they allow flaring. *See supra* pp. 4–5.

Indeed, the flaring requirements are part of BLM's comprehensive approach to capturing more natural gas. The Rule prohibits venting, except in narrow circumstances. 43 C.F.R. § 3179.6. Rather than venting, BLM requires operators to capture gas and route it to a sales line or to route it to a flare. *Id.* § 3179.6(a)–(b). Controlling and routing this gas, even if some is flared in the short run, puts operators one step closer to routing the gas to a sales line when capacity becomes available. And, under the Rule, operators must steadily decrease flaring, thereby increasing capture over time. 81 Fed. Reg. at 83,011. Like BLM, many state oil and gas commissions require flaring under their waste-reduction authority. *See, e.g.*, Colo. Code Regs. § 404-1:912; Wyo. Admin. Code Oil Gen. Ch. 3 § 39(b)–(c). Nothing forbids BLM from requiring operators to take this common-sense approach when they tap federal resources on federal lands. Indeed, it should count for the Rule, not against it, that BLM adopted a flexible approach that helps operators become more aware of their natural gas losses and gives them significant leeway in how and when to reduce their venting over an eight-year period.

Furthermore, the flaring provisions benefit the environment, and it makes no sense to require BLM to regulate with self-imposed blinders to hide these benefits. In fact, in its role as caretaker of public and tribal lands, BLM must take environmental factors into consideration. Roberts Decl. ¶¶ 17–19. *See infra* pp. 23–27.[13] BLM's authorities under the MLA and FLPMA are more than sufficient to support provisions of the Rule, like flaring, that do not immediately result in waste reduction, but have significant environmental benefits.

---

[13] Moreover, choosing flaring over venting is supported not just on the basis of its air quality benefits, but also because it promotes safety, 81 Fed. Reg. at 83,020, 83,037, something BLM has ample authority to address under its mandate to "insure the exercise of reasonable diligence, skill, and care" and provide for "the safety and welfare of the miners." 30 U.S.C. § 187.

Second, Petitioners' claim that the monetized benefits of BLM's rule, which include substantial benefits attributable to methane reductions, reveal the agency's true intent to establish air quality regulations, likewise lacks merit.  Indus. Memo. 7.  Petitioners ignore that agencies regularly consider the benefits of greenhouse gas reductions when evaluating regulatory actions—in fact, they are often required to do so—and their assessment of these benefits neither casts doubt on their underlying statutory authorities nor transforms their actions into air quality standards.  *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1203 (9th Cir. 2008) (holding that NHTSA was required to monetize the benefit of carbon emissions reduction in its analysis of the proper fuel economy standards).

The Seventh Circuit recently rejected an almost identical argument in *Zero Zone, Inc. v. U.S. Dep't of Energy*, 832 F.3d 654, 677 (7th Cir. 2016).  There, industry argued that the Energy Policy and Conservation Act "does not allow DOE to consider environmental factors," such as the social cost of methane.  *Id.*  The court disagreed, holding that in determining "whether an energy conservation measure is appropriate under a cost-benefit analysis, the expected reduction in environmental costs needs to be taken into account."  *Id.*  Here too, BLM appropriately considered environmental costs and benefits.  Decl. of Michael Hanneman ¶¶ 11–17.

## 2. The Clean Air Act does not preclude BLM's authority to promulgate the Rule.

Petitioners' argument is also wrong legally.  Insofar as the Rule reduces emissions from the oil and gas sector on public lands, this is not a jurisdictional defect, but an important co-benefit that stems from the fact that methane—the predominant constituent of natural gas—is also a powerful air pollutant.  That BLM and EPA may use some of the same tools to address their distinct, but overlapping, mandates does not undermine either agency's authority.

The Supreme Court's decision in *Massachusetts v. EPA* is controlling. There, EPA argued that it did not have authority to "regulate carbon dioxide emissions from motor vehicles because doing so would require it to tighten mileage standards, a job (according to EPA) that Congress has assigned to DOT." 549 U.S. at 531–32. The Supreme Court disagreed:

> But that DOT sets mileage standards in no way licenses EPA to shirk its environmental responsibilities. EPA has been charged with protecting the public's 'health' and 'welfare,' a statutory obligation wholly independent of DOT's mandate to promote energy efficiency. The two obligations may overlap, but there is no reason to think the two agencies cannot both administer their obligations and yet avoid inconsistency.

*Id*. at 532 (citations omitted). The same is true here. Like the mileage standards at issue in *Massachusetts*, measures to prevent venting, flaring and leaking gas achieve two independent goals: reducing waste and cleaning the air. But BLM's obligation to reduce waste is "wholly independent" of EPA's obligation to protect public health and welfare, and there is no reason that BLM and EPA cannot both administer these obligations and yet avoid inconsistency. *See also Arcadia, Ohio v. Ohio Power*, 498 U.S. 73, 88 (1990) (Stevens, J., concurring) (utilities were "subject to regulation of both the SEC and FERC" and such "overlap[]" was warranted given the differing "goals and expertise of the two agencies").

Overlapping agency obligations "are not rare or isolated. They can be found throughout the administrative state, in virtually every sphere of social and economic regulation, in contexts ranging from border security to food safety to financial regulation." Jody Freeman & Jim Rossi, *Agency Coordination in Shared Regulatory Space*, 125 Harv. L. Rev. 1131, 1134 (2012).

Petitioners' argument that the existence of the Clean Air Act precludes BLM from issuing the rule under the MLA and its other authorities fails. "There is no statutory text or established interpretive principle" to support Petitioners' contention that the Clean Air Act

precludes BLM's Waste Prevention Rule. *See POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2233 (2014).

Petitioners have pointed to no statutory language in the Clean Air Act that would preclude BLM from promulgating a waste rule that reduces air emissions. Where Congress wants to grant "exclusive" authority to an agency, it knows how to do so. For example, the Commodities Exchange Act ("CEA") declares that the Commodity Futures Trading Commission ("CFTC") "shall have exclusive jurisdiction . . . with respect to accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A); *see Hunter v. FERC*, 711 F.3d 155, 158–59 (D.C. Cir. 2013) (CEA "makes clear that the CFTC's jurisdiction is exclusive"). No similar language appears in the Clean Air Act.

This is not a case of field or conflict preemption, as some of Petitioners' arguments suggest. Indus. Memo. 10–20. There is no such thing as one federal statute preempting another. *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1205 n.2 (10th Cir. 2007) ("one federal statute cannot preempt another"); *see POM Wonderful LLC*, 134 S. Ct. at 2236.[14] "Quite to the contrary," the Clean Air Act and the MLA and FLPMA "complement each other in the federal regulation" of the oil and gas sector. *See id.* at 2233.

*POM Wonderful* is directly on point. There, POM Wonderful brought a claim under the Lanham Act alleging that Coca-Cola's labels were deceptive and misleading. *Id.* Coca-Cola responded that the suit was precluded by the "comprehensive regulation of labeling" and "more specific provisions" of the Federal Drug and Cosmetic Act ("FDCA"). *Id.* at 2236–37, 2239–40. Emphasizing that each statute had "its own scope and purpose," a unanimous Supreme Court

---

[14] Indeed, the one case Industry Petitioners cite, *Bell v. Cheswick Generating Station*, 734 F.3d 188, 190 (3d Cir. 2013), is a *state* preemption case in which the Third Circuit concluded that the Clean Air Act did *not* preempt the state law lawsuit. *See* Indus. Memo. 11.

disagreed, explaining that the statutes were "complement[ary]":  while "both statutes touch on food and beverage labeling, the Lanham Act protects commercial interests against unfair competition, while the FDCA protects public health and safety."  *Id*. at 2238.  Similarly here, both the MLA and the Clean Air Act "touch on" regulation of methane in the oil and gas sector—the MLA protects against waste of natural gas (methane) on *federal* lands, while the Clean Air Act protects the public from dangerous pollution (including methane) across the United States.  Rather than precluding one another, the two statutes complement each other.

