# UNITED STATES DISTRICT COURT
# DISTRICT OF WYOMING

| | |
|---|---|
| STATE OF WYOMING, et al., )<br>)<br>Petitioners, )<br>)<br>v. )<br>)<br>UNITED STATES DEPARTMENT )<br>OF THE INTERIOR, et al., )<br>)<br>Respondents, )<br>)<br>and )<br>)<br>WYOMING OUTDOOR COUNCIL, )<br>CENTER FOR BIOLOGICAL )<br>DIVERSITY, CITIZENS FOR A )<br>HEALTHY COMMUNITY, DINÉ )<br>CITIZENS AGAINST RUINING )<br>OUR ENVIRONMENT, )<br>ENVIRONMENTAL DEFENSE )<br>FUND, ENVIRONMENTAL LAW )<br>AND POLICY CENTER, )<br>MONTANA ENVIRONMENTAL )<br>INFORMATION CENTER, )<br>NATIONAL WILDLIFE )<br>FEDERATION, NATURAL )<br>RESOURCES DEFENSE COUNCIL, )<br>SAN JUAN CITIZENS ALLIANCE, )<br>SIERRA CLUB, THE )<br>WILDERNESS SOCIETY, )<br>WESTERN ORGANIZATION OF )<br>RESOURCE COUNCILS, )<br>WILDERNESS WORKSHOP, AND )<br>WILDEARTH GUARDIANS, )<br>)<br>Respondent-Intervenors. | Civil Case No. 2:16-cv-00285-SWS [Lead]<br><br>[Consolidated With 2:16-cv-00280-SWS]<br><br>Assigned: Hon. Scott W. Skavdahl |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

**DECLARATION OF BARBARA ROBERTS**
**Submitted In Support of Respondent-Intervenors' Response to Motions for a Preliminary Injunction**

I, Barbara Roberts, declare as follows:

1. I have extensive experience working on natural resource development, air quality planning, and energy policy—both as a state and federal official. From 1982 to 1990, I served as the Assistant Attorney General of Utah for the Division of Oil, Gas and Mining, which, among other things, is charged with addressing environmental impacts associated with development of oil and gas resources. In this capacity, I advised both the Division and the Board of Oil, Gas and Mining, the policy making entity for the Division.

2. Most recently, I served on the Colorado Air Quality Control Commission, the expert board with regulatory authority to protect air quality in Colorado. I served on the Commission for 6 years, including as Chair between 2009 and 2013.

3. At the Federal level, I served in the Environmental Protection Agency (EPA) during both the William J. Clinton and George W. Bush Administrations, where I was Senior Policy Advisor to the Assistant Administrator for the Office of Air and Radiation. The Office of Air and Radiation is the office within EPA

charged with developing national programs, policies, and standards for controlling air emissions. I also advised members of both the House and Senate on environmental, energy, and natural resource issues, including as an advisor to the Senators on the Committee on Environment & Public Works.

4. My over 30 years of experience has helped me develop legal, technical, administrative, and legislative expertise related to the operations of state and federal natural resource and air quality programs.

**Colorado is a Significant Producer of Oil and Natural Gas—Development that Contributes to Resource Loss and Air Pollution.**

5. Colorado is a significant producer of oil and gas, including thousands of wells on federal and tribal lands. The state had over 4,333 leases in effect on federal lands spanning 1,483,943 producing acres in fiscal year 2015.[1] A recent analysis by ICF International found that, in 2013, these lands were responsible for almost 4 billion cubic feet of natural gas losses.[2] This represents over 26 million dollars in waste.[3]

---

[1] BLM, Public Lands Statistics, Table 2. Total Number of Leases in Effect; Table 7. Number of Producing Acres on Federal Lands, https://www.blm.gov/wo/st/en/prog/energy/oil_and_gas/statistics.html.

[2] ICF International, Onshore Petroleum and Natural Gas Operations on Federal and Tribal Lands in the United States 8 (September 16, 2015), *available at* https://www.edf.org/sites/default/files/content/federal_and_tribal_land_analysis_presentation_091615.pdf

[3] Calculation based on ICF International, *Onshore Petroleum and Natural Gas Operations on Tribal and Federal Lands in the United States* (2015). This calculation assumes a market price of $3/Mcf. With a market price of $4/Mcf, the estimated value of lost gas increases to $135 million.

