# UNITED STATES DISTRICT COURT
# DISTRICT OF WYOMING

| | |
|---|---|
| STATE OF WYOMING, et al., | ) |
| | ) |
|     Petitioners, | ) |
| | ) Civil Case No. 2:16-cv-00285-SWS [Lead] |
|     v. | ) |
| | ) [Consolidated With 2:16-cv-00280-SWS] |
| UNITED STATES DEPARTMENT OF | ) |
| THE INTERIOR, et al., | ) Assigned: Hon. Scott W. Skavdahl |
| | ) |
|     Respondents, | ) |
| | ) |
| and | ) |
| | ) |
| WYOMING OUTDOOR COUNCIL, CENTER FOR BIOLOGICAL DIVERSITY, CITIZENS FOR A HEALTHY COMMUNITY, DINÉ CITIZENS AGAINST RUINING OUR ENVIRONMENT, ENVIRONMENTAL DEFENSE FUND, ENVIRONMENTAL LAW AND POLICY CENTER, MONTANA ENVIRONMENTAL INFORMATION CENTER, NATIONAL WILDLIFE FEDERATION, NATURAL RESOURCES DEFENSE COUNCIL, SAN JUAN CITIZENS ALLIANCE, SIERRA CLUB, THE WILDERNESS SOCIETY, WESTERN ORGANIZATION OF RESOURCE COUNCILS, WILDERNESS WORKSHOP, AND WILDEARTH GUARDIANS, | ) |
| | ) |
|     Respondent-Intervenors. | ) |

Declaration of Sarah Vogel

I, Sarah Vogel, declare as follows:

1. I am a resident of North Dakota and have lived here all my life, except for the years between 1967 and 1981, when I attended New York University School of Law and worked at various governmental and corporate positions in New York City, Greenwich, Connecticut and Washington D.C. I have practiced law in North Dakota in private practice and have worked for the State of North Dakota as an Assistant Attorney General from 1985 to 1988. In 1988, I was elected Commissioner of Agriculture and was reelected in 1992. I served eight years on the North Dakota Industrial Commission. Since 1996, I have been in private practice in Bismarck, North Dakota with Wheeler Wolf law firm, with the Sarah Vogel Law Partners, and since 2011 in solo practice. My focus has been on agricultural and civil rights law.

2. In 1951, my father and a partner bought 640 acres of farm and ranch land on the Fort Berthold Reservation in western North Dakota. In 2005, I bought a 50% share of the surface and in 2006, I bought the remaining 50% of the surface. I, my brother, and the heir of my deceased sister own a portion of the mineral rights under this farm. Thus, I own all of the surface and a portion of the mineral rights.

3. Since acquiring the farm, I have fenced the entire acreage, added a cabin, brought in electricity and rural water, and hired archeologists to locate the numerous cultural resources on the property. This cabin is a vacation home, and I go there in the spring, summer, fall and occasionally winter.

4. The land overlooks a deep bay into Lake Sakakawea and has one of the most beautiful views in North Dakota.

5. I also leased the mineral rights and these minerals are now divided between three spacing units. Each of the spacing units includes federally owned land managed by the Corps of Engineers, allotted trust land or tribal trust land.

6. Wells were drilled in two of the spacing units in late 2010 or early 2011. Those wells were placed on land I do not own but which is near the road on which I drive to my cabin. The first well has been flaring every single time I have driven by it since then. The second well has also been flaring every single time I have driven by it since then. Additional wells were placed on the pads of the original two wells over the years, and two new pads with additional wells were added since 2011. They also have been flaring every time I have driven by them.

7. I drive 16 miles from New Town to my cabin and the road is lined with well sites, and every well site is flaring every time I pass. My cabin is situated on a high point and I can see for miles in every direction. One night, I counted 21 flares. Flares more than one mile away from my cabin have cast shadows on the wall when I walked by a window at night. At night, one gets the full picture of the massive number of flares on the Fort Berthold Reservation.

8. I am familiar with North Dakota oil and gas law and rules, in part because I was on the Industrial Commission and in part because my law practice involved oil and gas issues which my farm clients experienced. I am also familiar with these rules based on my own ownership of minerals.

