CHRISTOPHER A. CROFTS
United States Attorney
C. LEVI MARTIN (WY Bar # 6-3781)
Assistant United States Attorney
District of Wyoming
P.O. Box 668
Cheyenne, WY 82003-0668
(307) 772-2124
christopher.martin@usdoj.gov

JOHN C. CRUDEN
Assistant Attorney General
MARISSA PIROPATO
CLARE BORONOW
Trial Attorneys
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
PO Box 7611
Washington, DC  20044-7611
Tel: (202) 305-0470 (Piropato)
(202) 305-0492 (Boronow)
Fax: (202) 305-0506
marissa.piropato@usdoj.gov
clare.boronow@usdoj.gov

*Attorneys for Federal Respondents*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

|  |  |
|---|---|
| STATE OF WYOMING and STATE OF MONTANA | ) ) ) ) No. 16-cv-00285-SWS |
| Petitioners, | ) ) [Consolidated with 16-cv-00280-SWS] |
| and | ) ) **FEDERAL RESPONDENTS'** |
|  | ) **CONSOLIDATED OPPOSITION TO** |
| STATE OF NORTH DAKOTA, | ) **PETITIONERS' AND PETITIONER-** |
|  | ) **INTERVENOR'S MOTIONS FOR** |
| Petitioner-Intervenor | ) **PRELIMINARY INJUNCTION** |
|  | ) |
| v. | ) |
|  | ) |

UNITED STATES DEPARTMENT OF THE )
INTERIOR, *et al*.,                              )
                                                           )
                               Respondents.       )
                                                           )
and                                                     )
                                                           )
WYOMING OUTDOOR COUNCIL, et al.    )
                                                           )
                     Respondent-Intervenors. )
_____ )

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................. 3

    I.      Venting, Flaring, and Capture During Oil and Gas Production ............................ 3

    II. The Waste Prevention Rule ................................................................ 4

STATUTORY BACKGROUND AND STANDARD OF REVIEW ......................................... 10

    I.      Review of Agency Action under the Administrative Procedure Act ("APA") .... 10

    II. Standard for Demonstrating Entitlement to Extraordinary and Preliminary Relief ...... 10

ARGUMENT .................................................................................................... 12

    I.      Petitioners Have Not Demonstrated A Likelihood of Success on the Merits ....... 12

          A.    BLM Promulgated the Waste Prevention Rule under Its Authority to Prevent the Waste of Federal and Indian Oil and Gas Resources and to Regulate Those Resources for the Benefit of the American Public ..... 13

               1.    BLM Has Statutory Authority to Minimize and Deter Waste in the Development of Federal and Indian Oil and Gas Resources ................................................................ 14

               2.    The Rule is a Waste Prevention Regulation ................................. 18

               3.    BLM Has Statutory Authority to Regulate Oil and Gas Development on Federal and Indian Lands in a Way that Protects the Environment ............................................. 22

               4.    Neither the Clean Air Act Nor State Air Quality Regulations Limit BLM's Authority to Promulgate a Rule that Has Air Quality Benefits ........................................................ 26

          B.    The Rule's Definitions of "Unavoidably Lost" Gas and "Avoidably Lost" Gas are Entitled to Deference Because They are Reasonable Under the MLA ................................................................ 31

               1.    The Rule's Definitions Are a Reasonable Refinement of BLM's Prior Regulations ............................................. 32

               2.    The Rule Accounts for an Operator's Reasonable Precautions to Prevent Waste, Including Economic Feasibility ................................................................. 35

3.    The Rule Will Not Increase the Abandonment of Oil and Gas Reserves ............................................................................... 38

4.    The Rule's Assessment of Royalties on Avoidably Lost Gas is Reasonable ......................................................................... 41

C.    BLM Has Authority to Limit Production of a New Well When It Could Exceed a System's Capture Capacity and to Defer or Condition Approval of an APD on Capture Capacity ............................. 43

D.    BLM Has Authority to Regulate Wells in a Federally-Approved Communitized Area or Unit..................................................... 46

1.    The Rule Clearly Defines the Problem Sought to be Remedied ......................................................................... 52

2.    Compliance Costs are not the Appropriate Measure of the Rule's Reasonableness ................................................... 52

3.    Consistent with Past Practice, BLM Will Protect Confidential Business Information ............................... 53

4.    The Rule's Requirement of a Waste Minimization Plan is Reasonable ......................................................................... 54

5.    BLM Complied with the APA's Notice and Comment Procedures..................................................................... 54

6.    The Rule Creates Exceptions Where Methane Streams Do Not Allow for Flaring .................................................. 56

F.    Petitioners' Challenge to the Agency's Cost Benefit Analysis Improperly Attempts to Manufacture a Battle of the Experts.................. 57

II.    An Injunction Would Not Serve the Public's Interest ........................................... 60

III.   Petitioners Have Failed to Demonstrate the Requisite Certain, Irreparable Harm .................................................................................................................. 65

IV.    The Balance of Harms Tips In the Government's Favor ...................................... 72

CONCLUSION.................................................................................................................. 74

# TABLE OF AUTHORITIES

**Cases**

A.O. Smith Corp. v. Fed. Trade Comm'n,
  530 F.2d 515 (3d Cir. 1976) ............................................................... 66

Allband Commc'ns Coop. v. FCC,
  135 S. Ct. 2072 (2015) ...................................................................... 13

Am. Hosp. Ass'n v. Harris,
  625 F.2d 1328 (7th Cir. 1980) ............................................................ 66

Am. Mining Cong. v. Thomas,
  772 F.2d 617 (10th Cir. 1985) ............................................................ 55

Amigos Bravos v. BLM,
  Nos. 6:09-cv-00037-RB-LFG, 6:09-cv-00414-RB-LFG, 2011 WL 7701433 (D.N.M. Aug. 3,
  2011) ............................................................................................. 28

Amoco Prod. Co. v. Heimann,
  904 F.2d 1405 (10th Cir.1990) ........................................................... 46

Associated Sec. Corp. v. Sec. & Exch. Comm'n,
  283 F.2d 773 (10th Cir. 1960) ..................................................... 11, 73

Autoskill v. Nat'l Educ. Support Sys.,
  994 F.2d 1476 (10th Cir. 1993) .......................................................... 12

Balt. Gas and Elec. Co. v. Natural Res. Def. Council, Inc.,
  462 U.S. 87 (1983) ................................................................... 10, 57

Beirne v. Sec'y of Dep't of Agric.,
  645 F.2d 862 (10th Cir. 1981) ............................................................ 55

Best v. Humboldt Placer Mine Co.,
  371 U.S. 334 (1963) .......................................................................... 22

Biodiversity Conservation All. v. Jiron,
  762 F.3d 1036 (10th Cir. 2014) .......................................................... 40

Boesche v. Udall,
  373 U.S. 472 (1963) .......................................................................... 23

Cal. Co. v. Udall,
  296 F.2d 384 (D.C. Cir. 1961) ..................................................... 15, 16

Camfield v. United States,
  167 U.S. 518 (1897) .......................................................................... 70

Caribbean Marine Servs. Co. v. Baldrige,
  844 F.2d 668 (9th Cir. 1988) ............................................................. 71

*Chamber of Commerce of the U.S. v. Edmondson*,
   594 F.3d 742 (10th Cir. 2010) ................................................. 67

*Chapman v. El Paso Natural Gas Co.*,
   204 F.2d 46 (D.C. Cir. 1953) ............................................. 16, 17

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*,
   467 U.S. 837 (1984) ................................................. 13, 31, 32

*Citizens to Pres. Overton Park v. Volpe*,
   401 U.S. 402 (1971) ......................................................... 10

*City of Arlington v. FCC*,
   133 S. Ct. 1863 (2013) ...................... 13, 14, 18, 22, 26, 31

*Copper Valley Mach. Works, Inc. v. Andrus*,
   653 F.2d 595 (D.C. Cir. 1981) ............................................. 23

*Cotton Petroleum Corp. v. New Mexico*,
   490 U.S. 163 (1989) ......................................................... 17

*Cronin v. U.S. Dep't of Agric.*,
   919 F.2d 439 (7th Cir. 1990) ............................................. 11

*CSX Transp., Inc. v. Surface Transp. Bd.*,
   584 F.3d 1076 (D.C. Cir. 2009) ...................................... 55, 56

*CTIA v FCC*,
   530 F.3d 984 (D.C. Cir. 2008) ........................................... 54

*Davis v. Mineta*,
   302 F.3d 1104 (10th Cir. 2002) ...................................... 11, 12

*Diné Citizens Against Ruining Our Environment v. Jewell*,
   839 F.3d 1279 (10th Cir. 2016) ...................................... 11, 12

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
   356 F.3d 1256 (10th Cir. 2004) ......................................... 10

*Duesing v. Udall*,
   350 F.2d 748 (D.C. Cir. 1965) ........................................... 23

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ......................................................... 32

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ......................................................... 31

*Freedom Holdings, Inc. v. Spitzer*,
   408 F.3d 112 (2d Cir. 2005) ............................................. 66

*Froholm v. Cox*,
   934 F. 2d 959 (8th Cir. 1991) ........................................... 47

*Gas Co. v. Fed. Energy Regulatory Comm'n*,
758 F.2d 669 (D.C. Cir. 1985) ......................................................... 66

*Getty Oil Co. v. Clark*,
614 F. Supp. 904 (D. Wyo. 1985) ..................................................... 23

*Greater Yellowstone Coal. v. Flowers*,
321 F.3d 1250 (10th Cir. 2003) ................................................ 68, 69, 71

*Greater Yellowstone Coal. v. Tidwell*,
572 F.3d 1115 (10th Cir. 2009) ....................................................... 24

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*,
508 F. Supp. 2d 295 (D. Vt. 2007) ................................................... 27

*Gulf Oil Corp. v. Andrus*,
460 F. Supp. 15 (C.D. Cal. 1978) ..................................................... 41

*Hain v. Mullin*,
436 F.3d 1168 (10th Cir. 2006) ....................................................... 38

*Heideman v. S. Salt Lake City*,
348 F.3d 1182 (10th Cir. 2003) ............................................ 65, 66, 71, 72

*Helfrich v. Blue Cross & Blue Shield Ass'n*,
804 F.3d 1090 (10th Cir. 2015) .................................................... 14, 26

*Hoyl v. Babbitt*,
129 F.3d 1377 (10th Cir. 1997) ....................................................... 23

*Humane Soc'y of the U.S. v. Gutierrez*,
558 F.3d 896 (9th Cir. 2009) ......................................................... 11

*In re FCC 11-161*,
753 F.3d 1015 (10th Cir. 2014) .................................................... 13, 18

*James River Flood Control Ass'n v. Watt*,
680 F.2d 543 (8th Cir. 1982) ......................................................... 64

*Jefferson Univ. v. Shalala*,
512 U.S. 504 (1994) .................................................................. 13

*Jicarilla Apache Tribe v. Supron Energy Corp.*,
728 F.2d 1555 (10th Cir. 1984) .................................................... 2, 17

*Kikumura v. Hurley*,
242 F.3d 950 (10th Cir. 2001) ........................................................ 67

*Kirkpatrick Oil & Gas Co. v. United States*,
675 F.2d 1122 (10th Cir. 1982) ............................................... 49, 50, 69

*Kleppe v. New Mexico*,
426 U.S. 529 (1976) ............................................................... 69, 70

*Knight v. United Land Ass'n,*
142 U.S. 161 (1891) ................................................................................. 22

*Lands Council v. McNair,*
537 F.3d 981 (9th Cir. 2008) ..................................................................... 11

*Lujan v. Nat'l Wildlife Fed'n,*
497 U.S. 871 (1990) ................................................................................. 39

*Marathon Oil Co. v. Andrus,*
452 F. Supp. 548 (D. Wyo. 1978) ............................................................. 41

*Marsh v. Or. Natural Res. Council,*
490 U.S. 360 (1989) .............................................................. 10, 39, 57, 59

*Massachusetts v. EPA,*
549 U.S. 497 (2007) ................................................................................. 27

*Mayo Found. for Med. Educ. & Research v. United States,*
562 U.S. 44 (2011) ............................................................................. 14, 15

*Monsanto Co. v. Geertson Seed Farms,*
561 U.S. 139 (2010) ................................................................................. 11

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ................................................................................... 10

*Naartex Consulting Corp. v. Watt,*
722 F.2d 779 (D.C. Cir. 1983) ................................................................. 16

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.,*
545 U.S. 967 (2005) ................................................................................. 31

*Nat'l Mineral Ass'n v. Jackson,*
768 F. Supp. 2d 34 (D.D.C. 2011) ............................................................ 66

*Nat'l Park Hospitality Ass'n v. Dep't of the Interior,*
538 U.S. 803 (2003) ................................................................................. 39

*Natural Res. Def. Council v. Berklund,*
458 F. Supp. 925 (D.D.C. 1978) ............................................................... 23

*Norton v. S. Utah Wilderness All.,*
542 U.S. 55 (2004) ................................................................................... 24

*Ohio v. Nuclear Regulatory Comm'n,*
812 F.2d 288 (6th Cir. 1987) ................................................................... 11

*Pauley v. BethEnergy Mines, Inc.,*
501 U.S. 680 (1991) ................................................................................. 13

*Pennsylvania v. Kleppe,*
533 F.2d 668 (D.C. Cir. 1976) ................................................................. 71

*Port Cities Properties v. Union Pacific Railroad Co.*,
518 F.3d 1186 (10th Cir. 2008) ............................................................. 66

*Reno v. Catholic Soc. Servs., Inc.*,
509 U.S 43 (1993) ................................................................................... 39

*S. Utah Wilderness All. v. Dabney*,
222 F.3d 819 (10th Cir. 2000) ............................................................... 32

*Salt Lake Tribune Pub. Co., LLC v. AT & T Corp.*,
320 F.3d 1081 (10th Cir. 2003) ............................................................. 12

*Sampson v. Murray*,
415 U.S. 61 (1974) ................................................................................. 66

*Schiavo ex rel. Schindler v. Schiavo*,
403 F.3d 1223 (11th Cir. 2005) ............................................................. 65

*Sierra Club, Inc. v. Bostick*,
787 F.3d 1043 (10th Cir. 2015) ............................................................. 18

*Sierra Club, Inc. v. Bostick*,
539 F. App'x 885 (10th Cir. 2013) .................................................... 11, 72

*Smithsfork Grazing Ass'n v. Salazar*,
564 F.3d 1210 (10th Cir. 2009) ............................................................. 51

*Stormans, Inc. v. Selecky*,
586 F.3d 1109 (9th Cir. 2009) ............................................................... 60

*Supply, Inc. v. Susquehanna River Basin Comm'n*,
No. 1:cv-06-2454, 2007 WL 551573 (M.D. Pa. Feb. 20, 2007) ............ 69

*Topaz Beryllium Co. v. United States*,
649 F.2d 775 (10th Cir. 1981) ............................................................... 25

*United States v. Mead Corp.*,
533 U.S. 218 (2001) .......................................................................... 15, 18

*United States v. Navajo Nation*,
537 U.S. 488 (2003) ............................................................................... 17

*United States v. Oakland Cannabis Buyers' Co-op.*,
532 U.S. 483 (2001) ............................................................................... 64

*Utah Envtl. Cong. v. Bosworth*,
443 F.3d 732 (10th Cir. 2006) ............................................................... 40

*Utah Envtl. Cong. v. Russell*,
518 F.3d 817 (10th Cir. 2008) .......................................................... 57, 59

*Utah Power & Light Co. v. United States*,
243 U.S. 389 (1917) .......................................................................... 69, 70

*Utah Shared Access All. v. Carpenter*,
463 F.3d 1125 (10th Cir. 2006) ........................................................ 24

*Utility Air Regulatory Group v. EPA*,
134 S. Ct. 2427 (2014) ...................................................................... 18

*Va. Soc'y for Human Life v. FEC*,
263 F.3d 379 (4th Cir. 2001) ............................................................ 12

*Van Hollen, Jr. v. Fed. Election Comm'n*,
811 F.3d 486 (D.C. Cir. 2016) .......................................................... 31

*Ventura County v. Gulf Oil Corp.*,
601 F.2d 1080 (9th Cir. 1979) .......................................................... 50

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) .................................................................. 11, 60

*Wildearth Guardians v. U.S. Fish & Wildlife Serv.*,
784 F.3d 677 (10th Cir. 2015) .......................................................... 13

*Wilderness Workshop v. BLM*,
531 F.3d 1220 (10th Cir. 2008) ........................................................ 10

*Winter v. Natural Res. Def. Council*,
555 U.S. 7 (2008) ....................................................... 10, 11, 12, 65

*Wright v. Fed. Bureau of Prisons*,
451 F.3d 1231 (10th Cir. 2006) ........................................................ 38

*Wyoming v. U.S. Department of Interior*,
674 F.3d 1220 (10th Cir. 2012) ........................................................ 71

*Wyoming v. United States*,
279 F.3d 1214 (10th Cir. 2002) ........................................................ 69

*Zen Magnets, LLC v. Consumer Prod. Safety Comm'n*,
No. 14-9610, 2016 WL 6872627 (10th Cir. Nov. 22, 2016) ............................ 55, 56

**Statutes**

5 U.S.C. § 553(b) ............................................................................ 55

5 U.S.C. § 705 ................................................................................ 11

5 U.S.C. § 706(2)(A) ........................................................................ 10

25 U.S.C. § 396d .............................................................................. 15

30 U.S.C. § 187 ..................................................................... 2, 15, 23

30 U.S.C. § 189 ....................................................................... 15, 23

30 U.S.C. § 209 .............................................................................. 23

30 U.S.C. § 225 .......................................................................... 2, 15, 31, 32

30 U.S.C. § 226(g) ................................................................................ 23

30 U.S.C. § 226(m) .............................................................. 16, 46, 47, 48

30 U.S.C. § 226(p)(2)(B)(i) .................................................................. 45

30 U.S.C. § 1701(a)(4) .......................................................................... 17

30 U.S.C. §§ 1717-1722 ....................................................................... 47

30 U.S.C. § 1732(b) .............................................................................. 24

30 U.S.C. § 1751 .................................................................................. 15

30 U.S.C. § 1756 ................................................................. 17, 42, 47

42 U.S.C. § 7610 .................................................................................. 27

43 U.S.C. § 1701(a)(8) .................................................................... 24, 28

43 U.S.C. § 1712(c) .............................................................................. 25

43 U.S.C. § 1712(c)(8) .......................................................................... 25

**Rules**

Mont. Admin. R. 36.22.1221 ................................................................ 21

