Reed Zars
Wyo. Bar No. 6-3224
Attorney at Law
910 Kearney Street
Laramie, WY 82070
Phone: (307) 760-6268
Email: reed@zarslaw.com

KAMALA D. HARRIS
Attorney General of California
DAVID A. ZONANA (*admitted pro hac vice*)
CA Bar No. 196029
Supervising Deputy Attorney General
MARY S. THARIN (*admitted pro hac vice*)
CA Bar No. 293335
GEORGE TORGUN (*admitted pro hac vice*)
CA Bar No. 222085
Deputy Attorneys General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1974
Facsimile: (510) 622-2270
E-mail: Mary.Tharin@doj.ca.gov

[*additional counsel listed on signature page*]

*Attorneys for State Respondents-Intervenors*

# UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | |
|---|---|
| STATE OF WYOMING, et al., | Case No. 16-cv-00285-SWS [Lead] |
| Petitioners, | [Consolidated With 2:16-cv-00280-SWS] |
| v. | Assigned: Hon. Scott W. Skavdahl |
| UNITED STATES DEPARTMENT OF THE INTERIOR, et al., | **STATE RESPONDENTS' OPPOSITION TO PETITIONER-STATES' MOTIONS FOR PRELIMINARY INJUNCTION** |
| Respondents, | |
| and | |
| STATE OF CALIFORNIA and STATE OF NEW MEXICO, | |
| State Respondents-Intervenors. | |

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................ 1

Factual and Procedural Background ....................................................................... 2

    I.     Oil and gas production on federal lands................................................ 2

    II.    The BLM rule ......................................................................................... 3

    III.   EPA's emissions standards for new sources in the oil and gas sector ... 5

Standard of Review ..................................................................................................... 5

Argument...................................................................................................................... 6

    I.     The Petitioner-States have failed to demonstrate that they are likely to succeed on the merits of their petition. ................................................ 6

         A.    BLM has clear statutory authority to promulgate the rule. ....................... 6

         B.    There is no merit to the Petitioner-States' contention that the rule is precluded by the Clean Air Act.................................................. 9

    II.    The Petitioner-States have failed to demonstrate irreparable harm. .................... 12

    III.   The balance of equities and the public interest support denial of the requested injunction........................................................................... 15

Conclusion................................................................................................................... 16

i

## INTRODUCTION

In this action, the States of Wyoming, Montana, and North Dakota (the "Petitioner-States") challenge, and seek a preliminary injunction to enjoin, a commonsense rulemaking by the U.S. Bureau of Land Management ("BLM") to update its regulations governing the waste of natural gas and royalty payments from new and existing oil and gas production activities on federal and Indian lands. 81 Fed. Reg. 83,008 (Nov. 18, 2006) (Waste Prevention, Production Subject to Royalties and Resource Conservation) (the "Rule"). The Petitioner-States' primary contention is that BLM lacked statutory authority to promulgate the Rule because it effectively regulates air pollution, a task that they argue has been exclusively delegated to the U.S. Environmental Protection Agency ("EPA") pursuant to the federal Clean Air Act. The Petitioner-States also contend that the Rule will cause harm to their states' sovereignty and economic interests and that the public interest favors an injunction.

Intervenor-Applicant States of California (by and through the California Air Resources Board) and New Mexico ("State Respondents") fundamentally disagree with these contentions. BLM is the federal agency explicitly charged by statute with overseeing oil and gas operations on federal and Indian lands, including the prevention of waste and the assessment of royalty payments. The fact that the Rule impacts air emissions does not transform it into a Clean Air Act rulemaking, nor is there any legal impediment to BLM's rulemaking due to the fact that BLM and EPA have separate (but complimentary) statutory obligations with regard to oil and gas development. Therefore, the Petitioner-States are unlikely to succeed on the merits. Further, the balance of equities and public interest weigh heavily against an injunction given the substantial benefits that the Rule will have for preventing waste of public resources, increasing

royalty payments, and decreasing emissions of harmful air pollutants and greenhouse gases.

Consequently, the Court should deny the Petitioner-States' motion for a preliminary injunction.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

### I. OIL AND GAS PRODUCTION ON FEDERAL LANDS

BLM oversees more than 245 million acres of land and 700 million subsurface acres of federal mineral estate across the United States. 81 Fed. Reg. at 83,014. Domestic production from almost 100,000 federal onshore oil and gas wells accounts for 11 percent of the nation's natural gas supply and 5 percent of its oil supply. *Id.* In fiscal year 2015, the production value of this oil and gas exceeded $20 billion and generated over $2.3 billion in royalties, approximately half of which was allocated to the states. *Id.*; *see* 30 U.S.C. § 191(a).

