Eric P. Waeckerlin – *Pro Hac Vice*
Kathleen Schroder – *Pro Hac Vice*
Erin K. Murphy – Wyo. Bar No. 7-4691
Davis Graham & Stubbs LLP
1550 17th Street, Suite 500
Denver, Colorado 80202
Tel:     303.892.9400
Fax:     303.893.1379
Eric.Waeckerlin@dgslaw.com
Katie.Schroder@dgslaw.com
Erin.Murphy@dgslaw.com

*Attorneys for Petitioners Western Energy Alliance and*
*Independent Petroleum Association of America*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| STATE OF WYOMING, et al., | ) | |
| | ) | |
| Petitioners, | ) | Civil Case No. 2:16-cv-00285-SWS [Lead] |
| | ) | |
| v. | ) | Consolidated with: |
| | ) | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, et al. | ) | Case No. 2:16-cv-00280-SWS |
| | ) | |
| Respondents. | ) | Assigned: Hon. Scott W. Skavdahl |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

### REPLY IN SUPPORT OF PETITIONERS'
### MOTION FOR PRELIMINARY INJUNCTION

Petitioners Western Energy Alliance (Alliance) and the Independent Petroleum
Association of America (IPAA) respectfully submit this reply in support of the Petitioners'
motion for preliminary injunction.

## I.    INTRODUCTION

Government Respondents, Intervenor-Respondents and State Respondents (collectively
"Respondents") advance near-treatises on the Bureau of Land Management's (BLM) authority to

manage waste to distract the Court from the fundamental legal infirmity with this Rule: BLM has promulgated a comprehensive air quality regulatory scheme without congressional authority. Respondents' arguments cannot overcome the fact the Rule is unconstitutional, BLM's action is *ultra vires*, and this Court has the authority under the United States Constitution to make this determination. *Marbury v Madison*, 5 U.S. 137 (1803).

Respondents submit over 130 pages of briefing that quickly delve into the intricate and nuanced history of BLM's waste prevention authority.[1] Petitioners, however, do not dispute BLM has statutory authority to manage waste and do not ask the Court to define the precise limits of such authority. Petitioners simply petition the Court to do what the United States Constitution requires: recognize that Congress has not authorized BLM to promulgate the Rule.

Respondents repeatedly attempt to obfuscate Petitioners' straightforward assertion that BLM has acted without authority in promulgating a comprehensive air quality regulatory scheme. For example, Respondents devote large portions of their briefs to BLM's ability to manage public lands in a way that limits impacts to air quality. But Petitioners do not argue BLM may never take discrete local or regional actions aimed at reducing impacts to air quality through individual land management plans.[2] The sweeping breadth of the Rule, which impacts every oil and natural gas facility on federal and Indian leases, cannot be compared to such limited actions.

Similarly, the Rule does not merely "update," "amend," or "refine" NTL-4A, as BLM claims. NTL-4A was six-pages long and addressed three issues: (1) defined avoidably lost gas subject to royalties; (2) authorized venting and flaring on a case-by-case basis; and (3) defined

---

[1] *See Citizen Groups' Resp. to Mots. for Prelim. Inj.*, Docket No. 69 (hereinafter "Cit.Grps."); *Federal Resp'ts' Consolidated Opposition to Pets.' and Pet.-Intervenor's Mots. for Prelim. Inj.*, Docket No. 70 (hereinafter "Govt."); *State Resp'ts' Opposition to Pet.-States' Mots. for Prelim. Inj.*, Docket No. 77 (hereinafter "CA/NM").

[2] *See generally* Petitioners' *Memorandum in Support of Mot. for Prelim. Inj.*, 16-CV-280, Docket No. 13 ("Pets.").

beneficial use of oil and gas not subject to royalty. On its face the Rule comprises 11 pages of single-spaced codifications spanning two parts and two more subparts of the Federal Register. It is preceded by nearly 70 pages of a highly-technical preamble. Substantively, the Rule changes longstanding concepts governing avoidable and unavoidable waste, and royalty-bearing gas. It requires operators to develop and disclose detailed and complex waste minimization plans with highly confidential and proprietary information. It creates new compliance obligations, all of which carry the full force of federal sanctions, including fines, penalties, permit delays, and lease suspensions. The fatal flaw, however, is that, for the first time in the Department of the Interior's existence and without congressional authorization, the Rule imposes a comprehensive air quality regulatory scheme on all oil and gas facilities on federal and Indian leases. This scheme includes requirements to control emissions, inspect and replace equipment, and it extends to <u>existing facilities</u>, which the Environmental Protection Agency (EPA) itself has not even done. The near-silence in Respondents' briefs concerning the regulation of existing facilities and the conflicts this Rule poses with Section 111(d) of the Clean Air Act (CAA) is deafening.

Remarkably, Government Respondents argue the Rule contains no air quality provisions because "[i]t sets no emission standards for particular pollutants and contains no air quality monitoring requirements." Govt. at 2. This statement is plainly wrong. First, the Rule imposes emission standards for storage tanks (limiting emissions to six tons per year (tpy) of volatile organic compounds (VOCs)) and contains provisions for monitoring leaks. *See* AR 438-441 (43 C.F.R. §§ 3179.203, 3179.301-305). Second, emissions standards and monitoring requirements are not necessary conditions for controlling air pollution. *See* 42 U.S.C. §7411(h). Petitioners urge the Court to reject Government Respondents' narrow and simplistic characterization of an air quality regulation.

Respondents mischaracterize other justifications for the Rule. Most concerning among them is the oversimplification and dismissive tone regarding why flaring and venting occurs. BLM would have this Court believe it has a monopoly of wisdom on this point—which can be boiled down to operator laziness, greed, and negligence. *See e.g.*, Govt. at 4 ("operators often <u>choose</u> the easiest, and most wasteful, option: flaring") (emphasis added); *id*. at 38 ("Petitioners would have this Court believe that operators operate in a vacuum"); *id*. ("Operators are aware, or could easily make themselves aware, of when new wells come on line" and "can also plan their development in a way that ensures they have adequate infrastructure to capture produced gas before a new well is drilled"); *id*. at 44 (Petitioners "ignore the fact that operators choose when and where to drill their wells"); Cit.Grps. at 47 (referencing "inadequate infrastructure"). If only it were so easy.

The reality is that the production, gathering, and distribution of oil and natural gas is perhaps one of the most complex endeavors in the modern industrial age. There are numerous reasons operators must flare or vent, none of which owe to laziness, greed, or negligence. In fact, the 2010 Government Accountability Office (GAO) report BLM relies upon, itself, acknowledges at least 60 percent of gas flared cannot be technically or economically captured (i.e., it must be flared or vented). *See* AR 448 (RIA at 2); AR 2672 (U.S. Gov't Accountability Office, GAO-11-34, *Federal Oil and Gas Leases: Opportunities Exist to Capture Vented and Flared Natural Gas, Which Would Increase Royalty Payments and Reduce Greenhouse Gases* (Oct. 2010)). BLM's attempt to paint such a complexity as black and white is misleading and ignores reality and its own data.[3]

---

[3] *See, e.g.*, AR 31727 (American Petroleum Institute (API) Comments at 41(April 22, 2016)) ("BLM in North Dakota has expressly acknowledged that in the Bakken it may be '<u>necessary</u> to

Similarly, BLM belittles the legitimate economic and other irreparable harms Petitioners will suffer from the Rule, calling the Rule's costs "modest" and "ordinary." *See* Govt. at 63 ("Petitioners present <u>no credible evidence of implementation costs</u> but rather suggest that any amount is too much because the Rule is not legal") (emphasis added).[4] Citizen Groups similarly claim operators are concerned with "nothing more than the possibility of a very small diminution in [ ] profits." *See* Cit.Grps. at 34. These statements ignore ample evidence of the serious threats the Rule poses to hundreds of operators. *See infra* § IV; *see also* Pets. at §§ III-VI. This treatment incorrectly assumes all oil and natural gas companies are the same, operate on uniform economics, and can absorb significant capital costs and withstand forced well shut-ins and associated loss of lease rights. Petitioners provide the Court several declarations serving as concrete examples of the serious and immediate impacts facing operators under the Rule, and more importantly what these impacts portend for smaller operators and marginally economic wells. *See generally* Decl. of D. Naatz, attached as <u>Exhibit 1</u> ("Naatz Suppl. Decl."); Decl. of J. Dunham, attached as <u>Exhibit 2</u> ("Dunham Decl."); Decl. of C. Miller, attached as <u>Exhibit 3</u> ("Miller Decl."); Decl. of J. Benton, attached as <u>Exhibit 4</u> (Benton Decl.); Decl. of K. Sgamma, attached as <u>Exhibit 5</u> ("Sgamma Suppl. Decl."); Decl. of D. Ballard, attached as <u>Exhibit 6</u> ("Ballard Decl.") (collectively, Exhibits 1-6).

