Wayne Stenehjem (admitted *pro hac vice*)
Attorney General
David Garner (admitted *pro hac vice*)
Hope Hogan (admitted *pro hac vice*)
Assistant Attorneys General
500 N. 9th Street
Bismarck, ND 58501
Phone: (701) 328-2925
ndag@nd.gov

Paul M. Seby (admitted *pro hac vice*)          Robert J. Walker (Wyo. Bar No. 7-4715)
Special Assistant Attorney General              Hickey & Evans, LLP
Greenberg Traurig, LLP                          1800 Carey Street, Suite 700
1200 17th Street, Suite 2400                    Cheyenne, WY 82003
Denver, CO 80202                                Phone: (307) 634-1525
Phone: (303) 572-6584                           Fax: (307) 638-7335
Fax: (303) 572-6540                             rwalker@hickeyevans.com
sebyp@gtlaw.com

*Counsel for Petitioner-Intervenor State of North Dakota*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| STATE OF WYOMING, | ) | |
| STATE OF MONTANA, and | ) | |
| STATE OF NORTH DAKOTA, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Case No. 16-cv-00285-SWS |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| THE INTERIOR; SALLY JEWELL, in her | ) | |
| official capacity as Secretary of the Interior; | ) | |
| UNITED STATES BUREAU OF LAND | ) | |
| MANAGEMENT; and NEIL KORNZE, in | ) | |
| his official capacity as Director of the | ) | |
| Bureau of Land Management, | ) | |
| | ) | |
| Respondents. | ) | |

## NORTH DAKOTA'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Petitioner State of North Dakota respectfully submits this Reply in Support of its Motion for Preliminary Injunction, and asks this Court to enjoin the implementation of the final rule of the Department of the Interior's Bureau of Land Management ("BLM") entitled "Waste Prevention, Production Subject to Royalties, and Resources Conservation: Final Rule," 81 Fed. Reg. 83,008 (Nov. 18, 2016) ("Final Rule").

## INTRODUCTION

Although BLM attempts to frame the Final Rule as a simple update to its rules preventing the "waste" of federally-owned natural gas, it is actually an ambitious federal program to control methane emissions from new and existing oil and gas operations that occurs, at least in North Dakota, primarily on private land and private mineral estates regulated by the State of North Dakota. Only five percent of North Dakota oil and gas production is from federal lands, but more than 30% of its pooled spacing units include a federal or tribal well and thus will be required to comply with the Final Rule. Helms Decl. ¶¶ 9, 12–13.

North Dakota has a comprehensive program for conserving its natural resources and maximizing the effective use of its oil and gas assets, including regulating venting and flaring, *see* N.D. Admin. Code Ch. 43-02-03, and air quality, *see* N.D. Admin. Code § 23-25-01 *et seq*. These programs were developed in keeping with the North Dakota legislature's instruction that it is the policy of North Dakota "to foster, to encourage, and to promote the development, production, and utilization of natural resources of oil and gas in the state in such a manner as will prevent waste." N.D. Cent. Code § 38-08-01.

The Final Rule substantially overlaps with these North Dakota regulations and often conflicts with them, ECF No. 40 at 80, and in so doing BLM seizes from the State the ultimate authority to prevent waste, maximize efficiency, regulate venting and flaring and make

enforcement decisions—even over private wells if they have been communitized with even the most miniscule federal mineral interest. This is a harmful, unlawful, and arbitrary intrusion into a vital and effective area of state regulation that is fundamental to North Dakota's economy and government, and North Dakota respectfully requests that this Court enjoin the Final Rule before it can go into effect on January 17, 2017.[1]

## A. The Final Rule Will Irreparably Harm North Dakota.

The Final Rule creates a new, intrusive and redundant federal regime to regulate the venting and flaring of natural gas from oil and gas wells, including private wells, in direct competition with North Dakota's established, successful state program. This will cause irreparable harm to North Dakota's sovereign interests.