Nor does the canon of interpretation that the specific governs the general apply.  *See* Indus. Memo. 26.  While "[i]t is true that specific statutory language should control more general language *when there is a conflict between the two*[,] [h]ere . . . there is no conflict."  *Nat'l Cable & Telecomm. Ass'n, Inc. v. Gulf Power Co.*, 534 U.S. 327, 335–36 (2002) (emphasis added). The canon does not fit for another reason:  BLM's authority to regulate waste of federal minerals is not a more general version of EPA's authority.  The Clean Air Act does not address waste from oil and gas operations on public lands, nor does it address which gas severed from public lands triggers the obligation to pay royalties.  Rather, as explained above, there is no conflict between BLM and EPA addressing their different obligations on different actors, and in the process delivering benefits that meet each other's animating goals.  *Supra* pp. 19–20.

Accordingly, cases like *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517 (1988), where the more specific statute "speaks directly to the dispute," are not applicable to this case.[15]

Nor is *FDA v. Brown & Williamson*, 529 U.S. 120 (2000), on point.  That case was "hardly an

---

[15] *See also United States v. Estate of Romani*, 523 U.S. 517, 534 (1998) (addressing "conflicting statutory provisions"); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384-85 (1992) (applying the specific/general cannon in a case regarding whether a specific federal law explicitly preempted a cause of action under a State's general consumer protection statute); *In re Gledhill*, 76 F.3d 1070, 1078 (10th Cir. 1996) ("[A] court should not construe a general statute to *eviscerate* a statute of specific effect." (emphasis added)).

ordinary case" because "[t]o find that the FDA ha[d] authority to regulate tobacco products, one [had to] . . . adopt an extremely strained understanding of 'safety' as it is used throughout the Act." *Id.* at 159–60. Here, by contrast, and as explained above, BLM's understanding of "waste" flows directly from the statute. *See supra* pp. 9–11.

Indeed, the only case Petitioners cite in support of their theory is this Court's decision in *Wyoming*, 2016 WL 3509415. States Memo. 13. But that case is materially different from this one. There, this Court concluded that because Congress had "explicitly removed" EPA's regulatory authority over hydraulic fracturing through an Act "intended . . . to expedite oil and gas development," "it defie[d] common sense for the BLM to argue that Congress intended to allow it to regulated the same activity." *Wyoming*, 2016 WL 3509415, at *10–11. This was true, this court determined, because Congress "ha[d] not directed the BLM to enact regulations governing hydraulic fracturing." *Id*. at *11. Here, by contrast, Congress has not removed the regulation of venting, flaring and leaking natural gas from the realm of federal regulation, and has explicitly delegated its legal authority to BLM to "establish[] terms of the . . . royalty," and "require[] . . . lessee[s] to 'use *all* reasonable precautions to prevent waste of oil or gas developed in the land.'" *Id.* at *5 (quoting 30 U.S.C. § 225) (emphasis added). BLM did exactly that in the Waste Prevention Rule.

### C. BLM Has Explicit Authority to Consider Environmental Factors in Overseeing Operations on Public Lands.

Petitioners suggest that BLM does not have authority to take environmental considerations into account when developing a comprehensive waste rule for public lands, for example, by requiring flaring instead of venting. *E.g.*, Indus. Memo. 21-26. In fact, the opposite is true: BLM is mandated to consider and mitigate the environmental impacts of operations

utilizing public lands under the MLA and FLPMA. BLM's environmental authorities provide additional support for those provisions of the Rule that have environmental benefits.

In addition to its waste prevention mandate, the MLA authorizes BLM "to prescribe necessary and proper rules and regulations" to "insur[e] the exercise of reasonable diligence, skill, and care in the operation of [leased] property," and to "protect[] . . .. the interests of the United States and . . . safeguard[] . . . of the public welfare." 30 U.S.C. §§ 187, 189. This public welfare goal gives BLM authority "to prevent environmental harm." *Nat. Res. Def. Council v. Berklund*, 458 F. Supp. 925, 936 & 936 n.17 (D.D.C. 1978). The Act also directs BLM to "regulate all surface-disturbing activities" for purposes of "conservation of surface resources." 30 U.S.C. § 226(g). Courts have consistently interpreted the term "conservation" in the MLA as "not only encompass[ing] conserving mineral deposits, but also [the] prevent[ion of] environmental harm." *See Hoyl v. Babbitt*, 129 F.3d 1377, 1380 (10th Cir. 1997); *Copper Valley Machine Works, Inc. v. Andrus*, 653 F.2d 595, 600 (D.C. Cir. 1981).[16]

FLPMA too provides BLM with explicit environmental authority. Under FLPMA, it is the "policy of the United States" to manage public lands "in a manner that will protect the quality of the scientific, scenic, historical, ecological, environmental, *air and atmospheric*, water resource, and archeological values." 43 U.S.C. § 1701(a)(8) (emphasis added). BLM implements this policy and others through its "multiple use" mandate. *Id.* § 1702(c). Under this

---

[16] Relying on a pre-*Chevron* case, *Chapman v. El Paso Natural Gas Co.*, 204 F.2d 46, 48–51 (D.C. Cir. 1953), Petitioners argue that Congress did not specifically authorize regulation of air quality under the MLA. Indus. Memo. 25. Not only does *Chapman* say nothing about the public welfare or conservation mandates of the MLA, *Chapman*'s holding has been overtaken by courts' repeated recognition that broad statutory terms provide agencies with considerable authority to regulate within their expertise. *See*, *e.g.*, *Helicopter Ass'n Int'l, Inc. v. Fed. Aviation Admin.*, 722 F.3d 430, 433–34 (D.C. Cir. 2013) (upholding aviation regulation where challenger "pointed to no express limitations on" agency's broad statutory authority to "protect[] individuals and property on the ground") (quoting 49 U.S.C. § 40103(b)(2))).

mandate, "BLM must strike a balance that avoids 'permanent impairment of the productivity of the land and the quality of the environment.'" *Utah v. U.S. Dep't of Interior*, 535 F.3d 1184, 1187 (10th Cir. 2008) (quoting 43 U.S.C. § 1702(c)). "It is past doubt that the principle of multiple use does not require BLM to prioritize development over other uses." *N.M. ex rel. Richardson v. BLM*, 565 F.3d 683, 710 (10th Cir. 2009).

FLPMA also requires BLM "by regulation or otherwise" to "take any action necessary to prevent unnecessary or undue degradation" ("UUD") of public lands. 43 U.S.C. § 1732(b); *see Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 623 F.3d 633, 644 (9th Cir. 2010). By its plain language, the UUD provision authorizes BLM to promulgate protective regulations. *See Manning v. United States*, 146 F.3d 808, 814–15 (10th Cir. 1998) (referencing UUD mandate as one basis for Interior Department mining regulations). FLPMA provides BLM expansive authority to "promulgate rules and regulations to carry out the purposes of this Act and of other laws applicable to the public lands." 43 U.S.C. § 1740; *see In re Permanent Surface Mining Litig.*, 653 F.2d 514, 522 (D.C. Cir. 1981) (en banc) (statutory grant of general rulemaking authority to agency found to be independent source of authority).

Protecting environmental values as part of BLM's mandate is nothing new. To "protect public health and safety," BLM has regulated hydrogen sulfide and sulfur dioxide emissions from oil and gas operations for decades. *See* Onshore Order No. 6, 55 Fed. Reg. 48,958, 48,968 (Nov. 23, 1990); *see also* 43 C.F.R. § 3164.1(b). Onshore Order No. 6 establishes "uniform national requirements and minimum standards of performance," including planning, monitoring, and technology standards (such as flare specifications), with different requirements based on the level of exposure expected for any occupied residence, school, church, park, or other areas that the public could reasonably be expected to frequent. 55 Fed. Reg. at 48,968, 48,970–75.

Likewise, BLM's own policies recognize its authority to protect "climate and air quality and any associated air-quality-related-values" from BLM-authorized activities.  AR 32,325.  Pursuant to a Secretarial Order, BLM must consider how emissions from oil and gas development on public lands contribute to climate change.  AR 32,327.  BLM's resource management plans establish specific air quality and climate goals.  AR 32,326–28.[17]  And BLM routinely imposes emission control requirements at the drilling permit stage, such as requiring specific engines, green completions, storage tank controls, and low or no-bleed pneumatics.  AR 32,326–27.  Each of these examples demonstrates BLM's long history of mitigating the impacts of oil and gas operations on public lands.  *See also* Ely Decl. ¶ 5; Roberts Decl. ¶ 19.