6. These resource losses are likewise associated with adverse air quality impacts throughout the state. For example, in addition to methane releases, oil and gas sources are a significant contributor to statewide Volatile Organic Compounds (VOCs) emissions—a precursor to ozone formation. The Denver-metropolitan and North Front Range areas violate national air quality standards for ozone, and were recently reclassified to a more serious nonattainment status under the Clean Air Act.

**Colorado Resource Conservation and Air Quality Requirements for the Oil and Natural Gas Sector.**

7. Colorado has long regulated sources in the oil and natural gas sector in a manner that conserves resources and addresses air emissions. That history has included standards adopted both by the Colorado Oil and Gas Conservation Commission ("OGCC") and the Colorado Air Quality Control Commission ("AQCC"), which recognize the dual benefits for resource conservation and air quality that many of these measures have.

8. For instance, in 2009, while I was serving on and chairing the AQCC, the OGCC adopted requirements to capture gas during completion operations.[4] In the Statement of Basis and Purpose adopted along with the Rule, OGCC

---

[4] Colorado Oil and Gas Conservation Commission, Regulation 805b(3), *available at* https://cogcc.state.co.us/documents/reg/Rules/LATEST/800Series.pdf.

recognized these green completion requirements would have multiple benefits, including reducing odors and waste, and minimizing methane emissions.[5]

9. At the same time, the AQCC adopted requirements to reduce VOC emissions from sources in the oil gas sector, like atmospheric storage tanks and pneumatic controllers.[6] During my time at the Commission, we coordinated closely with OGCC, given the multiple benefits of these requirements and overlapping purposes and jurisdictions of the OGCC and AQCC.  This coordination included technical discussions concerning the design of the requirements and likewise included a partnership to enforce the green completion standards.

10. In 2014, shortly after I left the AQCC, the Commission expanded these requirements, adopting new standards for certain sources like equipment leaks and liquids unloading, and extending others for sources like pneumatic controllers and storage tanks to apply more broadly to sources within the state.[7] In addition to the air quality benefits attributable to the Rule, the AQCC

---

[5] Statement of Basis, Specific Statutory Authority, and Purpose New Rules and Amendments to Current Rules of the Colorado Oil and Gas Conservation Commission, 2 CCR 404-1, *available at* http://cogcc.state.co.us/documents/reg/Rules/2008/COGCCFinalSPB_121708.pdf

[6] Colorado Department of Public Health & Environment, Air Quality Control Commission, Regulation 7 Control of Ozone via Ozone Precursors and Control of Hydrocarbons via Oil and Gas Emissions, *available at* https://www.colorado.gov/pacific/sites/default/files/5-CCR-1001-9.pdf.

[7] *Id.*

concluded that the measures would result in capture of an estimated $16.8 million in product that would otherwise be lost each year.[8]

11. These and earlier Colorado requirements have been implemented in a way that has conserved resources, addressed air quality, and has been consistent with the continued oil and gas development in the state. In fact, even with these regulations in place, oil and gas development has been thriving despite a price-related slump experienced in other states.[9]

**BLM's Waste Prevention Rule Deploys Many of the Measures that have Been Effectively Pioneered in Colorado**

12. BLM's waste prevention requirements build on many of the proven, cost-effective techniques that Colorado has successfully deployed to minimize waste and enhance air quality. Some examples include requirements to address pneumatic controllers, liquids unloading, equipment leaks, and storage tanks.

13. Notwithstanding Colorado's leadership in this area, BLM's rule includes important additional measures to reduce waste that likely go beyond what Colorado currently has in place, and so will secure important benefits on federal lands. In particular, BLM's rule includes detailed provisions designed to

---

[8] Regulatory Analysis for Proposed Revisions to Colorado Air Quality Control Commission Reguation Numbers 3, 6 and 7, available at
https://www.edf.org/sites/default/files/content/regulatoryanalysisattachment2013-01217.pdf.
[9] *See, e.g.*, U.S. Energy Information Administration, Colorado State Energy Profile
https://www.eia.gov/state/print.cfm?sid=CO.

minimize flaring that, although generally addressed in Colorado requirements, likely go beyond anything in place in Colorado on the state level.