9. I am aware that North Dakota has regulations which are designed to reduce flaring, including a prohibition on flaring after one year unless the well operator obtains a waiver, and a requirement that operators who violate that prohibition pay royalties and taxes on the flared gas. My experience is that flaring has not been reduced. My understanding is that the rate of flaring in North Dakota is still many times higher than in other oil producing states such as Texas or Oklahoma.

10. As an owner of mineral rights, I have been deprived of royalty income from flared gas. Under lease terms, royalties are paid only on "marketed" gas, and because the gas that is flared is not marketed, no royalties are paid on flared gas even though royalties are required to be paid if flaring continues past a year, per regulation.

11. A Consent Decree filed on December 1, 2016, between the U.S. and Slawson Exploration Company, underscores that there are still substantial issues with wasted gas and air pollution in North Dakota. That Consent Decree addresses allegations that Slawson violated North Dakota and federal law by failing to install and operate vapor control systems on storage tanks at its approximately 170 well pads in North Dakota, including many well pads in the Ft. Berthold reservation. This is no small matter. Under the Consent Decree, Slawson must pay a $2.1 million civil penalty, install pollution control and monitoring technology at a cost of about $4.1 million, and provide $2 million for environmental projects. That enforcement action was brought by the federal government – not by the State of North Dakota – even though Slawson was alleged to have violated both state and federal law. *See* https://www.epa.gov/enforcement/slawson-exploration-company-inc-clean-air-act-settlement#violations.

12. I am sure that my lost income is minor in comparison to the lost income to the Mandan Hidatsa and Arikara Nation of the Ft. Berthold Reservation and the tribal members who are entitled to income from the gas that is not being wasted. Indeed, the state of North Dakota also suffers lost income because it

owns land and mineral rights within the reservation, the income from which is supposed to benefit the public schools.

13. I have read Mr. Helms' Declaration and there are serious errors in that Declaration. For example, Mr. Helms asserts that North Dakota has many tracts of federal minerals that arise from land foreclosures during the 1930s by the Federal Land Bank. It is true that there were many such foreclosures but this is irrelevant, as the Federal Land Banks are not federal agencies. *See, e.g., Fed. Land. Bank of St. Paul v. Lillehaugen*, 404 N.W.2d 452 (ND 1987) (clarifying that state debtor-protection laws applied to Federal Land Banks and that the member-borrowers of those Banks are, in effect, their owners). They are farm lending cooperatives that are part of the federally chartered Federal Land Bank system. But BLM does not administer leasing of minerals owned by the Federal Land Banks. Further, the Bankhead Jones Farm Tenancy Act of 1937 did not result in foreclosures by the US government. Under this law, the federal government purchased land from homesteaders whose property had been destroyed by the dust bowl.

14. Mr. Helms also asserts an overriding state interest in regulating flaring and venting on the Fort Berthold reservation by claiming "even within those areas [the Dakota Prairie Grasslands and the Fort Berthold Reservation], the State of North Dakota owns all of the water rights." This simply isn't the case as to Fort Berthold, where my land is situated. *See, e.g.,* Charles Carvell, *Indian Reserved Water Rights: Impending Conflict or Coming Rapprochement Between the State of North Dakota and North Dakota Indian Tribes*, 85 N.D. L. Rev. 1, 1 (2009), stating that tribal water rights have priority over state water rights.

15. It is not feasible or appropriate for the federal government to simply abandon its legal and trust responsibilities to the Mandan Hidatsa and Arikara Nation in favor of the state of North Dakota.

16. I am heartened by the federal Bureau of Land Management's adoption of standards directing oil producers on federal lands – and in spacing units containing federal minerals – to cut down on flaring and venting. Since flaring continues despite North Dakota's rules, it is past time for BLM to make sure natural gas is not just being burned up or released, when there are, as I understand it, practical and proven technologies to put the gas in a pipeline or otherwise put it to good use.

17. The BLM rules likely will significantly reduce venting and flaring on and near my land, meaning less light interfering with my view of night skies, less air pollution, and more royalties going to me and other similarly-situated mineral rights' owners (including the state of North Dakota itself!). If the rules were overturned or vacated, I would not be able to enjoy my cabin

nearly as much as if they remain in place, and I would lose the additional royalties I'll receive with more gas captured.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 12, 2016.

*Sarah Vogel*
Sarah Vogel