**Regulations**

25 C.F.R. § 211.3 .................................................................................. 17

36 C.F.R. § 7.13(I)(2) ........................................................................... 28

36 C.F.R. § 294.46(d)(8) ...................................................................... 28

40 C.F.R. § 1502.1 ............................................................................... 28

40 C.F.R. § 1502.14(f) .......................................................................... 28

40 C.F.R. § 1502.16(h) ......................................................................... 28

43 C.F.R. §§ 2.26-2.36 ......................................................................... 67

43 C.F.R. § 3181.1 .......................................................................... 46, 48

43 C.F.R. § 3186.1 ............................................................................... 48

43 C.F.R. § 3161.1(b) ........................................................................... 48

43 C.F.R. § 3591.1(b)(3) ...................................................................... 28

43 C.F.R. § 3162.3-1 ............................................................................ 44

43 C.F.R. § 3179.3 ............................................................................... 45

43 C.F.R. § 3179.4 ........................................................ 9, 21, 33, 37, 42

43 C.F.R. § 3179.4(b) ................................................................................ 34

43 C.F.R. § 3179.6 ...................................................................................... 8

43 C.F.R. § 3179.6(a) ................................................................................ 20

43 C.F.R. § 3179.7 ...................................................................................... 8

43 C.F.R. §§ 3179.7-8 ............................................................................... 18

43 C.F.R. § 3179.7(b) ................................................................................ 39

43 C.F.R. § 3179.7(c)(3) ........................................................................... 41

43 C.F.R. § 3179.8 .................................................................................... 64

43 C.F.R. § 3179.8(a) ........................................................................ 35, 39

43 C.F.R. § 3179.9 .................................................................................... 21

43 C.F.R. § 3179.11 .................................................................................. 43

43 C.F.R. § 3179.12 ........................................................................... 30, 68

43 C.F.R. § 3179.102(a)(2) ....................................................................... 21

43 C.F.R. § 3179.102(b) ...................................................................... 9, 27

43 C.F.R. § 3179.102(c) ............................................................................ 36

43 C.F.R. § 3179.103(a)(3) ....................................................................... 21

43 C.F.R. §§ 3179.201-204 ........................................................................ 9

43 C.F.R. § 3179.201(a)(2) ................................................................... 9, 27

43 C.F.R. § 3179.201(b)(4) ................................................................. 36, 64

43 C.F.R. § 3179.202(1)-(2) ..................................................................... 20

43 C.F.R. § 3179.202(c) ............................................................................ 22

43 C.F.R. § 3179.202(f) ...................................................................... 36, 65

43 C.F.R. § 3179.203 ................................................................................ 20

43 C.F.R. § 3179.203(a)(2) ................................................................... 9, 27

43 C.F.R. § 3179.203(c) .............................................. 20, 22, 36, 65

43 C.F.R. §§ 3179.301-304 ........................................................................ 9

43 C.F.R. § 3179.301(c) ............................................................................ 20

43 C.F.R. § 3179.301(j) ....................................................................... 9, 27

43 C.F.R. § 3179.303(c) ...................................................................... 36, 65

43 C.F.R. § 3179.304 ................................................................................ 20

43 C.F.R. § 3179.401 ........................................................................................ 9, 68

43 C.F.R. § 3179.401(b) ......................................................................................... 30

43 C.F.R. § 3179.401(f) .................................................................................. 9, 29, 30

43 C.F.R. pt. 3180 ................................................................................................... 48

55 Fed. Reg. 48,958 (Nov. 23, 1990) ...................................................................... 28

64 Fed. Reg. 43,225 (Aug. 4, 1999) ........................................................................ 30

80 Fed. Reg. 59,332 (Aug. 29, 2016) ....................................................................... 59

81 Fed. Reg. 35,824 (June 3, 2016) ......................................................................... 59

2 CCR § 404-1:317m ............................................................................................... 20

N.D. Admin. Code 43-02-03-45 ............................................................................... 21

**Other Authorities**

Executive Order 12,866 ............................................................................................ 60

Executive Order 13,132 ............................................................................................ 30

## INTRODUCTION

When operators on Bureau of Land Management ("BLM")-administered leases vent or flare natural gas during oil and gas production, or allow gas to leak, they deprive the American public, states, and tribes of a source of domestic energy and of royalty revenues. Although some venting and flaring may be technically necessary during oil and gas production, in recent years, these losses have increased dramatically as the rate of well construction has outpaced that of capture and transmission infrastructure. Federal and Indian natural gas resources that could otherwise be captured and sold or used on-site for production are instead wasted because operators lack the incentives to ensure adequate capture capacity before drilling or to minimize losses from equipment and leaks.

The Waste Prevention Rule, an update of BLM's existing venting and flaring regulations, aims to fix this situation by requiring that operators who are benefitting from the production of public resources take reasonable, cost-effective measures to minimize the waste of those resources. It does this by addressing the three sources of gas loss during production—venting, flaring, and equipment leaks. It requires that operators capture a specified percentage of their total gas production. The Rule also requires that operators upgrade outdated equipment that releases large volumes of gas and that they inspect all equipment for leaks on a routine basis. It incentivizes compliance by imposing royalties on any gas lost in situations where the loss is not unavoidable, including when gas is flared in excess of the capture requirement.

Because the Rule is aimed at waste prevention, it falls squarely within BLM's authority under the Mineral Leasing Act ("MLA"), which requires oil and gas lessees to "use all reasonable precautions to prevent waste of oil and gas developed" on public lands and to observe "such rules . . . for the prevention of undue waste as may be prescribed" by the Secretary of the

Interior. 30 U.S.C. §§ 187, 225. The Rule also achieves BLM's statutory mandates to prevent the loss of royalties to which federal and state governments are entitled and to "ensure that Indian tribes receive the maximum benefit from mineral deposits on their lands." *Jicarilla Apache Tribe v. Supron Energy Corp.*, 728 F.2d 1555, 1568 (10th Cir. 1984).

Petitioners have mischaracterized the Rule as a "comprehensive air quality regime," presumably so that they could rely on the same types of arguments that this Court found persuasive in Petitioners' challenge to BLM's Hydraulic Fracturing Rule. But, contrary to Petitioners' assertions, the Waste Prevention Rule is not a pollution control rule and does not improperly infringe on the Environmental Protection Agency's ("EPA") authority under the Clean Air Act. It sets no emissions standards for particular pollutants and contains no air quality monitoring requirements. While the reduction of venting, flaring, and leaks will have air quality benefits, those benefits are simply another result of waste prevention. They are also well within BLM's longstanding authority to consider the environmental impacts of oil and gas development.

The waste of public resources and the associated loss of royalty revenues are ongoing harms suffered by the American public and federal, state, and tribal governments that far outweigh Petitioners' speculative economic harms. Because Petitioners have failed to demonstrate a likelihood of success on the merits of their claims or to overcome the public's strong interest in utilizing, rather than wasting, domestic energy sources, their request for a preliminary injunction must be denied.

**FACTUAL BACKGROUND**

I.      **Venting, Flaring, and Capture During Oil and Gas Production**

Natural gas is a valuable commodity that can be produced on its own or in conjunction

with oil. During oil production, operators frequently dispose of the associated gas by venting or

flaring if the gas cannot be easily captured for sale or used on-site. AR 459 (Regulatory Impact

Analysis for the Final Rule ("RIA") at 13). When an operator vents natural gas, as it does when it

employs pneumatic equipment that "bleeds" gas or when it releases tank vapors in order to

relieve tank pressure, the operator directly releases that gas into the atmosphere. When an

operator flares gas, as it does when the gas associated with oil production cannot be captured, it

combusts the gas, releasing the byproducts of that combustion into the atmosphere.

While flaring is sometimes truly unavoidable, as in emergencies, it is often done because

operators and midstream companies have not built the infrastructure needed to capture produced

gas. AR 23 (81 Fed. Reg. 6,616, 6,637 (Feb. 8, 2016)). For example, an operator drilling an

exploration well may not yet know whether the well will produce much gas. *Id.* Or, in some

fields, the wells may not produce enough gas to offset the cost of building pipeline infrastructure.

*Id.* More often, however, on BLM-administered leases, flaring occurs because the rising rate of

production has overwhelmed the capacity of the existing infrastructure. AR 24 (81 Fed. Reg. at

6,638). Each time a new oil well is connected to the gathering system—that is, the existing

network of pipelines—"it may increase the pressures on the system above the pressures

generated by existing producing wells, pushing those wells off the gathering system." *Id.*

Operators of the existing wells must then choose between shutting in the well (i.e., temporarily

ceasing production), curtailing production, reinjecting the gas, capturing the gas using alternative

3

technologies, or flaring. *Id.* Given these options, operators often choose the easiest, and most wasteful, option: flaring. *Id.*

While pipelines have long been the primary means of capturing and transporting produced gas, alternative methods of capture have become "increasingly available" in recent years. AR 5 (81 Fed. Reg. at 6,619). They include separating out natural gas liquids or compressing the gas, allowing it to be transported by truck to a processing plant for sale. AR 5, 23 (81 Fed. Reg. at 6,619, 6,637); AR 488-89 (RIA at 42-43). Operators can also use the gas to run micro-turbines to generate power for use on-site or for sale back to the grid. *Id.*

Despite their availability, oil and gas companies have not widely adopted these capture technologies. Because oil has been worth more than gas in recent years, operators have had an incentive to focus on oil development rather than gas capture. AR 23-24 (81 Fed. Reg. at 6,637-38). This is true even though gas capture is frequently profitable. *Id.*; AR 488 (RIA at 42).

## II.     The Waste Prevention Rule

The Department of the Interior has regulated venting and flaring to prevent the waste of federal and Indian natural gas since 1979 when it issued Notice to Lessees-4A ("NTL-4A"), which the Waste Prevention Rule will replace. NTL-4A prohibits venting and flaring of gas produced by oil wells, except when the gas is "unavoidably lost" as defined in NTL-4A and when the operator has sought and received BLM's approval to vent or flare. NTL-4A § IV.B. While unavoidably lost gas and gas vented or flared with BLM approval are exempted from royalties, gas that is "avoidably lost"—that is, gas lost due to an operator's negligence or failure to comply with the law—is subject to royalties. NTL-4A § I, II.A & C. NTL-4A also requires operators to measure and report each month the volume of gas sold, avoidably and unavoidably lost, vented or flared, or used for operations on the lease. *Id.* § V.

4

Since NTL-4A was issued in 1979, oil and gas production in the United States, and on BLM-administered leases, has increased dramatically. AR 366 (81 Fed. Reg. 83,008, 83,014 (Nov. 18, 2016)). Domestic production from the over 96,000 oil and gas wells administered by BLM now accounts for 11 percent of the Nation's natural gas supply and 5 percent of its oil supply. *Id.* In FY 2015 alone, federal and Indian leases produced oil and gas valued at $20.9 billion, which generated $2.3 billion in royalties. *Id.*

However, the American public has not fully benefitted from this increased production because it has been accompanied by an increase in the wasteful loss of gas. According to the Department of the Interior's Office of Natural Resources Revenue ("ONRR"), between 2009 and 2015 operators reported venting or flaring 2.7 percent of the natural gas produced on BLM-administered leases—enough natural gas to supply over 6.2 million households for a year.[1] AR 367 (81 Fed. Reg. at 83,015). In 2014 alone, gas vented and flared from federal and Indian leases had a sales value of $444 million and a royalty value of $56 million. AR 449 (RIA at 3). Also between 2009 and 2015, flaring of oil well gas increased by 318 percent, indicating that the waste of federal and Indian natural gas resources is a growing problem. AR 367 (81 Fed. Reg. at 83,015). The requests received by BLM for approval under NTL-4A to vent or flare royalty-free confirm this: between 2005, 2011, and 2014, the number of applications per year went from 50, to 622, to 1,248.[2] *Id.*

---

[1] ONRR's data likely underestimates the amount of gas lost from federal and Indian oil and gas development because it does not account for additional gas lost from equipment venting and leaks. AR 368-69 (81 Fed. Reg. at 83,015-16).

[2] Petitioners' statistics suggesting that methane emissions from the natural gas sector have decreased by 15 percent since 1990 are misleading. *See* ECF No. 13 at 4. First, those statistics apply only to natural gas development, not oil development. Since 1990, methane emissions from oil production field operations alone have increased 80 percent. *EPA Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2014*, at 3-59 (2016), *available at* https://www.epa.gov/sites/production/files/2016-04/documents/us-ghg-inventory-2016-chapter-

While flaring is sometimes unavoidable—for example, in an emergency—the majority of flaring on BLM-administered leases is a result of new well construction outpacing the existing infrastructure's capture capacity or occurring before capture infrastructure is in place. AR 5 (81 Fed. Reg. at 6,619). Flaring in these circumstances generally represents an operator's decision "to focus on near-term oil production rather than investing in the gas capture and transmission infrastructure that would be necessary to realize a profit from the associated gas." *Id.*

As the wasteful loss of gas from BLM-administered leases increased in recent years, federal oversight organizations took notice. In December 2007, the Royalty Policy Committee issued a report recommending that BLM update its regulations to improve royalty accountability. AR 369 (81 Fed. Reg. at 83,017). In 2010, the Department of the Interior's Office of Inspector General and the U.S. Government Accountability Office ("GAO") both recommended that BLM's regulations regarding the royalty-free use of gas be updated to take advantage of new capture technologies. *Id.* As evidence of the ongoing waste, the GAO estimated that in 2008 alone, operators vented or flared 50 billion cubic feet ("Bcf") of economically recoverable gas, representing about $23 million in lost royalties. AR 448 (RIA at 2). The GAO determined that around 40 percent of the natural gas vented and flared from onshore federal leases could be economically captured using currently available technologies. AR 16 (81 Fed. Reg. at 6,630). In 2016, the GAO reiterated this point in a second report finding that BLM's regulations failed to

_____

3-energy.pdf. Second, Petitioners' statistics apply to all natural gas development in the United States, not just natural gas development on BLM-administered leases. BLM-administered leases have seen a greater increase in flaring over time (318 percent since 2009) than U.S. development as a whole (93 percent increase since 1990). *Id.* at 3-68. Third, the decrease of methane emissions in the natural gas sector overall is driven by a decrease in emissions from transmission, storage, and distribution. "Over the same period, the production and processing segments saw increased methane emissions, of 31 and 13 percent, respectively." *Id.*

provide operators clear guidance on measuring and reporting lost gas. AR 369 (81 Fed. Reg. at 83,017).

In light of the growing problem of waste—and the accompanying loss of royalties—BLM recognized that NTL-4A was outdated and ineffective at preventing the waste of federal and Indian mineral resources. *Id.* In response, the agency set about developing new waste prevention regulations that take into account modern capture and production technologies and are easier for operators and the BLM to apply. *Id.* BLM reached out to stakeholders while developing the Rule, hosting numerous public meetings and soliciting comments during the scoping period. AR 373 (81 Fed. Reg. at 83,021).

BLM published the Proposed Rule on February 8, 2016. AR 2 (81 Fed. Reg. 6,616). The Proposed Rule proposed reducing waste by (1) limiting venting and flaring; (2) requiring the identification and repair of equipment leaks; (3) requiring the replacement of high-bleed equipment with no- or low-bleed equipment; and (4) minimizing losses of gas from storage vessels, well maintenance, and production activities. AR 5-10 (81 Fed. Reg. at 6,619-24). In particular, the Proposed Rule would have imposed a monthly limit on flaring that phased-in over a three-year period. AR 5-6 (81 Fed. Reg. at 6,619-20). It also would have updated NTL-4A's royalty provisions by more specifically defining when a loss of gas is unavoidable. *Id.*

BLM accepted comments from the public on the Proposed Rule from February 8, 2016, until April 22, 2016. Ex. A at ¶ 2 (Decl. of Timothy R. Spisak). The BLM received approximately 330,000 public comments, including approximately 1,000 unique comments. *Id.* The agency also hosted additional stakeholder meetings and met with state regulators from states with significant federal oil and gas production, including Petitioners North Dakota and Wyoming. AR 373 (81 Fed. Reg. at 83,021).

BLM coordinated closely with the Environmental Protection Agency ("EPA") in developing the Rule. Spisak Decl. ¶ 33. Because the Rule's waste prevention measures would have the ancillary effect of reducing methane emissions, the agency reviewed EPA air pollution regulations limiting methane emissions for oil and gas equipment and made sure that there was no conflict between them and the Rule. *Id.* ¶¶ 30-32. BLM discussed the Rule with EPA personnel on over 40 conference calls between January 2015 and October 2016. *Id.* ¶ 33. EPA provided comments on the Proposed and Final Rules, and BLM addressed those comments when it finalized the Rule. *Id.* ¶ 34.

On November 18, 2016, BLM issued the Final Rule. AR 360 (81 Fed. Reg. at 83,008). In the Final Rule, BLM refined many of the provisions of the Proposed Rule based on comments to ensure both that compliance was feasible for operators and that the Rule achieved its waste prevention objectives. The Final Rule prohibits venting, except in certain limited situations such as emergencies and where flaring is technically infeasible. 43 C.F.R. § 3179.6. Unlike the Proposed Rule's monthly flaring limits, the Final Rule adopts a more flexible capture-percentage approach, modeled on North Dakota's regulations, that requires operators to capture a certain percentage of the gas they produce each month, excluding specified volumes of allowable flared gas. 43 C.F.R. § 3179.7; AR 375-76 (81 Fed. Reg. at 83,023-24). Both the capture percentage and the flaring allowance phase-in over a ten-year period to give operators time to adjust. *Id.* The Final Rule gives operators additional flexibility in how to comply with the capture requirements by allowing them to meet those requirements on a lease-by-lease, county-wide, or state-wide basis. *Id.* at 83,023.

Like the Proposed Rule, the Final Rule retains NTL-4A's distinction between avoidably and unavoidably lost gas—with royalties owed on the former but not the latter—but clarifies the

NTL-4A approach by eliminating BLM's discretion to make unavoidable loss determinations on a case-by-case basis and instead listing the twelve broad categories in which a loss is always considered unavoidable. 43 C.F.R. § 3179.4. Any gas flared in excess of the capture requirements is deemed an avoidable loss. *Id.* The Final Rule also improves waste accountability by requiring that operators measure and report the amount of gas vented or flared above 50 million cubic feet ("Mcf") per day. *Id.* § 3179.9.

For leaks, the Final Rule requires that all operators inspect equipment twice a year and timely repair any leaks found. 43 C.F.R. §§ 3179.301-304. It also requires that operators update old and inefficient equipment that contributes to waste and minimize gas lost from storage vessels and during well maintenance, drilling, and completion. 43 C.F.R. §§ 3179.201-204.

Finally, the Final Rule acknowledges the potential for overlapping regulations by (1) allowing compliance with EPA's emissions requirements for new or modified sources to satisfy the requirements of the Rule when both EPA regulations and the Rule apply, 43 C.F.R. §§ 3179.102(b), 3179.301(j); (2) exempting from the Rule equipment covered by existing EPA regulations, *id.* §§ 3179.201(a)(2), 3179.202(a)(2), 3179.203(a)(2); and (3) allowing a state or tribe to request a variance from provisions of the Rule, so long as state or tribal regulations are at least as effective as the Rule in reducing waste, 43 C.F.R. § 3179.401. The Rule has no effect on the ability of states or tribes to enforce their own regulations, regardless of whether BLM has approved a variance. 43 C.F.R. § 3179.401(f).

The benefits of the Rule (the recovery and sale of additional natural gas and the reduction of methane emissions) are expected to exceed the costs (compliance and a small uptick in carbon dioxide emissions) by $46 to $204 million each year. AR 452 (RIA at 6). In total, the Rule is expected to result in a 35 percent reduction in the total volume of gas vented and a 49 percent

reduction in gas flared, and to generate $3-13 million in additional royalties each year. AR 451, 455 (RIA at 5, 9).