In California, BLM administers 15.2 million acres of public lands, nearly 15 percent of the state's land area, as well as 47 million acres of subsurface mineral estate and 592,000 acres of Native American tribal land.[2] These lands contain approximately 600 producing oil and gas leases covering more than 200,000 acres and 7,900 usable oil and gas wells.[3] Considering onshore BLM-administered leases nationwide, California is the third largest oil producer and the 13th highest natural gas producing state.[4]

---

[1] With regard to the motion for preliminary injunction filed by the Western Energy Alliance and Independent Petroleum Association of America, State Respondents hereby adopt the arguments in opposition made by the Federal Respondents and Intervenor Respondents. *See* Dkt. Nos. 69, 70.

[2] BLM, "California Public Lands 2015," *available at*: https://www.blm.gov/style/medialib/blm/ca/pdf/caso/publications.Par.1307.File.dat/Brochure_California_Public_Lands-2009.pdf.

[3] BLM, "California Oil and Gas," *available at*: https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/about/california.

[4] *Id.*

STATE RESPONDENTS' OPPOSITION TO PRELIM. INJUNCT. - Case No. 16-cv-00285-SWS

In New Mexico, BLM oversees over 13 million acres of public lands, 36 million acres of federal mineral estate, and approximately 8 million acres of Indian trust minerals.[5] New Mexico is the second highest producer among the states of gas on public lands, and the highest producer of crude oil.[6] In terms of volume of oil-well gas flared, New Mexico is the third highest state in the nation.[7] New Mexico, along with North Dakota and South Dakota, account for approximately 91 percent of the gas flared on public lands.[8] By statute, New Mexico uses its federal mineral leasing royalty payments for educational purposes. NMSA 1978, § 22-8-34(A).

## II.    THE BLM RULE

In recent years, the United States has experienced a boom in oil and gas production through the use of technological advances such as hydraulic fracturing and directional drilling. This increase in domestic energy production "has been accompanied by significant and growing quantities of wasted natural gas." 81 Fed. Reg. at 83,014. For example, between 2009 and 2015, nearly 100,000 oil and gas wells on federal land released approximately 462 billion cubic feet ("Bcf") of natural gas through venting and flaring, enough gas to serve about 6.2 million households for a year. *Id*. at 83,009. In 2014, operators vented and flared approximately 4.1 percent of the total production form BLM-administered leases, or enough natural gas to supply 1.5 million households for a year. *Id*. at 83,010. Several oversight reviews, including those by the Government Accountability Office ("GAO") and the Department of the Interior's Office of the Inspector General, have specifically called on BLM to update its "insufficient and outdated"

---

[5] BLM, "Mineral and Surface Acreage Managed by the BLM," *available at:* https://www.blm.gov/wo/st/en/info/About_BLM/subsurface.html. Note that BLM's administrative structure does not precisely track state lines with respect to oversight of Indian trust minerals.

[6] BLM, Regulatory Impact Analysis, Revisions to 43 C.F.R. 3100 and 43 C.F.R. 3600 and Additions to 43 C.F.R. 3178 and 43 C.F.R. 3179 ("RIA"), at 176, App. A-2 (Jan. 14, 2016) (using 2013 data).

[7] *Id*. at 202, Table 4 (using 2013 data).

[8] *Id.* at 201 (using 2013 data).

3

regulations regarding waste and royalties. *Id*. at 83,009-10. GAO estimated that federal royalty payments could increase by approximately $23 million annually if lessees captured and sold gas that could be economically captured with currently available control technologies.[9]

In November 2016, BLM finalized the Rule, updating 30-year old regulations governing the release of natural gas from new and existing oil and gas operations on federal and Indian lands and clarifying when produced gas lost through venting, flaring, or leaks is subject to royalties. 81 Fed. Reg. 83,008. The Rule is designed to force considerable reductions in waste from flaring (49%) and venting and leaked gas (35%), saving and putting to use up to 41 Bcf of gas per year. *Id*. at 83,014. BLM estimates that the Rule will produce additional royalties of $3–$14 million per year, and could also avoid an estimated 175,000-180,000 tons of methane emissions per year. *Id*. In addition, the Rule will reduce emissions of volatile organic compounds ("VOCs"), including benzene and other hazardous air pollutants, by 250,000–267,000 tons per year. *Id*.