Finally, Respondents argue the Rule is lawful because BLM somehow has a unique interest in preventing waste of "public resources." *See, e.g.*, Govt. at 2; CA/NM at 6

---

burn or release gas for a number of operational reasons, including lowering pressure to ensure safety.'") (emphasis in original).

[4] It is hard to comprehend how BLM can claim Petitioners have presented "no credible evidence of implementation costs," when BLM itself estimates the Rule will cost, in the aggregate, between $100 and $279 million per year, depending on the discount rate used. AR 450 (RIA at 4). BLM also estimates that the Rule will impose costs between $42,300 and $65,800 per operator. AR 575 (RIA at 129).

(describing BLM's charge to protect "the public welfare"). But the duty to prevent waste is fundamental to all oil and gas development, whether on federal and Indian leases or not, and mechanisms to conserve mineral resources have been in place since the early 20th century. Most states have developed a dual regulatory scheme, where the state oil and gas commission regulates waste and another regulatory body, typically the environmental department, regulates air quality. Two examples are Wyoming and its neighbor Colorado.[5] In both states, "flaring" has been carved out as the exclusive province of the oil and gas commissions, and they regulate this activity independently of the health/environmental departments. On the flip side, regulation of air quality is treated as the exclusive province of the health/environmental departments. In neither case has the state commission attempted to extend its waste prevention authority to air quality regulation or vice versa. Oil and gas commissions do not possess the requisite expertise to administer highly technical air quality regulatory schemes. The same is true for BLM. Like state environmental departments, EPA has the expertise to administer air quality, not BLM. The Court should not be persuaded of the Rule's legality simply because BLM considers itself the expert technical agency for all matters oil and natural gas. Ultimately, nothing in Respondents' briefs alters the fact that the Rule is an unlawful, unconstitutional and unreasonable exercise of BLM's statutory authority. Petitioners have demonstrated all four elements necessary for this Court to issue a preliminary injunction and Respondents have not shown otherwise. Pets. §§ III-VI.

---

[5] *See* Wyo. Stat. Ann. § 30-5-102 (charging Wyoming Oil and Gas Conservation Commission with the prevention of waste); Colo. Rev. Stat. § 34-60-102(1)(a)(II), 34-60-107 (charging Colorado Oil and Gas Conservation Commission with the prevention of waste); Wyo. Stat. Ann. § 35-11-105 (charging Wyoming Department of Environmental Quality with protection of air quality); Colo. Rev. Stat. § 25-7-104 (creating air quality control commission).

## II. LIKELIHOOD OF SUCCESS ON THE MERITS

Petitioners are likely to succeed on the merits of their petition because the Rule cannot survive judicial review. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994). Nothing in Respondents' briefs fixes the fact that this Rule fails all three *Olenhouse* determinations. *See generally* Pets. at 8-46. BLM does not have authority to promulgate the Rule and, even if it did, BLM did not comply with the Administrative Procedure Act (APA).

### A. BLM Does Not Have Authority to Enact Comprehensive Air Quality Regulations

#### 1. BLM Does Not Interpret a Statutory Ambiguity Implicating an Analysis under *Chevron*.

Respondents incorrectly argue BLM's interpretation of its authority to promulgate the Rule is entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See* Govt. at 13; Cit.Grps. at 9-16. Only where a case involves an agency's assertion of authority to regulate a particular activity under a statute it administers, must courts engage in the two-step inquiry adopted by the Supreme Court in *Chevron. See City of Arlington v. FCC*, 133 S.Ct. 1863, 1868 (2013) ("Congress, when it left ambiguity in a statute administered by an agency, understood that the ambiguity would be resolved . . . by the agency, and desired the agency . . . to possess whatever degree of discretion the ambiguity allows[.]") (emphases added) (citation and quotations omitted). For example, *Chevron* itself was about EPA's construction of one discrete term under the CAA—what constitutes a stationary source. 467 U.S. at 839-40, 866.

This Court need not reach the two-step analysis adopted in *Chevron* because Congress left no statutory ambiguity for BLM to resolve; BLM does not seek to resolve a specific statutory ambiguity with this Rule. Rather, BLM attempts to stitch together passing statements in seven different statutes to assert broad new regulatory powers over matters outside BLM's substantive

area of expertise.[6] Respondents argue BLM is the proper authority to construe these various statutes and assert the Court must afford BLM deference in the process. Govt. at 13-25; Cit.Grps. at 10. This goes too far. *See Marbury v. Madison*, 5 U.S. 137, 176 (1803) (it is the province of the courts to construe and determine the constitutionality of laws). Because *Chevron* and its progeny do not stand for the proposition that an agency's claim of authority based on a patchwork of statutes is entitled to deference, the Court may rule, without deference to BLM, that the Rule exceeds BLM's statutory authority.

### 2. Even if *Chevron* Applies, BLM Had No Authority to Promulgate the Rule and its Construction Receives No Deference.

Even if the Court applies *Chevron's* framework to its analysis of the Rule, Congress did not delegate authority to BLM to establish a comprehensive air quality regulatory regime with its land management or waste prevention authorities. When determining whether an agency acted within its scope of authority, the Court must first delineate the agency's scope of authority and discretion, and then consider "whether on the facts, the agency's action can reasonably be said to be within that range." *Olenhouse*, 42 F.3d at 1574. An administrative agency "may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law,'" and the Court must give effect to Congress' intent. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (citation omitted); *see also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Critically, even when it comes to agency jurisdiction, an agency's discretion and the delegation of general authority to promulgate

---

[6] *See* AR 371 (81 Fed. Reg. at 83019) (citing legal authority from MLA, 30 U.S.C. §§188-287, Mineral Leasing Act for Acquired Lands, 30 U.S.C. §§ 351-360, Federal Oil and Gas Royalty Management Act, 30 U.S.C. §§ 1701-1758; Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701-1785; Indian Mineral Leasing Act of 1938, 25 U.S.C. §§ 396a-g; Indian Mineral Development Act of 1982, 25 U.S.C. §§ 2101-2108; and Act of March 3, 1909, 25 U.S.C. § 396).

regulations only extends to matters "within the agency's substantive field." *See City of Arlington*, 133 S. Ct. at 1874. Here, Congress directly addressed the issue of whether any other federal agency except EPA has authority to comprehensively regulate air quality, and the answer is no. *See* Pets. at 9-26.

The Government Respondents maintain "[t]he 'question in every case is, simply, whether the statutory text forecloses the agency's assertion of authority.'" Govt. at 13 (citing *City of Arlington*, 133 S. Ct. at 1871). Yet the law is well established an agency cannot act simply because Congress has not expressly prohibited the agency from taking such action. *See Chamber of Commerce of U.S. v. NLRB*, 721 F.3d 152, 160 (4th Cir. 2013) (a court "[cannot] presume a delegation of power [to an agency] simply from the absence of an express withholding of power[.]"). Congress did not delegate authority to BLM to substantively regulate air quality on public lands—it specifically tasked EPA with that responsibility. Simply because the seven statutes may not address the issue of air quality regulation does not equate to permission. *Id.* Congress knows how to grant authority, and it does not do so by "hid[ing] elephants in mouseholes." *Whitman v. Am. Trucking Ass*, 531 U.S. 457, 468 (2001). It is irrational to interpret the general authority granted to BLM under a smattering of waste prevention and land use management statutes as providing the requisite authority to establish a comprehensive air quality rule. Thus, either under or outside of *Chevron*, the Rule is unlawful.