Because the Final Rule places North Dakota's "sovereign interests and public policies at stake," the harm North Dakota stands to suffer is "irreparable if deprived of those interests without first having a full and fair opportunity to be heard on the merits." *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001); *see also Int'l Snowmobile Mfrs. Ass'n v. Norton*, 304 F. Supp. 2d 1278, 1287 (D. Wyo. 2004) (National Park Service regulation adversely affecting State of Wyoming's ability to manage its trails program and fish populations was infringement on state sovereignty constituting irreparable harm); *Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*, 790 F.3d 1000, 1005 (10th Cir. 2015) (invasion of tribal sovereignty can constitute irreparable injury). Without a preliminary injunction, this harm to North Dakota's sovereignty will occur the moment the Final Rule goes into effect.

As North Dakota detailed in its opening memorandum and supporting declarations, the

---

[1] North Dakota never received a response to its December 2, 2016 letter to the Secretary of the Interior, respectfully seeking to defer the effective date of the Final Rule. *See* ECF No. 40-1. North Dakota has exhausted all efforts and has no recourse but to ask the Court for relief.

State has an extensive program that regulates the flaring of natural gas that is part of the core public policy of North Dakota to prevent waste and conserve its natural resources. More than half of North Dakota's tax revenue in years 2011–2013 came from the State's oil and gas taxes, not counting other revenues that were supported by the economic effects of a strong oil and gas industry. Office of the State Tax Comm'r, 52nd Biennial Report at 16 (2015).[2] As such, the regulation of oil and gas production to, among other things, maximize revenue for the benefit of its citizens is one of the most important state functions of the State of North Dakota and an absolutely core governmental interest.

This regulatory program has been extremely effective in decreasing waste by curbing the venting and flaring of natural gas. When the current boom began in 2004, the amount of natural gas flared in North Dakota began to climb rapidly, but after North Dakota implemented its current program that volume fell precipitously and is approaching pre-boom levels. *See* North Dakota Industrial Commission, North Dakota Monthly Gas Flared (2016), attached hereto as **Exhibit A**. This improvement is likely to continue as North Dakota phases in its flaring reduction goals. Helms Decl. ¶ 23.

BLM asserts that one of its reasons for promulgating the Final Rule is that "state regulations are subject to change." BLM Response at 29. However, change in the face of changing circumstances is a virtue, not a vice. The recent history of North Dakota's flaring regulations shows why North Dakota so highly values this sovereign (and common sense) right to change its laws. The oil and gas boom in the Bakken formation is still in its infancy, and much of the pipeline and gathering infrastructure is still being developed. The North Dakota

---

[2] Available at
https://www.nd.gov/tax/data/upfiles/media/52nd%20Biennial%20Report_with%20Bookmarks.pdf?20161223142109.

legislature and Industrial Commission have made significant changes in North Dakota law and administration to take into account the rapid development of this resource and intend to continue to improve their programs as development continues, infrastructure improves, more information becomes available, and the oilfield matures. "[A] uniform and comprehensive nationwide rule," *id*., promulgated and administered by a ponderous federal agency that has many other obligations besides managing development in the Bakken field will not be able to respond with the same speed and specialized attention. As North Dakota builds on its institutional expertise in preventing waste, including regulating venting and flaring, it will learn more about which of its current regulations are truly effective at protecting the public interest and which can be improved and adjust its programs to take this experience into account. However, the Final Rule deprives the State from exercising its sovereign authority to make those decisions, putting it in a federal straightjacket that, upon closer investigation, has nothing to do with controlling waste or the efficient use of resources.

BLM attempts to minimize the drastic and intrusive nature of these regulations, characterizing them as a routine update to its outdated waste regulations and thus not in competition with North Dakota's authority. As explained in North Dakota's opening memorandum, and further discussed below, this is a mischaracterization of the Final Rule. In their attempt to maintain the fiction that the Final Rule is not an air quality regulation, neither BLM nor the Intervenor-Respondents address the irreparable harm North Dakota will suffer in regulating air quality within its borders. Respondents brush aside any notion of infringement, claiming that it is a non-starter because "[w]hile the Rule [has] benefits on air quality, those benefits are the result of the Rule's primary purpose of reducing waste. . . ." BLM Response at 14. BLM addresses North Dakota's regulations that prevent waste and regulate air quality only