Ignoring these explicit statutory authorizations and history, Petitioners dismiss FLPMA as nothing more than a "land use planning statute."  Indus. Memo. 21.  But the plain language of the Act demonstrates that while land use planning is an important aspect of the statute, it is not the only one.  *See, e.g.,* 43 U.S.C. §§ 1713–16 (governing land sales, withdrawals, acquisitions, and exchanges); *id.* §§ 1761–71 (governing rights-of-way).  BLM's governing statutes grant it ample authority—indeed mandate it—to consider environmental factors when promulgating a rule that will affect the public lands.[18]

---

[17] In all resource management plans, BLM must "provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans."  43 U.S.C. § 1712(c)(8).  Although Industry Petitioners claim that this provision demonstrates that BLM has no role to play in air quality regulation, Indus. Memo. 21–22, the opposite is true.  By adding this explicit language in FLPMA, Congress made it clear that it intended for BLM to have a role in ensuring federal standards are met on federal lands.  Moreover, BLM has gone further in setting specific air quality and climate goals in its RMPs.

[18] The same is true for Indian leases.  The Interior Department owes a fiduciary trust obligation to tribes, which requires it to consider "the best interests of the Indian lessors."  *Woods Petroleum Corp. v. U.S. Dep't of Interior*, 18 F.3d 854, 859 (10th Cir. 1994).  These interests include economic, environmental, social, and cultural effects on tribes.  25 U.S.C. § 2103(b).  The Rule serves this trust obligation both by increasing the royalties that will accrue to tribal governments *and* protecting the environment from the harmful impacts of methane and other

State Petitioners rely on this Court's decision in *Wyoming*, 2016 WL 3509415, at *7, to argue that BLM's authority to protect the environment under the MLA is limited. States Memo. 17. The question in that case was whether the MLA and FLPMA authorized BLM to issue comprehensive regulations governing hydraulic fracturing. Here, BLM has clear authority to regulate waste, and the question is whether BLM can also consider environmental impacts in developing its waste regulation. The MLA and FLPMA explicitly give BLM that authority.

### D.    BLM May Regulate Communitized Land.

North Dakota and Industry Petitioners argue that BLM lacks authority to regulate private wells that are within communitized areas and units. N.D. Memo. 16–21; Indus. Memo. 37–39. There is no support for this argument.[19]

Communitization or "pooling" provides for development of a federal lease in coordination with other non-federal lands when it is not feasible to develop the federal lease independently, for example because it is part of a single pool of oil and gas. *See* 43 C.F.R. § 3105.2-2. As North Dakota acknowledges, BLM currently regulates "all wells and facilities on State or privately-owned mineral lands committed to a unit or communitization agreement which affects Federal or Indian interests." N.D. Memo 19 (quoting 43 C.F.R. § 3161.1(b)). And the

---

pollutant emissions. 81 Fed. Reg. at 83,020–21 (noting the number of tribal members who raised concerns about living near oil and gas development including toxic air pollution and excessive noise and light pollution from flares); Vogel Decl. ¶¶ 12, 15.

[19] To the extent that North Dakota also argues that BLM lacks authority to regulate private wells on split estate lands where private surface overlays federal minerals, it is wrong. N.D. Memo. 4–5, 18–20. As North Dakota recognizes, in addition to its authority over public lands, BLM has authority over "federal minerals," even where it does not own the surface estate. N.D. Memo. 17 (quoting 30 U.S.C. § 1702); *see also* 72 Fed. Reg. 10,308, 10,308–09, 10,336 (Mar. 7, 2007) (Onshore Order No. 1) (identifying BLM's duties on split estate lands). The Tenth Circuit recently held that when the federal government retains mineral ownership despite parting with ownership of the surface estate, it retains broad power to manage and regulate development of the minerals, as well as the right to regulate access over the surface estate. *Entek GRB, LLC v. Stull Ranches, LLC*, 763 F.3d 1252, 1254–57 (10th Cir. 2014).

Ninth Circuit upheld BLM's authority to regulate non-federal and non-Indian lands within units to protect federal resources. *Norfolk Energy, Inc. v. Hodel*, 898 F.2d 1435, 1440–41 (9th Cir. 1990). BLM similarly has authority to regulate waste on private lands within a communitized area because it affects federal resources.

Furthermore, owners of mineral interests enter into communitization agreements voluntarily, and in so doing submit to terms agreeing to BLM's waste prevention regulations. *See* Vogel Decl. ¶ 5. They agree that the Secretary of the Interior "shall have the right of supervision over all fee and State mineral operations within the communitized area to the extent necessary to . . . assure that no avoidable loss of hydrocarbons occurs in which the United States has an interest pursuant to applicable oil and gas regulations of the Department of the Interior."[20] BLM is simply exercising terms to which companies themselves have agreed.

BLM's obligation to prevent waste in communitized areas that include Federal or tribal minerals makes sense and is in keeping with BLM's duty to regulate the waste of federal minerals under the MLA. It is a well-accepted principle in oil and gas law that a well owner must be prevented from wasting the common reservoir. *See* 38 Am. Jur. 2d *Gas and Oil* § 152. The application of the Rule to federally-approved communitized areas, including private tracts within those areas, prevents waste of federal minerals and therefore is appropriate and necessary.

---

[20] Model Form of a Federal Communitization Agreement, BLM Manual 3160-9, App. 1 at 9, www.blm.gov/style/medialib/blm/wo/Information_Resources_Management/ policy/blm_handbook.Par.26234.File.dat/3160-9-Communitization%20Manual.pdf; *see also* 43 C.F.R. § 3186.1 at § 16 (model unit agreement) ("Operations hereunder and production of unitized substances shall be conducted to provide for the most economical and efficient recovery of said substances without waste, as defined by or pursuant to State or Federal law or regulation.").

### E. The Waste Prevention Rule Is Not Arbitrary and Capricious.

Petitioners' arguments that BLM's Waste Prevention Rule is arbitrary and capricious are unavailing. The arbitrary and capricious standard under the Administrative Procedure Act ("APA") "is a deferential one." *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1164 (10th Cir. 2002). "When courts consider [arbitrary and capricious] challenges, an agency's decision is entitled to a presumption of regularity, and the challenger bears the burden of persuasion." *San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1045 (10th Cir. 2011) (internal citations omitted). "Deference to the agency is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise." *Utah Envtl. Cong. v. Russell*, 518 F.3d 817, 824 (10th Cir. 2008) (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)). In the context of a preliminary injunction, courts have recognized that "the arbitrary and capricious standard along with the deference to the agency impose a high barrier for Plaintiffs to clear in order to show a likelihood of success on the merits." *Coal. of Concerned Citizens to MakeArtSmart v. Fed. Transit Admin.*, Civ. No. 16-252, 2016 U.S. Dist. LEXIS 102071, at *9 (D.N.M. July 29, 2016). Petitioners have not met this high burden.

As an initial matter, many of Petitioners contentions that the Rule is arbitrary and capricious are not ripe for review. Where the "harm [is] contingent upon uncertain or speculative future administrative action," and "[w]here disputed facts exist," greater caution is required prior to concluding that an issue is ripe for review." *Sierra Club v. Yeutter*, 911 F.2d 1405, 1417 (10th Cir. 1990) (citing *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 163–64 (1967)). For example, Industry Petitioners complain that the Rule's requirement that operators submit waste minimization plans is arbitrary and capricious because it compels disclosure of confidential, proprietary and competitive information. Indus. Memo. 43. But, as further explained below, BLM has generally-applicable protections for such information, and Industry

Petitioners offer no reason to think they are inadequate. *Infra* pp. 35–37. Indeed, these regulations provide companies an opportunity to challenge in court any decision to release information that they believe is confidential, proprietary or competitive. Industry Petitioners' claim thus is not ripe for judicial review in this action.

Likewise, the States complain—without any evidence that it is common—that some emissions streams do not contain sufficient methane to flare. States Memo. 17. But BLM's Rule allows for exemptions where flaring is impracticable, including "when the gas is not readily combustible." 43 C.F.R. § 3179.6(b)(1). If BLM fails to grant such an exemption, Petitioners may challenge that failure in court. For now, the question is not ripe.