14. BLM's Waste Prevention Rule is emblematic of the many instances of complementary federal and state jurisdiction to address energy and environmental issues that I have witnessed throughout my career. The Rule utilizes technologies that have been proven at the state level and deploys them in a way tailored to BLM's focus on resource waste, while recognizing the air quality benefits that the technologies and practices will also deliver.

15. The Rule also recognizes the complementary federal and state interests in managing resources and protecting air quality. BLM's regulators have the expertise to determine what measures are protective of air quality across a variety of circumstances while working with states where appropriate. For instance, BLM provides for variances under which state regulations can supplant the Rule. 43 C.F.R. § 3179.401. Such variances are available where state requirements "perform at least equally well in terms of reducing waste of oil and gas, reducing environmental impacts from venting and or flaring of gas, and ensuring the safe and responsible production of oil and gas . . ." as the Rule. BLM also commits to "coordinate, on a case-by-case basis" with the relevant state agency," 43 C.F.R. § 3179.12, when application of the Rule "may adversely affect production" of non-federal minerals.

## Colorado has Long Partnered with Federal Land Managers to Effectuate Complementary Jurisdiction in a way that Protects and Recognizes Both Federal and State Interests

16. Colorado has long partnered with the federal government, including the Department of the Interior, on measures to harmonize management of federal lands within the state and to minimize environmental impacts on those lands. These efforts have recognized the federal government's distinct interest in managing federal lands, while both respecting and building from complementary state interests and expertise. In my experience, this process of state and federal interaction does not slow down or interfere with state permitting processes.

17. For example, since 1991, the OGCC has had an ongoing memorandum of understanding (MOU) with BLM and the Rocky Mountain Region of the United States Forest Service (NFS). This MOU was updated on July 10, 2009 to "provide for efficient and effective oil and gas permitting" on federal lands within the state.[10] Under the agreement, OGCC practices and standards that are "at least as stringent as comparable federal standards or practices" are incorporated into an operator's federal authorization.[11] BLM's waste rule

---

[10] Memorandum of Understanding Among Bureau of Land Management, Colorado State Office, U.S. Forest Service, Rocky Mountain Region, and Colorado Oil and Gas Conservation Commission Concerning Oil and Gas Permitting on BLM and NSGS lands in Colorado (July 10, 2009), *available at* http://cogcc.state.co.us/documents/gov/federal/BLM_COGCC_USFS_Permitting_MOU_2009.pdf
[11] *Id.*

adopts a similar approach and allows for coordination with a state agency in certain instances to streamline state and federal permitting requirements.

18. Beyond the oil and gas sector, I was involved in the implementation of a MOU between the Colorado Department of Public Health and Environment, the Department of Interior's National Park Service, and EPA Region 8 to address nitrogen deposition and other impacts to the park ecosystem in Rocky Mountain National Park. As with the previous examples, the MOU recognized the distinct but complementary interests, roles, and expertise that the relevant federal and state agencies brought to bear in protecting national park land.

19. Along with these specific programs, there are numerous examples of BLM coordinating with federal and state agencies through the NEPA process to ensure federal lands are developed and managed in a manner that seeks to mitigate environmental harm. BLM plays the lead role in developing environmental impact assessments and air quality mitigation options—reflective of the agency's distinct role as a land manager.[12] This includes the power to designate air quality mitigation measures of its choosing, even as BLM often actively coordinates with other federal and state agencies to make

---

[12] *See* 42 C.F.R. § 1501.5.

those determinations. Through this process, BLM ensures proposed measures are complementary and effective.[13]

20. BLM's Waste Prevention Rule follows and fits well within this long tradition of federal–state collaboration to manage and minimize adverse environmental impacts on federal lands.

I declare under penalty of perjury that the foregoing is true and correct.

Barbara Roberts

Dated December 14, 2016

---

[13] *See e.g.*, BLM Vernal Field Office, Monument Butte Final EIS 2-29 – 2-30 (2016), available at https://eplanning.blm.gov/epl-front-office/eplanning/docset_view.do?projectId=62904&currentPageId=88062&documentId=75396; BLM Pinedale & Rock Springs Field Offices, *Final Environmental Impact Statement: Jonah Infill Drilling Project Sublette County, Wyoming* at 4-3 to 4-4 (Jan. 2006), *available at* http://www.blm.gov/style/medialib/blm/wy/information/NEPA/pfodocs/jonah.Par.6205.File.dat/10chap4.pdf.