## STATUTORY BACKGROUND AND STANDARD OF REVIEW

### I.     Review of Agency Action under the Administrative Procedure Act ("APA")

To succeed, challenges to an agency's decision brought under the APA must show that the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989); *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). Agency action will be upheld if the agency has considered the relevant factors and articulated a rational connection between the facts found and choice made. *Balt. Gas and Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983). The scope of review is narrow and the court is not to substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

### II.    Standard for Demonstrating Entitlement to Extraordinary and Preliminary Relief

An injunction "is a matter of equitable discretion" and is "an extraordinary remedy that may only be awarded upon a clear showing that the [petitioner] is entitled to such relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22, 31-32 (2008). "[B]ecause a preliminary injunction is an extraordinary remedy, the [movant's] right to relief must be clear and unequivocal." *Wilderness Workshop v. BLM*, 531 F.3d 1220, 1224 (10th Cir. 2008) (quoting *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004)) (internal quotation marks omitted). To obtain a preliminary injunction, a petitioner must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the

public interest." *Winter*, 555 U.S. at 20. The Tenth Circuit recently confirmed that the relaxed test for determining whether a movant has shown a substantial likelihood of success on the merits set forth in *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002), did not survive the Supreme Court's decision in *Winter v. Natural Res. Defense Council*, 555 U.S. 7, 22 (2008). *Diné Citizens Against Ruining Our Environment v. Jewell*, 839 F.3d 1279, 1282 (10th Cir. 2016). Thus, "[a] party seeking a preliminary injunction must prove that *all four* of the equitable factors weigh in its favor." *Sierra Club, Inc. v. Bostick,* 539 F. App'x 885, 888–89 (10th Cir. 2013).[3]

These principles apply with equal force in environmental cases. Under controlling Supreme Court precedent, an injunction "is not a remedy which issues as of course," even where success on the merits is likely. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982) (reversing determination that an injunction was required to address unpermitted discharges following a finding of liability under the Clean Water Act).

Finally, an injunction must be crafted so as not to extend more broadly than necessary. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 159-63 (2010). Such an injunction should not cover areas or activities that fall outside those that are challenged by the Petitioner or found by the Court to require further agency analysis. *See Lands Council v. McNair*, 537 F.3d 981, 1004 n.14 (9th Cir. 2008). That is, the Court must tailor the injunction to remedy a specific harm to Petitioners arising from a particular legal flaw in the Rule. For this reason, a sweeping, nationwide injunction of the entire Rule, or one that would apply to all aspects of the Rule

---

[3] These standards and requirements apply with equal force to any "stay" petitioners may request under 5 U.S.C. § 705. While that provision authorizes district courts to postpone the effective date of an agency action pending conclusion of judicial review proceedings, it may only be invoked upon satisfaction of the *Winter* factors. *See, e.g.*, *Associated Sec. Corp. v. Sec. & Exch. Comm'n*, 283 F.2d 773, 774-75 (10th Cir. 1960); *Humane Soc'y of the U.S. v. Gutierrez,* 558 F.3d 896, 896 (9th Cir. 2009); *Cronin v. U.S. Dep't of Agric.*, 919 F.2d 439, 446 (7th Cir. 1990); *Ohio v. Nuclear Regulatory Comm'n,* 812 F.2d 288, 290 (6th Cir. 1987).

regardless of whether they are individually flawed, would be inappropriate. At a minimum, the preliminary injunction must be tailored so that it is "no more burdensome" than necessary to provide relief to the parties before the Court. *See Va. Soc'y for Human Life v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001), *overruled on other grounds by Th*e *Real Truth About abortion, Inc. v. FEC*, 681 F.3d. 544 (4th Cir. 2012).

## ARGUMENT

### I.  Petitioners Have Not Demonstrated A Likelihood of Success on the Merits

To demonstrate a substantial likelihood of success on the merits, a petitioner must "present 'a prima facie case showing a reasonable probability that [it] will ultimately be entitled to the relief sought.'"[4] *Salt Lake Tribune Pub. Co., LLC v. AT & T Corp*., 320 F.3d 1081, 1100 (10th Cir. 2003) (quoting *Autoskill v. Nat'l Educ. Support Sys.,* 994 F.2d 1476, 1487 (10th Cir. 1993)). Petitioners have not met that burden here. BLM has authority under the MLA, the Federal Oil and Gas Royalty Management Act of 1982 ("FOGRMA"), the Indian Mineral Leasing Act ("IMLA"), and its statutory trust responsibilities to promulgate a rule aimed at preventing the waste of federal and Indian mineral resources. That the Rule has benefits to air quality does not undercut its waste prevention purpose—a regulation that prevents wasteful losses of natural gas necessarily reduces emissions of that gas. Additionally, the Rule's approach to waste prevention is reasonable as it reflects the agency's thoughtful determination of how best to minimize losses of gas due to venting, flaring, and leaks, and incentivize the capture and use of produced gas. Because the Rule is part of the expert agency's "complex and highly technical

---

[4] As discussed above, the Tenth Circuit recently confirmed that the relaxed test for determining whether a movant has shown a substantial likelihood of success on the merits set forth in *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002), did not survive the Supreme Court's decision in *Winter v. Natural Res. Defense Council*, 555 U.S. 7, 22 (2008). *Dine Citizens Against Ruining Our Environment v. Jewell*, 839 F.3d 1279, 1282 (10th Cir. 2016).

regulatory program" for oil and gas development, "broad deference is all the more warranted."

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991)).

### A. BLM Promulgated the Waste Prevention Rule under Its Authority to Prevent the Waste of Federal and Indian Oil and Gas Resources and to Regulate Those Resources for the Benefit of the American Public

Despite Plaintiffs' efforts to mischaracterize it as a "comprehensive air quality regime," the Waste Prevention Rule fits squarely within BLM's authority under the MLA to reduce the waste of federal oil and gas resources. Courts analyze an agency's interpretation of its own statutory authority under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984). *City of Arlington v. FCC*, 133 S. Ct. 1863, 1868-69, 1874 (2013); *Wildearth Guardians v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677, 683 (10th Cir. 2015). At *Chevron* step one, a court applies the traditional tools of statutory interpretation to determine whether Congress has "directly spoken to the precise question at issue." *City of Arlington*, 133 S. Ct. at 1868 (quoting *Chevron*, 467 U.S. at 842-43). The "question in every case is, simply, whether the statutory text forecloses the agency's assertion of authority." *Id.* at 1871. If the statute is "silent or ambiguous with respect to the specific issue," the court proceeds to step two to consider "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 1868 (quoting *Chevron*, 467 U.S. at 843).

Here, Congress has unambiguously delegated to BLM authority to regulate oil and gas development on federal and Indian lands for the prevention of waste and to ensure payment of royalties on salable natural gas. Because of this clear delegation, the agency's interpretation of its statutory authority to regulate waste prevention from oil and gas production is entitled to deference. *See id.*; *In re FCC 11-161,* 753 F.3d 1015, 1120 (10th Cir. 2014) (deferring to the

FCC's interpretation of the scope of its statutory authority) *cert. denied by Allband Commc'ns Coop. v. FCC*, 135 S. Ct. 2072 (2015). While the Rule benefits on air quality, those benefits are the result of the Rule's primary purpose of reducing waste and, in any case, fall within BLM's statutory authority to regulate oil and gas development in a way that protects the environment.

1.  **BLM Has Statutory Authority to Minimize and Deter Waste in the Development of Federal and Indian Oil and Gas Resources**

By their plain terms, the MLA, FOGRMA, IMLA, and BLM's statutory trust responsibilities to Indian mineral owners give BLM the authority to regulate federal and Indian oil and gas development to prevent waste, ensure the payment of royalties on salable minerals, and protect the safety of workers. "[T]he delegation of general authority to promulgate regulations extends to all matters 'within the agency's substantive field.'" *Helfrich v. Blue Cross & Blue Shield Ass'n*, 804 F.3d 1090, 1109 (10th Cir. 2015) (quoting *City of Arlington*, 133 S. Ct. at 1874). Where Congress has unambiguously vested authority in an agency to administer a statute, "courts need not try to discern whether '*the particular issue* was committed to agency discretion.'" *Id.* (quoting *City of Arlington*, 133 S. Ct. at 1874); *see also Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 57 (2011) (A court's inquiry into whether Congress has delegated rulemaking authority to an agency "does not turn on whether Congress's delegation of authority was general or specific."). Rather, under *Chevron*, a court must defer to an agency's exercise of that authority. *City of Arlington*, 133 S. Ct. at 1874. In light of these principles, the question here is not whether the MLA, FOGRMA, and IMLA specifically grant BLM the authority to regulate venting, flaring, and equipment leaks, but rather whether they unambiguously grant BLM broad authority to regulate the development of federal and Indian oil and gas resources for the prevention of waste. The answer to that question is "yes."

First, the MLA, FOGRMA, and IMLA all contain broad grants of rulemaking authority to achieve their objectives. Under the MLA, BLM may "prescribe necessary and proper rules and regulations" and "do all things necessary to carry out and accomplish the purposes" of the Act. 30 U.S.C. § 189. FOGRMA states that "[t]he Secretary shall prescribe such rules and regulations as he deems reasonably necessary to carry out" the statute. 30 U.S.C. § 1751. And the IMLA makes all oil and gas operations on Indian lands subject "to the rules and regulations promulgated by the Secretary." 25 U.S.C. § 396d. "[S]uch 'express congressional authorizations to engage in the process of rulemaking' [are] 'a very good indicator of delegation meriting *Chevron* treatment.'" *Mayo Found.*, 562 U.S. at 57 (quoting *United States v. Mead Corp.,* 533 U.S. 218, 229 (2001)).

Second, the terms of the MLA, FOGRMA, and IMLA make clear that Congress intended the Secretary, through the BLM, to exercise that rulemaking authority to prevent the waste of federal and Indian resources and to ensure the proper payment of royalties to federal, state, and tribal governments. Under the MLA, the Secretary is the "statutory guardian of [the] public interest" and "[h]e has a responsibility to insure that [the nation's mineral] resources are not physically wasted." *Cal. Co. v. Udall*, 296 F.2d 384, 388 (D.C. Cir. 1961). To that end, the MLA states that:

> All leases of lands containing oil or gas, made or issued under the provisions of this chapter, shall be subject to the condition that the lessee will, in conducting his explorations and mining operations, *use all reasonable precautions to prevent waste of oil or gas developed in the land . . . .*

30 U.S.C. § 225 (emphasis added). Section 187 confirms that the BLM has authority to issue regulations to carry out the MLA's waste prevention objectives: "Each lease shall contain provisions for the purpose of insuring the exercise of reasonable diligence, skill, and care in the operation of said property" and "a provision that such rules for the safety and welfare of the

miners and for the prevention of undue waste as may be prescribed by [the] Secretary shall be observed." *Id.* § 187. Section 187 also authorizes the Secretary to develop "such other provisions as he may deem necessary to insure the sale of the production of such leased lands to the United States and to the public at reasonable prices, for the protection of the interests of the United States, . . . and for the safeguarding of the public welfare." *Id.*

Other provisions in the MLA, as well as the statute's legislative history, echo the concern with waste. [5] *See, e.g.*, 30 U.S.C. § 226(m) ("The Secretary of the Interior, to avoid waste or to promote conservation of natural resources, may authorize the subsurface storage of oil or gas . . . ."); H.R. Rep. No. 65-1138, at 19 (1919) (The MLA is intended to "prevent monopoly and waste and other lax methods that have grown up in the administration of our public-land laws" and to provide for royalties "so that the Government may not be passing title to the national resources without receiving something in return therefor."); H.R. Rep. No. 65-206, at 6 (1917) ("Careful provisions relative to continued development to prevent waste and speculation are inserted in the bill that will . . . practice conservation of this resource that is so universally used and in which we all feel a keen interest in the prevention of its waste in any form."). Taken together, these provisions support the MLA's promotion of "wise development of [the nation's] natural resources and to obtain for the public a reasonable financial return on assets that 'belong' to the

---

[5] State Petitioners misrepresent BLM's position when they say, without support, that the agency believes the MLA gives it authority to prevent the waste of methane. ECF No. 22 at 16. The MLA gives BLM the authority to prevent the waste of federal mineral resources. The agency's authority to promulgate the Waste Prevention Rule is rooted in its statutory obligation to prevent the waste of natural gas that could otherwise be captured, sold, and used for the benefit of the American public. AR 361 (81 Fed. Reg. 83,009).

public."[6] *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 790 (D.C. Cir. 1983) (quoting *Cal. Co.,* 296 F.2d at 388).

Congress reiterated its concern about wasted oil and gas in FOGRMA. That statute states that "[a]ny lessee is liable for royalty payments on oil or gas lost or wasted from a lease site when such loss or waste is due to negligence on the part of the operator of the lease . . . ." 30 U.S.C. § 1756. The legislative history for FOGRMA makes clear that Congress was particularly concerned about the government's failure to collect its fair share of royalties on oil and gas produced on federal and Indian minerals. *See* Cong. Rec.-Senate 28,829 (1982); Cong. Rec.-House 26,002 (1982).

In addition, Congress has instructed the Secretary to "aggressively carry out his trust responsibility in the administration of Indian oil and gas." 30 U.S.C. § 1701(a)(4). To that end, BLM must adopt "the alternative that is in the best interests of the Indian tribe." *Jicarilla Apache Tribe*, 728 F.2d at 1567. What is in the best interest of the Indian tribe is determined by consideration of a range of factors, including "economic considerations" and "probable financial effect on the Indian mineral owner." 25 C.F.R. § 211.3. BLM also has a duty under IMLA to

---

[6] Petitioners cite *Chapman v. El Paso Natural Gas Co.*, 204 F.2d 46 (D.C. Cir. 1953), out of context to argue that the MLA's references to waste prevention are too "vague" to justify BLM's regulation of air quality. ECF No. 13 at 25. But BLM has never claimed that the MLA gives it authority to regulate air quality; rather, the MLA's waste prevention provisions unambiguously give BLM authority to regulate waste. In any case, *Chapman* is inapposite because it dealt with the interpretation of an unrelated provision in the MLA regarding common carriers. The court's decision in that case that the Secretary lacked authority to regulate the full operations of common carriers turned both on the specific statutory language of the common carrier provision and on the fact that the Federal Power Commission already regulated the operations of common carriers under the Natural Gas Act. 204 F.2d at 52. The court in *Chapman* also found it "significant" that the Secretary had not before attempted to regulate common carriers in this way. *Id.* at 51. This is in contrast to the instant case, where no other agency has authority to regulate waste from federal and Indian oil and gas mineral development and where BLM has regulated venting and flaring since 1979.

"ensure that Indian tribes receive the *maximum* benefit from mineral deposits on their lands."
*Jicarilla Apache Tribe*, 728 F.2d at 1568; *see also United States v. Navajo Nation*, 537 U.S. 488, 493–94 (2003) (IMLA is intended to "provid[e] Indian tribes with a profitable source of revenue." (quoting *Cotton Petroleum Corp. v. New Mexico,* 490 U.S. 163, 179 (1989))).

Taken together, the MLA, FOGRMA, IMLA, and BLM's statutory trust responsibilities to Indian mineral owners unambiguously provide congressional authorization to BLM to regulate oil and gas development to prevent the waste of federal and Indian mineral resources, protect the safety of workers, and ensure receipt of royalties on salable gas. Indeed, BLM has duly exercised its authority under these statutes for decades. For example, NTL-4A, issued in 1979, imposed royalties on avoidably lost gas, noting that such gas had been "wasted." NTL-4A § I.  Thus, the Waste Prevention Rule is neither "an enormous and transformative expansion of" BLM's regulatory authority" nor a recent discovery "in a long-extant statute" of "an unheralded power." *Utility Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2444 (2014). Rather, it is an amendment of BLM's longstanding venting and flaring regulations in accordance with an authority to prevent waste unambiguously delegated to the Secretary by Congress.[7]

### 2.  The Rule is a Waste Prevention Regulation

The text and structure of the Rule, combined with BLM's longstanding history of regulating venting and flaring, demonstrate that the Rule is a waste prevention regulation, not an

---

[7] Even if the MLA, FOGRMA, and IMLA were ambiguous as to BLM's authority to promulgate the Waste Prevention Rule to prevent waste, BLM's interpretation of those statutes as granting such authority is owed deference under step 2 of *Chevron* because it is reasonable in light of the statutory language and legislative history discussed above. *Mead*, 533 U.S. at 229; *In re FCC 11-161,* 753 F.3d at 1120 ("[W]e defer to the FCC's interpretation of a statutory ambiguity that concerns the scope of its regulatory authority."). When Congress speaks in "capacious terms," such as requiring "reasonable precautions to prevent waste," "it wishes to enlarge[] agency discretion" and allow the agency to "fill in the gaps." *Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1057 (10th Cir. 2015) (quoting *City of Arlington*, 133 S. Ct. at 1868).

air quality regulation, and that it fits squarely within the agency's statutory authority under the

MLA, FOGRMA, IMLA, and BLM's statutory trust responsibilities. The Rule, an update to

NTL-4A (the agency's current but outdated venting and flaring regulation), reduces waste by

addressing each source of gas loss—venting, flaring, and equipment leaks—by:

(1)    Requiring the capture of the vast majority of natural gas produced during oil and gas development (43 C.F.R. §§ 3179.7-8);

(2)    Prohibiting venting except in certain limited situations (*Id.* § 3179.6);

(3)    Assessing royalties on any gas flared in excess of the capture requirement (*Id.* §§ 3179.4-7);

(4)    Clarifying which losses of oil and gas are "avoidable," and therefore royalty-bearing (*Id.* § 3179.4);

(5)    Requiring that operators replace high-bleed equipment—that is, equipment that releases large quantities of gas—with no- or low-bleed equipment (*Id.* §§ 3179.201-202);

(6)    Requiring tank vapor gas from certain storage vessels to be routed to a sales line (*Id.* § 3179.203);

(7)    Requiring that operators inspect, identify, and repair equipment leaks in a timely manner (*Id.* §§ 3179.301-305);

(8)    Placing limits on the volume of gas that can be flared royalty-free during well completions and initial production testing (*Id.* §§ 3179.102-103);

(9)    Placing a 24 hour limit on the time for which an operator can flare royalty-free during well tests subsequent to the initial production test (*Id.* § 3179.104); and

(10)   Requiring that operators submit with each application for permit to drill ("APD") a Waste Minimization Plan that sets forth a strategy for how the operator will control waste from venting and flaring and meet the capture requirements of the Rule (*Id.* § 3162.3-1).

*See also* AR 474-75 (RIA at 28-29) (summarizing Rule's requirements by source of lost gas).

Taken together, these requirements prevent the waste of federal resources by minimizing the

total amount of natural gas—and subsequently, the total amount of royalties—lost from BLM-

administered leases. And the benefits are quantifiable: each year, the Rule is expected to reduce

the total volume of gas vented on BLM-administered leases by about 35 percent and the total

volume flared by 49 percent, result in additional natural gas production of 9-41 Bcf, and generate

$3-14 million in additional royalties. AR 366 (81 Fed. Reg. at 83,014); *see also* AR 451, 454

(RIA at 5, 8).

The fact that the Rule benefits air quality does not transform it into a "comprehensive air quality regime." The structure and provisions of the Rule make clear that its primary purpose is to prevent waste. The Rule does not contain emissions limits for particular pollutants. Nor does the Rule require that operators measure particulate matter, such as PM 2.5, or other common air pollutants.[8] Instead, it specifically focuses on the conservation and capture of gas produced from federal and Indian leases. *See, e.g.*, 43 C.F.R. §§ 3179.6(a), 3179.7, 3179.202(1)-(2), 3179.203(c)(1), 3179.301(c), 3179.304. In this way, the Rule ensures that gas is either sold or used productively on the lease, rather than wasted, and that federal, state, and tribal governments receive royalties on as much salable gas as possible. The Rule's focus on capturing natural gas, rather than simply disposing of it in an environmentally friendly manner, also indicates that the goal is retention of gas for use and for sale, not merely reduction of emissions.