The Rule regulates four main areas of oil and gas production: venting, flaring, leak detection, and royalties on waste. *Id*. at 83,010-13. In sum, the Rule reduces the waste of natural gas by disallowing venting except under specified conditions and requiring updates to existing equipment. The Rule's flaring regulations reduce waste by requiring gas capture percentages that increase over time, providing exemptions that are scaled down over time, and requiring operators to submit Waste Minimization Plans. Leak detection requirements, which are aligned with EPA emissions standards discussed below, require semi-annual inspections for well-sites and quarterly inspections for compressor stations. Finally, the Rule modifies the definition of "unavoidable losses" and states that all other losses of gas are deemed "avoidable" and thus

---

[9] GAO, "Federal Oil and Gas Leases: Opportunities Exist to Capture Vented and Flared Natural Gas, Which Would Increase Royalty Payments and Reduce Greenhouse Gases" (Oct. 2010) at 24-25, *available at*: http://www.gao.gov/new.items/d1134.pdf.

subject to royalties.  The rule is effective on January 17, 2017.

### III.  EPA'S EMISSIONS STANDARDS FOR NEW SOURCES IN THE OIL AND GAS SECTOR

In June 2016, EPA promulgated standards for new, reconstructed, and modified sources in the oil and natural gas sector ("EPA NSPS Standards"), which limit emissions of both greenhouse gases ("GHGs") and volatile organic compounds ("VOCs") under the Clean Air Act. 81 Fed. Reg. 35,824 (June 3, 2016).  These new source performance standards, or NSPS, follow from EPA's 2009 determination that GHGs endanger both public health and welfare of current and future generations by causing or contributing to climate change.  *Id*. at 35,825.  The EPA NSPS Standards set requirements for reducing GHG emissions, specifically methane, as well as VOCs across a variety of additional emission sources in the oil and natural gas source category (*i.e.*, production, processing, transmission, and storage).  *Id*.  The EPA NSPS Standards are currently being challenged before the D.C. Circuit, where California, New Mexico, and several other states have moved to intervene in defense of the rulemaking.  *State of North Dakota, et al. v. U.S. EPA*, No. 16-1242 (D.C. Cir. filed July 15, 2016).[10]

### STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy" that "is never awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (internal quotations and citations omitted).  Rather, such relief "should not be issued unless the movant's right to relief is 'clear and unequivocal.'"  *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) (quoting *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001)).  "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 24,

---

[10] Contrary to its arguments here that the Rule improperly intrudes on EPA's authority to regulate emissions under the Clean Air Act, North Dakota contends in the D.C. Circuit that the EPA NSPS Standards exceed EPA's statutory authority and are unconstitutional.

5

(2008) (internal quotations omitted).

To obtain a preliminary injunction, the moving party must demonstrate four factors: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest. *Id*. at 20. A plaintiff's failure to prove any one of the four preliminary injunction factors renders its request for injunctive relief unwarranted. *See id*. at 23–24. "[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id*. at 24 (internal quotations and citations omitted).

## ARGUMENT

### I. THE PETITIONER-STATES HAVE FAILED TO DEMONSTRATE THAT THEY ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR PETITION.

#### A. BLM has Clear Statutory Authority to Promulgate the Rule.

BLM has clear authority to enact rules to prevent waste and regulate royalties from oil and gas operations on federal and Indian lands. Pursuant to the Mineral Leasing Act ("MLA"), the Indian Mineral Leasing Act and Indian Mineral Development Act, and the Federal Land and Policy Management Act ("FLPMA"), BLM has worked for decades to prevent waste and ensure that the public benefits from mineral production on public lands. First, the Mineral Leasing Act of 1920, 30 U.S.C. §§ 181-287, provides BLM with broad regulatory power to protect "the interests of the United States" and safeguard "the public welfare" in administering federal mineral leases, including oil and gas leases. 30 U.S.C. §§ 187 (Secretary of Interior must ensure Federal mineral leases provide for "the protection of the interests of the United States, …. and for the safeguarding of the public welfare"), 189 ("The Secretary of the Interior is authorized to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of this chapter"). Specifically, the MLA requires oil and

6

gas lessees to observe "such rules . . . for the prevention of undue waste as may be prescribed by [the] Secretary," *id*. § 187, and to "use all reasonable precautions to prevent waste of oil or gas developed in the land." *Id*. § 225. The MLA "should be broadly construed in order for the Secretary to properly carry out his proprietary function on behalf of the government and its citizens." *Hannifan v. Morton*, 444 F.2d 200, 202 (10th Cir. 1971) (citing *United States v. Ohio Oil Co*., 163 F.2d 633, 639-40 (10th Cir. 1947)); *see Boesche v. Udall*, 373 U.S. 472, 478 (1963) (Secretary has authority under MLA to "prescribe…rules and regulations governing in minute detail all facets of the working of the land").