### 3. Respondents Ask this Court to Ignore the Rule's Central Comprehensive Air Quality Regulatory Scheme.

Respondents characterize the Rule as a logical extension of BLM's longstanding waste prevention authority and necessary to update NTL-4A to "ensure the proper payment" of

royalties.[7] *See* Govt. at 72 (characterizing the Rule's air quality effects as "incidental"); *see also* CA/NM at 1 (describing the Rule as a "commonsense rulemaking"); *id.* at 8 ("the Rule may also have benefits for air quality"). Such portrayals are belied by the Rule's text, structure, and impact. Moreover, these characterizations ignore the Rule's direct outgrowth of the White House's March 2014 Climate Action Plan and the administration's methane reduction plan to address climate change.

Government Respondents list ten core provisions from the Rule and characterize each as waste management efforts. Govt. at 19. Six of the ten provisions, however, in nomenclature and effect directly regulate air emissions and air quality, including: (1) the prohibition on venting; (2) replacement requirements for pneumatic controllers; (3) the Leak Detection and Repair (LDAR) program; (4) control requirements for storage vessels; (5) placing limits on emissions volumes during well completions and initial production testing; and (6) requiring waste minimization plans to reduce flaring. The first five are substantive air quality control requirements, and numbers two through five are taken directly from EPA air control requirements under New Sours Performance Standards (NSPS) OOOO and OOOOa. *See* 40 C.F.R. §§ 60.5390, 60.5390a, 60.5397a, 60.5395, 60.5395a, 60.5375, 60.5375a. If the Rule is truly just a reasonable refinement of NTL-4A that happens to produce "incidental" air quality co-benefits, it begs the question why BLM needed to convene over 40 conference calls with EPA staff prior to issuing the Rule. Govt. at 8. Petitioners urge the Court not to give credence to these semantics, and instead to look at the Rule's effect.

---

[7] Government Respondents claim "[t]he text and structure of the Rule, combined with BLM's longstanding history of regulating venting and flaring demonstrate that the Rule is a waste prevention regulation, not an air quality regulation[.]" Govt. at 18-19. This statement suggests the Court should ignore the substance and impact of agency action, which is incorrect.

Moreover, Government Respondents claim this Rule is a waste prevention regulation because it does not impose emission standards or limits for particular pollutants. *See* Govt. at 20 (arguing it is "clear" the Rule's "primary purpose is to prevent waste" because it "does not contain emissions limits for particular pollutants" or "require that operators measure particulate matter, such as PM 2.5, or other common air pollutants"); *see also* CA/NM at 10 ("the Rule does not set new source emission standards"). This claim is incorrect in two respects.

First, the Rule does regulate emissions. Section 3179.203 requires operators control emissions from storage vessels if they have the potential for VOC emissions equal to or greater than six tpy. On its face this is an emission limit for VOCs from storage vessels. Furthermore, the storage vessel provision is modeled directly upon emissions standards under EPA's NSPS OOOO and OOOOa, as well as several state air quality regulations (e.g., Colorado and Wyoming). Additionally, in BLM's own words, the LDAR requirements under Sections 3179.301–305 "establish[] a fixed semiannual schedule for <u>monitoring</u> leaks," AR 370 (81 Fed. Reg. at 83,018) (emphasis added), and "[f]inal section 3179.302 also allows any person to request and BLM to approve the use of an alternative <u>monitoring</u> device, accompanied by a <u>monitoring</u> protocol." AR 379 (81 Fed. Reg. at 83,027) (emphases added).

Second, emissions limits do not necessarily define an air quality regulation. A central provision of the CAA, Section 111, provides for air pollution control under a variety of means, including work practice and operational standards. *See* 42 U.S.C. § 7411(h) ("if in the judgment of [EPA], it is not feasible to prescribe or enforce a standard of performance, [EPA] may instead promulgate a design, equipment, work practice, or operational standard, or combination thereof"). In fact, many of the oil and gas air quality regulations promulgated by EPA under Section 111 are work practice or operational standards (e.g., LDAR). If Government

Respondents were correct on this point, Petitioners expect EPA would be surprised to learn virtually none of its recent oil- and- gas-related regulations actually control air pollution.

### 4. The Rule Conflicts with EPAs Authority.

The Rule conflicts with the CAA authority delegated to EPA, states, and tribes, and it erodes the act's cooperative federalism framework. *See generally* Pets. at 10-20. The Rule also tramples on the narrowly-tailored approach Congress requires EPA take when regulating air emissions from oil and gas sources. *Id*. For example, in its response, BLM asserts the majority of flaring on BLM-administered leases is the result of "new well construction." Govt. at 6 (emphasis added). If that is the case, the Rule need not extend so broadly to all existing sources. BLM's assertion illuminates why the Rule is reckless and not narrowly tailored to address the specific problem (i.e., new well construction). It also demonstrates how the Rule conflicts with the CAA by regulating existing sources before EPA does and without adhering to the narrow requirements and procedure under section 111(d) of the CAA. *See* 42 U.S.C. §7411(d).

Respondents characterize the Rule as merely permissible agency "overlap." *See* Govt. at 27-28; CA/NM at 10. Petitioners do not dispute statutory and regulatory overlap can and does occur. Respondents ignore, however, that to take <u>any</u> action an agency must act within the scope of its authority and must exercise such authority reasonably. Without satisfying these fundamental requirements, cooperative and overlapping agency obligations cannot, by definition, exist. One agency may not simply wander into the jurisdiction of another without express and specific congressional authority.

The case law upon which Respondents rely to justify this overlap is not relevant here. The Supreme Court in *Massachusetts v. EPA* determined one term, "air pollutant," under one statute, the CAA, unambiguously authorized EPA to regulate carbon dioxide and other

greenhouse gas (GHG) emissions from new motor vehicles following an endangerment finding. 549 U.S. 497, 528 (2007). The Court found the "wholly independent" statutory obligations of each agency—the Department of Transportation (DOT) to promote energy efficiency through mileage standards and EPA to protect public health—capable of being coordinated on the very narrow issue of GHG emissions from vehicle tailpipes. *Id*. at 532. In contrast to this case, the Court implicitly recognized DOT and EPA had clear, independent regulatory authority in the first instance. The issue simply was whether this independent statutory authority was capable of coordination. Unlike BLM here, EPA was not requesting the Court find new authority or expand its existing regulatory powers; in fact, EPA requested narrower statutory authority than the Court ultimately found. The holding in *Massachusetts* was also limited in effect—to the extent EPA went on to regulate GHGs from motor vehicles following an endangerment finding, it had to coordinate with DOT mileage standards to ensure consistency.

This is a much different case. BLM asks this Court to construe numerous provisions of seven different statutes to assert new and expansive regulatory authority. The effect of BLM's request would be the judicial authorization of sweeping new statutory powers. A similar framework and request may well have resulted in a different outcome in *Massachusetts*. A finding in BLM's favor would upend the regulation of the entire oil and natural gas industry, substituting BLM for the EPA in many significant ways related to air quality control—not the least of which being BLM's regulation of existing facilities before EPA has even tried to do so. *See e.g.* AR 389 (81 Fed. Reg. at 83,037). This cannot be what the *Massachusetts* Court meant when it said two agencies, in theory, can "administer their obligations and yet avoid inconsistency." 549 U.S. at 532. Moreover, Congress did not intend this result when it directed

BLM to "provide for compliance with applicable" air pollution standards in FLPMA. *See* 43 U.S.C. § 1712(a)(8).