indirectly, asserting that the agency "considered the full universe of state regulations while developing the Rule," but concluded that "a uniform and comprehensive nationwide rule was the best way to prevent the waste." *Id.* at 29. Such a one-size-fits-all approach is precisely why the Final Rule is harmful to North Dakota, not only because it illegally subjects numerous private and State lands to BLM regulation and subverts the State's own policies and regulations to control waste, but also because it directly impinges on North Dakota's primary, delegated authority to administer air pollution control regulations—an authority it has enjoyed for five decades. *See* N.D. Admin Code § 33-15-14; *see also* Glatt Decl. ¶¶ 14–21.

BLM argues that North Dakota will not suffer any harm to its sovereign interests because "State regulations [will] continue to apply to oil and gas operations in tandem with the Rule, just as they always have under BLM's existing regulatory system," BLM Response at 68. However, there can be no doubt that it disrupts the regulatory regime established by the State and the balance the State seeks to strike between the need for further development and the importance of environmental regulations. The variance provisions do not cure this because they grant the ultimate authority over this important area of state law to the discretion of BLM officials.[3]

Finally, North Dakota has demonstrated that it will suffer substantial economic harms if the Final Rule goes into effect. ECF No. 40 at 11-15. BLM dismisses these concerns as "highly speculative," BLM Response at 68, but makes no effort to specifically dispute the sworn declarations of State officials. "[A]n injury is not speculative simply because it is not certain to occur." *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003). Instead, BLM changes the subject to argue, in an attack on state sovereignty, that North Dakota has no

---

[3] The fact that states with different sovereign interests support the Final Rule, *see* ECF 64-1, is not relevant to the question of whether North Dakota will suffer irreparable injury and is entitled to a preliminary injunction.

legitimate interest in the unencumbered operation of its own programs, BLM Response at 68–69, an argument more properly addressed to the merits. BLM also argues that economic concerns can never give rise to an irreparable harm, citing *Wyoming v. United States*, 674 F.3d 1220 (10th Cir. 2012), which is not a preliminary injunction case at all. This misstates the law. The relevant inquiry is whether there is "a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages," *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003). That test is certainly met here, as no money damages would be available against the federal government here for the harm caused by the Final Rule.

**B.      North Dakota is Likely to Succeed on the Merits.**

With regard to the merits, BLM and Respondent-Intervenors both make the same logical fallacy in their Responses. They argue that because BLM has authority to prevent waste of federal minerals, and because the regulations governing the royalties paid on vented and flared natural gas are in need of updating, that gives BLM unlimited authority to impose any regulation that is arguably related to that purpose—without regard to the actual amount of "waste" that is prevented or the value of the natural gas "saved" relative to the costs of compliance with the regulation. Furthermore, so Respondents argue, BLM even has authority to impose those regulations on private property as well as public. In doing so, BLM substitutes its sovereignty for that of North Dakota, and its judgment for that of expert North Dakota agencies that have historically been entrusted with the responsibility to regulate these lands and resources under the State's "traditional and primary power over land and water use," *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001), and by Congressional delegation under 42 U.S.C. § 7407(a).

1.      **BLM Lacks Jurisdiction to Impose the Final Rule on Private Oil and Gas Interests.**

BLM is wholly without authority to apply the Final Rule to mineral interests owned by the State and private parties. In North Dakota, the Final Rule will fall primarily on private oil and gas interests, located on private land. Helms Decl. ¶¶ 9, 12–13. North Dakota has numerous federal mineral interests that were originally associated with small farms scattered across the state that went into foreclosure during the Great Depression. *Id*. The federal government retained the mineral rights to these tiny tracts when it resold the surface to private owners, and those little mineral estates have now been communitized with the surrounding state and private land. *Id*. BLM seeks to apply the Final Rule not only to these small federal estates, but also to purely non-federal interests that surround them. 81 Fed. Reg. at 83,039. These communitized pools or spacing units have always been regulated by the State. *See* 49 Fed. Reg. 37,357; 43 C.F.R. § 3161.1.