Petitioners' arbitrary and capricious claims are also simply erroneous. They launch multiple attacks on BLM's calculation of the costs and benefits of the Waste Prevention Rule. None stick. Faced with BLM's conservative and reasonable natural gas price assumptions, Industry Petitioners and North Dakota incorrectly argue that the Rule is flawed because BLM used an inflated natural gas price of $4/Mcf to calculate the estimated savings producers will enjoy under the Rule, thereby making producers' savings look larger than they really will be. Indus. Memo. 45; N.D. Memo. 23–24. In doing so, Petitioners mischaracterize the use of the $4/Mcf figure. AR 449. The agency used the $4/Mcf figure to calculate the estimated gas vented and flared on public lands in 2014. By contrast, to calculate the estimated savings from the Rule, BLM used the schedule of natural gas prices published by the Energy Information Administration—widely-used government forecasts of natural gas prices through 2040 that account for processing and transportation costs—which BLM further "discounted" to account for the fact that producers must pay royalties on production. The discounted figures BLM used to calculate estimated savings from the Rule start at $2.39/Mcf in 2017, rising gradually to a high of

$3.97/Mcf in 2025, and never reach $4.00/Mcf during the forecast period.  AR 486; tbl. 7-5.

These figures are lower than the Energy Information Administration projections, which forecast

that natural gas prices will increase over time to $4.58/Mcf in 2020, $5.29/Mcf in 2025, and

$5.06/Mcf 2030.  AR 484–85.  Moreover, since Petitioners filed their motions, gas prices have

risen to over $3.50/Mcf.[21]

Industry Petitioners also argue that BLM's use of the Social Cost of Methane protocol is

arbitrary and capricious because the protocol is not a "well recognized or accepted economic

model."  Indus. Memo. 46.  This is incorrect, as demonstrated by extensive record evidence.

Hanneman Decl. ¶ 11.  The Social Cost of Methane protocol has been approved by the federal

Office of Management and Budget, approved by an interagency working group for purposes of

regulatory analyses, used to assess the benefits associated with several other major rulemakings,

and rests upon an extensive body of peer-reviewed literature as well as models that have been

subject to several rounds of public comment.  AR 477–83; *see* Hanneman Decl. ¶¶ 15–17

(describing process for adopting the Social Cost of Methane protocol).  Its use has also been

upheld by an appellate court.  *See Zero Zone*, 832 F.3d at 677 (7th Cir. 2016) (rejecting a nearly

identical challenge to DOE's use of the social cost of carbon).

Petitioners' additional claim that BLM took credit for emission reductions already

required under state programs is also meritless.  The Regulatory Impact Analysis describes in

detail the regulatory frameworks that are in place for sources of oil and gas waste/emissions in

various states (including Wyoming), and explains how BLM excluded sources that are subject to

those requirements (as well as EPA regulations) from its assessment of costs and benefits

associated with the Rule.  *See* AR 501 (excluding pneumatic controllers in Upper Green River

---

[21] *See* Bloomberg Markets, *Energy*, http://www.bloomberg.com/energy (last visited Dec. 15, 2016); CEI Decl. ¶ 38.

Basin ("UGRB") and Colorado from the analysis); AR 505 (excluding pneumatic pumps that are subject to state requirements); AR 515 (noting that storage vessels affected by Wyoming requirements were not excluded, but that the number of impacted facilities is very low); AR 535 (excluding Colorado and UGRB wells from LDAR analysis). And even if it were the case that BLM incorporated the effects of state regulations into its cost-benefit analysis, that would mean that BLM also over-estimated the costs of the rule—since those same regulations also come with costs to producers, which BLM did not incorporate in its analysis. AR 450.

State Petitioners also claim that BLM ignored social costs associated with additional flaring, including regional ozone increases. States Memo. 19. In fact, BLM's Environmental Assessment ("EA") analyzed ozone impacts associated with the Rule, and concluded that the Rule would reduce ozone. AR 680, AR 678 (Tbl. 21). The EA notes that BLM modeling for Utah has indicated that "[volatile organic compound (VOC)] emissions, rather than NOx emissions, are the primary factor driving the formation of ozone" on BLM-managed lands in Utah and Wyoming that exceed the NAAQS for ozone. AR 663. As a result, BLM "expects that the VOC reductions under [the proposed rule] could help address unhealthy levels of ozone pollution that are currently occurring on certain public lands managed by the Bureau," AR 663, and that the final rule "would reduce emissions of VOCs, and thus the formation of ozone, that would otherwise occur under the No Action Alternative." AR 680; *see also* Ely Decl. ¶ 7; Lachelt Decl. ¶ 5; Roberts Decl. ¶ 6.

Petitioners have not overcome the high degree of deference granted agencies to demonstrate a likelihood of success based on their arbitrary and capricious claims.

## II.     The Rule Will Not Irreparably Harm the State or Industry Petitioners.

Because the Rule benefits State Petitioners by increasing royalties and subjects Industry Petitioners to minor compliance costs that will be offset by revenue from increased capture,

Petitioners fail to meet their high burden of proving irreparable harm. To support a preliminary injunction, a threatened injury must be imminent and "certain, great, actual 'and not theoretical.'" *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting *Wis. Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). "Speculation or unsubstantiated fear of what may happen in the future cannot provide the basis for a preliminary injunction." *Schrier*, 427 F.3d at 1266. Petitioners' four theories of harm amount to mere speculation about economic harms, and ignore applicable law.

### A. Industry Petitioners Do Not Face Irreparable Economic Harm.

As an initial matter, Industry Petitioners cannot demonstrate irreparable harm based on paying royalties on gas the Rule deems "avoidably lost" because if Petitioners ultimately prevail on the merits and the Court sets aside the Rule's royalty requirements, any overpaid royalties can be recovered from the agency. 30 U.S.C. § 1721a.

Additionally, the compliance costs associated with the Rule are minimal and legally insufficient to constitute irreparable harm. Courts have held that "ordinary compliance costs are typically insufficient to constitute irreparable harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005); *Wis. Gas. Co.*, 758 F.2d at 674–75; *A.O. Smith Corp. v. Fed. Trade Comm'n*, 530 F.2d 515, 527 (3d Cir. 1976). This is because the harm supporting an injunction must be "great" and "substantial." *Heideman*, 348 F.3d at 1189–90 (citing *Wis. Gas. Co.*, 758 F.2d at 674). A plaintiff seeking to enjoin an agency regulation must make "a strong showing that the economic loss would significantly damage its business above and beyond a simple diminution in profits." *Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 43 (D.D.C. 2000); *see also Heideman*, 348 F.3d at 1189 (affirming denial of injunction where plaintiffs presented no evidence that companies "had been forced out of business" by ordinance).

Industry Petitioners have shown nothing more than the possibility of a very small diminution in their members' profits. That small loss in profits will often be reduced by offsetting revenue from selling additional gas captured pursuant to the Rule. *See* Roberts Decl. ¶ 11. BLM estimated that average annual compliance costs would range from about $44,600 to $65,800 for each company, reducing profits by around 0.15% per company. *See* AR 575–76 (analyzing the impacts for small producers and concluding that $55,200 midpoint average annual compliance cost represents an average reduction in profit margin of 0.15%); *see also* Decl. of Conservation Economics Institute ("CEI") ¶ 49. Moreover, the cost of compliance while this case is pending will be even smaller because many of the Rule's requirements do not take effect for a year. *See, e.g.*, 43 C.F.R. §§ 3179.7 (gas capture), 3179.201 (pneumatic controllers), 3179.202 (pneumatic pumps), 3179.203 (storage vessels); *see also* CEI Decl. ¶¶ 3–6. If briefing is expedited, final judgment could be entered before many of the Rule's provisions even apply.

Industry Petitioners assert that under the Tenth Circuit's decision in *Chamber of Commerce of the U.S. v. Edmondson*, 594 F.3d 742 (10th Cir. 2010), even minimal compliance costs represent irreparable injury. Indus. Memo. 50. The harms alleged in *Chamber*, however, were much different from the ordinary compliance costs at issue here. In *Chamber*, plaintiffs faced the threat of penalties for failing to comply with an unconstitutional state immigration law. 594 F.3d at 759, 771. The threat of enforcement, and imposition of civil sanctions, were found to represent irreparable injury. *Id.* at 771. The *Chamber* plaintiffs, in fact, emphasized that they were *not* basing their irreparable harm argument solely on compliance costs. Consolidated Br. of Pls.-Appellants, 2008 WL 4735384, at *69 (Oct. 14, 2008) (arguing that it was "demonstrably false" that plaintiffs had only established "out-of-pocket" compliance costs and "administrative expenses").