Petitioners argue that the Rule's preference for flaring over venting—both of which are forms of gas disposal—is evidence that the Rule is intended to regulate air quality rather than waste. In fact, flaring is safer than venting because uncombusted methane is highly explosive and it creates risks to workers of hypoxia and exposure to various associated pollutants. AR 401 (81 Fed. Reg. at 83,049). For that reason, the Department of the Interior's Conservation Division Manual, internal guidance for implementing NTL-4A, has long required flaring rather than venting. Dep't of the Interior, Conservation Division Manual 665.5 § 3.G(4) (June 23, 1980) ("Because of safety requirements, gas which cannot be beneficially used or sold must normally be flared, not vented."); *see also* BLM Onshore Order No. 2, 53 Fed. Reg. 46,798, 46,809 (Nov.

---

[8] The provision of the Rule governing leaks from storage vessels refers to volatile organic compounds ("VOCs"), a type of air pollutant. 43 C.F.R. § 3179.203. However, as it explained in the preamble to the Final Rule, BLM used VOCs in that provision "as a proxy for natural gas losses since the VOCs in this context are coming from the natural gas from storage vessels." AR 364 (81 Fed. Reg. at 83,012).

18, 1988) ("Where noncombustible gas is likely or expected to be vented, the system shall be provided supplemental fuel for ignition and to maintain a continuous flare.").

Equally important, within the oil and gas industry and among state regulations, flaring, not venting, is the standard method of disposing of gas that is not captured. *See* 2 Colo. Code Regs. § 404-1:317m ("Any gas escaping from the well during drilling operations shall be, so far as practicable, conducted to a safe distance from the well site and burned."); Mont. Admin. R. 36.22.1221 (entitled "Burning of Waste Gas Required"); N.D. Admin. Code 43-02-03-45 ("Pending arrangements for disposition for some useful purpose, all vented casinghead gas shall be burned."). Despite Petitioners' claims to the contrary, the Final Rule is evidence that BLM has tried hard to accommodate state and industry practices where possible to reduce potential compliance costs.

The Rule's preference for flaring over venting also works with the various provisions of the Rule to incentivize capture and reduce waste. *See* Ex. B (explaining the waste prevention purpose for each of the Rule's flaring provisions). First, by assessing royalties on flaring in excess of the allowable limit, the Rule incentivizes operators to capture instead of flare. AR 389, 401 (81 Fed. Reg. at 83,037, 83,049); 43 C.F.R. § 3179.4, 3179.7(d). Second, shifting operators from venting to flaring means that operators are more likely to meet the 50 Mcf per day flare volume that triggers the Rule's measurement requirements. AR 401 (81 Fed. Reg. at 83,049); 43 C.F.R. § 3179.9. When operators measure the amount of gas flared, they give themselves and BLM "a better sense of how much gas is being wasted—and thus how much could be made available for productive use and/or sold to offset the costs of waste prevention equipment." AR 401 (81 Fed. Reg. at 83,049). Third, requiring flaring rather than venting means that operators will likely reach the Rule's 20 Mcf per well limit on royalty-free flaring during well completion

and initial production testing sooner, thereby providing a financial incentive to reduce waste. *Id.*; 43 C.F.R. §§ 3179.102(a)(2), 3179.103(a)(3). Fourth, the Rule's requirement that operators direct lost gas from certain equipment to a flare device eliminates the lowest cost option for handling that gas—venting—thereby making an upgrade to zero-emission equipment or gas capture more economical choices. AR 412 (81 Fed. Reg. at 83,060); 43 C.F.R. §§ 3179.202(c), 3179.203(c).

In claiming that the Rule regulates air quality, Petitioners have conveniently cherry-picked a few provisions, such as the venting prohibition, and taken them out of context to support their allegations. What is more, the key evidence they provide of BLM's intent to regulate air quality—the Rule's preference for flaring over venting—is actually a continuation of both BLM's and the states' historical practice. When the Rule is read in full, it becomes clear that its provisions work together to disincentivize activities that cause the waste of natural gas and to incentivize capture so that, whenever possible, gas is either used productively or sold.

### 3. BLM Has Statutory Authority to Regulate Oil and Gas Development on Federal and Indian Lands in a Way that Protects the Environment

While BLM's primary authority for the Rule derives from its mandate to prevent the waste of federal mineral resources, as the "guardian of the people of the United States over the public lands," BLM also has authority under the MLA and the Federal Land Policy and Management Act ("FLPMA") to consider the environmental impacts of oil and gas development on public lands and resources. *Knight v. United Land Ass'n*, 142 U.S. 161, 181 (1891); *see also Best v. Humboldt Placer Mine Co.*, 371 U.S. 334, 336 (1963) ("[T]he Department [of the Interior] has been granted plenary authority over the administration of public lands, including mineral lands; and it has been given broad authority to issue regulations concerning them."). For this reason, this Court must defer to BLM's interpretation of those delegations unless traditional

tools of statutory construction "foreclose[] the agency's assertion of authority." *City of Arlington*, 133 S. Ct. at 1871.

The MLA allows the Secretary to suspend operations on a lease "in the interest of conservation" and to regulate "all surface-disturbing activities" "in the interest of conservation of surface resources." 30 U.S.C. §§ 209, 226(g). "In the interest of conservation" encompasses not only conserving mineral deposits, "but also . . . prevent[ing] environmental harm." *Hoyl v. Babbitt*, 129 F.3d 1377, 1380 (10th Cir. 1997) (citation omitted); *Copper Valley Mach. Works, Inc. v. Andrus*, 653 F.2d 595, 601 & n.7 (D.C. Cir. 1981) (same); *Getty Oil Co. v. Clark*, 614 F. Supp. 904, 915 (D. Wyo. 1985) (same). Moreover, Congress broadly instructed BLM to protect the "interests of the United States" and the "public welfare." 30 U.S.C. § 187. And Congress authorized BLM to "prescribe necessary and proper rules and regulations," as well as "to do any and all things necessary to carry out and accomplish the purposes of this chapter." *Id.* § 189. The Rule readily falls within this broad delegation to regulate oil and gas operations in a way that limits harm to the environment. A long line of MLA case law confirms both BLM's authority to regulate waste operations and the public's interest in protecting mineral and non-mineral resources and the environment. *Boesche v. Udall*, 373 U.S. 472, 477-81 (1963) (BLM may prescribe "rules and regulations governing in minute detail all facets of the working of the land"); *Duesing v. Udall*, 350 F.2d 748, 751 (D.C. Cir. 1965) (finding that Secretary has discretion under the MLA to close lands to oil and gas development to protect wildlife); *Natural Res. Def. Council v. Berklund*, 458 F. Supp. 925, 936 n.17 (D.D.C. 1978) ("The Secretary's broad authority to set lease terms to prevent environmental harm derives from [the National Environmental Policy Act] NEPA and the Mineral Leasing Act."), *aff'd*, 609 F.2d 553 (D.C. Cir. 1979).

FLPMA also grants BLM authority to consider environmental impacts as part of its regulation of oil and gas development. FLPMA requires that BLM manage public lands "in a manner" that both protects "air and atmospheric" values and also "recognizes the Nation's need for domestic sources of minerals." 43 U.S.C. § 1701(a)(8), (12). At the heart of FLPMA are the principles of "multiple use" management and "sustained yield." *Id.* § 1732(a). The definition of "multiple use" explicitly includes the consideration of environmental impacts: "The term 'multiple use'" refers to the "harmonious and coordinated management" of the Nation's public land resources "without permanent impairment of the productivity of the land and the quality of the environment." *Id.* § 1702(c); *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004) (quoting 43 U.S.C. § 1702(c)) ("'Multiple use management' is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put, 'including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific and historical values.'"). Significantly, FLPMA requires the Secretary to consider "the relative values of the resources and not necessarily . . . the combination of uses that will give the greatest economic return or the greatest unit output." *Id.* Thus, BLM has both the authority and an affirmative duty under FLPMA to consider the Rule's impacts on "air and atmospheric" and other environmental values and to balance those values with oil and gas development.

Importantly, BLM's authority under FLPMA is not limited to the land use planning process. To achieve the statute's objectives, BLM may "regulate" the "use, occupancy, and development of public lands" through "published rules" and "take any action necessary to prevent unnecessary or undue degradation of the lands." 30 U.S.C. § 1732(b); *see also Greater Yellowstone Coal. v. Tidwell*, 572 F.3d 1115, 1126 (10th Cir. 2009) (noting that Section 1732(b)

"refers to *all* land uses and development"). Such regulations are "a lawful discharge of the

BLM's duty, independent of the planning process." *Utah Shared Access All. v. Carpenter*, 463

F.3d 1125, 1136 (10th Cir. 2006) (upholding BLM off-road vehicle restrictions issued outside of

the land use planning process under FLPMA as an "exercise of its authority to address resource

degradation"); *see also Topaz Beryllium Co. v. United States*, 649 F.2d 775, 778 (10th Cir. 1981)

(upholding BLM regulations under FLPMA's "general rulemaking authority"). As a regulation

that both prevents the waste of federal mineral resources and also improves air quality, the Waste

Prevention Rule exemplifies BLM's authority under FLPMA to balance different values for the

public good.

Petitioners mistakenly allege that FLPMA's requirement that the Secretary "provide for

compliance with applicable pollution control laws," 43 U.S.C. § 1712(c)(8), limits BLM's

authority to issue a regulation that affects air quality. ECF No. 13 at 22. First, that provision

applies by its own terms only to the "development and revision of land use plans." 43 U.S.C. §

1712(c). The Rule is not a land use plan and, as explained above, BLM has authority to take

action under FLPMA outside of the land use planning process. *Powder River Basin Res. Council*,

183 IBLA 83, 94 (2012) (noting that § 1712(c)(8) is inapplicable because "we are not in this case

concerned with developing, maintain, or revising a land use plan"). Second, that provision, and

the cases cited by Petitioners, say nothing about BLM's ability to promulgate its own regulations

that benefit air quality. *See id.* at 95 (finding BLM did not violate § 1712(c)(8) where the lease

form and FEIS required compliance with federal and state air regulations because BLM had no

duty under FLPMA to actually ensure that operators complied); *Coal. for Responsible Mammoth

Dev.*, 187 IBLA 141, 231 (2016) (finding for purposes of § 1712(c)(8) that BLM may assume

federal and state enforcement of air quality regulations for NEPA purposes). So long as BLM

requires that lessees comply with applicable federal, state, and tribal pollution laws, which it does by requiring such compliance in its standard lease form, BLM has fulfilled its duty under Section 1712(c)(8).

BLM thus has ample authority to take into account air quality during its regulation of oil and gas production of federal and Indian minerals. Because the delegations of regulatory authority in the MLA and FLPMA "extend to all matters 'within the agency's substantive field,'" the Court should defer to BLM's reasonable interpretation of that authority. *Helfrich*, 804 F.3d at 1109 (quoting *City of Arlington*, 133 S. Ct. at 1874).

### 4. Neither the Clean Air Act Nor State Air Quality Regulations Limit BLM's Authority to Promulgate a Rule that Has Air Quality Benefits

The Clean Air Act's grant of authority to EPA to regulate air quality does not preclude BLM from promulgating a rule that benefits air quality. To begin with, Petitioners' overstate the similarities between the Rule and EPA regulations. Because the Rule is a waste prevention regulation, not an air quality regulation, the majority of the Rule's provisions have no analogous EPA regulation. *See* Ex. C (comparing the Rule's provisions with EPA regulations); AR 476 (RIA at 30); AR 389 (81 Fed. Reg. at 83,037). In addition, the Rule regulates existing wells and equipment, whereas current EPA regulations cover only new, modified, and reconstructed sources.[9] AR 389 (81 Fed. Reg. at 83,037). In the few circumstances where both BLM and EPA regulate the same activity and the same sources, BLM worked closely with EPA to ensure that

---

[9] EPA recently issued a final Information Collection Request ("ICR") for information needed to help the agency determine how to best reduce methane and other harmful emissions from existing sources in the oil and natural gas industry. The issuance of the final ICR is the first step towards any potential future regulations establishing emission requirements for existing oil and gas sources. AR 389 (81 Fed. Reg. at 83,037). Therefore, "it will be many years before existing sources in this sector are subject to binding requirements under Clean Air Act section 111(d), and it is not yet evident what shape those requirements will take." *Id.*

the regulations do not conflict. *See* AR 370, 390 (81 Fed. Reg. at 83,018, 83,038). For example, the Rule deems an operator to be in compliance with its well completion and leak detection requirements if the operator is in compliance with EPA's well completion and fugitive emissions monitoring requirements, respectively. 43 C.F.R. §§ 3179.102(b), 3179.301(j). Likewise, the Rule exempts equipment from its requirements if that equipment is subject to EPA regulations. 43 C.F.R. §§ 3179.201(a)(2), 3179.202(a)(2), 3179.203(a)(2).

While BLM's obligations under the MLA, FOGRMA, FLPMA, IMLA, and its statutory trust obligations to Indian mineral owners may overlap with the EPA's obligation under the the Clean Air Act insofar as the reduction of wasteful venting, flaring, and leakage of gas also reduces the emission of certain pollutants, "there is no reason to think the two agencies cannot both administer their obligations and yet avoid inconsistency."[10] *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007). In *Massachusetts v. EPA*, the Supreme Court upheld similar overlapping authorities, finding that EPA has a statutory duty to regulate motor vehicle emissions even though the Department of Transportation is charged with promoting energy efficiency. *Id.* at 531-32; *see also Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 350 (D. Vt. 2007) (explaining that if a conflict arises between National Highway Transit and Safety Administration regulations and EPA regulations, "the federal agencies involved . . . are capable of and even encouraged to cooperate in a joint accommodation or resolution."). Thus, while EPA may have exclusive authority to carry out the purposes of the Clean Air Act, it

---

[10] Multiple of the Petitioners in this lawsuit, who are claiming that EPA has exclusive authority to regulate air quality, are separately challenging EPA's authority to regulate emissions from oil and gas sources. *W. Energy Alliance v. U.S. EPA*, No. 16-1266 (D.C. Cir. filed Aug. 2, 2016); *North Dakota v. U.S. EPA*, No. 16-1242 (D.C. Cir. filed July 15, 2016); *IPAA v. U.S. EPA*, No. 16-1262 (D.C. Cir. filed Aug. 1, 2016). Therefore, it is clear that their interest is not in avoiding conflicting regulations, but rather to avoid any federal regulation at all of oil and gas development.

does not have exclusive authority to promulgate regulations that benefit air quality. 42 U.S.C. § 7610 ("[T]his chapter shall not be construed as superseding or limiting the authorities and responsibilities, under any other provision of law, of the Administrator or any other Federal officer, department, or agency.); *see also, e.g.*, 36 C.F.R. § 7.13(I)(2), (I)(4)(iii) (National Park Service emission requirements for snowmobiles and snowcoaches in Yellowstone); 36 C.F.R. § 294.46(d)(8) (Forest Service regulation requiring consideration of "the best available technology to minimize noise and air emissions" during oil and gas development in Colorado roadless areas). This is made clear by Congress' express delegation of authority to BLM in FLPMA to manage public lands "in a manner that will protect the quality of . . . air and atmospheric . . . values." 43 U.S.C. § 1701(a)(8).

As discussed above, BLM has a longstanding history of regulating mineral development in a way that implicates air quality. NTL-4A benefits air quality by limiting when and how gas can be vented and flared. NTL-4A §§ II, III. Other regulations expressly require operators and lessees to limit air impacts. *See, e.g.*, 43 C.F.R. § 3591.1(b)(3) (requiring solid minerals lessees to reclaim the surface of leased lands so as to "avoid, minimize, or repair . . . pollution of the air"); Onshore Oil & Gas Order No. 6, 55 Fed. Reg. 48,958, 48,968 (Nov. 23, 1990) (requiring operators to take measures to avoid human exposure to hydrogen sulfide, a toxic gas produced in oil and gas development). BLM also routinely considers air quality impacts in its land use planning as mandated by FLPMA and strategies to mitigate those impacts as required by NEPA. 43 U.S.C. § 1701(a)(8); 40 C.F.R. §§ 1502.1, 1502.14(f), 1502.16(h); AR 389, 392 (81 Fed. Reg. at 83,037, 83,040). For example, its resource management plans frequently include emissions mitigation standards. 81 Fed. Reg. at 83,037 & n.121; *see also Amigos Bravos v. BLM*, Nos. 6:09-cv-00037-RB-LFG, 6:09-cv-00414-RB-LFG, 2011 WL 7701433, at *4, 16 (D.N.M. Aug. 3,

2011) (upholding BLM's air quality analysis in an environmental impact statement for an RMP where those documents included "several mitigation measures designed to improve the region's air quality").

Existing state air quality and oil and gas regulations also do not limit BLM's authority to promulgate a rule that benefits air quality. BLM, as a federal agency, is not bound by state regulations. And, because the Rule was promulgated pursuant to the MLA, FOGRMA, IMLA, and FLPMA, it is not subject to the Clean Air Act's procedural requirements, including its cooperative federalism regime.

But that is not to say that BLM ignored existing state regulations. As it did with EPA's regulations, BLM considered the full universe of state regulations while developing the Rule. *See* AR 19-20 (81 Fed. Reg. 6,633-34); AR 467-69 (RIA at 21-23). The agency determined that state regulations did not adequately prevent the waste of federal and Indian minerals or ensure payment of royalties on those resources for a number of reasons. First, only one state (North Dakota) had comprehensive requirements to limit flaring and only one state (Colorado) had comprehensive requirements to reduce losses from venting and leaks. AR 371 (81 Fed. Reg. at 83,019). Second, state regulations do not apply to leases on Indian lands and states do not have a statutory mandate to prevent the waste of federal resources. *Id.* Finally, state regulations are subject to change. *Id.* BLM decided that a uniform and comprehensive nationwide rule was the best way to prevent the waste of federal and Indian resources, regardless of which state they are located in. *Id.*

Contrary to the Petitioners' claims, the Rule does not usurp authority from the states to enforce their own regulations. 43 C.F.R. § 3179.401(f). State regulations continue to apply to oil and gas operations in tandem with the Rule, just as they did under BLM's pre-existing regulatory

system. Moreover, the Rule contains two key provisions to account for existing state regulations: (1) it requires that BLM "coordinate, on a case-by-case basis, with the State regulatory authority" whenever a BLM action under the Rule "may adversely affect production of oil or gas that comes from non-Federal and non-Indian mineral interests," 43 C.F.R. § 3179.12, and (2) it allows states and tribes to request a variance from any provision of the Rule so long as state, local, or tribal regulations "would perform at least equally well in terms of reducing waste of oil and gas, reducing environmental impacts from venting and/or flaring of gas, and ensuring the safe and responsible production of oil and gas" as compared to the Rule, 43 C.F.R. § 3179.401(b). Contrary to the Petitioners' claims, the Rule does not usurp any authority from the states to enforce their own regulations. If a state is granted a variance, it retains the right to enforce state regulations. 43 C.F.R. § 3179.401(f).