Pursuant to the Indian Mineral Leasing Act of 1938, 25 U.S.C. §§ 396a–396g, and the Indian Mineral Development Act of 1982, 25 U.S.C. §§ 2101–08, BLM also has the authority to regulate oil and gas development on 56 million acres of Indian mineral estate held in trust by the federal government. *See, e.g.,* 25 U.S.C. § 396d; *see also* 25 C.F.R. §§ 211.1(c), 211.4, 225.1(c) (BLM's regulations governing oil and gas operations apply on Indian land). As the Tenth Circuit has stated, "[t]he federal statutory and regulatory scheme governing oil and gas operations on Indian land covers virtually every aspect of such operations…." *Ute Mountain Ute Tribe v. Rodriguez*, 660 F.3d 1177, 1181 (10th Cir. 2011).

The Federal Land Policy and Management Act, 43 U.S.C. §§ 1701-84, also provides BLM with broad authority to regulate "the use, occupancy, and development of the public lands." 43 U.S.C. § 1732(b). For example, FLPMA specifically provides BLM with authority to take any action, by regulation or otherwise, "necessary to prevent unnecessary or undue degradation of the lands." *Id*. FLPMA also mandates that BLM, "with respect to the public lands, shall promulgate rules and regulations to carry out the purposes of this Act and of other laws applicable to the public lands." *Id*. § 1740.

The Petitioner-States concede that BLM has authority under the MLA to regulate natural

7

gas waste and royalties. *See* Memorandum in Support of Wyoming and Montana's Motion for Preliminary Injunction ("WY Memo.") at 15-16, Dkt. No. 22; Memorandum in Support of North Dakota's Motion for Preliminary Injunction ("ND Memo.") at 21, Dkt. No. 35. However, they contend that BLM goes beyond this authority because it regulates other emissions streams and the Rule "is still fundamentally an air quality rule" because it "requires owners and operators to flare, instead of vent, emission streams." *Id*. These assertions fail.

Petitioner-States mischaracterize the Rule, which not only prohibits the venting of natural gas except under specified conditions, but also requires a phased *reduction* in flaring by increasing capture requirements over time, with the ultimate goal of phasing out routine flaring. 81 Fed. Reg. at 83,011. These requirements are based on preventing waste or ensuring the safety of oil and gas operations, which are indisputably within the authority of BLM to regulate. *See* 81 Fed. Reg. at 83010-11. The fact that the Rule may also have benefits for air quality does not render it invalid, given that it is fully consistent with BLM's statutory authorities. *See* 30 U.S.C. § 187 (BLM required to ensure that mineral leases safeguard "the public welfare"); 43 U.S.C. § 1701(a)(8) (public lands shall be "managed in a manner that will protect the quality of … ecological, environmental, [and] air and atmospheric… values").[11] Stated another way, BLM is fully authorized and is legally required to consider the issues of air quality and public health in its regulation of oil and gas operations on federal and Indian lands.[12]

North Dakota separately contends that BLM lacks authority to regulate federally-approved units or communitized parcels. ND Memo. at 18-21. However, other than citing to the

---

[11] Petitioner-States readily admit that their own agencies with jurisdiction over oil and gas operations impose similar restrictions on venting and flaring to reduce waste. *See* ND Memo. at 7; WY Memo. at 6.

[12] For the same reasons, the Rule is not arbitrary and capricious in its regulation of various waste streams. *See* WY Memo at 17-18. With regard to the Petitioner-States' contention that BLM arbitrarily failed to consider the costs of the Rule (*see* WY Memo. at 18-19; ND Memo. at 23-25), State Respondents hereby adopt the arguments made by the Federal Respondents and Intervenor Respondents. *See* Dkt. Nos. 69, 70.