Citizen Groups argue *POM Wonderful LLC v. Coca-Cola Company*, 134 S. Ct. 2228, 2236 (2014), is directly on point. *See* Cit.Grps. at 21-22. *POM Wonderful* is inapplicable. In *POM Wonderful*, the Supreme Court considered "whether a private party may bring a Lanham Act claim challenging a food label that is regulated by the [Federal Drug and Cosmetic Act]." 134 S. Ct. at 2236. *POM Wonderful* is inapplicable because the present inquiry is not whether a private party may bring a limited cause of action under one statute or another. Rather, the dispositive issue in this case is the existence and scope of a federal agency's statutory authority.

1. **The Patchwork of Statutes BLM Cites Do Not Give it Authority to Comprehensively Regulate Air Quality.**

The Federal Oil & Gas Royalty Management Act (FOGRMA), Indian Mineral Leasing Act (IMLA), FLPMA, MLA and other sources cited by Respondents do not confer on BLM the authority to regulate air quality, for the reasons outlined in Petitioners' Brief. *See generally* Pets. at 21-26. Government Respondents maintain FLPMA allows BLM to manage public lands to protect air quality, pointing to air quality mitigation measures within BLM resource management plans (RMPs). *See* Govt. at 28. These measures reinforce BLM's limited authority to manage air quality. *See* AR 389 (81 Fed. Reg. at 83,037). Petitioners do not dispute BLM adopts air quality management measures in RMPs pursuant to its land use planning authority. *See* 43 U.S.C. § 1712(e); *Amigos Bravos v. BLM*, Nos. 6:09-cv-00037-RB-LFG, 6:09-cv-00414-RB-LFG, 2011 WL 7701433 (D.N.M. Aug 3, 2011). These management measures, however, are specific to the localized resources, developed in consultation and coordination with state air quality agencies,

and are not nationwide standards.[8] In fact, localized air quality management is appropriate and consistent with the cooperative federalism structure of the CAA.

Respondents similarly place too much weight on FLPMA's direction that BLM "take any action necessary to prevent unnecessary or undue degradation" of the public lands. 43 U.S.C. § 1732(b); *see* Govt. at 24; Cit.Grps. at 25; CA/NM at 7. BLM has not determined the Rule is "necessary" to prevent unnecessary or undue degradation of the public lands. *See generally* AR 361-366 (81 Fed. Reg. at 83,009-83,015). Furthermore, BLM has never relied on this rulemaking authority to enact such a sweeping rule that affects a principal or major use of the public lands. *See* 43 U.S.C. § 1702(l). Moreover, this Rule marks BLM's first assertion of such authority; BLM has consistently characterized its land management authority as distinct from EPA's authority to regulate air quality.[9] None of the cases cited by Respondents stand for the notion that BLM's ability to prevent "unnecessary or undue degradation" confers broad air quality

---

[8] BLM's air quality management measures have faced objections that they exceed the agency's authority. *See, e.g.*, BLM Approved RMP & Record of Decision for Public Lands Administered by the Tres Rios Field Office, Dolores, Colorado App. S, S-23 (2015), available at https://www.blm.gov/co/st/en/fo/sjplc/land_use_planning.html (citing public comment requesting BLM and Forest Service "clarify the limits of their authority over visibility impacts under the [CAA] to acknowledge that they cannot regulate oil and gas facilities' emissions").

[9] *See* BLM Air Resource Management Program Strategy 2015–2020 (2015), available at https://www.blm.gov/style/medialib/blm/wo/Planning_and_Renewable_Resources/soilwaterair/s wa_shared.Par.45752.File.dat/AirResourceProgramStrategy_2015to2020.pdf (observing BLM and EPA "have distinct roles and responsibilities under the legal framework governing air resource management"); Memorandum of Understanding Among the U.S. Dep't of Agric., U.S. Dep't of the Interior, and U.S. Envtl. Prot. Agency, Regarding Air Quality Analysis and Mitigation for Federal Oil and Gas Decisions through the National Environmental Policy Act (June 23, 2011) (describing BLM's authority over air quality as limited to developing land use plans and providing for compliance with state and pollution control laws), available at http://www.doi.gov/news/pressreleases/upload/29704-Joint-MOU-Air-Quality-FINAL.pdf.

regulatory authority.[10] *See id.* FLPMA does not allow BLM to issue the Rule, and Respondents

offer no justification to the contrary.[11]

### B. Even Under BLM's Statutory Authority to Regulate Waste and Manage Federal Land, the Rule is not Reasonable, and it is Procedurally Deficient, Arbitrary, and Capricious.

Although this Court should not afford BLM any deference in its construction of the land

management statutes for the reasons outlined above, even if it does, Petitioners have shown the

Rule still must be set aside. *See generally* Pets. at §§ III-VI.

### 1. The Rule Does Not Reasonably Construe BLM's Authority under MLA to Manage Waste.

The Rule impermissibly construes BLM's waste management authority for the reasons

cited in Petitioners brief.[12] *See* Pets. at Section III(B)-(D). Government Respondents argue the

---

[10] Government Respondents mischaracterize the Interior Board of Land Appeals' decision *Coalition for Responsible Mammoth Development*, 187 IBLA 141 (2016), as holding "for purposes of § 1712(c)(8) that BLM may assume federal and state enforcement of air quality regulations for NEPA purposes." *See* Govt. at 25. In this decision, the IBLA recognized states— not BLM—through the CAA enforce air quality standards, and BLM may rely on enforcement of air quality standards by these agencies in its NEPA decisions. *See* 187 IBLA at 231 (holding BLM "does not itself enforce the requirements of the CAA" but must ensure compliance in executing its NEPA authority).

[11] Citizen Groups observe BLM regulates emissions of hydrogen sulfide from oil and gas operations. *See* Cit.Grps. at 25 (citing BLM Onshore Order No. 6, 55 Fed. Reg. 48,958 (Nov. 23, 1990)). Onshore Order No. 6 is not analogous to the Rule. BLM did not issue Onshore Order 6 under the guise of its land management authority under FLPMA. *See* 55 Fed. Reg. at 48,968. Moreover, Onshore Order 6 has a narrow purpose to "protect public health and safety and those personnel essential to maintaining control of the well." *Id.*

[12] The Citizen Groups argue BLM's interpretation of its own regulation deserves deference. *See* Cit.Grps. at 11-12. Under *Auer v. Robbins*, 519 U.S. 452, 461 (1997), a court must defer to an agency's interpretation of its own regulation unless "plainly erroneous or inconsistent with the regulation." At issue in *Auer* and similar cases, however, are agencies' administrative interpretations of their regulations. *See id.* at 454-55 (challenging employee's salary status); *Gonzales v. Oregon*, 546 U.S. 243, 255 (2006) ("An administrative rule may receive substantial deference if it interprets the issuing agency's own ambiguous regulation") (emphasis added). BLM is plainly interpreting statutory authorities, not a regulation. Citizen Groups offer the tortured rationale that BLM's definition of "avoidably lost" is entitled to *Auer* deference because

Rule's definition and treatment of "unavoidably lost" gas is reasonable "[b]ecause the Rule maintains the distinction between avoidably and unavoidably lost gas[.]" Govt. at 42. Their argument elevates form over substance. The Rule unreasonably narrows unavoidably lost gas to only twelve circumstances, entirely removing the flexibility and case-by-case analysis that has governed since 1979. Pets. at 29-30. Further, these new categories do not cover "all truly unavoidable situations," such as maintenance events on gathering systems and do not make the rules "easier for operators to follow." Govt. at 37; *see* Miller Decl. ¶ 14. In these respects, the Rule's definition of "unavoidably lost" is actually inconsistent with the concept of "waste" under the MLA. Pets. at 30-31.