Although BLM attempts to characterize this application to private minerals as an afterthought—an incidental effect of carrying out its statutory duty to protect federal resources—in fact it is absolutely central and not at all incidental. Indeed, the incidental presences of minor federal mineral estates are being leveraged by BLM to exercise control over oil and gas operations covering large swathes of State and private land. "Of the vented and flared gas reported to [the Office of Natural Resources Revenue], 15 percent came from wells extracting only federal minerals; 8.8 percent came from wells extracting only Indian minerals, and 76.2 percent from wells extracting minerals with mixed ownership (some combination of Federal, Indian, fee (private) and State minerals)" 81 Fed. Reg. at 83,015. It is not clear how much of the estimated quantifiable benefit from the Final Rule derives from the regulation of methane

emissions from state and private oil and gas interests, which BLM chose to not separately break out in the Final Rule's preamble or Regulatory Impact Analysis.

Regulating private lands and private minerals unquestionably falls outside BLM's authority to "issue regulations necessary to implement the provisions of this Act with respect to the management, use, and protection of the public lands," 43 U.S.C. § 1733, and to accomplish the purposes of the Mineral Leasing Act, which applies to "all land and interests in land owned by the United States which are subject to the mineral leasing laws, including mineral resources or mineral estates reserved to the United States in the conveyance of a surface or nonmineral estate," 30 U.S.C. § 1702. Instead, oil and gas development on these interests is heavily regulated by North Dakota. Helms Decl. ¶ 19; see N.D. Cent. Code § 38-08-06.4. North Dakota aims to apply a regulatory framework that encourages the efficient and environmentally sound development of oil and gas by combining strict measures against waste and environmental protections with the prompt processing of permits and an intelligent, intimate understanding of local conditions. *See* Helms. Decl. ¶ 23.

BLM's limited authority to regulate State and private oil and gas interests derives from 30 U.S.C. § 226(m) and from the consent of owners and lessees, and it exists to protect the federal government as a landowner, not to impose general regulations on private land in the public interest—a role played instead by the State. *See* 30 U.S.C. § 226(m) ("For the purpose of more properly conserving the natural resources of any oil or gas pool, field, or like area . . . lessees thereof and their representatives may unite with each other . . . in collectively adopting and operating under a cooperative or unit plan of development or operation of such pool, field, or like area, or any part thereof, whenever determined and certified by the Secretary of the Interior to be necessary or advisable in the public interest."). The Secretary may reserve the right to

make certain changes in the operations of the units relevant to her role in coordinating oil and gas production, but § 226(m) does not provide broad authorization to apply subsequent federal regulations: "[a]ny plan authorized by the preceding paragraph which includes lands owned by the United States may, in the discretion of the Secretary, contain a provision whereby authority is vested in the Secretary of the Interior . . . to alter or modify from time to time the rate of prospecting and development and the quantity and rate of production under such plan." *Id.*

Contrary to the statements of BLM and the Respondent-Intervenors, *see* BLM Response at 47-84 and Respondent-Intervenor Response at 27-28, implementing regulations for § 226(m) have subsequently maintained a sharp distinction between the supervision exercised by BLM over federal leases and the much more limited authority exercised over private and State leases. Respondents cite 43 C.F.R. § 3161.1(b), which says, "[r]egulations in this part relating to site security, measurement, reporting of production and operations, and assessments or penalties for noncompliance with such requirements are applicable to all wells and facilities on State or privately-owned mineral lands committed to a unit or communitization agreement which affects Federal or Indian interests, notwithstanding any provision of a unit or communitization agreement to the contrary." But Respondents fail to cite the parallel provision governing federal and Indian oil and gas leases, 43 C.F.R. § 3161.1(a), which states that "all operations conducted on a Federal or Indian oil and gas lease by the operator are subject to the regulations in this part." These two provisions, when read together, operate as a limitation on the regulation of private mineral interests, which are subject to "security, measurement, reporting of production and operations," but not to broader BLM regulation, such as detailed environmental regulation of the conduct of their operations (or, if BLM is to be believed, the regulation of waste). Similarly, Part 3180, cited by BLM for the proposition that "BLM already regulates operations in Federal

units or in BLM-approved state pools," BLM Response at 48, actually says, "[a]ll unit agreements on Federal leases are subject to the regulations contained in Part 3160 of this title, Onshore Oil and Gas Operations," 43 C.F.R. § 3180.0-1, but, "[a]ll unit operations on non-Federal lands included within Federal unit plans are subject [only] *to the reporting requirements of Part 3160* of this title." *Id.* (emphasis added). Therefore, BLM's own regulations recognize BLM's limited authority over oil and gas operations on non-federal lands, and BLM cannot transform a minor federal mineral estate into the imposition of federal sovereignty over surrounding private estates.