Moreover, *Chamber* found "a strong likelihood" that the Oklahoma immigration restrictions violated the Supremacy Clause of the U.S. Constitution. 594 F.3d at 770. "When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (quotation omitted). Here, there is no constitutional deficiency.[22]

Industry's approach would effectively eliminate irreparable harm from the injunction standard whenever a business challenges an agency regulation: "Any time a corporation complies with a government regulation that requires corporation action, it spends money and loses profits; yet it could hardly be contended that proof of such an injury, alone, would satisfy the requisite for a preliminary injunction." *A.O. Smith Corp.*, 530 F.2d at 527. Industry's theory ignores black-letter law that only "great" and "substantial" harm justifies injunctive relief, *Heideman*, 348 F.3d 1189–90, and that an injunction is an "extraordinary" remedy not normally available for economic harms. *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003).

## B. Industry Members Do Not Face Irreparable Harm from Disclosure of Confidential Business Information.

Even though BLM's confidentiality regulations shield industry from revealing confidential information, Industry Petitioners also claim their members would suffer irreparable

---

[22] The other cases Industry Petitioners cite also do not support their argument because none enjoined a regulation based solely on the harm from minor compliance costs. *See Ohio Oil Co. v. Conway*, 279 U.S. 813 (1929) (injunction appropriate for tax that was allegedly unconstitutional, where no mechanism existed for refund of overpaid tax); *Direct Mktg. Ass'n v. Huber*, No. 10-cv-01546, 2011 WL 250556, at *6 (D. Colo. Jan. 26, 2011) (finding irreparable harm from constitutional violation, not just compliance costs); *Air Conditioning, Heating & Refrigeration Inst. v. City of Albuquerque*, Civ. No. 08-633, 2008 WL 5586316, at *5 (D.N.M. Oct. 3, 2008) (local ordinance allegedly preempted under Supremacy Clause of Constitution, and would harm customer relations); *Okla. ex rel. Okla. Tax Comm'n v. Int'l Registration Plan, Inc.*, 264 F. Supp. 2d 990, 993, 997 (W.D. Okla. 2003) (interstate regulatory organization sanctioning Oklahoma by directing other states to withhold substantial vehicle registration fees).

harm because BLM plans to "post each waste minimization plan for public review." Indus. Memo. 50–51. According to Industry's theory, BLM has not assured that confidential business information will be protected. *Id.* In fact, however, BLM plans to give waste management plans the same protections as other confidential information submitted to the agency, such as applications for permits to drill ("APDs"). 81 Fed. Reg. at 83,043. APDs—like waste minimization plans—often include confidential business information, and BLM has managed for years to protect that information from disclosure.

Industry Petitioners offer no reason to think that BLM's existing confidentiality protections are inadequate. 43 C.F.R. §§ 2.26–2.36. A company submitting information it believes is a trade secret can identify and designate it as such. *Id.* § 2.26. If BLM later receives a Freedom of Information Act request, the agency must "promptly notify a submitter in writing." *Id.* § 2.27(a). The submitting company then is given an opportunity to object to release of the information and explain why it represents a trade secret before BLM releases it. *Id.* §§ 2.28, 2.30–2.32. If BLM decides to release the information over an objection, the agency must provide the company with ten days advance notice so the company can challenge that decision in court. *Id.* §§ 2.33, 2.35(c).

These regulations show that no injunction is needed against the Rule. Even if a future disagreement arises between BLM and a submitter about the confidentiality of certain information, BLM's regulations provide for resolution of any such disagreement—and judicial relief if necessary—before that information is disclosed. *Id.* As a result, no injury is "imminent," and no injunction against the Rule is necessary to prevent disclosure.

Industry Petitioners also fail to show any likelihood that BLM would violate its own regulations. Indus. Memo. 51–52. BLM employees, in fact, have a powerful incentive to

comply: the Trade Secrets Act subjects federal employees to criminal prosecution, civil fines, and loss of employment for unauthorized disclosure of confidential information. 18 U.S.C. § 1905. Any theoretical possibility of improper disclosure is "purely speculative" and does not support an injunction. *Greater Yellowstone Coal.*, 321 F.3d at 1258.

C. **The States Have Not Shown that They Face Imminent Economic Harm from the Rule.**

The Rule will boost state treasuries by increasing royalties, funding much-needed schools and roads. *See* Ely Decl. ¶ 9; Lachelt Decl. ¶¶ 2, 8; Vogel Decl. ¶¶ 16–17. Yet the States claim they will suffer irreparable harm absent an injunction because the Rule "creates incentives for oil and gas producers to develop in states [unlike Wyoming and Montana] without significant federal land," and thus may cause the States to lose tax revenue. States Memo. 20. This claim rests on mere speculation, which is inadequate to establish such an injury. *See Heideman*, 348 F.3d at 1189; *Schrier*, 427 F.3d at 1266–67.

As an initial matter, North Dakota's and Wyoming's economic claims suffer from a glaring omission: they completely ignore the additional royalty revenue the Rule will generate for them. *See* CEI Decl. ¶ 51; Ely Decl. ¶ 9; Lachelt Decl. ¶¶ 2, 8; Vogel Decl. ¶¶ 16–17. BLM estimates that the Rule will yield up to $14 million per year in new royalties, 81 Fed. Reg. at 83,014, half of which will be paid to the states. 30 U.S.C. § 191 (50% distributed to states). The States never consider the financial benefits they will get from the Rule, or whether those benefits will offset the speculative losses they predict.

Additionally, where a state alleges that it faces injury from reduced tax revenue due to a federal regulation, a particularly high level of specific evidence is required. In *Wyoming v. U.S. Department of Interior*, 674 F.3d 1220 (10th Cir. 2012), the Tenth Circuit ruled that in making a very similar claim of injury, Wyoming failed to establish Article III standing. *Id.* at 1231–35.

Wyoming challenged an Interior Department regulation limiting snowmobile use in Yellowstone National Park. *Id*. at 1224. Wyoming claimed it had standing to challenge the regulation because the limits would harm tourism and thus reduce tax revenues. *Id.* at 1231–34. The Court rejected these allegations as a basis for standing because "virtually all federal policies" have some generalized effect on states, and thus, "impairment of state tax revenues should not, in general, be recognized as sufficient injury-in-fact" for standing. *Id.* at 1234 (quoting *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976)); *see also Arias v. DynCorp*, 752 F.3d 1011, 1015 (D.C. Cir. 2014) ("Lost tax revenue is generally not cognizable as an injury-in-fact for purposes of standing.").

To establish an injury based on lost taxes, *Wyoming* requires a "fairly direct link between the state's status as a . . . recipient of revenues and the legislative or administrative action being challenged." 674 F.3d at 1234 (quotation omitted). "[C]onclusory" affidavits and "speculative economic data" are insufficient where they "provide no underlying evidence" demonstrating that a regulation will actually have such an impact. *Id.* at 1232–33.

Because conclusory or speculative claims about lost tax revenues cannot establish standing, they certainly do not support a "clear and unequivocal" showing to merit the extraordinary remedy of a preliminary injunction. *Schrier*, 427 F.3d at 1258 (quotation omitted); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 495–96 (2009) (overturning nationwide injunction against regulation for lack of detailed, specific evidence showing application of rule would injure plaintiff). And their irreparable harm theory relies on exactly the type of speculation rejected in *Wyoming*. *See Utah v. Babbitt*, 137 F.3d 1193, 1203 n.12 (10th Cir. 1998) (issue of irreparable harm is "[c]losely related to" the injury-in-fact element of standing).

Indeed, the claims the States do make about lost tax revenue are unsupported. Montana submits absolutely no evidence or affidavits supporting its claim of injury. *See* States Memo. 19–23. There is therefore no basis for this Court to conclude that Montana will suffer any economic injury from the Rule. *See Heideman*, 348 F.3d at 1189 (affirming denial of injunction where plaintiffs failed to offer evidence supporting attorney's argument about irreparable harm).