Because the Rule does not obligate the states to act or limit their authority, BLM determined that no federalism assessment was required. Executive Order 13,132 requires that an agency "assess the necessity" for an action if that action "would limit the policymaking discretion of the States." 64 Fed. Reg. 43,225, 43,256 (Aug. 4, 1999). As it explained in its Response to Comments, the Rule "imposes no obligations on State or local governments" and does not "deprive such governments of their own authority." RTC at 5.11.2. To the extent the Rule may have an impact on non-Federal or non-Indian oil and gas development, the Rule expressly requires coordination with the States. *Id.*; 43 C.F.R. § 3179.12. Equally important, Executive Order 13,132 "is intended only to improve the internal management of the executive branch, and is not intended to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies, its officers, or any person." 64 Fed. Reg. at 43,259.

In sum, the Waste Prevention Rule is a lawful exercise of BLM's longstanding and unambiguous authority under the MLA, FOGRMA, and IMLA to prevent the waste of federal and Indian mineral resources and to ensure that federal, state and tribal governments receive royalties on salable minerals.

## B. The Rule's Definitions of "Unavoidably Lost" Gas and "Avoidably Lost" Gas are Entitled to Deference Because They are Reasonable Under the MLA

Petitioners contend that the Rule's definition of "unavoidably lost" and "avoidably lost" oil and gas are inconsistent with the MLA's requirement that lessees use "reasonable precautions to prevent waste of oil or gas," 30 U.S.C. § 225, because (1) the Rule represents a change in how BLM defines avoidably lost gas; (2) the Rule fails to account for all possible reasonable precautions to prevent waste; (3) the definitions will lead to more waste; and (4) the Rule improperly expands operators' royalty obligations. ECF No. 13 at 28-33, 37. None of these contentions have merit.

"If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) (citing *Chevron*, 467 U.S. at 843-44 & n.11). This is because, by leaving a statutory provision ambiguous, Congress has "implicit[ly] delegate[ed] . . . *to the agency* to fill in the statutory gaps." *Van Hollen, Jr. v. Fed. Election Comm'n*, 811 F.3d 486, 495 (D.C. Cir. 2016) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)). Deference is particularly appropriate when "the provision concerns an interstitial administrative matter, in respect to which the agency's expertise could have an important role to play" and "the matter, in context, is complex, likely making the agency's expertise useful in helping to answer the 'reasonableness' question

that the statute poses." *City of Arlington*, 133 S. Ct. at 1876. Because the MLA is ambiguous as to when an operator has taken "reasonable precautions" such that the loss of gas was unavoidable, this Court must defer to BLM's reasonable determination that the Rule's definitions of avoidably and unavoidably lost gas adequately account for an operator's "reasonable precautions" to prevent waste.

### 1. The Rule's Definitions Are a Reasonable Refinement of BLM's Prior Regulations

Far from the sea-change that Petitioners suggest, the new definitions under the Rule are reasonable refinements to BLM's existing regulations in NTL-4A. Agencies are allowed to change their interpretations of statutory provisions: "An initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis." *Chevron*, 467 U.S. at 863–64. "An agency is free to change the meaning it attaches to ambiguous statutory language, and the new interpretation may still be accorded *Chevron* deference." *S. Utah Wilderness All. v. Dabney*, 222 F.3d 819, 828 (10th Cir. 2000). So long as the agency's "new policy is permissible under the statute, [] there are good reasons for it, and [] the agency *believes* it to be better, which the conscious change of course adequately indicates," it must be upheld. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Because the Rule's definitions of avoidably and unavoidably lost gas largely maintain the same structure and terms as the definitions in NTL-4A, and continue to serve the MLA's waste prevention objective, they represent a reasonable interpretation of the MLA's requirement that operators take "reasonable precautions to prevent waste of oil and gas." 30 U.S.C. § 225.

Under both NTL-4A and the Rule, gas that is lost through negligence, failure to comply with laws, regulations, or lease terms, or failure to take all prudent and reasonable steps to avoid

waste would be categorized as avoidably lost. And under both NTL-4A and the Rule, gas released from low-pressure production vessels, or during emergencies, well purging, or well tests would be categorized as unavoidably lost, as long as it is not lost through negligence, failure to comply with laws, regulations, or lease terms, or failure to take all prudent and reasonable steps to avoid waste. But rather than leaving the question of whether a loss is unavailable under any other circumstance to be determined by BLM on a case-by-case basis, as under NTL-4A, the Rule identifies a list of circumstances in which losses of gas are presumptively deemed unavoidable. This list reflects circumstances that BLM has generally considered to result in unavoidable losses under NTL-4A. Thus, while the Rule reorganizes the structure of the provisions to clarify them and refines certain terms, under most circumstances, application of the Rule will classify gas as avoidable or unavoidable exactly as it would have been classified under NTL-4A. *See* AR 365 (81 Fed. Reg. at 83,013) ("[T]he final rule also updates the pre-existing royalty provisions in NTL-4A to more clearly and specifically define when a loss of gas is considered 'unavoidable' and royalty-free and when it is considered 'avoidable' and subject to royalties.").

Although the Rule makes two key changes to the definitions in NTL-4A, these changes are reasonable because they aid administrative efficiency and better serve the MLA's waste prevention purposes. First, the Rule eliminates the option under NTL-4A for an operator to request permission to flare royalty-free on a case-by-case basis. Instead, the Rule includes under the definition of unavoidably lost gas all the scenarios in which gas can reasonably be considered unavoidably lost. 43 C.F.R. § 3179.4. This change is intended to make the Rule easier for both operators and BLM to apply and to eliminate unnecessary paperwork. In the last decade, the number of applications to vent or flare has increased over 2,000 percent: in 2005, BLM received

50 applications and in 2014, it received 1,248 applications. Spisak Decl. ¶ 15. "By establishing clear-cut categories for unavoidable and avoidable losses, the final rule will dramatically reduce the large number of requests for approval to flare royalty-free that operators have had to file and the BLM has had to process each year." AR 365 (81 Fed. Reg. at 83,013); *see also* AR 5 (81 Fed. Reg. at 6,619).

Second, under the Rule, gas flared in excess of the limits set by the Rule's capture requirements is "avoidably lost" and thus subject to royalties. 43 C.F.R. § 3179.4(b). This provision has no counterpart in NTL-4A because NTL-4A does not set capture requirements. However, it is integral to the Rule's capture and waste prevention scheme because it disincentivizes flaring in excess of the capture requirements—that is, wasteful flaring. Thus, the Rule's excess flared gas provision serves MLA's waste prevention objective by encouraging operators to reduce total flaring. *See* AR 400 (81 Fed. Reg. at 83,048). It also serves FOGRMA's goal of assessing royalties on gas that is wasted. *Id.* at 83,038.

BLM's revision of the definitions of "avoidably" and "unavoidably" lost gas "to enhance clarity and consistency," AR 51 (81 Fed. Reg. at 6,665), is precisely the sort of agency thoughtfulness that *Chevron* deference is intended to encourage. Faced with changing circumstances, including a dramatic increase in oil and gas production and associated flaring, more effective capture and development technologies that minimize the loss of gas, and more requests for exceptions in individual cases, BLM did what an agency is supposed to do: it refined its definitions to better achieve the waste prevention objectives of the MLA and FOGRMA. *See* AR 369 (81 Fed. Reg. at 83,017) ("NTL-4A neither reflects today's best practices and advanced technologies, nor is particularly effective in minimizing waste of public minerals.").

### 2. The Rule Accounts for an Operator's Reasonable Precautions to Prevent Waste, Including Economic Feasibility

Petitioners allege that the Rule's definitions of avoidably and unavoidably lost gas fail to accommodate situations in which capturing gas is not economically feasible, arguing that a requirement to capture gas when capture is not economically viable is not a "reasonable precaution to prevent waste." ECF No. 13 at 30. They also claim that the Rule's definition of "unavoidable loss" fails to account for all possible unavoidable losses. *Id.* As to the first contention, "there is no statutory or jurisprudential basis for" Petitioners' suggestion that "BLM must conduct an inquiry into a lessee's economic circumstances before determining a loss of oil or gas to be 'avoidable.'" AR 390 (81 Fed. Reg. at 83,038). Nevertheless, the Rule accounts for the economic feasibility of capture by retaining a modified version of the exception in NTL-4A.

Under NTL-4A, an operator can request permission from the Supervisor to vent or flare gas from an oil well royalty-free when the operator demonstrates that:

> the expenditures necessary to market or beneficially use such gas are not economically justified and that conservation of the gas, if required, would lead to premature abandonment of recoverable oil reserves and ultimately to a greater loss of equivalent energy than would be recovered if the venting and flaring were permitted to continue.

NTL-4A at IV.B. Likewise, under the Rule, an operator can request a capture percentage lower than that required by Section 3179.7 if "the operator demonstrates, and BLM agrees, that the applicable capture percentage under § 3179.7 would impose such costs as to cause the operator to cease production and abandon significant recoverable oil reserves under the lease." 43 C.F.R. § 3179.8(a). As BLM explained in the Final Rule's preamble, "the showing should illuminate whether compliance would cause the operator to be deprived of the value of the lease, not simply cause a reduction in profit." AR 404 (81 Fed. Reg. at 83,052). This is because only the former represents a truly economically infeasible situation. In the latter situation, the long-term benefit

of capturing more salable gas will offset the initial investment in compliance technologies. AR 488, 494, 517, 534, 540 (RIA at 42, 48, 71, 88, 94).

The Rule also accounts for the economic feasibility of compliance with other provisions. An operator can receive an exemption from or modification of the Rule's well completion, pneumatic controller, pneumatic diaphragm pump, storage vessel, and leak detection requirements if it demonstrates that compliance "would impose such costs as to cause the operator to cease production and abandon significant recoverable oil reserves under the lease." 43 C.F.R. §§ 3179.102(c), 3179.201(b)(4), 3179.202(f), 3179.203(c)(3), 3179.303(c). For example, an operator that meets the exemption criteria for pneumatic controllers does not have to replace a high-bleed controller. *Id.* § 3179.201(b)(4). And because emissions from pneumatic controllers are considered unavoidable losses, *id.* § 3179.4, the operator can avoid paying royalties on them.

Petitioners argue that a situation in which an operator flares because its well has been bumped off a gathering system due to a new well coming on line is an example of where the Rule, by not allowing the operator to flare royalty-free, requires the operator to go beyond taking "reasonable precautions" to prevent waste. But their argument is premised on the false assumption that the only way to avoid flaring in this situation is to install a redundant gathering system. Petitioners ignore other options available to the operator. The operator could have recognized the risks of new wells coming online and worked with the mid-stream company to upgrade the gathering system. Or the operator could have planned for such situations by investing in alternative capture methods, such as equipment to convert the gas into compressed natural gas ("CNG") for transportation by truck. AR 488-89 (RIA at 42-43). The operator could also use the gas for other production purposes, re-inject it, or temporarily curtail production. *Id.*

at 11; *see also* AR 400 (81 Fed. Reg. at 83,048) (explaining that while certain events "may be out of the control of operators, . . . they are often expected and operators can therefore plan for them").

As for Petitioners' second contention—that the Rule's definition of "unavoidable loss" fails to account for all unavoidable losses—the Rule's definition includes twelve types of operations and sources that cover the situations in which the unavoidable loss of gas is reasonable in light of current technology.[11] 43 C.F.R. § 3179.4. While the Rule's definition eliminates an operator's ability under NTL-4A to request special approval to vent or flare on a case-by-case basis, that change is reasonable because the new definition accounts for all truly unavoidable situations and therefore is easier for operators to follow and BLM to administer. AR 365 (81 Fed. Reg. at 83,013) ("By establishing clear-cut categories for unavoidable and avoidable losses, the final rule will dramatically reduce the large number of requests for approval to flare royalty-free that operators have had to file and the BLM has had to process each year.").

Indeed, the only example that Petitioners provide of an allegedly unavoidable loss not covered by Section 3179.4 is scheduled maintenance on a gathering system operated by a third party. ECF No. 13 at 31. The argument that loss of gas due to *scheduled* maintenance is *unavoidable* is inherently inconsistent. As BLM explained in the Rule's preamble, "scheduled maintenance of downstream pipeline or processing plants is neither unexpected nor unusual, and the BLM believes an operator should be able to plan ahead to address those events—for example, by identifying alternative capture approaches or planning to temporarily reduce

---

[11] Based on comments, BLM added two unavoidable loss situations to the Final Rule that had not been included in the Proposed Rule to ensure that the list included all reasonable unavoidable losses. AR 400 (81 Fed. Reg. at 83,048). It then explained why other possible unavoidable loss situations suggested by commenters were not truly unavoidable and thus not appropriate for inclusion in the Rule. *Id.*

production or shut in the well . . . ." AR 400 (81 Fed. Reg. at 83,048); *see also* AR 409 (81 Fed. Reg. at 83,057). This is both reasonable and in the public interest: gas that cannot be captured cannot be sold for the benefit of either the operator or the public, or used productively on the lease, so it is better to leave those resources in the ground (and capture them later) than waste them.

Petitioners would have this Court believe that operators operate in a vacuum at the peril of any new well that might come on line or any maintenance that might occur. In fact, oil and gas development requires significant planning and cooperation among lessees, operators, midstream companies, and many others. Operators are aware, or could easily make themselves aware, of when new wells come on line and when maintenance is scheduled and can plan for those eventualities. They can also plan their development in a way that ensures they have adequate infrastructure to capture produced gas before a new well is drilled. The Rule incentivizes such forethought—and thereby better serves the purposes of the MLA and FOGRMA—by imposing costs on the waste generated when an operator fails to plan ahead and drills without ensuring adequate infrastructure. *See Wright v. Fed. Bureau of Prisons*, 451 F.3d 1231, 1234 (10th Cir. 2006) ("[O]ur task is to interpret the words of the statute in light of the purposes Congress sought to serve." (quoting *Hain v. Mullin,* 436 F.3d 1168, 1176 (10th Cir. 2006))).

### 3. The Rule Will Not Increase the Abandonment of Oil and Gas Reserves

Petitioners next allege that the Rule runs contrary to the MLA's exhortation that lessees' take reasonable precautions to prevent waste because it will increase "waste" by causing operators to abandon oil and gas reserves if they cannot meet Section 3179.8's requirements for an alternative, lower capture requirement. ECF No. 13 at 32-33. The argument is specious. Under Section 3179.8, an operator may qualify for an alternative capture requirement if it

demonstrates that the capture percentage under Section 3179.7 would force the operator to "abandon significant recoverable oil reserves under the lease." 43 C.F.R. § 3179.8(a).

Petitioners insist that operators whose oil reserves do not qualify as "significant" will choose to abandon them rather than comply with the Rule.[12] ECF No. 13 at 32-33. But this argument fails, first because it is speculative and completely unsupported. Petitioners provide no evidence whatsoever to demonstrate that operators are likely to choose to shut-in or abandon wells rather than comply with the Rule. In contrast, BLM has provided substantial data and analysis demonstrating that compliance costs will be affordable for most operators. AR 454, 575-76 (RIA at 8, 129-30) (estimating an average profit reduction for small businesses of 0.15 percent); *see also Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) ("[A]n agency must have discretion to rely on the reasonable opinions of its own qualified experts . . . ."). Because the Rule's capture requirements phase-in over a ten-year period, 43 C.F.R. § 3179.7(b), operators will have time to adjust and can spread their compliance costs over a multi-year period.

_____

[12] To the extent Petitioners challenge the Rule based on potential harms from the Rule's application to them, their claims are not ripe. For example, Petitioners contend that the Rule is arbitrary because it will force premature abandonment of subsurface reserves that are not deemed "significant," ECF No. 41 at 32-33, but only upon Rule implementation will the parties know to what extent, if at all, such abandonment will occur. These types of speculative implementation claims are not ripe until BLM applies the Rule to Petitioners or their members in a concrete way. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) ("[A] regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him.); *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 812 (2003) (concluding that facial challenge to regulations "should await a concrete dispute about a particular" application); *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S 43, 58 (1993) (reasoning that, when a regulation does not govern the plaintiff's primary conduct, "a controversy concerning a regulation is not ordinarily ripe for review under the [APA] until the regulation has been applied to the claimant's situation by some concrete action"). To the extent that Petitioners' challenge goes beyond BLM's authority to promulgate the Rule, Petitioners here must wait for the Rule to be applied to them or their members before seeking the extraordinary remedy of an injunction.

AR 581 (RIA at 135). And ultimately, the Rule's capture requirements increase operators' revenues by increasing the total amount of gas captured for sale. AR 488, 494, 517, 534, 540 (RIA at 42, 48, 71, 88, 94). Where BLM has provided substantial data, analysis, and explanation to support its findings, Petitioners conclusory allegations are insufficient to render BLM's decision arbitrary and capricious. *Cf. Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1060 (10th Cir. 2014) ("[A]n agency's action is 'arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" (quoting *Utah Envtl. Cong. v. Bosworth,* 443 F.3d 732, 739 (10th Cir. 2006))).

Second, Petitioners overlook BLM's discretion in determining whether potentially abandoned reserves are "significant" for purposes of instituting an alternative capture requirement under Section 3179.7. As the agency explained, it decided not to define "significant reserves" in the Rule so as to preserve BLM's discretion to consider each request on a case-by-case basis. AR 403 (81 Fed. Reg. at 83,051) ("The BLM considered development of a quantitative metric [for determining whether reserves are significant], but determined that setting a quantitative threshold, such as number of days of production lost, might be arbitrary and ineffective."). Thus, Petitioners' assumption that BLM will unreasonably withhold exemptions from operators who truly cannot afford to comply with the Rule is baseless. *See* AR 569 (RIA at 123) ("BLM does not anticipate [the premature abandonment of marginal wells] occurring because of the ability to issue exemption clauses where appropriate . . . .").

Third, Petitioners' claim that shutting-in a well can reduce its productivity, leading to waste, is controverted by operators' actions in the field. "[I]t is not uncommon for operators to

shut in and restart production due to market conditions." AR 404 (81 Fed. Reg. at 83,052). This is demonstrated by the hundreds of wells currently drilled in North Dakota but shut-in while operators wait for oil prices to rise. While repeated shutting in can eventually decrease the productivity of a well, industry practice indicates that the costs of shut-ins are far outweighed by the economic benefits of waiting to produce in better market conditions. Moreover, by allowing operators to average their gas capture across all of their wells in a county or state, the Rule gives operators flexibility in deciding whether a given well should be shut-in. 43 C.F.R. § 3179.7(c)(3).

Petitioners' claims that the Rule will increase waste are particularly unfounded here, where the Rule's raison d'etre is waste prevention and BLM has provided substantial data and analysis supporting the efficacy of the Rule's waste prevention regime. Where Petitioners have provided no evidence whatsoever to rebut BLM's expert analysis, their claims must fail.

### 4. The Rule's Assessment of Royalties on Avoidably Lost Gas is Reasonable

Petitioners' argument that the Rule's definition of "unavoidably lost" gas impermissibly expands the types of gas subject to royalties is based on a misreading of the District of Wyoming's decision in *Marathon Oil Co. v. Andrus*, 452 F. Supp. 548, 551 (D. Wyo. 1978). *Marathon* involved a challenge to NTL-4, the royalty regulations that preceded NTL-4A. NTL-4 made "all oil and gas" produced on federal leases subject to royalties, including oil and gas unavoidably lost. 452 F. Supp. at 549. This represented a shift from the federal government's prior interpretation of Section 17 of the MLA, which states that royalties are to be paid on oil or gas "removed or sold from the lease," as exempting "unavoidably lost" gas from royalties. *Id.* at 550-51. The court held that the government's new interpretation was impermissible in light of the statutory language. *Id.* at 551-53; *see also Gulf Oil Corp. v. Andrus*, 460 F. Supp. 15 (C.D.