STATE RESPONDENTS' OPPOSITION TO PRELIM. INJUNCT. - Case No. 16-cv-00285-SWS

language of a 1984 preamble to a royalty rule, North Dakota offers no legal authority for this proposition. *See Norfolk Energy, Inc. v. Hodel*, 898 F.2d 1435, 1440-42 (9th Cir. 1990) (holding that "[w]hile a single sentence in the preamble apparently limited BLM authority to regulate" federally-approved units, "the overall regulatory and statutory scheme" provided such authority); *see also* 43 C.F.R. Part 3180 (BLM regulations for Onshore Oil and Gas Unit Agreements).

In sum, BLM acted well within its statutory authorities in promulgating the Rule.[13]

## B. There Is No Merit to the Petitioner-States' Contention that the Rule is Precluded by the Clean Air Act.

The primary contention made by the Petitioner-States is that BLM lacked statutory authority to promulgate the Rule because it constitutes an "air quality" or "air pollution" regulation that only EPA has the delegated authority to issue pursuant to the Clean Air Act. WY Memo. at 9-10, 12-14; ND Memo. at 2-3, 21-22. While the Petitioner-States admit that "[s]ome requirements in the rule appear to derive from BLM's statutory role as a land management agency" (WY Memo. at 9) and that "the [Mineral Leasing Act] empowers the BLM to prevent the waste of methane on federal land" (WY Memo at 16), their argument is based on the fact that *some* aspects of the Rule are consistent with or reference the EPA NSPS Standards. WY Memo. at 9-10, 13; ND Memo. at 21-22. However, this argument is baseless and provides no justification for the Court to enjoin the Rule.

As the Petitioner-States admit, the Rule is not a Clean Air Act regulation. *See* WY Memo at 13 (the Rule does not follow the "framework delineated in the Clean Air Act"); ND Memo. at 22 (the Rule was developed "without considering the factors required by the CAA").

---

[13] The Petitioner-States do not challenge BLM's authority to regulate royalties. Memo. at 9 n.4. In the Federal Oil and Gas Royalty Management Act ("FOGRMA"), Congress explicitly made lessees "liable for royalty payments on oil or gas lost or wasted from a lease site when such loss or waste is due to…the failure to comply with any rule or regulation, order or citation issued under [FOGRMA] or any mineral leasing law." 30 U.S.C. § 1756.

STATE RESPONDENTS' OPPOSITION TO PRELIM. INJUNCT. - Case No. 16-cv-00285-SWS

While BLM acknowledges the air quality and climate change benefits of reducing methane and other emissions from oil and gas operations, *see* 81 Fed. Reg. at 83,009, the Rule does not set new source emission standards for the purposes of protecting public health and welfare, as set forth under the Clean Air Act. Rather, the purpose of the Rule is to update decades-old requirements governing the "waste of natural gas owned by the American public and tribes" and the payment of royalties at new and existing oil and gas facilities. *Id*. at 83,015. As discussed in Part I.A. above, there is no dispute that these functions are clearly within the statutory of authority of BLM as part of its oversight of oil and gas operations on federal and Indian lands. *See, e.g.,* 30 U.S.C. § 187; 43 U.S.C. § 1701.

The fact that some aspects of the Rule are "similar to" and "consistent with" EPA requirements does nothing to undermine BLM's authority. *See* WY Memo. at 9-10. The public lands laws administered by BLM often overlap with pollution control laws such as the Clean Air Act or Clean Water Act without any conflict. *See, e.g.*, 30 U.S.C. § 187 (requiring Secretary of Interior to ensure that Federal mineral leases safeguard "the public welfare"); 43 C.F.R. § 3591.1(b) (lessees "shall take such action as may be needed to avoid, minimize or repair….[p]ollution of the air"); *see also Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin*., 538 F.3d 1172, 1219 (9th Cir. 2008) ("Energy conservation and environmental protection are not coextensive, but they often overlap.").

The U.S. Supreme Court has already rejected the contention that two agencies with overlapping mandates are somehow prohibited from administering their separate statutory obligations. In *Massachusetts v. EPA*, the Court considered EPA's authority to regulate carbon dioxide emissions under the Clean Air Act. *Mass. v. EPA*, 549 U.S. 497 (2007). EPA argued that doing so would improperly require it to tighten vehicle mileage requirements, a task that Congress had assigned to the U.S. Department of Transportation ("DOT"). *Id*. at 531-32. The

10

Court rejected this argument:

> But that DOT sets mileage standards in no way licenses EPA to shirk its environmental responsibilities. EPA has been charged with protecting the public's "health" and "welfare," 42 U.S.C. § 7521(a)(1), a statutory obligation wholly independent of DOT's mandate to promote energy efficiency. *See* Energy Policy and Conservation Act, § 2(5), 89 Stat. 874, 42 U.S.C. § 6201(5). The two obligations may overlap, but there is no reason to think the two agencies cannot both administer their obligations and yet avoid inconsistency.