Likewise, Government Respondents offer no meaningful response to Petitioners' assertion the Rule increases rather than decreases waste. Although Government Respondents assert Petitioners present "no evidence whatsoever" to show operators may be forced to shut-in or abandon wells rather than comply with the Rule, *see* Govt. at 39, the reality is the Government Respondents simply do not accept Petitioners' repeated assertions that the Rule will cause wells to be shut in or abandoned. *See* Pets. at 32-33; Miller Decl. ¶¶ 18-20; Benton Decl. ¶ 10; Dunham Decl. ¶¶ 6-7; Naatz Supp. Decl. ¶¶ 6-10; Sgamma Supp. Decl. ¶¶ 4-8. Instead, the Government breezily claims, without any support, that operators can simply increase pipeline capacity and other infrastructure if and where they want. *See* Govt. at 3 (flaring "is often done because operators and midstream companies have not built the infrastructure needed to capture produced gas.") (emphasis added). Evidence shows lack of pipeline capacity is beyond operators' control and flaring must occur for many reasons, including safety. *See* State Director Review No. 922-15-07 (Feb. 11, 2016), attached hereto as Exhibit 7, at 7 (recognizing lack of

---

BLM introduced this term in the Rule and NTL-4A. Because the definition of "avoidably lost" is set forth in a formal rule rather than administrative rule, *Auer* is inapplicable.

pipeline capacity is beyond operator's control and flaring is inevitable) (referenced in API

Comments and NDPC Comments); *id.* at 11 (recognizing BLM and other federal agencies are

responsible for pipeline delays, and discussing challenges associated with building pipelines);

AR 31727 (API Comments at 46) ("The BLM in North Dakota has expressly acknowledged that

in the Bakken it may be '<u>necessary</u> to burn or release gas for a number of operational reasons,

including lowering pressure to ensure safety.'") (emphasis in original). Government Respondents

err by claiming simple solutions exist to the Rule's complex problems.

      Government Respondents also claim "the final rule will dramatically reduce the large

number of requests for approval to flare royalty-free that operators have had to file and the BLM

has had to process[.]" Govt. at 34. To justify this statement Government Respondents rely, in

part, on various exemptions and alternative flaring options available through sundries in the

Rule. Government Respondents irrationally fail to acknowledge exemption requests and

premature abandonment applications filed by operators will increase in the wake of this Rule,

likely offsetting any reductions in flare requests. *See* AR 31719 (API Comments at 38) ("With

the large increase in the number of Sundry Notice submittals and requirements for approval by

BLM . . . API is concerned that BLM will not be able to review and respond in a reasonable

amount of time to requests for royalty-free treatment [] under § 3178.9); AR 31833 (API

Comments at 111) (noting that BLM generally underestimates the burden to operators <u>and</u> the

agency for all sundry notices).

      Finally, Respondents incorrectly argue non-federal parties to unit agreements and

communitization agreements contractually agreed to the Secretary's regulation of all oil and gas

operations, including nonfederal and non-Indian wells. Govt. at 46, 48; Cit.Grps. at 28. BLM's

authority to regulate the "quantity and rate of production" federal units cannot be equated to a

power to limit venting, flaring, or waste or to impose air quality controls. *See* 43 C.F.R. § 3186.1 ¶ 21; *accord* 30 USC § 226(m). Indeed, a federal lease treats the lessee's obligation to prevent waste as distinct from the lessor's ability to specify the "rate" of production. *See* BLM Form 3110-11, Offer to Lease and Lease for Oil and Gas (2008) § 4.[13]  Accordingly, BLM's contractual right to regulate "quantity and rate of production" is just that—the authority to oversee the amount and pace of production.  Similarly, the Secretary's "right of supervision" over fee and state mineral operations within a communitized area cannot be reasonably construed as an unfettered right to regulate development. Noticeably, federal unit and communitization agreements do not include a provision akin to the language in a federal lease that "[r]ights granted are subject to. . . regulations. . . hereinafter promulgated when not inconsistent with lease rights granted."  BLM Form 3110-11, *supra*.  Parties to unit and communitization agreements did not consent to the BLM's regulatory authority over nonfederal and non-Indian wells.

## 2.  The Rule Lacks Justification under the APA.

BLM failed to base the Rule on substantial evidence on the record as required by the APA. *See generally* Pets. at 39-44. Respondents' briefs do not cure this defect. Among other things, the Rule fails to identify the problem it seeks to solve or how it actually solves anything.

First, Government Respondents cite misleading data by claiming that venting and flaring is increasing rapidly. *See* Govt. at 52 ("BLM considered data showing that the quantities of vented and flared gas was increasing exponentially. . . studies indicating that more natural gas is lost through leaks and unreported venting than previously understood."). In fact, venting and flaring is decreasing on a per well basis while overall production is increasing. Pets. at 41 n. 34.

---

[13] Available at https://www.blm.gov/style/medialib/blm/noc/business/eforms.Par.71287.File.dat/3100-011.pdf.

Leak rates are well below one percent on most sites. *See* AR 3502-09.[14] Additionally, a recent National Oceanic and Atmospheric Administration (NOAA) study found that globally, methane emissions from the fossil fuel industry are actually down despite large production increases.[15] *See* AR 17515-16.

Second, in terms of royalty value, Government Respondents criticize Petitioners' point that the Rule only reduces *de minimis* waste volumes by attacking Petitioners' underlying data. *See* Govt. at 52 n.18 (arguing Petitioners rely on "outdated and arguably incomplete" data). However, Petitioners based their expected royalty value calculation on the data BLM itself offers in the RIA. *See* AR 461 (RIA at 15). The issue is not whether the Rule is too expensive, but rather that the Rule has a *de minimis* impact—which it does when viewed in this light. Accordingly, the Rule cannot be justified as a waste prevention measure under the APA.

Third, BLM estimates the Rule is expected to deliver a 35 percent reduction in total volume of venting and a 49 percent reduction in flaring. *See* Govt. at 9-10 (citing AR 451, 455 (RIA at 5, 9)); CA/NM at 4. However, BLM entirely ignores the most recent June 2016 GAO report, which demonstrated severe limitations and problems in BLM's flaring and venting data, and ultimately concluded BLM "does not have the information it needs" to assess the extent of flaring and venting or ensure it is minimizing waste. AR 19894 (Gov't Accountability Office, GAO-16-607, *Oil and Gas Leasing: Interior Could Do More to Account for and Manage*

---

[14] *See also* Allen, David T., *et al.*, "Methane Emissions from Process Equipment at Natural Gas Production Sites in the United States: Liquid Unloadings," Environ. Sci. Technol. (2015), 49 (1), pp 641-48 (available at http://pubs.acs.org/doi/abs/10.1021/es504016r).

[15] The lead scientist for the NOAA study also characterized methane from oil and gas as "not directly responsible for the increase in total [global] methane emissions observed since 2007." http://www.noaa.gov/media-release/study-finds-fossil-fuel-methane-emissions-greater-than-previously-estimated

*Natural Gas Emissions*, 14 (July 2016)). To justify this Rule in a "waste prevention" context on such uncertain and inaccurate data is arbitrary and capricious.

Finally, the cost benefit analysis and related conclusions are arbitrary. *See generally* RIA. Respondents repeatedly argue the Rule is justified because it reduces waste and only has incidental effects on air quality. Respondents also argue Petitioners fail to acknowledge the environmental and social benefits of the Rule. Govt. at 52-53; Cit.Grps. at 2. However, the only way the costs justify this Rule is through its purported air quality benefits as measured by the social cost of methane (SCM), Pets. at 46; Dunham Decl. ¶ 16. This justification, which is the <u>only</u> way BLM can get benefits to exceed costs is improper and renders the rule arbitrary and capricious.