The BLM Manual makes the same distinction between federal and Indian leases on the one hand, and non-Federal leases in a communitization agreement on the other: "All drilling and completion, certain reworking, and all abandonment operations on BLM supervised leases in approved communitization agreements must be approved in advance by the authorized officer."[4] Contrast that with, "Such operations on non-BLM supervised lands need no BLM approval and should be accepted for the record only." *Id.*

These provisions and provisions in the model unit agreements that grant BLM authority to prevent waste should be read in light of the purpose of unitization and communitization. This purpose is to address the problem "that mineral deposits don't always follow plat lines," and that uncoordinated development "often yielded frantic, duplicative, and crazy-quilt exploration activities in what amounted to a single oil and gas field." *Entek GRB, LLC v. Stull Ranches, LLC*, 763 F.3d 1252, 1254 (10th Cir. 2014). Thus, unitization is designed to prevent a particular type of waste, the type that occurs when multiple wells race to drain the same reservoir.

---

[4] BLM Manual 3160-9, at Q, available at www.blm.gov/style/medialib/blm/wo/ Information_Resources_Management/policy/blm_handbook.Par.26234.File.dat/3160-9-Communitization%20Manual.pdf.

Operations on unitized lands are to be performed "for the benefit of each and every tract of unitized land." *Id*. The waste prevention provisions in the unitization agreements exist to prevent waste in the form of duplicative operations and inefficient management of the oil field, for the equal benefit of all the owners—public and private.

By contrast, the Final Rule imposes large costs on private owners that have little to do with the efficient management of oil fields and the prevention of waste. Only a small fraction of the benefits claimed by BLM have anything to do with the prevention of waste from either private or public mineral estates, though the entirety of the burden will be borne by the States and private parties. BLM implicitly concedes that the Final Rule cannot be justified by the economic value of the natural gas that would otherwise be lost, i.e., the "avoided waste." The vast majority of the benefits claimed by BLM have nothing to do with waste avoidance, instead attributed by BLM to the so-called "social cost of carbon" associated with decreasing methane emissions, a strictly public benefit that, as calculated by the government, extends even beyond the United States to the citizenry of the entire world. Regulations that benefit the public interest may be appropriate when they are imposed on the general public by the relevant agency with such expansive jurisdiction. However, BLM is not the agency entrusted with reducing "waste" or regulating methane emissions from private oil and gas interests on private land, and it should not be allowed to defend its effort to seize jurisdiction over these private interests by pointing to alleged benefits that have nothing to do with the prevention of "waste" on public lands and instead rely on assertions of national, and even global, benefits unrelated to the economic value of the "waste" BLM claims is the foundation of its Final Rule

Finally, BLM relies on dicta from an Eighth Circuit case which states, "[p]ursuant to this statute, regulations have been promulgated directing the BLM to manage all aspects of said unit

agreements." *Froholm v. Cox*, 934 F.2d 959, 964–65 (8th Cir. 1991). That case, however, dealt with the original decision to enter into unit agreements, which—unlike the management of the drilling operations—are governed by comprehensive federal statutory provisions and related regulations. *Id*. at 963. That case does not reach the issue of whether BLM may impose detailed operating requirements and environmental regulations on private interests in existing units. Respondent-Intervenor's reliance on *Kleppe* and the Property Clause of the U.S. Constitution, art. IV, § 3, cl. 2, is likewise unavailing: "The Property Clause is a grant of power only over federal property." *Kleppe v. New Mexico*, 426 U.S. 529, 537–38 (1976). BLM cannot rely on the Property Clause to exercise sovereignty over oil and gas operations on private lands.