Wyoming and North Dakota offer little more. They fail to name a single company expected to move operations out of state due to the Rule. *See Schrier*, 427 F.3d at 1266 (claim of "lost opportunities" by terminated employee was too speculative to support finding of irreparable harm where plaintiff "provided no evidence of actual lost opportunities"). Instead, Wyoming submits affidavits making vague predictions that "restrictive federal regulatory requirements" will "discourage production" of minerals in that state, ECF 22-6 (Hill Decl. ¶ 4), and asserting that BLM approval delays "may act as encouragement for operators" to avoid drilling federal minerals. ECF 22-5 (Watson Decl. ¶ 21); *see also* ECF 22-1 (Vehr Decl. ¶ 30) (opining without analysis that the Rule "may encourage" companies to invest in states with fewer federal minerals, which "may result" in lower tax revenue and job losses). But Wyoming offers no evidence supporting this speculation, or showing that the Rule would materially impact development in that state. Instead it predicts lost tax revenues solely "based on an assumption" that the Rule will reduce oil and gas production by 10%. ECF 22-7 (Noble Decl. ¶ 5); *see* CEI Decl. ¶¶ 52–67.[23]

---

[23] The States also err by assuming that any hypothetical delays in production would cause irreparable harm. If the Rule is set aside in a final judgment, there is no reason to doubt that any postponed development and revenues would recover. *See Heideman*, 348 F.3d at 1189 (no irreparable harm where company would be able to "resume their [business activities] in the event they prevail on the merits").

North Dakota makes several dramatic but unsupported predictions about the Rule's impact. North Dakota claims that delays resulting from the Rule will cut development by "approximately one-half," and the Rule will result in the loss of "more than 1,000 jobs from the relocation of oil and gas operations." N.D. Memo. 13–14. North Dakota fails to support these claims with any meaningful analysis. CEI Decl. ¶¶ 53–55. Mr. Lynn Helms, a state oil and gas regulator, asserts that the 50% reduction in development will occur because BLM processing times "will result in a delay of more than six months for every future oil and gas well" drilled in a spacing unit containing federal or Indian minerals. ECF 40-2 ¶¶ 29–30. His declaration offers no explanation at all for why such a six-month delay will result, other than to say it is "based on my understanding" of BLM permit approval times. *Id.* ¶ 29. And his prediction of 1,000 jobs lost is "derived from" a study done by the North Dakota Department of Mineral Resources. *Id.* ¶ 33. That study, however, is not submitted to the Court and Mr. Helms does not disclose what the study actually says (much less the date, title or other information about the study that might provide an adequate evidentiary foundation). *See* CEI Decl. ¶ 47.

Unlike the States, BLM did perform a detailed assessment of the Rule's likely impact. The agency determined that the Rule's modest compliance costs—0.15% of average profits, AR 576—are "not expected to impact the investment decisions of firms or significantly adversely impact employment." AR 454 The agency explains: "we do not think that this rule would cause operators to shift new drilling away from Federal and Indian Lands in most, if not all, regions." AR 567. The States have offered no evidence or analysis to refute this conclusion. In Colorado, development increased after the State adopted similar rules. *See* Roberts Decl. ¶ 11.

The State Petitioners also offer no analysis showing that the specter of administrative delays associated with the Rule will significantly hamper development. BLM evaluated this

issue, and incorporated administrative burdens into its estimate of the Rule's modest compliance costs. AR 542, 576. The agency's analysis shows that most provisions add little to current processing times. For example, Wyoming and North Dakota complain about delays in BLM approval of waste minimization plans, ECF 22-5 ¶ 5; N.D. Memo. 13, but the plans are only expected to require about two hours each to process. AR 546.

In fact, State Petitioners disregard evidence showing that federal bureaucracy is not a material constraint on the level of drilling on public lands. *See* CEI Decl. ¶¶ 56–67. Under existing federal rules, BLM APD approval already takes considerably longer than many state approvals. *Compare* ECF 22-5 ¶ 14 (alleging BLM APD approval takes 200 days); ECF 40-2 ¶ 25 (alleging BLM APD approval takes up to 9 months) *with* ECF 40-2 ¶ 25 (North Dakota approves average state APD in 23 days). Despite these alleged delays, by September 2015 oil and gas companies had stockpiled *more than 2,000 approved* federal permits in Wyoming that they were not using.[24] At 2015 drilling rates, those 2,000 APDs amount to more than a four-and-a-half-year supply of permits available for use in Wyoming.[25] In North Dakota, companies had accumulated more than a three-year supply of unused federal drilling permits.[26] These approved permits lay idle for reasons unrelated to BLM administrative delays—such as the depressed

---

[24] BLM, Approved Applications for Permit to Drill – Not Drilled (Sept. 30, 2015), https://www.blm.gov/style/medialib/blm/wo/MINERALS__REALTY__AND_RESOURCE_PROTECTION_/energy/oil___gas_statistics/data_sets.Par.86452.File.dat/AAPD%20Report%20(approved_apd_not_drilled_9_30_2014).pdf.

[25] BLM, Number of Well Bores Started (Spud) on Federal Lands (435 wells started in Wyoming in fiscal year 2015), https://www.blm.gov/style/medialib/blm/wo/MINERALS__REALTY__AND_RESOURCE_PROTECTION_/energy/oil___gas_statistics/data_sets.Par.36209.File.dat/numberofwellboresstartspud.pdf.

[26] *Supra* nn.24–25 (reporting 722 unused drilling permits in North Dakota as of September 30, 2015, with 226 wells started in that state in fiscal 2015).

market price for oil and gas.  The States do not even attempt to show how the Rule's modest administrative requirements would suddenly reverse this surplus permit situation.

Enjoining the Rule based on the States' speculation about potential losses of tax revenue would render the irreparable harm requirement meaningless whenever a state challenges a federal regulation and "would create a dangerous precedent."  *Wyoming*, 674 F.3d at 1234.

### D.  The Rule Causes No "Sovereign Injury" to the States.

The Constitution commits plenary and proprietary authority over federal lands to the federal government—not the states.  *Kleppe v. New Mexico*, 426 U.S. 529, 540 (1971). State Petitioners claim the Rule will cause an irreparable injury to their "sovereign interest" as "the sole authority to regulate production" of minerals and venting and flaring from oil and gas facilities within their borders.  States Memo. 20; N.D. Memo. 6–11.  The States have no such interest:  on federal lands, they have no right to be the "sole" (or even the primary) regulator of venting, flaring or oil and gas development.

The Constitution's Property Clause power makes management of federal property— including federal mineral development—the prerogative of Congress.  *Kleppe*, 426 U.S. at 540; *see also Ventura Cty.*, 601 F.2d at 1083.  "State jurisdiction over federal land does not extend to any matter that is not consistent with the full power in the United States" under the Property Clause.  *Wyoming v. United States*, 279 F.3d 1214, 1227 (10th Cir. 2002) (quotations omitted). The federal government's authority over federal property does not preclude the application of all state laws.  But "federal legislation necessarily overrides conflicting state laws under the Supremacy Clause . . . . [W]here [the] state laws conflict with . . . legislation passed pursuant to the Property Clause, the law is clear:  The state laws must recede."  *Kleppe*, 426 U.S. at 543.

Congress has delegated its authority under the Property Clause to BLM through the MLA and FLPMA.  Because those statutes vest authority with BLM, the States have no sovereign

interest in being the sole regulator of federal mineral development.  *See N. Arapaho Tribe v. Burwell*, No. 14-cv-247, 2015 WL 872190, at *15–*16 (D. Wyo. Feb. 26, 2015) (rejecting argument that tribe suffered irreparable harm from Affordable Care Act regulations infringing on its sovereign authority where tribe unlikely to succeed on merits of that claim).

Nor can the States show that their sovereign interests are impaired merely by BLM's adopting the Rule.  The only cases the States cite found injuries to state sovereign interests based on much different facts.  *Kansas v. United States* involved a federal decision by the National Indian Gaming Commission that certain privately-owned lands in Kansas were "[I]ndian lands" under the jurisdiction of the Miami Tribe.  249 F.3d 1213, 1218–19 (10th Cir. 2001).  Absent that decision, the State of Kansas "exercise[d] a degree of sovereignty over the tract which allows it the right to prohibit gaming thereon."  *Id.* at 1223.  By granting them "[I]ndian land" classification, the decision extended the tribe's sovereignty over those lands and meant that Kansas "may not extend application of its laws to the tract absent Congressional consent."  *Id.*

In contrast, the Rule does not transfer jurisdiction over any lands or change their legal status.  The Rule applies only to lands and minerals owned by the federal government, where (regardless of the Rule) the federal government is the primary sovereign.  The Rule simply addresses how BLM will administer its own decisions for activities on federal lands.[27]

The other case the State cites involved preemption of state law by a federal statute.  *See Wyo. ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008) (Wyoming had Article III standing to challenge application of federal firearms statute that conflicted with state statute).  That also is not the situation here:  the States do not assert that the Rule preempts all state

_____

[27] The States are wrong that the Rule injures their sovereignty by applying to state minerals that are subject to a federal communitization agreement.  *See* States Memo. 21–22; 81 Fed. Reg. at 83,039.  States and companies enter into communitzation agreements voluntarily and agree to follow federal waste prevention rules.  *See supra* pp. 27–28; *see also* Vogel Decl. ¶ 5.

regulation of waste or venting and flaring. Wyoming, North Dakota and Montana can continue to enforce their own rules on federal lands, side by side with the federal requirements.