41

Cal. 1978) (finding Section 17 of the MLA did not permit assessment of royalties on gas used on-lease for production purposes). Notably, the definition of "unavoidably lost" gas was not before the court and the court did not attempt to define it. Because the Rule maintains the distinction between avoidably and unavoidably lost gas and does not impose royalties on unavoidably lost gas, it gives effect to Section 17 of the MLA and does not run afoul of *Marathon*.

Nor does FOGRMA "circumscribe" BLM's authority to assess royalties on unavoidably lost gas. Just the opposite—30 U.S.C. § 1756, enacted in 1983, five years after the *Marathon* decision and three years after BLM's issuance of NTL-4A, evinces Congress' intent to expand royalty obligations to reach waste due to negligence or the failure to comply with the law. 30 U.S.C. § 1756 (provision entitled "Expanded royalty obligations"). FOGRMA essentially memorializes two of the terms in NTL-4A's definition of avoidably lost gas by imposing royalties on vented or flared gas that is lost due to negligence or due to a lessee's or operator's failure to comply with the applicable law. *Compare* 30 U.S.C. § 1756 *with* NTL-4A at II.A. It places no limits on the assessment of royalties on gas lost for reasons other than negligence or failure to comply with the law, such as failure to take reasonable precautions to prevent waste. Indeed, if anything, Section 1756 of FOGRMA emphasizes Congress' specific concern with preventing the waste of federal and Indian mineral resources.

Finally, BLM has authority to impose royalties on "excess flared gas." *See* ECF No. 13 at 36. Under the Rule, if an operator fails to meet the capture percentage in a given month, all gas flared in excess of his flaring allowance is royalty-bearing. 43 C.F.R. §§ 3179.4, 3179.7(d). Petitioners contend that because the definition of excess flared gas fails to distinguish between excess gas that is avoidably lost and unavoidably lost, it exceeds BLM's authority. But that

argument assumes that excess flared gas can be lost in a way that is truly unavoidable. In fact, the Rule's capture targets and flaring allowables provide for sufficient flaring to accommodate unavoidable losses. AR 400-01 (81 Fed. Reg. at 83,048-49). The Rule provides operators with additional flexibility to accommodate unexpected situations by allowing operators to average their gas capture across all of their wells in a county or state. *Id.* Thus, if despite this flexibility, an operator exceeds its flaring allowance in a given month, it is reasonable for BLM to consider that excess gas to be per se avoidably lost. *Id.*

In short, BLM has maintained the distinction between unavoidable and avoidable losses for royalty purposes, as required by the MLA. Because the statute is ambiguous as to what constitutes an unavoidable loss, this Court should defer to the agency's reasonable definitions of those terms since those definitions best serve the statute's waste prevention goal

### C. BLM Has Authority to Limit Production of a New Well When It Could Exceed a System's Capture Capacity and to Defer or Condition Approval of an APD on Capture Capacity

Section 3179.11 highlights two additional tools BLM has to prevent waste: it allows BLM to "exercise its authority under applicable laws and regulations, as well as its authority under the terms of applicable permits, orders, leases, and unitization or communitization agreements" to (1) temporarily limit the production level of "an oil well newly connected to a gas pipeline" if production from that well is expected to force other producing wells off the pipeline and (2) "delay action on an APD" or "approve the APD with conditions for gas capture or limitation on production" if "gas capture capacity is not yet available on a given lease." 43 C.F.R. § 3179.11. Unlike other provisions in the Rule, these two provisions create no new authority for BLM. Rather, they expressly rely on existing "authority under applicable laws and regulations, . . . permits, orders, leases, and unitization or communitization agreements." *Id.*

Because these provisions do not alter the existing legal regime, they do not represent a new interpretation or expansion of BLM's authority and cannot be attacked on that basis. *See* AR 406 (81 Fed. Reg. at 83,054).

Petitioners' remaining arguments are without merit. To the extent Petitioners suggest that temporarily limiting production of a new well under Section 3179.11(a) is unreasonable, they ignore the fact that operators choose when and where to drill their wells. If an operator drills a well without sufficient pipeline capacity in place to handle the gas produced from the new well and from other wells already on the pipeline, they can and should employ other means of capturing the gas. *See* AR 488-89 (RIA at 42-43); AR 400 (81 Fed. Reg. at 83,048). Thus, BLM is not "presum[ing]" it has the "physical ability and legal authority to ensure universal access to pipelines." ECF No. 13 at 34. It is creating a system that incentivizes operators to ensure adequate capture capacity, whether it be in the form of pipelines, mobile capture equipment, or other systems, *before drilling* so as to prevent the waste of federal resources. *See* 43 C.F.R. § 3162.3-1 (requiring that, as part of the waste minimization plan submitted along with an APD, "[c]ertification that the operator has provided one or more midstream processing companies with information about the operator's production plans, including the anticipated completion dates and gas production rates of the proposed well or wells"); AR 400 (81 Fed. Reg. at 83,048) ("The BLM has determined that it is not reasonable for operators to develop oil wells and plan to use flaring as the primary and routine disposal method for the associated gas. . . . [A] reasonable operator can . . . work[] with the midstream companies to ensure that there is adequate pipeline capacity available to support transport of associated gas prior to building out large well developments.").

As for Section 3179.11(b), under Onshore Order No. 1, BLM can defer action on an APD or approve it subject to conditions of approval. 72 Fed. Reg. at 10,334. If BLM defers approval, it must notify the operator of "any steps that the applicant could take for the permit to issue." 30 U.S.C. § 226(p)(2)(B)(i); *see also* 72 Fed. Reg. at 10,334. Nothing in the MLA or Onshore Order 1 prevents these steps from including steps to increase gas capture capacity.

Petitioners are incorrect in asserting that such steps would be unreasonable grounds for deferral of approval because "gas capture capacity is beyond an operator's control." ECF No. 13 at 34. Operators can increase gas capture capacity by, for example, contracting with another midstream operating company to gain access to additional pipelines or acquiring mobile capture equipment. *See* 43 C.F.R. § 3179.3 (defining "capture infrastructure" to include "pipelines, facilities, or other equipment (including temporary or mobile equipment) used to capture, transport, or process gas. Capture infrastructure includes, but is not limited to, equipment that compresses or liquefies natural gas, removes natural gas liquids, or generates electricity from gas"); AR 488-89 (RIA at 42-43) (discussing alternative capture technologies). Indeed, the suggestion that an operator has no control over capture is directly contradicted by the fact that the volume of gas flared from gas wells decreased 86 percent from 2009 to 2015 in response to the EPA's emissions limits for hydraulically fractured gas wells.[13] AR 367 (81 Fed. Reg. at 83,015).

In sum, flaring due to a lack of capture capacity is negligent flaring because operators can and should plan ahead for adequate capture capacity before drilling. BLM's attempt to put the

---

[13] This is in contrast to flaring of associated gas from oil wells, which has increased by 318 percent on BLM-administered leases in the same time period. AR 367 (81 Fed. Reg. at 83,015).

burden of that negligence on the operator rather than the American public is reasonable in light of the MLA's authority to prevent waste.

### D. BLM Has Authority to Regulate Wells in a Federally-Approved Communitized Area or Unit

Industry Petitioners' contention—that BLM lacks authority to apply the Rule to non-federal or non-Indian wells within leases that are part of a federally-approved communitized area or unit[14]—also fails to establish a likelihood of success. The argument fails because Petitioners ignore: (1) BLM's statutory authority to regulate federally-managed leases subject to unitization or communitization agreements (or "mixed-ownership production"); (2) the fact that, in most unitized leases, operators have agreed contractually to abide by the Secretary's authority to limit oil and gas losses; (3) the extensive role BLM already plays in mixed-ownership production; (4) that BLM's establishment of reasonable waste prevention measures in mixed-ownership production is not infringing on states' police powers; and (5) that there is no evidence of significant well shut-in due to the Rule, and, in any event, the Rule provides several exceptions to its requirements when an operator demonstrates financial hardship. *See* Ex. D (explaining various exceptions to the Rule's requirements).

---

[14] Communitization is an agreement to combine small tracts, which include one or more federal and/or Indian leases, to commit sufficient acreage to comply with the relevant regulatory requirements. Communization Agreements in the 21st Century, 2006 No. 4 RMMLF-INST Paper No. 3. Under the MLA, "[w]hen separate tracts cannot be independently developed and operated in conformity with an established well-spacing or development program, any lease, or portion thereof, may be pooled with other lands, whether or not owned by the United States, under a communitization or drilling agreement . . . when determined by the Secretary of the Interior to be in the public interest." 30 U.S.C. § 226(m). "Unitization refers to the consolidation of mineral or leasehold interests in oil or gas covering a common source of supply." *Amoco Prod. Co. v. Heimann,* 904 F.2d 1405, 1410–11 (10th Cir.1990). Section 17 of the MLA allows for federal leases to be operated under a unitization agreement "[f]or the purpose of more properly conserving the natural resources of any oil or gas pool, field, or like area." 43 C.F.R. § 3181.1.

First, Industry Petitioners' suggestion that BLM lacks the authority to regulate state and private interests in a mixed-ownership production overlooks BLM's ample statutory authority to do so under the MLA and FOGRMA. As an initial matter, the MLA governs the unitization and communitization of federal leases with state and private interests. 30 U.S.C. § 226(m). Under Section 226(m), the Secretary may authorize the pooling of private and state lands with lands owned by the United States to form an operating unit and, with the consent of the parties, to alter and regulate all leases committed to the unit. *See. e.g.,* 30 U.S.C. § 226(m). And under Section 226(m), "regulations have been promulgated directing the BLM to manage all aspects of said unit agreements." *Froholm v. Cox,* 934 F. 2d 959, 965 (8th Cir. 1991) (citing 43 C.F.R. §§ 3180.0-1 - 3183.7). Likewise, communization allows pooling if separate tracts cannot be independently developed and operated in conformity with an established well-spacing or development program and such pooling is therefore "in the public interest." 30 U.S.C. § 226(m).

Similarly, under FOGRMA, Interior has extensive investigatory and enforcement powers relating to the collection of royalties from federal and Indian lessees. *See* 30 U.S.C. §§ 1717-1722. To that end, FOGRMA provides the BLM with authority over State and private tracts in federally-approved units in order to ensure royalty accountability. AR 391 (81 Fed. Reg. at 83,039). Importantly, FOGRMA authorizes the collection of royalties on "oil or gas lost or wasted from a lease site[15] when such loss or waste is due to negligence on the part of the operator of the lease, or due to the failure to comply with any rule or regulation . . . ." 30 U.S.C. § 1756. In short, under the MLA and FOGRMA, BLM has the statutory authority to regulate federally-managed leases that are in communitized or unitized arrangements.

---

[15] "Lease site," as used in FOGRMA, is not limited to federal and Indian lands and may include non-federal lands committed to a federal unit or communitization agreement. *See Maralex Resources, Inc.*, 186 IBLA 34, 42 (2015).

Second, BLM has contractual authority to apply the Rule to private and state interests. BLM's standard form unit agreement — signed by the owners of working, royalty, and other oil and gas interests in the unit area[16] — provides that the Authorized Officer may regulate the quantity and rate of production in the interest of conservation. 43 C.F.R. § 3186.1, ¶ 21. Thus, owners in the unitized area grant the BLM the right to regulate the quantity and rate of production in the interest of conservation. In addition, the standard communitization agreement provides that the Secretary or her authorized representative "shall have the right of supervision over all fee and state mineral operations within the communitized area to the extent necessary to monitor production and measurement, and to assure that no avoidable loss of hydrocarbons occurs . . . ." *See* BLM Manual 3160-9 – Communitization, App'x 1, ¶ 12. Simply put, under the standard agreements that govern unitized and communitized leases, operators assent to the Secretary's authority to limit the loss of oil and gas. BLM therefore has authority under those contracts to apply the Rule to non-federal wells.

Third, there is no merit to Industry Petitioners' argument that the Rule represents a dramatic departure from BLM's past practice of "limited oversight" of nonfederal wells. As discussed above, BLM already regulates operations in Federal units or in BLM-approved State pools, pursuant to 30 U.S.C. § 226(m). *See* 43 C.F.R. part 3180. The Rule does not alter that statutory authority or the rules pertaining to communization agreements and unitization. Nor does it regulate oil and gas operations which are conducted in private mineral estates underlying private lands without affecting any federal or Indian leasehold interest. And BLM under 43 CFR § 3161.1(b)[17] has historically applied its regulations governing site security, measurement,

---

[16] 43 C.F.R. § 3186.1. Unless the federal lands constitute less than 10% of the total unit area, an operator must use a federal unit agreement. 43 C.F.R. § 3181.1.

[17] Current 43 C.F.R. § 3161.1(b) specifically provides:

reporting production, and any associated penalties to wells and facilities on State or privately-owned mineral lands committed to a unit or communitization agreement. *Id*. Moreover, to the extent that any BLM enforcement action under the Rule adversely affects production of oil or gas from non-Federal and non-Indian mineral interests, BLM explicitly committed in Section 3179.11 of the Rule to coordinate on a case-by-case basis with the State regulatory authority with jurisdiction over that non-federal and non-Indian production. BLM's proposed coordination with the States is consistent with current practice, in which the BLM and State regulators work together closely in regulating and enforcing requirements that apply to operators producing from federal or Indian and non-federal non-Indian mineral interests. AR 53 (81 Fed. Reg. at 6,667). On this ground as well, Industry Petitioners fail to show a likelihood of success.

Fourth, Industry Petitioners' suggestion that the Rule would subject nonfederal wells in mixed-ownership production to duplicative regulations and would infringe on the state police power is misguided. As an initial matter, while it is true that the EPA and various states have air quality regulations that apply to mixed-ownership production, the Rule, as discussed *supra*, is not an air quality regulation. Rather, the Rule prevents the waste of federal resources in units or communitized areas. *See supra* at 14-17. Nor do "[s]tates have primacy over regulation of waste on federal leases." ECF No. 13 at 38. Precedent in this Circuit establishes that State and local regulation of federal oil and gas production cannot pose a "significant threat to any identifiable federal policy or interest." *See Kirkpatrick Oil & Gas Co. v. United States*, 675 F.2d 1122, 1126

---

Regulations in this part relating to site security, measurement, reporting of production and operations, and assessments or penalties for noncompliance with such requirements are applicable to all wells and facilities on State or privately-owned mineral lands committed to a unit or communitization agreement which affects Federal or Indian interests, notwithstanding any provision of a unit or communitization agreement to the contrary.

(10th Cir. 1982). In *Kirkpatrick*, the court noted the states lack the power to compel communitization under a state pooling agreement. *Id.* Nor could they "conflict with the Secretary's judgment of the best standards for conservation purposes." The court noted that "if state orders were to apply to federal lands without the Secretary's approval, it would interfere with the Secretary's control over its own lessees and lease provisions requiring, for example, the lessee to drill in different production zones or to produce at particular rates." *Id.*; *see also Ventura County v. Gulf Oil Corp.*, 601 F.2d 1080, 1086 (9th Cir. 1979) ("[where] those state laws conflict . . . with other legislation passed pursuant to the Property Clause, the law is clear: The state laws must recede."). It is therefore the Secretary, not the States, who has "primacy" over the regulation of waste associated with the development and extraction of federal minerals. The fact that federal minerals may be wasted during operations on State or private tracts committed to a unit or communitization agreement does not divest the Secretary of her regulatory authority over that waste. Industry Petitioners' arguments that the Rule is illegal because of coexisting State regulations are thus not well-founded.

Finally, Industry Petitioners' suggestion that the Rule will cause operators to "regularly" shut-in wells is not only highly speculative, *see supra* at 38-40, but also is not relevant to whether BLM has the authority to apply the Rule to mixed-ownership production in the first instance. That is, Industry Petitioners offer no factual support for their assertion that the Rule will reduce revenue to private mineral owners beyond bare conjecture that the Rule will cause wells to shut down. But even if their speculation had some merit, Industry Petitioners fail to explain why the Rule's alleged economic effects on private operators who have consented to enter into communization or unitization agreements render it illegal. AR 391 (81 Fed. Reg. 83,039) ("The fact that States and private parties have chosen to enter into unitization or

communitization agreements whereby State or private oil or gas is commingled with Federal or Indian oil or gas, and produced concurrently with Federal or Indian oil or gas does not deprive BLM of its authority to impose to impose reasonable waste prevention requirements . . . .").

What is more, Petitioners' predictions about losses of revenues to private or state operators ignores that there are exceptions to the Rules requirements where they would "impose such costs as to cause the operator to cease production and abandon significant recoverable oil reserves." *See infra* at 64.  BLM has a long history of evaluating similar kinds of requests of for exemptions from regulatory requirements due to economic hardship based on analogous qualitative criteria. In other words, operators need not cease production if the Rule does, as Industry Petitioners speculate, impose too many costs to justify continued production; operators may seek exemptions. Petitioners' arguments that the Rule will lead to mass closure of wells is unsupported and ignores key provisions of the Rule designed to prevent the very scenario the Industry Petitioners raise here.

Petitioners therefore cannot show a likelihood of success on any of their arguments that the Rule's application to units and communitized areas exceeds BLM's authority.

### E.  The Rule Is Not Arbitrary and Capricious

Even if BLM has authority to promulgate the Rule, Petitioners argue, the Rule itself is invalid because BLM made particular decisions about its provisions that are arbitrary or capricious. Those arguments do not support a preliminary injunction here. The Rule represents a reasonable balance between competing interests and is supported by substantial evidence in the Record. A "presumption of validity attaches to the [Rule] and the burden of proof rests with the appellants who challenge such action." *Smithsfork Grazing Ass'n v. Salazar*, 564 F.3d 1210, 1214 (10th Cir. 2009) (quotations omitted). Petitioners have not met that burden.

### 1. The Rule Clearly Defines the Problem Sought to be Remedied

First, the Rule is a clearly defined waste prevention measure and the agency unambiguously found that while waste from venting and flaring has increased exponentially in recent years, BLM's regulations have failed to keep up. *See supra* at 4-6. In the preamble to the Rule, BLM explained that "while there is some uncertainty regarding the total volume of natural gas lost during production on public and tribal lands, the volume is unacceptably high." AR 367 (81 Fed. Reg. at 83,015). In determining that the "volume is unacceptably high," the BLM considered data showing that the quantities of vented and flared gas was increasing exponentially and academic and government studies indicating that more natural gas is lost through leaks and unreported venting than previously understood. Spisak Decl. ¶¶ 6-13. And oversight and independent reviews, including OIG and GAO reports, "have consistently found that the BLM's existing requirements regarding venting and flaring are insufficient, and recommended that the BLM update its regulations and guidance on royalty free use and waste prevention." AR 617 (EA at 6). BLM therefore made a considered decision that revised and modernized waste minimization measures were necessary for federal and Indian oil and gas minerals.