*Id*. at 532; *see also Ctr. for Biological Diversity*, 538 F.3d at 1219 (same); *Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d 1151, 1163, 1166–67 (E.D. Cal. 2007) (same). Here, the fact that EPA has established emissions standards for new sources in the oil and gas sector in no way precludes BLM from fulfilling its statutory duty to regulate waste from new and existing sources, even if the legal obligations imposed by the agencies may overlap.

In addition, there is no preemptive or preclusionary language in the Clean Air Act that would prevent BLM from enacting the Rule. It is a basic principle of statutory construction that courts must interpret statutes "'to give effect to each if we can do so while preserving their sense and purpose.'" *U.S. ex rel. Bergen v. Lawrence*, 620 F.Supp. 1414, 1419 (D. Wyo. 1985) (quoting *Watt v. Alaska*, 451 U.S. 259, 267 (1981)). Petitioner-States have failed to demonstrate why the EPA and BLM cannot both achieve their statutory obligations with regard to regulation of the oil and gas industry.

Moreover, nowhere do the Petitioner-States demonstrate that the Rule is inconsistent with other regulations. In fact, they admit the opposite. *See* WY Memo. at 9-10 (noting that certain provisions of the Rule are "similar to" or "consistent with" state and EPA requirements), 13 ("the area of overlap is small"); ND Memo. at 2-3 (noting that some provisions of the Rule are "modeled off North Dakota law"). This is not by accident. BLM specifically recognized that overlapping regulatory regimes can create difficulties for operators, and it "carefully considered and minimized overlaps" with other regulations to the extent practicable. 81 Fed. Reg. at 83,010. EPA also noted in its NSPS rule that it "worked closely with BLM during development of this

11

rulemaking in order to avoid conflicts in requirements between the NSPS and BLM's proposed rulemaking."  81 Fed. Reg. at 35,825; *see id*. at 35,831 ("While we intend for our rule to complement the BLM's action, it is important to recognize that the EPA and the BLM are each operating under different statutory authorities and mandates in developing and implementing their respective rules.").  Furthermore, the Rule covers many sources that EPA's rulemaking does not, such as waste from existing sources and routine flaring of associated gas from oil wells. *See* 81 Fed. Reg. at 83,010.  Consequently, there is nothing in the Clean Air Act that precludes BLM's promulgation of the Rule.

## II.   THE PETITIONER-STATES HAVE FAILED TO DEMONSTRATE IRREPARABLE HARM.

The Petitioner-States make two arguments to allege that they will suffer irreparable harm if the Rule is not enjoined.  WY Memo. at 19-22; ND Memo. at 6-15.  First, they contend that the Rule establishes "potentially conflicting regulations" that will "create[ ] incentives for oil and gas producers to develop in states without significant federal land" and result in "lost revenue" and jobs.  WY Memo. at 20; ND Memo. at 11-15.  Second, the Petitioner-States claim that the Rule will harm state sovereignty because they "will no longer have sole authority to regulate production of state minerals within their borders" or enforce their own regulations.  WY Memo. at 20-21; ND Memo. at 6-11.  These contentions lack merit.

As the Tenth Circuit has recently stated, "purely speculative harm" is insufficient to demonstrate irreparable harm for purposes of a preliminary injunction.  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009).  Other than generalized statements in an affidavit, the Petitioner-States provide no evidence to support their contention that the Rule will "encourage" operators to invest in other states without federal land or result in lost revenue.  WY Memo. at 20; ND Memo. at 12-13.  These unsupported statements are not sufficient to "show a significant risk of irreparable harm."  *See Greater Yellowstone Coalition v. Flowers*, 321 F.3d

12

1250, 1258 (10th Cir. 2003); *Cody Laboratories, Inc. v. Sebelius*, 2010 WL 3119279 (D. Wyo. July 26, 2010) (holding that plaintiffs' "conclusory statements of possible economic harm lack both detail and factual support and are thus too speculative to merit preliminary injunctive relief").