Predictably, Citizen Groups urge the Court to consider the recent opinion in *Zero Zone, Inc. v. Department of Energy*, 832 F.3d 654 (7th Cir. 2016), when evaluating the Rule's benefits. *Zero Zone* is not relevant here and does not support BLM's novel use of the social cost of methane to justify this Rule. At issue in *Zero Zone* was a Department of Energy rule promulgated under the Energy Policy and Conservation Act (EPCA), as amended, to improve the energy efficiency of commercial refrigerators. The 2005 amendments to EPCA included provisions with a global reach. *See e.g.*, Pub. L. No. 109-58, § 985, 119 Stat. 909 (codified at 42 U.S.C. § 16341(b)(3)) (providing for assistance "in the development and transfer of energy supply and efficiency technologies that would have a beneficial impact on world energy markets"). In contrast, the statutes at issue here, including the CAA, only authorize the regulation of domestic activity. Thus, the statutory framework at issue in *Zero Zone* is entirely different. Moreover, the commodities at issue in *Zero Zone*—commercial refrigerators—reach global markets. Thus, it was arguably relevant to consider global climate change impacts in that

context. Here, the only way the Rule's benefits outweigh its costs is through an evaluation of global benefits. BLM did not consider domestic benefits at all. *See* AR 452 (RIA at 6).

Moreover, the cost benefit analysis does not address the cost of the Rule on a per-well basis. The analysis focuses on the per entity cost. *See* AR 575-76 (RIA at 129-30). This omission is arbitrary and makes it impossible for BLM to evaluate the actual impact of the Rule. *See* Dunham Decl. ¶¶ 10-12. For example, the Rule will impact smaller operators much differently than larger operators. Miller Decl. ¶¶ 11, 17-19; Benton Decl. ¶ 10; Ballard Decl. ¶ 7; Dunham Decl. ¶¶ 10-14. Even a small uptick in monthly costs on marginally economic wells can force a small operator to shut-in a well. Miller Decl. ¶ 19; Dunham Decl. ¶¶ 10-14; Sgamma Supp. Decl. ¶ 8. And the Rule affects thousands of marginally economic wells. These flaws in the economic assessment demonstrate BLM has not articulated a rational connection between the facts found and the choices made, and lacks a reasoned basis for the Rule. *See Olenhouse*, 42 F.2d at 1575.

## III.    PETITIONERS DEMONSTRATE LIKELIHOOD OF IRREPARABLE HARM

Petitioners have met their burden of establishing "that irreparable injury is likely in the absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original). Petitioners demonstrate "a significant risk" their members "will experience harm that cannot be compensated after the fact by monetary damages." *RoDa Drilling Co. v. Siegal*, 552 F. 3d 1203, 1210 (10th Cir. 2009) (citation omitted) (emphasis added).[16] Specifically, Petitioners demonstrate application of the Rule will: (1) impose compliance costs that cannot be recovered because of the United States' sovereign immunity; (2) require disclosure of proprietary and confidential information; and (3) require payment of additional royalties on gas BLM now characterizes as "avoidably lost." Contrary to

---

[16] Respondents claim Petitioners must wait for the Rule's implementation to know they will suffer harm. Govt. at 39 n. 12. This is contrary to well-established law. *Winter*, 555 U.S. at 31.

Respondents' claims, these types of irreparable harm are precisely the kinds of injuries preliminary injunctions are meant to address. Likewise, this harm is not "speculative," "unsupported" or "modest." *See generally* Exhibits 1-6.

### A. The Compliance Costs Constitute Irreparable Harm Petitioners' Members are Likely to Suffer Absent an Injunction.

Respondents argue the compliance costs Petitioners' members will incur after the Rule becomes effective do not justify a preliminary injunction, and assert the harm likely to occur is not irreparable. Govt. at 65-67; Cit.Grps. at 32-35; CA/NM at 12-15. These assertions are simply wrong, and the supporting authority is selectively cited, taken out of context, or outdated. For example, Respondents cite several cases for the proposition that compliance costs are insufficient to constitute irreparable harm. Respondents ignore that compliance costs in these cases were compensable by monetary or other corrective relief at a later date. *See Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) ("It is also well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm [because] <u>such losses are compensable by monetary damages</u>.") (emphasis added) (citations omitted); *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("'Mere injuries [ ] in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. <u>The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation</u>, weighs heavily against a claim of irreparable harm.'") (citation omitted) (emphasis added); *Wisconsin Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985) (same); *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) (not addressing issues of sovereign immunity and resulting inability to recover costs at a later date); *Am. Hosp. Assn v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980) (same). In contrast, because of sovereign immunity, Petitioners' members cannot recover costs incurred to comply with the Rule.

Similarly, Government Respondents' assertion that the court in *Chamber of Commerce v. Edmondson*, 594 F.3d 742 (10th Cir. 2010), "found irreparable harm not based on the specter of unrecoverable compliance costs" has no merit. Govt. at 67. The court plainly stated "[i]mposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury." *Edmondson*, 596 F.3d at 770-71 (citations omitted). The court later repeated, "[i]f forced to comply with the [Act], the Chambers' members will face a significant risk of suffering financial harm [.] Yet, because Oklahoma and its officers are immune from suit for retrospective relief[,] these financial injuries cannot be remedied." *Id.* at 771 (emphases added) (citations omitted).

The Government Respondents also mislead the Court when stating: "Petitioners contend that because they will not be able to recover any potential compliance costs as damages, they need not prove that these losses are certain, great, actual, or imminent." Govt. at 66 (citing *Nat'l Mining Assn v. Jackson*, 768 F. Supp. 2d 34, 52 (D. D.C. 2011)). This is a mischaracterization of Petitioners' position. Petitioners have shown not only that the compliance costs here are unrecoverable due to sovereign immunity, but also that those costs are "certain, great, actual [and] imminent."[17] *Id.* Petitioners' members will suffer immediate, irreparable harm if the Rule takes effect on January 17, 2017. *See, e.g.*, Dunham Decl. ¶¶ 4-9; Miller Decl. ¶¶ 8-15 (discussing the immediate, irreparable effect of the Rule's royalty provisions), ¶¶ 16-19 (discussing the Rule's effect on marginally economic wells and resultant costs and impacts associated with shutting in such wells), ¶¶ 20-21 (discussing costs and impacts of record keeping and reporting requirements of the Rule), ¶¶ 22-23 (discussing resources expended for future drilling and the effect of being the Rule on these plans), ¶ 19 (estimating 28 percent of the

---

[17] Nonetheless, even "to say that a harm is 'minimal' is not to say it is nonexistent." *Heideman*, 348 F.3d at 1190. *See generally* Exhibits 1-6.

company's wells may be shut-in due to the Rule). *See also* Benton Decl. ¶ 10 (estimating a cost of $3 million to comply in just one field); Ballard Decl. ¶ 7-8 (discussing delays and duplicative compliance obligations and enforcement risks).

BLM estimates the Rule will cost between $110 and $279 million per year, AR 450 (RIA at 4), and evidence in the record suggests BLM has significantly underestimated the costs of compliance. *See* Pets. at 50; *accord* Dunham Decl. ¶ 4-9. Although BLM's brief dismisses costs borne by operators as "modest," Govt. at 66, Petitioners' members disagree with this characterization. The majority of operators affected by this Rule are not multi-national oil conglomerates. Most operators cannot swiftly shift assets or mobilize expensive alternative capture technologies,[18] pressure midstream companies to expand capacity,[19] or afford to simply suspend or abandon leases rather than comply with the Rule.[20] Naatz Supp. Decl. ¶¶ 9-10; Sgamma Supp. Decl. ¶ 3; Miller Decl. ¶¶ 16-17. And of those industry members who are the archetypal major operators, this Rule is sure to cost them far in excess of the $42,300 to $65,800

---

[18] Miller Decl. ¶ 21 (discussing prohibitive cost and safety issues with mobile capture technology).

[19] BLM portrays coordinating with midstream companies as an easy task, *see, e.g.*, Govt. at 3, but the evidence and information available to BLM shows otherwise. *See* AR 33950-52 (North Dakota Petroleum Council Comments) *and* AR 31729-30 (API Comments). Also, the Rule only functions the way BLM says it will if BLM actually has the capacity and power to be the ultimate manager of giant, multi-faceted, complex production and gathering systems, with the ability to monitor and relieve capacity constraints in real-time and coordinate maintenance events and infrastructure limitations. *See, e.g.*, 43 C.F.R. § 3179.9.