## 2. The Legal Justifications for the Final Rule do Not Match its Actual Effects.

BLM invokes two sources of authority to take over this important area of state sovereignty. The first is its authority to prevent waste because lost natural gas "deprive[s] the American public, states, and tribes of a source of domestic energy and of royalty revenues." BLM Response at 1. However, BLM only hopes to obtain $3–10 million per year in additional royalties from the waste avoided under this rule, less than a rounding error in the federal budget and far less than the Final Rule's $110–279 million per year price tag. 81 Fed. Reg. at 83,014. Under any rational scenario, spending $110–279 million to save $10 million makes no sense and is plainly arbitrary and capricious. BLM instead attempts to dress up the cost-benefit analysis by relying on alleged benefits for the benefit of the public treasury (i.e., the royalties based on the market value of the "saved" natural gas) that have nothing to do with preventing "waste." The foundation of BLM's cost-benefit justification for the Final Rule is precisely what BLM disingenuously claims is only an incidental byproduct of its "waste prevention" rule. Remarkably, approximately 88% ($189–247 million per year) of the estimated quantifiable

benefits that BLM hopes to achieve from the Final Rule has nothing to do with the economic value of preventing waste (i.e., collecting royalties), and instead is derived from a model that calculates the *social cost* of methane emissions, not only for the United States but for the entire world. *Id*. Applying the time-honored technique of "follow the money," this lays bare BLM's claim that this is a "waste prevention rule" under its jurisdiction that just happens to have incidental environmental benefits. To the contrary, this is a comprehensive environmental regulation aimed at the control of methane emissions on public and private lands, dressed up as a waste reduction regulation to provide BLM a fig leaf of jurisdiction.

The Mineral Leasing Act requires federal leases to include provisions requiring the lessee to "use all reasonable precautions to prevent waste of oil or gas developed in the land," 30 U.S.C. § 225, but the Final Rule—instead of insisting on "reasonable precautions"— micromanages every detail on the oil well operations (every detail except the actual availability of gathering pipelines to economically capture natural gas, which is the hands of "midstream" companies not subject to the Final Rule) and imposes compliance costs far in excess of the value of any wasted gas. Imposing $110–279 million of cost for each $10 million in additional royalties obtained is certainly not what Congress had in mind when it directed that the government be a good steward of public resources. There are surely more cost-effective measures to increase federal royalties without creating a major new regulatory program that, using BLM's own data, will not efficiently increase royalties, and in an area where existing state and federal regulators are already administering comprehensive regulations.

BLM argues, without citing any legal authority, that "[c]ompliance costs are . . . not the appropriate measure of whether the Rule is a reasonable exercise of BLM's waste prevention authority." BLM Response at 53. To the contrary, a statute that incorporates a concept of

reasonableness "requires at least some attention to cost." *Michigan v. E.P.A.*, 135 S. Ct. 2699, 2707 (2015). "Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions." *Id*. When a regulation's cost far outweighs its benefits, it is arbitrary and capricious. *Id*.

Because the value of the resources BLM claims to preserve in its Final Rule is so minimal, and virtually all of the quantified purported benefits are wholly unrelated to the royalty income that BLM claims is the basis for the Final Rule, BLM is forced to rely on sweeping assertions of regulatory authority in addition to its specific authority to prevent waste and collect royalties. These assertions are exaggerated.[5] For example, BLM states that it has broad authority to suspend operations on a lease "in the interest of conservation," but the authorities it cites for that proposition make it clear that it refers only to temporary suspensions under specific circumstances and may not interfere with the lease-holders vested rights. BLM Response at 23. BLM then quotes—completely out of context—selective phrases from 30 U.S.C. § 187, dealing with conditions that BLM may place on newly issued leases, so that it sounds like a broad grant of authority "to protect 'the interests of the United States.'" BLM Response at 23. Most of the statutes and cases cited by BLM are completely irrelevant, dealing with land-use plans, off-road vehicle access, and the decision to open lands for leasing. *Id*. at 22–25. This scattershot invocation of unrelated statutes and cases suggests that BLM is much less sure of its authority than it pretends. And these purported "authorities" do not free BLM from its obligation to ensure that its actions are not arbitrary and capricious.