The States complain about overlapping federal and state regulations, but that describes the status quo. BLM oil and gas regulations are nothing new, and companies developing federal minerals already must obtain permits and other approvals from both federal and state agencies. Those agencies have ample experience coordinating their regulatory schemes. Roberts Decl. ¶¶ 14, 16–20. North Dakota's laws address permitting and operations, as well as venting and flaring. N.D. Admin. Code § 43-02-03, have co-existed for decades with BLM's current oil and gas operational rules. In fact, North Dakota's existing regulations expressly recognize federal authority over "United States government leases," stating that "all persons drilling and producing on United States government land shall comply with the United States government regulations." N.D. Admin. Code § 43-02-03-07. North Dakota's claim of sovereign injury is inconsistent with its own regulations.

Other states also manage to coordinate overlapping federal and state regulatory spheres. In Colorado, for example, the state Oil and Gas Conservation Commission has a memorandum of understanding with BLM and U.S. Forest Service describing how the agencies will coordinate their administration of dual permitting systems on federal lands. *See* Roberts Decl. ¶ 17. BLM's Rule takes a similar approach: it provides that when its application "may adversely affect production" of non-federal minerals, "BLM will coordinate, on a case-by-case basis," with the relevant state agency. 43 C.F.R. § 3179.12. In addition, BLM provides for variances under which state regulations can supplant the Rule. *Id.* § 3179.401. Such variances are available where state requirements "perform at least equally well in terms of reducing waste of oil and gas, reducing environmental impacts from venting and/or flaring of gas, and ensuring the safe and

responsible production of oil and gas." *Id.* States retain their enforcement powers. *Id.*; *see also* Roberts Decl. ¶ 15. State Petitioners will not suffer irreparable injury from coordinating with BLM on implementation of state and federal requirements, as had been the case for years with existing oil and gas regulations.[28]

Tellingly, State Petitioners fail to show that any operational conflict will actually arise where "it is impossible to comply with both state and federal law." *Cal. Coastal Comm'n v. Granite Rock*, 480 U.S. 572, 581 (1987). For example, North Dakota suggests that BLM's Rule allows venting in certain circumstances when it is not permitted under state regulations. N.D. Memo. 8. But North Dakota never explains why that is problematic: a company complying with North Dakota's potentially stricter limits will also be in compliance with the federal Rule. *See* Vogel Decl. ¶ 11. Conversely, where the Waste Prevention Rule imposes stricter limits on venting and flaring than North Dakota does, there is no reason to think that complying with the federal regulation would violate state law. Even if the State Petitioners could offer a hypothetical example of how the Rule might conflict with state regulation in practice, such a conflict can be addressed through the Rule's case-by-case coordination provision, or through a variance. *See supra* pp. 5–6, 44. State Petitioners do not show that these mechanisms are inadequate to resolve any operational conflicts, or that they have even attempted to make use of them. *See Granite Rock*, 480 U.S. at 588–89 (rejecting mining company's preemption challenge

---

[28] The States completely ignore the role of the Rule's case-by-case coordination section in avoiding conflicts. They object to the variance option because it remains under the control of BLM and "would not allow states to maintain sovereignty." States Memo. 22; N.D. Memo. 8–9. This just repeats their misguided argument that the exercise of federal authority infringes on their sovereign authority. *See supra* pp. 42–43.

to state environmental law where state agency had not yet imposed any permit conditions on mining activity in question).

### III. The Balance of Equities and Public Interest Weigh Decisively in Favor of Denying the Motions.

To obtain a preliminary injunction, Petitioners are required to demonstrate that the balance of equities favors an injunction, and that an injunction is in the public interest. *Winter*, 555 U.S. at 20; *Greater Yellowstone Coal.*, 321 F.3d at 1255. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). Here, the public benefits of the Rule far outweigh the speculative harm Petitioners allege will occur absent an injunction.

The public benefits of the rule are clear, as highlighted by BLM's cost-benefit analysis, which found net benefits of $46-204 million per year. AR 453. That figure includes cost savings to the industry, as well as the social benefits of reducing the release of a potent greenhouse gas, methane, into the atmosphere. AR 451; 81 Fed. Reg. at 83,014; Hanemann Decl. ¶ 14. It does not account for many benefits of the Rule that BLM *did not* monetize, including additional royalties, health benefits from the reduction of particulate matter, ozone-forming VOCs, and hazardous air pollutants, and safety and nuisance benefits. AR 453; 81 Fed. Reg. at 83,014; *see* Ely Decl. ¶ 9; Lachelt Decl. ¶¶ 6–7; Vogel Decl. ¶ 17. But just because they were not monetized does not mean these benefits do not exist. The royalty benefits of the Rule alone are significant; States, tribes, and federal taxpayers are currently losing millions of dollars annually that could be used to fund schools, health care, and infrastructure, and which the rule will recoup. 81 Fed. Reg. at 83,014; *see* Ely Decl. ¶¶ 3, 9; Lachelt Decl. ¶¶ 2, 8; Vogel Decl. ¶¶ 16–17.

First, the Waste Prevention Rule helps prevent the waste of a public resource: publicly-owned natural gas. When natural gas is released into the atmosphere, burned unused, or leaked through inadequate infrastructure, the American public loses a valuable resource that could have been used productively. 81 Fed. Reg. at 83,009; Lachelt Decl. ¶¶ 2–3. In 2014, operators vented about 30 Bcf and flared at least 81 Bcf of natural gas from BLM-administered leases. 81 Fed. Reg. at 83,010. This amount of gas could have supplied nearly 1.5 million households with gas for a year. *Id.* Moreover, every year, taxpayers, tribes, and States lose out on royalty revenues that they would have received on wasted natural gas—revenues that could have been used to support essential public services. *Id.* at 83,009.

Second, the Waste Prevention Rule helps reduce the noise and visual nuisance to local communities of flares that "sound like the roaring of jet engines" and "can light up the night sky as bright as day." ECF 27-12 at 63 (Decl. of Lisa Deville); *see* ECF 27-8 at 10-11 (Decl. of Francis Don Schreiber). In some communities with dense oil and gas development, such as the Fort Berthold Indian Reservation in North Dakota, residents contend day and night with such nuisances. Vogel Decl. ¶¶ 5–7; 17; ECF 27-4 at 44 (NRDC Comments).

Third, the Waste Prevention Rule benefits the environment and public health by reducing emissions of the potent greenhouse gas methane, VOCs that contribute to smog, and carcinogenic air pollutants such as benzene. 81 Fed. Reg. at 83,009, 83,069, 83,077. Petitioners claim that the air quality benefits the Rule purports to achieve are "virtually zero." Indus. Memo. 52. This is incorrect. To start, the Rule will reduce VOC emissions by 250,000 to 267,000 tons per year. 81 Fed. Reg. at 83,069. The VOC emissions achieved by the Rule would help to ease ozone burdens throughout the West. Ely Decl. ¶ 7. Exceedances of the NAAQS of 70 parts per billion ("ppb") for ozone often occur near oil and gas development, caused in large

part by venting and leaking of natural gas by the oil and gas sector. *See* AR 32,325–28. Areas particularly affected include the UGRB of Wyoming, the Uinta Basin of Utah, and the Front Range of Colorado. *See* Roberts Decl. ¶ 6.[29]

The Rule will also have the ancillary benefits of reducing hazardous air pollutants such as benzene, nitrogen oxides, and sulfur oxide, and reducing the formation of particulate matter, which causes respiratory and health problems and contributes to visibility impacts. 81 Fed. Reg. at 83,069; AR 642–43. The Rule's flaring provisions also protect safety by limiting the venting of high-pressure, flammable gas. 81 Fed. Reg. at 83,010, 83,037.