### 2. Compliance Costs are not the Appropriate Measure of the Rule's Reasonableness

Second, Petitioners argue that the Rule is arbitrary and capricious because they allege the compliance costs purportedly dwarf the expected royalty value from the wasted gas. ECF No. 13 at 41. According to the Petitioners, the Rule cannot be justified as a waste prevention measure if it is too expensive. But, even if accurate[18], Petitioners' royalty calculation provides only part of

---

[18] Industry Petitioners base their royalty calculation on a 2010 GAO report using 2008 data that does not take into account the potential productive uses of flared gas. AR 461 (RIA at 15). In other words, they base their calculations on outdated and arguably incomplete data.

the story: it does not capture the environmental benefits of the Rule or the related social benefits. AR 451-52, 553 (RIA at 5-6, 107) (estimating social benefits between $189 and $247 million and total benefits to be between $209 and $403 million annually). Compliance costs are therefore not the appropriate measure of whether the Rule is a reasonable exercise of BLM's waste prevention authority. And, in any event, BLM found the Rule would generate positive net royalties from minimizing waste, concluding that the Rule would generate between $65.4 million and $82.3 million over a ten-year evaluation period accounting for the reduction of royalties from deferred crude oil production. AR 564 (RIA at 118).[19] Taking into account these potential royalty gains along with the Rule's significant environmental benefits, BLM's adoption of the Rule was reasonable.

### 3. Consistent with Past Practice, BLM Will Protect Confidential Business Information

Third, Industry Petitioners' argument—that the Rule's requirement that operators submit waste minimization plans with applications for permits to drill new wells compels disclosure of confidential business information—is misguided. As discussed *supra*, consistent with its longstanding practice, BLM expressly committed to protect confidential information submitted to it. *See* AR 395 (81 Fed. Reg. at 83,043) (disclosure of waste minimization plans would be "subject to any protections for confidential business information"); *id.* at 83,051 ("operators routinely provide information to the BLM that consider confidential. . . . BLM will handle the

---

[19] Industry Petitioners further invite this Court to view the Rule through the lens of its air quality benefits. ECF No. 13 at 42. This is misguided. The Rule is not an air quality regulation. *See supra*. Despite Industry Petitioners' arguments to the contrary, BLM does not primarily justify the Rule as a climate change control measure but rather identifies limiting the emissions that contribute to climate change as an ancillary effect of waste prevention. AR 361 (81 Fed. Reg. at 83,009) (noting that measures to conserve gas and avoid waste will have beneficial environmental effects, including reducing methane emissions, which contribute to climate change).

information in accordance with applicable regulations in 43 CFR part 2"); *id.* at 83,053-4 (BLM

will disclose the volume of gas reported, "subject to any protections for confidential business

information"); *id.* at 83,067 (BLM will disclose inspection reports available subject to any

"protections for confidential business information"). Courts have "long presumed that executive

agency officials will discharge their duties in good faith," *CTIA v. FCC*, 530 F.3d 984, 989 (D.C.

Cir. 2008), and Industry Petitioners offer no credible reason why that assumption would not

apply with equal force here.

### 4. The Rule's Requirement of a Waste Minimization Plan is Reasonable

Fourth, Industry Petitioners' argument that the Rule's requirement that operators adopt a

waste minimization plan lacks a "rational basis" also ignores the record in this case. The Rule

clearly articulates that the purpose of the waste minimization plan is to require operators to

formulate their approach to satisfy the capture requirements in Subpart 3179. 81 Fed. Reg. at

83,042. BLM was explicit that the plans were a "reasonable, low cost, and effective way to

encourage operators to consider and plan for capturing gas before the development of every new

well." AR 394 (81 Fed. Reg. at 83,042). Moreover, BLM explained that waste minimization

plans also can "drive significantly better outcomes" by promoting the early disclosure of

information to allow for better planning and coordination among operators and midstream

companies such as pipeline operators. *Id.* Industry Petitioners' unsupported argument that the

Rule's waste minimization plan requirement lacked a rational justification also does not establish

a likelihood of success.

### 5. BLM Complied with the APA's Notice and Comment Procedures

Fifth, Industry Petitioners' argument that BLM failed to comply with the APA's notice-

and-comment procedures, because it did not reopen the comment period to address technical

changes to the gas capture requirements, erroneously assumes that *any* change to a proposed rules necessitates an additional public comment period. *See* 5 U.S.C. § 553(b), (c). It does not. Industry Petitioners specifically complain they did not receive adequate notice of the scope of the final rule because BLM did not afford them an opportunity to comment on the change to the Rule allowing operators to calculate flaring across a state-wide area rather than just within a particular leasehold. *See* § 3178.7(b). However, "[i]t is a well settled and sound rule which permits administrative agencies to make changes in the proposed rule after the comment period without a new round of hearings." *Beirne v. Sec'y of Dep't of Agric.*, 645 F.2d 862, 865 (10th Cir. 1981). This "well settled" rule applies where the final rule is a "logical outgrowth" of the proposed rule. *Am. Mining Cong. v. Thomas*, 772 F.2d 617, 637 (10th Cir. 1985). "A final rule qualifies as a logical outgrowth if interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *Zen Magnets, LLC v. Consumer Prod. Safety Comm'n*, No. 14-9610, 2016 WL 6872627, at *9–10 (10th Cir. Nov. 22, 2016) (quoting *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079–80 (D.C. Cir. 2009)) (internal quotation marks omitted).

In *Zen Magnets*, the Tenth Circuit found that a rule revision was a logical outgrowth of the proposed rulemaking where the agency (1) sought comments on the rule's scope; (2) evinced concern about the definition in the proposed rule that was later revised in the final rule; and (3) the revision to the rule reflected earlier concerns about the proposed rule. *Id.* So too here. Like *Zen Magnets*, BLM's notice to the proposed rulemaking expressly sought comments on the leasehold flaring limits, including their reasonableness. AR 27 (81 Fed. Reg. at 6,641). The Proposed Rule summarized North Dakota's state-wide capture target approach, to which the Final Rule expressly looked in crafting its provisions, and requested comment on other

"innovative" approaches to limit flaring. *Id*. Moreover, the BLM not only stated in the Proposed Rule that it considered North Dakota's flaring regulations in developing the Proposed Rule but also explained North Dakota's phased-in, state-wide capture target approach. AR 20 (81 Fed. Reg. at 6,634). That is, the Proposed Rule made plain BLM's concerns over the appropriate level of gas capture requirements and, although it did not specifically seek comments on it, explained a state-wide capture target approach. The Final Rule notes that changes from the Proposed Rule to the Final Rule were in response to comments received, including those of Petitioners. AR 375 (81 Fed. Reg. at 83,023).

Given BLM's interest in "innovative" approaches, its request that stakeholders comment on leasehold flaring limits, and BLM's discussion of North Dakota's phased-in statewide capture target approach, it was thus foreseeable that BLM would revise the rule to incorporate Section 3179.7's gas capture requirements. *See Zen Magnets*, 2016 WL 6872627 at *9-10. "Moreover, the resulting revision was not 'surprisingly distant from the original'" gas capture requirements. *Id.* (quoting *CSX Transp.*, 584 F.3d at 108). The change to the capture requirements is the logical outgrowth of BLM's goal of reducing flaring in the Proposed Rule but the approach in the Final Rule is more adaptable. To that end, the Final Rule is explicit that the purpose of the revision is to "provide operators with more flexibility to take better account of variable conditions on different leases, and communitized areas in different parts of the country." AR 376 (81 Fed. Reg. at 83,024). Because the capture target requirement in the Final Rule is a logical outgrowth of the proposed rule, BLM satisfied the APA's notice-and-comment requirement.

### 6. The Rule Creates Exceptions Where Methane Streams Do Not Allow for Flaring

Finally, State Petitioners further argue that the Rule is arbitrary because it requires flaring even when methane streams are insufficient to allow for flaring. ECF No. 22 at 17-18. But State

Petitioners are manufacturing a problem where none exists: the Rule does not require flaring when it is "technically infeasible." Section 3179.6 specifies that an operator need not engage in flaring "when flaring the gas is technically infeasible, such as when the gas is not readily combustible or the volumes are too small to flare." The Rule includes additional exceptions to specific flaring requirements. *See* § 3179.101 (no flaring required for well drilling where "technically infeasible"); § 3179.102 (no flaring requirement for well completion and related operations where "technically infeasible"); § 3179.105 (in emergencies, operator may vent gas royalty free). State Petitioners simply ignore these provisions that provide that flaring is not required when "technically infeasible." Nor have they offered any credible evidence that these exceptions are not sufficient. State Petitioners cannot show likelihood of success that the Rule is arbitrary where, as here, the Rule provides reasonable flexibility.

### F. Petitioners' Challenge to the Agency's Cost Benefit Analysis Improperly Attempts to Manufacture a Battle of the Experts

Petitioners' challenge to BLM's cost benefit analysis is fundamentally a disagreement with the agency's technical conclusions. But Petitioners ignore the deferential standard of review applicable to BLM's scientific and technical conclusions. Courts "must generally be at [their] most deferential" when an agency is "making predictions, within its area of special expertise, at the frontiers of science." *Baltimore Gas & Elec. v. NRDC*, 462 U.S. 87, 103 (1983); *see also Utah Envtl. Cong. v. Russell*, 518 F.3d 817, 824 (10th Cir. 2008) (citing *Marsh*, 490 U.S. at 378) ("Deference to the agency is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise.").[20] Petitioners make several arguments challenging BLM's reasonable technical judgments, none of which have merit.

---

[20] Industry Petitioners' criticism that the "Rule also fails to account for the totality of BLM's rulemakings" relevant to oil and gas development offers no credible reason why those

Industry Petitioners' and Petitioner-Intervenor's argument that the agency used "inflated" gas prices in its cost benefit analysis is flawed. BLM considered fluctuating oil and gas prices and the fact that current prices were low. AR 484 (RIA at 38). In estimating predicted oil and gas prices, the agency relied on the U.S. Energy Information Administration's ("EIA") future price projections and its index on price data. *Id.* Using ONRR data for 2015, BLM determined that it is reasonable to assume that operators plausibly would receive prices for natural gas and crude oil slightly less (75 percent and 98 percent respectively) than the published index prices and, after considering feedback about low natural gas prices, BLM assumed a predicted price of 75 percent of the EIA projection. *Id.* at 39. Petitioner-Intervenor's argument that this analysis was insufficient and that the agency should have considered different market scenarios or accounted for the "uncertainty" in prices discounts BLM's careful consideration of fluctuating gas prices. ECF No. 40 at 24. Nor does Petitioner-Intervenor explain why its preferred approach would have led to a more accurate outcome. Likewise, Industry Petitioners' contention that BLM "inflated" natural gas prices in calculating the benefits of the Rule ignores that BLM reduced published predicted natural gas prices in calculating the anticipated benefits of the Rule in an effort to use a conservative price estimate. In short, Industry Petitioners' and Petitioner-Intervenor's quibble with BLM's methodology in predicting gas prices wrongly asks this Court to second guess the well-supported technical judgment of the expert agency. But Petitioners' bare disagreement with

---

rulemakings — which address site security (81 Fed. Reg. 81,356); minimum standards for the measurement of oil produced (81 Fed. Reg. 81,462); and minimum standards for the accurate measurement and proper reporting of all gas removed or sold (81 Fed. Reg. 81,516)—would be so germane to the agency's cost analysis of the Waste Prevention Rule as to require an assessment of aggregate costs. Indeed, these Rules address security and measurement standards and cannot be credibly characterized as key to the agency's cost benefit analysis here.

the agency's technical decisions fails to establish a likelihood of success. *Utah Envtl. Cong.*, 518 F.3d at 824.

Next, Industry Petitioners take issue with BLM's reliance on the projected social cost of methane to calculate benefits, citing the economic model as not "well-recognized." ECF No. at 45-46. But Industry Petitioners' dispute with BLM's methodological choices is yet another attack on the agency's well-reasoned technical judgments. *Marsh*, 490 U.S. at 378. The social cost of methane is a metric developed by the U.S. government's Interagency Working Group on the Social Costs of Greenhouse gases, and it represents the best available estimates of the monetary value of impacts arising from marginal changes in methane emissions, taking into account a "range of anticipated climate impacts, such as net changes in agricultural productivity and human health, property damage from increased flood risk, and changes in energy system costs, such as reduced costs for heating and increased costs for air conditioning." AR 478-79 (RIA at 32-33). And while it is true that the SCM is a global metric, nothing prevents the agency from considering global impacts as well as domestic ones in evaluating effects.[21] The SCM is a technical update to the U.S. government's social cost of carbon metric, which has been utilized in multiple rulemakings. EPA used the SMC in its rulemaking[22] and it is supported by technical papers.[23] Industry Petitioners may disagree with the economic model BLM selected but that

---

[21] State Petitioners suggest that BLM ignored the social costs of the Rule and is focused on the benefits of the Rule to international air pollution to the exclusion of impacts in the United States. ECF No. 22 at 19. This statement wholly disregards BLM's analysis of local and regional social impacts. AR 361 (81 Fed. Reg. at 83,009); AR 681 (EA at 70); AR 553 (RIA at 107).

[22] Specifically, EPA used SCM in its final rule entitled *Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources*, 81 Fed. Reg. 35,824 (June 3, 2016), and its final rule for *New Source Standards of Performance for Municipal Solid Waste Landfills*, 80 Fed. Reg. 59,332 (Aug. 29, 2016).

[23] *See, e.g.*, Marten A.L., Kopits K.A., Griffiths C.W., Newbold S.C., Wolverton A. 2015. Incremental CH4 and N2O mitigation benefits consistent with the US Government's SC-

disagreement does not render the Rule arbitrary or capricious.[24]  On this ground as well,

Petitioners' challenge to BLM's cost-benefit analysis fails to establish a likelihood of success.

## II.      An Injunction Would Not Serve the Public's Interest

The public interest favors denial of Petitioners' motion because the Rule confers

economic benefits on the American public and tribes, reduces waste of public resources, and also

benefits the environment. Petitioners all but ignore the public interest in their motions, focusing

instead on the mistaken allegation that the Rule is outside the BLM's authority. But the public

interest is an important factor to weigh in deciding whether courts should grant preliminary

injunctions, regardless of the merits' of a petitioners' legal claims. *See Stormans, Inc. v. Selecky*,

586 F.3d 1109, 1139 (9th Cir. 2009) ("If, however, the impact of an injunction reaches beyond

the parties, carrying with it a potential for public consequences, the public interest will be

relevant to whether the district court grants the preliminary injunction."). "In exercising their

sound discretion, courts of equity should pay particular regard for the public consequences in

employing the extraordinary remedy of injunction." *Weinberger*, 456 U.S. at 312. In the instant

case, the public interest will not be served if the Rule is preliminarily enjoined.

The public has a strong interest in preventing unnecessary waste of public and tribal oil

and gas resources and BLM has a statutory mandate to minimize waste of these resources. Spisak

CO2 estimates, Climate Policy 15(2):272-298; Addendum to Technical Support Document on
Social Cost of Carbon for Regulatory Impact Analysis under Executive Order 12866.
        [24] State Petitioners' argument that the agency overestimated benefits because Wyoming's
regulations already reduce emissions is not well founded. As an initial matter, the Rule's impacts
go well beyond Wyoming. And Wyoming's regulations are not as extensive as those proposed in
the Rule. *See supra*. Wyoming and the potential impact of its regulations should therefore not be
the touchstone of BLM's analysis. In all events, BLM weighed data on the actual volumes flared,
which would account for any reductions in flaring due to Wyoming's regulations. AR 461-64,
468-69 (RIA at 15-18, 22-23). BLM's baseline for its analysis of projected emissions reduction
therefore reflected the actual impact of Wyoming regulations; there was not double counting as
State Petitioners contend.

Decl. ¶ 4; *see supra* at 17-22. Natural gas is a limited public resource that is critical to the Nation's energy security. *Id.* at ¶ 6. There is an immediate need for a modernized Rule addressing waste associated with oil and gas production. *Id.* at ¶ 3. Oil and gas technology has made significant advances in recent years and, due in large measure to these advances, production has dramatically increased. *Id.* at ¶ 6. The American public has not reaped the full benefit of this increased production because it has been accompanied by a significant upsurge in the waste of natural gas. *Id.* at ¶ 6.

BLM's regulations have not kept up with technological developments in natural gas and oil production. BLM has not updated the rules governing waste from oil and gas production for over 30 years. Spisak Decl. ¶ 3. The implications of this regulatory gap are significant: BLM manages almost a third of the Nation's mineral estate, and production from 96,000 onshore wells, accounting for 11 percent of the Nation's natural gas supply and 5 percent of its oil. AR 361 (81 Fed. Reg. at 83,009). ONRR reported that in fiscal year 2015, operators produced 183.4 million barrels ("bbl") of oil, 2.6 trillion cubic feet ("Tcf") of natural gas, and 3.3 billion gallons of natural gas liquids from onshore federal and Indian oil and gas leases. Spisak Decl. ¶ 5. The production value of this oil and gas exceeded $20.9 billion and generated over $2.3 billion in royalties. *Id.*

Between 2009 and 2015, federal and Indian operators reported that that they vented or flared 462 Bcf of natural gas, which would power 6.2 million households for a year. Spisak Decl. ¶ 7. In 2014 alone, operators vented approximately 30 Bcf and flared at least 81 Bcf of natural gas from leases administered by BLM, which is almost 5 percent of the total production of those leases in the year. AR 362 (81 Fed. Reg. at 83,010). By 2015, operators flared at least 85 Bcf, a 114 percent increase from 2009 levels. AR 363 (81 Fed. Reg. at 83,011). A 2010 GAO report

61

examined the amounts of natural gas being vented and flared on federal oil and gas leases and concluded that around 40 percent of the natural gas estimated to be vented or flared from onshore federal leases could be economically captured with contemporary control technologies. Spisak Decl. ¶ 20. The GAO report concluded that BLM regulations did not address new capture technologies or significant sources of lost gas and that BLM's current efforts to minimize these natural gas losses were insufficient. *Id.*

By preventing the waste of public oil and gas resources, the Rule preserves an important domestic energy source while providing taxpayers, tribes and States with royalty revenues. Once fully implemented, BLM estimates that the Rule's capture targets will reduce flaring by up to 50 percent relative to 2015 levels. *Id.* The BLM further estimates that the Rule's leak detection and repair requirements will increase natural gas production from BLM-administered leases by 5.25 Bcf per year. *Id.* at ¶ 23. BLM anticipates that the Rule will have a limited impact on the levels of natural gas and oil produced from onshore federal and Indian leases. *Id.* at ¶ 24. While BLM expects a potential decline in crude oil production ranging from zero to 3.2 million bbl (representing 0 to 0.07 percent of total production) per year due to possible curtailment of oil production, it also anticipates an increase in natural gas production ranging from 9 to 41 Bcf (representing 0.03 to 0.15 percent of production) per year as operators increase the amount of captured gas. *Id.*; AR 561 (RIA at 115).

The Rule is also expected to have significant environmental benefits. Local communities will benefit from the Rule as it is expected to reduce visual and noise impacts from flaring. AR 361, 373 (81 Fed. Reg. at 83,009, 83,021); AR 681-82 (EA at 70-71). Similarly, the Rule is expected to benefit regional and global air quality through the ancillary reduction in emissions that contribute to smog, regional haze, and health problems. AR 361, 366, 429 (81 Fed. Reg. at

83,009, 83,014, 83,077); AR 677-680 (EA at 66-69). Finally, because the primary constituent of natural gas is methane—a powerful greenhouse gas—the Rule is expected to have a beneficial long-term effect on climate change. AR 361, 429 (81 Fed. Reg. at 83,009, 83,077); AR 674 (EA at 63). Even if these benefits are irrelevant to analyzing BLM's statutory authority for the purposes of Petitioners' merits claims, the Court may clearly take them into account in applying the equitable factors for a preliminary injunction.