In fact, given Petitioner-States' repeated assertions that they and EPA are already regulating such matters, these allegations make little sense. *See* WY Memo. at 6-7; ND Memo. at 15 ("Venting and flaring is already heavily regulated by North Dakota and other petitioners and by the EPA"). With regard to states that have significant federal land but lack such requirements, the Rule will actually benefit Petitioner-States by providing a level playing field and ensuring consistency across state lines. In addition, while the effective date of the Rule is January 17, 2017, many requirements of the Rule, such as reductions in flaring and increased capture requirements, are phased in over time and do not begin until one year after the effective date, thus causing no immediate harm to Petitioner-States. *See* 81 Fed. Reg. at 83,011.

Moreover, the Rule does not cause irreparable harm to state sovereignty. The Petitioner-States have no sovereign right to be the "sole authority" on federal and Indian lands. The U.S. Constitution's "Property Clause gives Congress the power over the public lands 'to control their occupancy and use, to protect them from trespass and injury, and to prescribe the conditions on which others may obtain rights in them.'" *Kleppe v. New Mexico*, 426 U.S. 529, 540 (1976) (quoting *Utah Power & Light Co. v. United States*, 243 U.S. 389, 405 (1917)); *see* U.S. Constitution, art. IV, § 3, cl. 2.

Further, Petitioner-States' allegations of irreparable harm are contradicted by the Rule and State Respondents' experience. BLM expressly acknowledges that it is not the only agency with responsibility to oversee oil and gas production on federal and tribal lands, and it specifically consulted with state and federal regulators to minimize duplication and conflict. 81

13

Fed. Reg. at 83,010.  Indeed, if a state or tribe demonstrates that its regulation imposes equally effective requirements, the Rule allows BLM to grant a variance from particular requirements and apply the state or tribal rules instead.  *Id*.; *see* 43 C.F.R. § 3179.401.  The fact that BLM is able to enforce these state or tribal rules for which the variance was granted, in lieu of BLM's own rules, does not affect state sovereignty or prevent the Petitioner-States from continuing to enforce their own regulations.  *See* WY Memo. at 21-22; ND Memo. at 8-9.  Given that this variance process is not yet effective and has not been triggered, Petitioner-States' claims that it would "exacerbate" or "fail[ ] to mitigate" their alleged harms are unfounded.

The State of California and BLM have worked cooperatively for many years to regulate oil and gas operations on Federal lands in California.  In particular, the California Department of Conservation, Division of Oil, Gas, & Geothermal Resources ("Division") and BLM have operated for several years under a Memorandum of Understanding ("MOU") that "applies to oilfield operations on all federally-owned land administered by BLM in California."[14]  The stated purposes of the MOU are "to delineate procedures for regulating oilfield operations where both the BLM and the Division have jurisdictional authority, to streamline operations, and to minimize duplication."  The MOU further states that BLM and the Division "recognize that it is in the best interest of the respective agencies and the public to exchange information and combine resources where possible."

California is also in the process of developing its own measures to more aggressively curb emissions from the oil and gas sector.[15]  The California Air Resources Board ("ARB") has

---

[14] The MOU is *available at*:  ftp://ftp.consrv.ca.gov/pub/oil/regulations/DOGGR-BLM-%20MOU%202012.pdf.

[15] California Air Resources Board, Public Hearing To Consider the Proposed Regulation for Greenhouse Gas Emission Standards For Crude Oil And Natural Gas Facilities Staff Report: Initial Statement Of Reasons (May 31, 2016), *available at*:  https://www.arb.ca.gov/cc/oil-gas/Oil%20and%20Gas%20ISOR.pdf.

introduced draft rules on GHG emissions from oil and natural gas facilities designed to reduce methane emissions by 40%-45% in 2025. The proposed ARB regulations would in some ways mirror the Rule by addressing existing facilities, imposing limits on flaring and venting, and requiring quarterly leak inspections. ARB's proposed regulation applies to BLM lands, and ARB would likely enter into an MOU with BLM to coordinate enforcement should the regulation proceed to implementation.[16] Consistent with BLM's findings for its Rule, ARB staff estimates that the costs of the proposed regulation will be "negligible, including the impact on growth of employment, investment, personal income, and production," while at the same time providing "substantial statewide reductions of several toxic air contaminants and criteria air pollutants" and GHG reduction benefits.[17]

Consequently, Petitioner-States' failure to show a significant risk of irreparable harm from the Rule warrants denial of an injunction.