[20] BLM asserts if operators cannot capture emissions, then operators can simply suspend their leases. Govt. at 6. BLM, however, has been criticized for its use of lease suspensions by at least one of the Citizens Groups, thus raising questions as to the availability of suspensions as a viable alternative to flaring. *See* The Wilderness Society, *Land Hoarders*: *How Stockpiling Leases is Costing Taxpayers* (2015), *available at* https://wilderness.org/sites/default/files/TWS %20Hoarders%20Report-web.pdf; Gov't Accountability Office, GAO-09-74, *Oil and Gas Leasing: Interior Could Do More to Encourage Diligent Development*, 4-7 (Oct. 2008).

BLM estimates because they operate many wells. *See id.*; *see also* AR 573, 575 (RIA at 127, 129); Dunham Decl. ¶ 10.

Respondents also suggest the phased-in approach of some of the Rule's provisions prevents Petitioners from claiming their members will suffer irreparable harm before the Court can rule on the merits of this case. Govt. at 39-40; CA/NM at 13. These statements are inaccurate and self-serving given the evidence on the record showing Petitioners' members must immediately begin to expend capital to come into compliance with the Rule, *see* Pets. at 49, and the fact that BLM itself acknowledges the "requirements to replace existing equipment would necessitate immediate expenditures." AR 450 (RIA at 4) (emphasis added); *see also* Miller Decl. ¶¶ 10-12; Benton Decl. ¶ 10. In short, the record and evidence in the attached declarations demonstrate ample, immediate and serious harm to Petitioners' members for which they cannot be compensated.

### B. The Rule Risks Public Disclosure of Proprietary Information.

Section 3162.3-1 of the Rule requires operators submit natural gas waste minimization plans with APDs. In submitting waste minimization plans to BLM, the Rule requires operators to disclose commercially sensitive and proprietary information about anticipated production from a proposed well. Pets. at 50-52; AR 430 (43 C.F.R. § 3162.3-1(j)(5)(i)–(iv)); *see also* Spisak Decl. ¶ 36 (acknowledging the Rule "could result in operators submitting confidential business information [ ] to BLM"). These projections and data are highly confidential and valuable; operators go to great lengths to protect this type of information from outside disclosure or unnecessary internal dissemination. Miller Decl. ¶ 26; AR 31710 (API Comments at 29) (explaining the sensitive nature of this information). Nonetheless, BLM has stated it will disclose waste minimization plans to the public. AR 395 (81 Fed. Reg. at 83,043) (stating BLM will post

each waste minimization plan for public review, subject to any protections for confidential business information).

Disclosure of this type of sensitive information cannot be remedied after the fact with monetary damages, and therefore would constitute irreparable harm. *See* Pets. at 50-52; *see also Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1148-49 (D. Kan. 2007) (holding threat of proprietary information disclosure may demonstrate irreparable harm); *FMC Corp. v. Taiwan Tainan Giant Indus. Co., Ltd.*, 730 F.2d 61, 63 (2nd Cir. 1984) ("A trade secret once lost is, of course, lost forever."); *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92 (3rd Cir. 1992) (threat of trade secret disclosure may establish immediate irreparable harm); *Estee Lauder Cos. Inc. v. Batra*, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006) (Even where a trade secret has not yet been disclosed, irreparable harm may be found based upon a finding that trade secrets will be disclosed). Petitioners have demonstrated this injury "is of such imminence that there is a clear and present need for equitable relief." *Heideman,* 348 F.3d at 1189 (emphasis removed).

Government Respondents state "if [operators] indicate [to BLM] that the information is considered confidential, BLM will handle the information in accordance with applicable regulations in 43 CFR part 2." Govt. at 67. On the record, however, BLM refuses to confirm the information required in waste minimization plans is actually subject to any statutory protections, even though BLM knows what type of information it will require and can make this assessment. *See* AR 403 (81 Fed. Reg. at 83,051) (stating only that "BLM will handle the information in accordance with" its Freedom of Information Act regulations); *see also* Pets. at 51-52. BLM's refusal to affirmatively recognize information in waste minimization plans as confidential gives operators little comfort their information will be protected. The Rule, therefore, presents a significant risk that proprietary and confidential business information will be publicly disclosed,

and once disclosed the harm cannot be remedied. Thus, Petitioners have demonstrated a significant risk of irreparable harm supporting a preliminary injunction.

## IV.    EQUITIES AND PUBLIC INTEREST WEIGH IN FAVOR OF INJUNCTIVE RELIEF

The third and fourth preliminary injunction factors—the balance of the equities and the public interest—also weigh strongly in favor of injunctive relief. Government Respondents' argument that an injunction will cause BLM to "suffer substantial harm" is without merit. Govt. at 74. Respondents rely on the now-tired notion that this Rule is merely an update to NTL-4A. *See id.* (stating that "BLM is presently regulating oil and gas waste under a regime that is now 37 years old"); *see also* CA/NM at 3-4 (arguing the Rule is necessary for BLM to revise its "insufficient and outdated" waste and royalty regulations). Such logic suggests an absurd outcome: a court should refrain from enjoining agency action lest the agency be stuck with its outdated regulatory scheme. BLM had the opportunity to lawfully update NTL-4A for 30 years. Tellingly, BLM has only now strayed beyond the confines of its statutory authority in the wake of the White House's directives on climate change. The balance of the equities and the public interest weigh in favor of enjoining such action to preserve the status quo.

Moreover, Citizen Groups offer four explanations for how the Rule serves the public interest. *See* Cit.Grps. at 47-49. Two of the four reasons are air-quality justifications. Citizen Groups argue the Rule will "benefit[] the environment and public health by reducing emissions of the potent greenhouse gas methane, VOCs that contribute to smog, and carcinogenic air pollutants such as benzene." *Id.* at 47. Additionally, Citizen Groups claim "the Rule will play an important role in slowing the pace of climate change." *Id.* at 48; *see also* Govt. at 63 (listing the Rule's impact on climate change as a reason that an injunction does not serve the public interest). Notwithstanding the fact this Rule has virtually zero impact on climate change, Pets. at 41-43,

these justifications are yet more evidence the Rule is aimed at air quality control, not waste prevention, and that BLM cannot rationalize the Rule without citing to its alleged impacts on global climate change.

## V.  CONCLUSION

Respondents' briefs focus on the intricacies and nuanced history of BLM's waste prevention authority in an attempt to obfuscate Petitioners' assertion that BLM acted without authority in promulgating a comprehensive air quality regulatory scheme. Petitioners do not dispute BLM has statutory authority to manage waste and do not ask the Court to define the precise limits of such authority. Petitioners ask this Court to recognize that Congress has not authorized BLM to promulgate this sweeping Rule, and also ask the Court to require BLM to meet the burdens administrative law imposes on the agency. Petitioners demonstrate they are likely to succeed on the merits here. Petitioners also demonstrate the Rule will cause Petitioners and their members irreparable harm, and the equities and public interest favor a preliminary injunction. Thus, the Court should grant Petitioners' motion and enjoin BLM from implementing its final Rule until resolution of this litigation.

WHEREFORE, Petitioners Western Energy Alliance and the Independent Petroleum Association of America respectfully request that this Court  grant its motion for preliminary injunction.

Dated this 23rd day of December, 2016.