---

[5] BLM's reliance on its authority to "aggressively carry out [its] trust responsibility in the administration of Indian oil and gas" is particularly ironic, since, as BLM admits, this carries an obligation to maximize revenue to the tribes. BLM Response at 17-18 (citations omitted). The alleged benefits of reducing methane emissions are calculated globally, and are not cost savings to the owners of the mineral interests, including tribal interests.

North Dakota, by contrast, has unambiguous and longstanding authority to regulate oil and gas development within its borders, which it has exercised for decades to prevent waste, conserve resources for the benefit of its citizens, and regulate venting and flaring. *Vogel v. Marathon Oil Co*., 79 N.W.2d 471, 479 (N.D. 2016). It has comprehensive venting and flaring regulations, and an administrative apparatus to enforce and apply those regulations successfully. Helms Decl. ¶ 19; *see* N.D. Cent. Code § 38-08-06.4; *see also* Exhibit A.

Implicitly acknowledging the Final Rule's overlapping and conflicting federal regime, BLM justifies it by asserting that it is "within Congress' authority to promulgate federal legislation that 'necessarily override[s] and preempt[s] conflicting state laws, policies, and objectives under the Constitution's Supremacy Clause. . . .'" BLM Response at 70. Even if this argument were to be accepted at face value, conspicuously absent from BLM's assertion is the concomitant finding of "necess[ity]" made clear through Congressional intent. *See Wyeth v. Levine*, 555 U.S. 555, 565 (2009); *see also Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 98 n.9 (2d Cir. 2006). BLM cannot articulate the "clear Congressional intent" authorizing the Final Rule's intrusive effect because there is none. *See Bond v. United States*, 134 S.Ct 2077, 2089 (2014) ("when legislation 'affect[s] the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision.'") (quoting *United States v. Bass,* 404 U.S. 336, 349 (1971)) To the contrary, the Final Rule imposes detailed air-emissions restrictions on the venting and flaring of natural gas—a task which Congress clearly assigned to States, and to a lesser extent the EPA, under the Clean Air Act. *See e.g.* 42 U.S.C. § 7407(a).

The Final Rule will irreparably harm North Dakota. It exceeds the bounds of BLM's jurisdiction and is arbitrary and capricious. North Dakota respectfully asks this Court to enjoin it from taking effect.

Respectfully submitted this 23th day of December, 2016.

/s/ *Paul M. Seby*

Paul M. Seby (admitted *pro hac vice*)
Special Assistant Attorney General
Greenberg Traurig, LLP
1200 17th Street, Suite 2400
Denver, CO 80202
Phone: (303) 572-6584
Fax: (303) 572-6540
sebyp@gtlaw.com

Wayne Stenehjem (admitted *pro hac vice*)
Attorney General
David Garner (admitted *pro hac vice*)
Hope Hogan (admitted *pro hac vice*)
Assistant Attorneys General
500 N. 9th Street Bismarck, ND 58501
Phone: (701) 328-2925
ndag@nd.gov

Robert J. Walker (Wyo. Bar No. 7-4715)
Hickey & Evans, LLP
1800 Carey Street, Suite 700
Cheyenne, WY 82003
Phone: (307) 634-1525
Fax: (307) 638-7335
rwalker@hickeyevans.com

**ATTORNEYS FOR PETITIONER-INTERVENOR STATE OF NORTH DAKOTA**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of State of North Dakota's

Reply in Support of Motion for Preliminary Injunction was served via CM/ECF to the parties

listed below on December 23, 2016.