Fourth, the Rule will play an important role in slowing the pace of climate change. Petitioners claim that the Rule has virtually no impact on greenhouse gas emissions. Indus. Memo. 52. This is wrong. In fact, the Rule will reduce emissions of methane by 175,000–180,000 tons per year. 81 Fed. Reg. at 83,014. While this may only constitute a small percentage of *global* greenhouse gas emissions, the Supreme Court has recognized that "massive problems" like climate change will be addressed incrementally. *Massachusetts*, 549 U.S. at 525. This makes sense: climate change presents a classic example of the tragedy of the commons. Hanemann Decl. ¶¶ 8–11. If everyone throws their trash into a lake, it will make the entire lake uninhabitable for wildlife and unswimmable and unfishable for humans, so no one should throw their trash into the lake. Further, BLM found that the social benefits of these methane reductions were significant, amounting to some $189-247 million annually (with the range of

---

[29] Recent studies have documented decreased lung function and airway inflammation in young, healthy adults at ozone concentrations as low as 60 ppb, well below the current NAAQS of 70 ppb. 80 Fed. Reg. 65,292, 65,318 (Oct. 26, 2015); AR 32,309. Ozone is a powerful oxidant that can inflame and damage airways, causing coughing, wheezing, and shortness of breath. AR 641–42. Children in particular are at risk. *Id.* Exposure to ozone also affects vegetation and ecosystems. AR 642; ECF 27-9 at 1 (Decl. of Judith J. Fox-Perry) (describing the sudden death of large, mature juniper trees in their natural habitat after introduction of a compressor station).

dollar benefits tied to the range of methane reductions that could be achieved under the Rule).

AR 452. Thus, the Rule plays a needed role in minimizing climate change threats that

undermine the ecological health of public lands: drought, declining snowpack, dwindling water

in streams, larger and more frequent wildfires, and the spread of invasive species. AR 638–41;

*see also* AR 32,323–24.

Petitioners argue that EPA and the States already have regulations in place controlling a

significant portion of the emissions that BLM seeks to regulate. Indus. Memo. 52. This too is

incorrect. As a fundamental issue, EPA's New Source Performance Standards for oil and gas

cover only *new* sources. As for state oil and gas rules, they leave many gaps in natural gas waste

regulation. Ely Decl. ¶ 8; *see also supra* p. 6. Further, if, as the petitioning States suggest, their

"stringent" and "robust" waste regulations are as stringent as the Waste Prevention Rule, N.D.

Memo. 7; States Memo. 21, then those states may receive variances from the Rule. 43 C.F.R.

§ 3179.401.

The Rule will prevent waste of a valuable national resource, increase royalties to States,

tribes, and affected communities, improve public health and safety, and limit the impacts of

climate change. The balance of the equities and the public interest therefore weigh against an

injunction.

## IV.    The Court Should Not Enjoin Any Portion of the Rule that Is Severable.

If this Court finds that any portion of the Waste Prevention Rule should be enjoined, it

must assess whether the offending provisions of the Rule are severable and tailor any preliminary

injunctive relief accordingly. "It is well settled that an injunction must be narrowly tailored to

remedy the harm shown." *ClearOne Commc'ns, Inc. v. Bowers*, 643 F.3d 735, 752 (10th Cir.

2011) (internal bracket removed) (quoting *Garrison v. Baker Hughes Oilfield Operations, Inc.*,

287 F.3d 955, 962 (10th Cir. 2002)); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S.

139, 165–66 (2010) ("If a less drastic remedy . . . was sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction was warranted.").

"A regulation is severable if the severed parts operate entirely independently of one another, and the circumstances indicate the agency would have adopted the regulation even without the faulty provision." *Ariz. Pub. Serv. Co. v. EPA*, 562 F.3d 1116, 1122 (10th Cir. 2009) (internal quotation omitted). There are many ways in which the Waste Prevention Rule may be severable. For example, a finding by this Court that BLM was without authority to adopt the flaring provisions would not authorize this Court to enjoin other portion of the rule, such as the royalty and planning provisions, which operate independently of the flaring provisions and are supported by independent analysis. Likewise, a finding that the Waste Prevention Rule meets the standard for a preliminary injunction where it operates on private communitized land would not authorize the Court to enjoin the Rule where it operates only on federal, tribal, or split-estate lands. Finally, should the Court conclude that there is irreparable harm with respect to the provisions of the Rule that go into effect less than one year after the effective date, it should not enjoin those provisions of the Rule that go into effect one year after the effective date or later, as the court will likely be able to issue a decision on the merits within that timeframe.

## CONCLUSION

Because Petitioners have not demonstrated a clear and unequivocal right to the extraordinary remedy of a preliminary injunction, their motions should be denied.

Respectfully submitted on December 15, 2016,

/s/ Robin Cooley
Robin Cooley, CO Bar #31168 (*admitted pro hac vice*)
Michael S. Freeman, CO Bar #30007 (*admitted pro hac vice*)
Joel Minor, CO Bar #47822 (*admitted pro hac vice*)
Earthjustice
633 17th Street, Suite 1600
Denver, Colorado 80202
Phone: (303) 623-9466
rcooley@earthjustice.org
mfreeman@earthjustice.org
jminor@earthjustice.org

*Attorneys for Respondent-Intervenors Natural Resources Defense
Council, Sierra Club, The Wilderness Society, and Western
Organization of Resource Councils*

Susannah L. Weaver, DC Bar #1023021 (*admitted pro hac vice*)
Donahue & Goldberg, LLP
1111 14th Street, NW, Suite 510A
Washington, DC 20005
Phone: (202) 569-3818
susannah@donahuegoldberg.com

*Attorney for Respondent-Intervenor Environmental Defense Fund*

Laura King, MT Bar #13574 (*admitted pro hac vice*)
Shiloh Hernandez, MT Bar #9970 (*admitted pro hac vice*)
Western Environmental Law Center
103 Reeder's Alley
Helena, MT 59601
Phone: (406) 204-4852
king@westernlaw.org
hernandez@westernlaw.org

Erik Schlenker-Goodrich, NM Bar #03-196 (*admitted pro hac vice*)
Western Environmental Law Center
208 Paseo del Pueblo Sur, #602
Taos, New Mexico 87571
Phone: (575) 613-4197
eriksg@westernlaw.org

*Attorneys for Respondent-Intervenors Citizens for a Healthy
Community, Diné Citizens Against Ruining Our Environment,
Montana Environmental Information Center, National Wildlife*

*Federation, San Juan Citizens Alliance, WildEarth Guardians,*
*Wilderness Workshop, and Wyoming Outdoor Council*

Darin Schroeder, KY Bar #93282 (*admitted pro hac vice*)
Ann Brewster Weeks, MA Bar #567998 (*admitted pro hac vice*)
Clean Air Task Force
18 Tremont, Suite 530
Boston, MA 02108
Phone: (617) 624-0234
dschroeder@catf.us
aweeks@catf.us

*Attorneys for Respondent-Intervenor National Wildlife Federation*

Jennifer Cassel, IL Bar #6296047 (*admitted pro hac vice*)
Rachel Granneman, IL Bar #6312936 (*admitted pro hac vice*)
Environmental Law & Policy Center
35 E. Wacker Drive, Suite 1600
Chicago, IL 60601
Phone: (312) 673-6500
jcassel@elpc.org
rgranneman@elpc.org

*Attorneys for Respondent-Intervenor Environmental Law & Policy*
*Center*

Lisa McGee, WY Bar #6-4043
Wyoming Outdoor Council
262 Lincoln Street
Lander, WY  82520
(307) 332-7031
lisa@wyomingoutdoorcouncil.org

*Local Counsel for Respondent-Intervenors*

**CERTIFICATE OF SERVICE**

I certify that on December 15, 2016, I filed the foregoing **CITIZEN GROUPS'**

**RESPONSE TO MOTIONS FOR A PRELIMINARY INJUNCTION** using the United

States District Court CM/ECF which caused all counsel of record to be served by electronically.

<u>/s/ Robin Cooley</u>
Robin Cooley
*Attorney for Respondent-Intervenors*