As an initial matter, Petitioners assume that enjoining the Rule would have no practical effect on whether it is ultimately implemented. This is incorrect. Any delay in implementation would also delay the benefits of the Rule that would begin to accrue to the American public as soon as it goes into effect. That is, the environmental and economic benefits that will accrue once the Rule is implemented would be be suspended. Thus, Petitioners cannot avoid their burden of demonstrating that the public interest runs in their favor on the grounds that an injunction would be harmless.

Petitioners contend that enjoining the Rule from taking effect would promote the public interest by: (1) saving federal taxpayers Rule implementation costs; (2) reducing the delay for APD approvals because Montana and Wyoming already regulate in this area and will process APDs faster than BLM; and (3) preventing the Rule from rendering certain leases "uneconomical." Petitioners' arguments lack merit.

First, Petitioners' argument that delaying implementation of the Rule prevents public expenditures on an illegal rule is circular and ignores the Rule's provisions limiting waste and optimizing royalty revenue. What is more, Petitioners present no credible evidence of implementation costs but rather suggest that any amount is too much because the Rule is not legal. The United States has determined that the Rule is in the public interest and is prepared to

bear the risk that implementation will ultimately have to be undone as a result of litigation in order to secure the immediate benefits of the Rule. And, as discussed *infra* and *supra*, Congress itself has established a policy against the waste of federal and Indian mineral resources and this policy is of itself strong evidence of the public interest. *See United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497–98 (2001). Indeed, in the sole case State Petitioners cite, the court found that the public interest weighed in the United States' favor because of the adverse effects associated with the delay of project implementation, including increased costs. *James River Flood Control Ass'n v. Watt*, 680 F.2d 543, 544–45 (8th Cir. 1982).

Second, to the extent that the Petitioners' arguments hinge on the State Petitioners' complementary—and in their view superior—state regulatory regimes for air quality, State Petitioners do not show, and cannot show, that they have a comprehensive waste management regulatory system in place for federal and Indian minerals within their borders. No State has established a comprehensive set of regulations governing venting, flaring and leak prevention. AR 370-71 (81 Fed. Reg. at 83,018-19). State regulations, moreover, do not apply to BLM-administered leases on Indian lands. AR 371 (81 Fed. Reg. at 83,019). State regulations are also subject to change as state governments change, and states do not have a statutory mandate or trust responsibility to reduce waste on federal and Indian leases. *Id.* BLM cannot rely on a patchwork of state regulatory regimes to adequately protect public resources nationwide.

Finally, Industry Petitioners contend that the Rule could render certain leases unprofitable and thus hurt gas production but offer only speculation to support this point. In fact, the Rule has several provisions that would enable operators to obtain relief if necessary to prevent well abandonment. *See* 43 C.F.R. §§ 3179.8 (alternative capture requirement), 3179.102(c) (exception to well completion requirements), 3179.201(b)(4) (exception to pneumatic controller

requirements), 3179.202(f) (exception to pneumatic diaphragm requirements), 3179.203(c)(3) (exception to storage vessel requirements), 3179.303(c) (exception to leak detection and repair requirements). Even assuming Industry Petitioners are correct that the Rule's costs may push a small subset of leases to the point of unprofitability, they disregard that the Rule will also increase captured production and royalties on a comparatively larger scale due to the Rule's waste minimization measures. AR 451-454 (RIA at 5-8). Additionally, the potential economic burden on *unidentified* operators does not render the Rule contrary to the public interest.

BLM has set forth with specificity how the Rule will prevent waste, protect the environment, and otherwise benefit the public. Petitioners have not made a similar particularized showing, as they must. Because the Rule is in the public interest, this factor militates against an injunction.

## III.     Petitioners Have Failed to Demonstrate the Requisite Certain, Irreparable Harm

"A showing of irreparable harm is the *sine qua non* of injunctive relief." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1241 (11th Cir. 2005) (citation omitted). Irreparable harm is not "merely serious or substantial"; the alleged injury must instead be "certain, great, actual and not theoretical." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (citations omitted). The mere "possibility" of harm is not sufficient—Petitioners must make a clear showing that "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. Here, Petitioners claim that, absent an injunction, its members will suffer irreparable injury in the form of (1) compliance costs, (2) disclosure of proprietary business information, and (3) harm to the sovereign interests of State Petitioners and Petitioner-Intervenor. But none of these alleged injuries satisfies Petitioners' burden to establish an irreparable harm that a preliminary injunction could address.

First, Industry Petitioners and Intervenors are incorrect that their potential compliance costs constitute imminent irreparable harm. It is well-settled that economic loss in itself does not constitute irreparable harm. *Sampson v. Murray,* 415 U.S. 61, 90 (1974) ("The key word in this consideration is *irreparable.* Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough."); *Heideman*, 348 F.3d at 1189; *Port Cities Properties v. Union Pacific Railroad Co*., 518 F.3d 1186, 1190 (10th Cir. 2008) (a party's alleged irreparable harm must be "certain and great" and generally cannot consist of economic loss). Petitioners contend that because they will not be able to recover any potential compliance costs as damages, they need not prove that these losses are certain, great, actual, or imminent. This argument finds no support in the law: the recoverability of economic losses is but one element for consideration in assessing an irreparable injury. *Nat'l Mineral Ass'n v. Jackson*, 768 F. Supp. 2d 34, 53 (D.D.C. 2011) ("the mere fact that economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable harm"). Moreover, "ordinary compliance costs are typically insufficient to constitute irreparable harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005); *Wisc. Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674-75 (D.C. Cir. 1985); *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980). Despite this general rule, Industry Petitioners and Petitioner-Intervenor invite this Court to effectively eliminate the irreparable harm requirement in suits against the government by reducing it to a showing of modest compliance costs. But "[a]ny time a corporation complies with a government regulation that requires corporation action, it spends money and loses profits; yet it could hardly be contended that proof of such an injury, alone, would satisfy the requisite for a preliminary injunction." *A.O. Smith Corp. v. Fed. Trade Comm'n*, 530 F.2d 515, 527 (3d Cir. 1976).

The court's decision in *Chamber of Commerce of the U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010) does not mandate a different result. There, the Tenth Circuit found irreparable harm not based on the specter of unrecoverable compliance costs as Petitioners suggest, but because petitioners' failure to comply with an unconstitutional state immigration law could lead to "investigation and other consequences for having engaged in a discriminatory practice" and potential "debarment from public contracts." *Id. Chamber* also involved "a strong likelihood" that the subject state statute violated the Supremacy Clause of the U.S. Constitution, *id.* at 770, and where constitutional rights are implicated, the necessary showing of irreparable injury is significantly diminished, if not eliminated altogether. *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001). Here, the Industry Petitioners allege neither the kind of threatened injuries faced by the *Chamber* petitioners nor that the Rule is unconstitutional. Rather, they complain of ordinary compliance costs that cannot constitute imminent irreparable injury.

Second, Industry Petitioners' arguments that the Rule would cause them irreparable harm by forcing their members to disclose trade secrets submitted in applications for permits to drill is equally misguided. BLM routinely receives and protects confidential business information. 43 C.F.R. §§ 2.26-2.36; AR 395, 403 (81 Fed. Reg. at 83,043, 83,051); Spisak Decl. ¶ 36. The agency's existing regulations allow a company that submits information constituting a trade secret to designate that information as protected. *Id.* § 2.26. Operators "routinely provide information to the BLM that they consider confidential; if they indicate [to BLM] that the information is considered confidential, the BLM will handle the information in accordance with applicable regulations in 43 CFR part 2." AR 403 (81 Fed. Reg. at 83,051). The Rule will not alter any of these protections. Given BLM's longstanding practice of protecting confidential business information and its regulations protecting such information, Industry Petitioners'

concerns are far too speculative to demonstrate imminent or irreparable harm. *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003).

Third, State Petitioners' and Petitioner-Intervenor's argument that the Rule will impose irreparable injury to their state sovereign interests is highly speculative and incorrectly premised on their conclusion that BLM lacked legal authority to promulgate the Rule. As an initial matter, BLM possesses legal authority to promulgate a rule regulating the waste of federal and Indian oil and gas resources. *Infra* Section I.A.

Moreover, the State Petitioners and Petitioner-Intervenor cannot credibly claim that they will suffer imminent irreparable harm to their sovereign interests because the Rule protects against such harm. First, States would not be prevented in any way from continuing to implement or enforce their rules. State regulations continue to apply to oil and gas operations in tandem with the Rule, just as they always have under BLM's existing regulatory system. Notably, operators are currently subject to both States' rules and NTL-4A. In addition, the Rule includes a variance procedure that allows equally or more effective State requirements to substitute for — i.e., displace completely — the comparable BLM requirement so long as the State can show that the State requirements would perform at least as well as the Rule in: (1) reducing waste of oil and gas; (2) reducing environmental impacts from venting and flaring and (3) ensuring the safe and responsible production of oil and gas. AR 388 (81 Fed. Reg. at 83,036); 43 C.F.R. §3179.401. A variance does not interfere with a State's enforcement of its own regulations; the State retains authority to take action under state law. 43 C.F.R. §3179.401(f). In addition, Section 3179.12 of the Rule further requires BLM to coordinate with States when BLM action to enforce the Rule could adversely affect state or private mineral interests. 43 C.F.R. § 3179.12. State Petitioners and Petitioner-Intervenor give these carefully crafted provisions short

shrift and suggest that the use of the variance process, or the mere act of BLM regulating in this area, will interfere with their ability to implement their complimentary regimes. But any incidental burden arising from the variance process or coordination with the agency is not itself irreparable harm but rather reflects the cost of operating in a regulated area. *See Pa. Supply, Inc. v. Susquehanna River Basin Comm'n.,* No. 1:cv-06-2454, 2007 WL 551573, at *4 (M.D. Pa. Feb. 20, 2007) (holding the burdens on operations of complying with government regulations are not irreparable harm). Given that the States have yet to seek any variances—and they are forecasting the insufficiency of the variances without any concrete evidence—the claimed harm to the States' sovereign interests is speculative at best. *Greater Yellowstone Coal.*, 321 F.3d at 1258.

What is more, the States' principal premise that they have the exclusive right to regulate waste from oil and gas extraction involving federal and Indian mineral interests is incorrect. Even where State mineral interests are intertwined with federal mineral interests, States do not possess an unassailable sovereign right to regulate activities on federally-owned lands. *See Kirkpatrick Oil & Gas Co. v. United States*, 675 F.2d 1122, 1124–26 (10th Cir. 1982) (explaining that the Secretary of Interior has the ultimate authority to approve communitized wells on federal and state lands). Congress has the authority to manage the mineral interests of the United States under the Property Clause of the Constitution and Congress delegated that authority to the Secretary of the Interior for the mineral interests at issue here through, *inter alia*, the MLA and FLPMA. *See Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976); *Wyoming v. United States*, 279 F.3d 1214, 1227 (10th Cir. 2002). "State jurisdiction over federal land 'does not extend to any matter that is not consistent with full power in the United States to protect its lands, to control their use and to prescribe in what manner others may acquire rights in them.'" *Wyoming*, 279 at 1227 (citing *Utah Power & Light Co. v. United States,* 243 U.S. 389, 404

(1917)). And it is within Congress' authority to promulgate federal legislation that "necessarily override[s] and preempt[s] conflicting state laws, policies, and objectives under the Constitution's Supremacy Clause, U.S. Const. art. VI, cl. 2." *Id*. As discussed *supra*, the fact that certain state- or privately-owned oil and gas is commingled with Federally-managed oil and gas does not divest BLM of its authority to impose reasonable waste prevention measures on federally-managed gas. AR 391 (81 Fed. Reg. at 83,039). State Petitioners' and Petitioner-Intervenor's suggestion that their sovereign interest in regulating any state minerals commingled with federal mineral interests necessarily trumps any federal interest has no legal support and, in fact, turns federal supremacy on its head. *See Kleppe*, 426 U.S. at 543 ("'A different rule would place the public domain of the United States completely at the mercy of [the State].'" (quoting *Camfield v. United States,* 167 U.S. 518, 526 (1897)). In short, State Petitioners and Petitioner-Intervenor cannot claim any irreparable injury to their "sovereign interest" by reason of the Rule.

Finally, State Petitioners and Petitioner-Intervenor suggest that an injunction is warranted because of the potential loss of tax or royalty income due to compliance costs, industry flight, and permitting delays. As discussed *supra*, such economic losses are not tantamount to imminent irreparable harm. But even it were proper to consider monetary damages in assessing irreparable harm, the kind of damage to oil and gas production about which the States complain is highly speculative. Indeed, the States offer no concrete evidence that the oil and gas industry would be so diminished by the Rule as to reduce tax revenue or the extent to which, if at all, they would collect less taxes. Nor do they offer anything more than conjecture as to operators abandoning state and federal mining interests. What is more, the Rule provides for several economic exemptions where an operator shows, and BLM concurs, that compliance with the Rule's requirements "would impose such costs as to cause the operator to cease production and abandon

significant oil reserves under the lease." *See, e.g.*, § 3179.102 (exemption from the requirements of § 3179.102(a); § 3179.201 (exemption from pneumatic controllers requirement); § 3179.202 (exemption from pneumatic diaphragm pumps); § 3179.203 (exemption from storage vessels requirement); § 3179.303(operator may request approval of a leak detection program that does not meet the criterion specified in § 3179.303(b)). BLM therefore provided for several exceptions in the Rule to prevent abandonment of significant recoverable oil reserves.

Where, as here, a state alleges economic harm from reduced tax revenue by reason of federal regulation, they must do more than offer theories and speculation as to what might happen to the industry once the regulation takes effect. *Greater Yellowstone Coal.*, 321 F.3d at 1258 (purely speculative harm will not suffice); *Heideman*, 348 F.3d at 1189 (denial of injunction appropriate because no supporting evidence offered for irreparable harm).

In *Wyoming v. U.S. Department of Interior*, 674 F.3d 1220 (10th Cir. 2012), the Tenth Circuit rejected an analogous claim that the State had standing to challenge a federal regulation because it would harm tourism and thereby reduce tax revenue. The court noted that "virtually all federal policies" have some generalized effect on states, and thus, "impairment of state tax revenues should not, in general, be recognized as sufficient injury-in-fact" for standing. *Wyoming*, 674 F.3d at 1234 (quoting *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976)). Rather, the State had to do more than offer "speculative economic data" or "conclusory" affidavits because such data was "too speculative" to establish injury. *Id.* at 1231-33; *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 675 (9th Cir. 1988) ("Because the threat of civil liability is too attenuated and conjectural to constitute a basis for their standing, it follows that this injury is too speculative to constitute an irreparable harm justifying injunctive relief." (citations omitted)). Here too, State Petitioners and Petitioner-Intervenor rely on conjecture and

conclusory declarations to buttress their harms arguments but, as *Wyoming* makes plain, predications and prognostications are insufficient. For example, Petitioner-Intervenor complains of processing delays, but bases that prediction on their understanding of how BLM processes applications and staffing requirements. This is precisely the kind of speculation that is not sufficient to establish irreparable harm. *Heideman*, 348 F.3d at 1189. Moreover, the State Petitioners complain that the additional regulatory requirements will reduce royalties paid to mineral owners, but they fail to point to one specific example of a company with anticipated diminished royalties and how that will materially impact state tax revenues. State Petitioners' and Petitioner-Intervenor's predictions and speculations about economic harms from reduced taxes and other state receipts cannot constitute irreparable harm. On this ground as well, their motion for emergency relief should be denied.

## IV.     The Balance of Harms Tips In the Government's Favor

The third preliminary injunction factor—whether Petitioners' "threatened injury outweighs the injury the opposing party will suffer under the injunction"—also militates against an injunction. *Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 889 (10th Cir. 2013) (internal citations omitted). As discussed *supra*, the rule will minimize harmful waste of oil and gas, bringing BLM's regulations on waste prevention into the Twenty-first century. In support of their claim that the balance of harms tips in their favor, Petitioners make four arguments that largely recycle their public interest arguments.

First, Petitioners suggest that because not all of the Rule's beneficial air quality effects will be realized immediately, the public interest tips in favor of an injunction. But this ignores that the Rule is primarily a waste minimization measure, and its effects on air quality are incidental. *See supra* at 14-15.  Consistent with this primary goal of the Rule, it immediately sets

into motion the process for minimizing waste on BLM-managed leases even if the Rule's incidental air quality effects are not realized immediately.

Second, State Petitioners and Petitioner-Intervenor further contend that the States already regulate in this area, diminishing the Rule's anticipated environmental benefits. But State Petitioners' argument—that the Wyoming and Montana programs regulate oil and gas facilities for conservation—elides that their programs are not comprehensive waste prevention programs addressing the three issues the Rule regulates: venting, flaring and leaking. AR 371 (81 Fed. Reg. at 83,019). Nor do the programs in Wyoming and Montana have applicability beyond the borders of those states or on Indian lands. In short, the Rule's environmental benefits are not reduced by the presence of complimentary state programs.

Third, Petitioners suggest that an injunction is in the public interest because it will preserve the status quo. This is incorrect. An injunction is only appropriate to preserve the status quo where Petitioner has satisfied all four *Winter* factors; the status quo is not an independent end. *See Associated Sec. Corp.* 283 F.2d at 774.

Fourth, Petitioners argue that the Rule will impose additional costs on BLM through increased administrative responsibilities and lost revenues. But BLM estimates that the Rule will produce additional net royalties of $3 to $14 million dollars a year and have a negligible impact on production. AR 366 (81 Fed. Reg. at 83,014). The Rule will therefore be beneficial to the public fisc. And Petitioners' arguments on administrative costs borne by BLM are not based on hard data but on speculation. Even if Petitioners are correct that the Rule may involve additional administrative costs in certain areas, it also removes some of the uncertainties and associated administrative burdens associated with the current operative regulation, NTL-4A. AR 365 (81 Fed. Reg. at 83,013); AR 6 (81 Fed. Reg. at 6,620). In all events, *assuming arguendo* that the

agency will face increased administrative costs to implement a rule that will increase royalty revenues and is beneficial to the environment, this does not tip the equities in Petitioners' favor.

In contrast to the absence of a credible harm to Petitioners, as demonstrated by BLM's comprehensive analysis of the environmental benefits and economic impacts of the Rule, *see supra*, BLM will suffer substantial harm should an injunction issue. Congress has delegated to BLM the authority to manage federal mineral resources and, under the MLA, directed the agency to minimize waste from oil and gas production. BLM is presently regulating oil and gas waste under a regime that is now 37 years old, and was promulgated before the advent of technological advances that have changed how operators drill for oil and gas. And as discussed above, under the Rule, BLM will minimize waste and its attendant harms to the environment while optimizing royalties and gas capture from oil and gas production from federal and Indian lands. The balance presumptively tips in favor of allowing the agency to carry out its statutorily mandated duty particularly where, as here, the agency carefully crafted a waste prevention measure to address changed circumstances.

## CONCLUSION

Because Petitioners have not met their burden to demonstrate that the extraordinary remedy of a preliminary injunction is necessary, the Court should deny their motions.

Respectfully submitted this 15th day of December, 2016.

By:     /s/ *Marissa Piropato*

MARISSA PIROPATO
CLARE BORONOW

/s/ *C. Levi Martin*

C. Levi Martin
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on December 15, 2016, a copy of the foregoing **CONSOLIDATED OPPOSITION TO PETITIONERS' AND PETITIONER-INTERVENOR'S MOTION FOR PRELIMINARY INJUNCTION** was served by filing a copy of that document with the Court's CM/ECF system, which will send notice of electronic filing to counsel of record.

 /s/ *Marissa Piropato*            
Marissa Piropato