### III. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST SUPPORT DENIAL OF THE REQUESTED INJUNCTION.

There is no merit to the Petitioner-States' contention that the balance of equities and the public interest support their request for a preliminary injunction. First, the Petitioner-States contend that in contrast to the irreparable harm that they will purportedly suffer, BLM "will likely save taxpayer money by not implementing an illegal program." WY Memo. at 23, 24. Of course, given that the Petitioner-States have failed to demonstrate a likelihood of success on the merits (*i.e.*, the Rule is not "illegal"), this argument fails. In these circumstances, "[a]voiding delay that would inevitably add to the cost of" implementing the Rule warrants denial of the injunction. *See James River Flood Control Ass'n v. Watt*, 680 F.2d 543, 544 (8th Cir. 1982).

Second, the Petitioner-States assert that there will be no waste of natural resources or

---

[16] *Id.* at 109.

[17] *Id.* at ES-4, 29-30.

STATE RESPONDENTS' OPPOSITION TO PRELIM. INJUNCT. - Case No. 16-cv-00285-SWS

harm to the environment because the states already have programs regulating these issues. WY Memo. at 23-25; ND Memo. at 15. However, nowhere do the Petitioner-States demonstrate that their rules will prevent as much waste, or be as environmentally protective, as those proposed by BLM. The Petitioner-States also fail to acknowledge that the Rule would apply in states and on tribal lands that lack any similar requirements. *See* 81 Fed. Reg. at 83,010 ("neither EPA, nor State and tribal regulations fully address the issue of waste of gas from BLM-administered leases"). Moreover, the Petitioner-States fail to show that BLM's Rule would produce less royalties for the federal and state governments than their own regulations. *Id.* at 83,014 (estimating a 35% reduction in methane emissions from 2014 levels and additional royalties of $3-$14 million per year). Thus, contrary to the Petitioner-States' arguments, significant harm would occur to the public through the waste of resources, loss of royalty payments, and increased air pollution if the Rule were enjoined.

State Respondents believe that BLM has a crucial role to play in ensuring the responsible development of oil and gas resources on federal and Indian lands, and that it is in the public interest to provide a baseline level of protection against the waste of a public resources and a more level playing field for oil and gas development. *See F.T.C. v. Alliant Techsystems Inc.*, 808 F.Supp. 9, 22-24 (D.D.C. 1992) (discussing the "public's clear and fundamental interest in promoting competition"). Because the Rule is likely to result in the stronger protection of federal lands and greater prevention of the waste of natural resources, which belong to the People, the public interest weighs strongly in favor of denying the injunction.

## CONCLUSION

For the foregoing reasons, the Court should deny Petitioner-States' motions for preliminary injunction.

Dated: December 21, 2016

Respectfully Submitted,

/s/ Reed Zars
Reed Zars
Wyo. Bar No. 6-3224
Attorney at Law
910 Kearney Street
Laramie, WY 82070
Phone: (307) 760-6268
Email: reed@zarslaw.com

*Attorney for State Respondents-Intervenors*

KAMALA D. HARRIS
Attorney General of California
DAVID A. ZONANA (*admitted pro hac vice*)
CA Bar No. 196029
Supervising Deputy Attorney General
MARY S. THARIN (*admitted pro hac vice*)
CA Bar No. 293335
GEORGE TORGUN (*admitted pro hac vice*)
CA Bar No. 222085
Deputy Attorneys General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1974
Facsimile: (510) 622-2270
E-mail: Mary.Tharin@doj.ca.gov

*Attorneys for the State of California, by and through the California Air Resources Board*

HECTOR BALDERAS
Attorney General of New Mexico
William Grantham (*admitted pro hac vice*)
NM Bar No. 15585
Assistant Attorney General
Post Office Drawer 1508
Santa Fe, New Mexico 87504-1508
Telephone: (505) 827-6000
Direct: (505) 717-3520
Facsimile: (505) 827-5826
Email: wgrantham@nmag.gov

*Attorneys for the State of New Mexico*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of December, 2016, I electronically filed the foregoing OPPOSITION TO PETITIONER-STATES' MOTIONS FOR PRELIMINARY INJUNCTION with the Clerk of the Court using the CM/ECF system, which caused all counsel of record to be served electronically.

$\hspace{3cm}$ /s/ Reed Zars