Respectfully submitted,

DAVIS GRAHAM & STUBBS LLP

By: _s/ Eric P. Waeckerlin_
Eric P. Waeckerlin – *Pro Hac Vice*
Kathleen Schroder – *Pro Hac Vice*
Erin K. Murphy – Wyo. Bar No. 7-4691
1550 17th Street, Suite 500
Denver, Colorado 80202
Tel:    303.892.9400
Fax:    303.893.1379
Eric.Waeckerlin@dgslaw.com
Katie.Schroder@dgslaw.com
Erin.Murphy@dgslaw.com

*Attorneys for Petitioners Western Energy*
*Alliance and the Independent Petroleum*
*Association of America*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 23rd day of December, the foregoing **REPLY IN SUPPORT OF PETITIONERS' MOTION FOR PRELIMINARY INJUNCTION** was filed electronically with the Court, using the CM/ECF system, which caused automatic electronic notice of such filing to be served upon the following:

| | |
|---|---|
| Erik Edward Petersen<br>Senior Assistant Attorney General<br>Elizabeth Morrisseau, Assistant Attorney<br>    General<br>**Wyoming Attorney General's Office**<br>2320 Capitol Avenue<br>Cheyenne, WY 82002<br>(307) 777-6946<br>erik.petersen@wyo.gov,<br>jessica.curless@wyo.gov<br><br>*Attorneys for Petitioner State of Wyoming* | Timothy C. Fox, Montana Attorney General<br>Alan L. Joscelyn, Chief Deputy Attorney<br>    General<br>Tommy H. Butler, Deputy Attorney General<br>**Montana Department of Justice**<br>215 North Sanders<br>PO Box 201401<br>Helena, MT 59620-1401<br>(406) 444-0662<br>timothyfox@mt.gov<br>alanjoscelyn@mt.gov<br>tommybutler@mt.gov<br><br>*Attorneys for the State of Montana* |
| C. Levi Martin, Assistant Deputy U.S.<br>    Attorney<br>**United States Attorney's Office**<br>J.C. O'Mahoney Federal Courthouse<br>2120 Capitol Avenue, Suite 4000<br>Cheyenne, WY 82001<br>(307) 772-2124<br>Christopher.Martin@usdoj.gov<br><br>*Attorneys for Respondents The Honorable*<br>*Sally Jewell and U.S. Secretary of the Interior,*<br>*and for the U.S. Bureau of Land Management* | David P. Garner, Assistant Attorney General<br>Hope Hogan, Assistant Attorney General<br>**North Dakota Attorney General's Office**<br>500 North 9th Street<br>Bismarck, ND 58501<br>(701) 328-3640<br>dpgarner@nd.gov<br>hhogan@nd.gov<br><br>*Attorneys for Petitioner Intervenor, the State of*<br>*North Dakota* |

| | |
|---|---|
| Marissa Piropato<br>Clare M. Boronow<br>**United States Department of Justice**<br>Environmental and Natural Resources Division<br>601 D Street NW<br>Washington, DC 20004<br>(202) 305-0470 (Ms. Piropato)<br>(202) 305-0492 (Ms. Boronow)<br>Marissa.piropato@usdoj.gov<br>Clare.boronow@usdoj.gov<br><br>*Attorneys for The Honorable Sally Jewell*<br>*U.S. Secretary of the Interior, and for the U.S.*<br>*Bureau of Land Management* | George Torgun, Deputy Attorney General<br>David A. Zonana, Deputy Attorney General<br>Mary Tharin, Deputy Attorney General<br>**California Department of Justice**<br>Office of the Attorney General<br>1515 Clay Street, 20th Floor<br>Oakland, CA 94612<br>(510) 879-1002 (George Torgun)<br>(510) 879-1248 (David Zonana)<br>(510) 879-1974 (Mary Tharin)<br>george.torgun@doj.ca.gov<br>david.zonana@doj.ca.gov<br>mary.tharin@doj.ca.gov<br><br>*Attorneys for the State of California* |
| Wayne Stenehjem, Attorney General<br>**North Dakota Attorney General's Office**<br>600 East Boulevard Avenue, Suite 125<br>Bismarck, ND 58505<br>(701) 328-2210<br>ndag@nd.gov<br><br>*Attorneys for Petitioner Intervenor, the State of*<br>*North Dakota* | Paul M. Seby<br>**Greenberg Traurig LLP**<br>1200 17th Street, Suite 2400<br>Denver, CO 80202<br>(303) 572-6500<br>sebyp@gtlaw.com<br><br>*Attorneys for Petitioner Intervenor, the State of*<br>*North Dakota* |
| William G. Grantham, Assistant Attorney<br>    General<br>PO Box 1508<br>Sante Fe, NM 87504-1508<br>(505) 717-3520<br>wgrantham@nmag.gov<br><br>*Attorney for the State of New Mexico* | Robert John Walker<br>**Hickey & Evens**<br>1800 Carey Avenue, Suite 700<br>PO Box 467<br>Cheyenne, MY 82003-0467<br>(307) 634-1525<br>rwalker@hickeyevans.com<br><br>*Attorneys for Petitioner Intervenor, the State of*<br>*North Dakota* |

| | |
|---|---|
| Jennifer L. Cassel<br>Rachel Leigh Granneman<br>**Environmental Law & Policy Center**<br>35 East Wacker Drive, Suite 1600<br>Chicago, IL 60601<br>(312) 795-3726 (Ms. Cassel)<br>(312) 795-3737 (Ms. Granneman)<br>jcassel@elpc.org<br>rgranneman@elpc.org<br><br>*Attorney for Respondent-Intervenors, Center for Biological Diversity, et al.* | Ann Brewster Weeks, Legal Director<br>Darin Schroeder<br>**Clean Air Task Force**<br>18 Tremont, Suite 530<br>Boston, MA 02108<br>(617) 624-0234 (Ms. Weeks)<br>(303) 579-4165 (Mr. Schroeder)<br>aweeks@catf.us<br>dschroeder@catf.us<br><br>*Attorney for Respondent-Intervenors, Center for Biological Diversity, et al.* |
| Erik Schlenker-Goodrich<br>**Western Environmental Law Center**<br>208 Paseo del Pueblo Sur, Suite 602<br>Taos, NM 87571<br>(575) 613 4197<br>eriksg@westernlaw.org<br><br>*Attorney for Respondent-Intervenors, Center for Biological Diversity, et al.* | Lisa Dardy McGee<br>**Wyoming Outdoor Council**<br>262 Lincoln Street<br>Lander, WY 82520<br>(307) 332-7031<br>lisa@wyomingoutdoorcouncil.org<br><br>*Attorney for Respondent-Intervenors, Center for Biological Diversity, et al.* |
| Susannah L. Weaver<br>**Donahue & Goldberg, LLP**<br>1111 14th Street NW, Suite 10A<br>Washington, DC 20005<br>(202) 569-3818<br>susannah@donahuegoldberg.com<br><br>*Attorney for Respondent-Intervenors, Center for Biological Diversity, et al.* | Brandon Lee Jensen<br>**Budd-Falen Law Offices, LLC**<br>300 East 18th Street<br>PO Box 346<br>Cheyenne, WY 82003-0346<br>(307) 632-5105<br>Brandon@buddfalen.com<br><br>*Attorneys for Petitioner State of Montana* |

| | |
|---|---|
| Joel Minor<br>Michael S. Freeman<br>Robin Cooley<br>**Earthjustice**<br>633 17th Street, Suite 1600<br>Denver, CO 80202<br>(303) 996-9628 (Mr. Minor)<br>(303) 966-9615 (Mr. Freeman)<br>(303) 996-9611 (Ms. Cooley)<br>jminor@earthjustice.org<br>mfreeman@earthjustice.org<br>rcooley@earthjustice.org<br><br>*Attorney for Respondent-Intervenors, Center for Biological Diversity, et al.* | Laura H. King<br>Shiloh Hernandez<br>**Western Environmental Law Center**<br>103 Reeder's Alley<br>Helena, MT 59601<br>(406) 204-4852 (Ms. King)<br>(406) 204-4861 (Mr. Hernandez)<br>king@westernlaw.org<br>hernandez@westernlaw.org<br><br>*Attorney for Respondent-Intervenors, Center for Biological Diversity, et al.* |
| Reed Zars<br>**State of California and State of New Mexico**<br>910 Kearney Street<br>Laramie, WY 82070<br>(307) 760-6268<br>reed@zarslaw.com<br><br>*Attorney for State of California and State of New Mexico* | |

*s/ Paige Finnell*