Erik Petersen
Senior Assistant Attorney General
Elizabeth Morrisseau
Assistant Attorney General
Wyoming Attorney General's Office
2320 Capitol Ave.
Cheyenne, Wyoming 82002
(307) 777-6946
erik.petersen@wyo.gov
elizabeth.morrisseau@wyo.gov
*Counsel for the State of Wyoming*

Brandon L. Jensen
Budd-Falen Law Offices, LLC
300 East 18th Street
P.O. Box 346
Cheyenne, Wyoming 82003-0346
(307) 632-5105
brandon@buddfalen.com

Timothy C. Fox, Montana Attorney General
Alan L. Joscelyn, Chief Deputy Attorney General
Tommy H. Butler, Deputy Attorney General
Montana Dept. of Justice
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401
(406) 444-0662
timothyfox@mt.gov
alanjoscelyn@mt.gov
tommybutler@mt.gov
*Counsel for the State of Montana*

Clare M. Boronow
Marissa A. Piropato
United States Department of Justice
Environmental and Natural Resources Division
601 D Street NW
Washington, DC 20004

clare.boronow@usdoj.gov
marissa.piropato@usdoj.gov

C. Levi Martin
United States Attorney's Office
P.O. Box 668
Cheyenne, WY 82003-0668
Christopher.Martin@usdoj.gov
*Counsel for the United States Department
of the Interior, et al.*

Robin Cooley
Michael S. Freeman
Joel Minor
Earthjustice
633 17th Street, Suite 1600
Denver, Colorado 80202
Phone: (303) 623-9466
rcooley@earthjustice.org
mfreeman@earthjustice.org
jminor@earthjustice.org
*Attorneys for Respondent-Intervenors Natural Resources Defense
Council, Sierra Club, The Wilderness Society*

Susannah L. Weaver
Donahue & Goldberg, LLP
1111 14th Street, NW, Suite 510A
Washington, DC 20005
Phone: (202) 569-3818
susannah@donahuegoldberg.com
*Attorney for Respondent-Intervenor Environmental Defense Fund*

Laura King
Shiloh Hernandez
Western Environmental Law Center
103 Reeder's Alley
Helena, MT 59601
Phone: (406) 204-4852
king@westernlaw.org
hernandez@westernlaw.org
Erik Schlenker-Goodrich
Western Environmental Law Center
208 Paseo del Pueblo Sur, #602
Taos, New Mexico 87571
Phone: (575) 613-4197
eriksg@westernlaw.org

*Attorneys for Respondent-Intervenors Citizens for a Healthy
Community, Diné Citizens Against Ruining Our Environment,
Montana Environmental Information Center, National Wildlife
Federation, San Juan Citizens Alliance, WildEarth Guardians,
Wilderness Workshop, and Wyoming Outdoor Council*

Darin Schroeder
Ann Brewster Weeks
Clean Air Task Force
18 Tremont, Suite 530
Boston, MA 02108
Phone: (617) 624-0234
dschroeder@catf.us
aweeks@catf.us
*Attorneys for Respondent-Intervenor National Wildlife Federation*

Jennifer Cassel
Rachel Granneman
Environmental Law & Policy Center
35 E. Wacker Drive, Suite 1600
Chicago, IL 60601
Phone: (312) 673-6500
jcassel@elpc.org
rgranneman@elpc.org
*Attorneys for Respondent-Intervenor Environmental Law & Policy
Center*

Lisa McGee
Wyoming Outdoor Council
262 Lincoln Street
Lander, WY 82520
(307) 332-7031
lisa@wyomingoutdoorcouncil.org
*Local Counsel for Respondent-Intervenors*

Kamala D. Harris
Attorney General of California
David A. Zonana
Supervising Deputy Attorney General
Mary S. Tharin
George Torgun
Deputy Attorneys General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1974

Facsimile: (510) 622-2270
E-mail: Mary.Tharin@doj.ca.gov

Reed Zars
Wyo. Bar No. 6-3224
Attorney at Law
910 Kearney Street
Laramie, WY 82070
Phone: (307) 760-6268
Email: reed@zarslaw.com
*Attorneys for the State of California, by and through the California Air Resources Board*

Hector Balderas
Attorney General of New Mexico
William Grantham
Assistant Attorney General
Post Office Drawer 1508
Santa Fe, New Mexico 87504-1508
Telephone: (505) 827-6000
Direct: (505) 717-3520
Facsimile: (505) 827-5826
Email: wgrantham@nmag.gov
*Attorneys for the State of New Mexico*

/s/ *Paul M. Seby*