Erik Petersen (Wyo. Bar No. 7-5608)
Senior Assistant Attorney General
Elizabeth Morrisseau (Wyo. Bar No. 7-5307)
Assistant Attorney General
Wyoming Attorney General's Office
2320 Capitol Avenue
Cheyenne, WY 82002
Ph: (307) 777-6946
erik.petersen@wyo.gov
elizabeth.morrisseau@wyo.gov

*Attorneys for Petitioner State of Wyoming*

Brandon L. Jensen (Wyo. Bar No. 6-3464)
Budd-Falen Law Offices LLC
300 East 18th Street
Post Office Box 346
Cheyenne, Wyoming 82003-0346
Ph: (307) 632-5105
brandon@buddfalen.com

Timothy C. Fox, Montana Attorney General
Alan L. Joscelyn, Chief Deputy Attorney General
Tommy H. Butler, Deputy Attorney General
Montana Dept. of Justice
215 North Sanders
Post Office Box 201401
Helena, Montana 59620-1401
Ph: (406) 444-0662
timothyfox@mt.gov
alanjoscelyn@mt.gov
tommybutler@mt.gov

*Attorneys for Petitioner State of Montana*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| STATE OF WYOMING and STATE OF MONTANA, | ) ) ) | |
| Petitioners, | ) ) | |
| and | ) ) | Civil No. 16-285-S |
| STATE OF NORTH DAKOTA, | ) ) | |
| Petitioner-Intervenor, | ) ) | **PETITIONER WYOMING AND PETITIONER MONTANA'S REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| v. | ) ) ) | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | ) ) | |
| Respondents, | ) ) | |
| and | ) ) | |
| WYOMING OUTDOOR COUNCIL, *et al.* | ) ) | |
| Respondent-Intervenors. | ) | |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .............................................................................................. iii

INTRODUCTION ............................................................................................................. 1

I.   The Venting and Flaring Rule is not a resource conservation rule ............................ 1

    a.   The Mineral Leasing Act authorizes the Bureau to limit environmental
    harm to leased surface areas, not to promulgate national air quality regulations ....... 2

    b.   Equipment maintenance and operations controls are air quality control
    techniques that may have the ancillary effect of capturing saleable gas ................... 4

II.  The Bureau's other specific arguments fail .............................................................. 6

    a.   The Clean Air Act bars the Bureau from enforcing Wyoming's or
    Montana's state implementation plans through its variance process. ....................... 7

    b.   The variance process conflicts with the EPA's delegation of authority to
    enforce new source performance standards ............................................................ 8

    c.   *Massachusetts v. EPA* does not stand for the proposition that one
    agency may do the work of another agency ........................................................... 10

    d.   The Mineral Leasing Act does not grant exclusive control to the
    United States Government over state and private minerals communitized
    with federal minerals ........................................................................................... 12

III. Wyoming and Montana will be irreparably harmed if the Venting and
    Flaring Rule goes into effect on January 17, 2017 ................................................. 13

    a.   Wyoming and Montana's sovereign rights will be harmed as soon as the
    Venting and Flaring Rule goes into effect ............................................................ 13

    b.   The variance process does not alleviate the harms resulting from the
    Venting and Flaring Rule ..................................................................................... 14

    c.   Even if the variance provision eliminated redundant regulation, there is no
    guarantee that the Bureau will both grant variances to Wyoming and Montana
    and agree to appropriate memoranda of understanding with the States ................. 15

IV.  A preliminary injunction is in the public interest .................................................. 17

i

V.      Conclusion ............................................................................................................ 20

CERTIFICATE OF SERVICE ............................................................................... 22

# TABLE OF AUTHORITIES

## CASES

*Copper Valley Mach. Works, Inc., v. Andrus*
653 F.2d 595 (D.C. Cir. 1981)............................................................................ 3

*Getty Oil Co. v. Clark*
614 F. Supp. 904 (D. Wyo. 1985) ...................................................................... 4

*Hoyl v. Babbit*
129 F. 3d 1377 (10th Cir. 1997) ........................................................................ 3

*Massachusetts v. EPA*
549 U.S. 497 (2007) ................................................................................... 10, 11

*Metro. Wash. Coal. For Clean Air v. District of Columbia*
639 F.2d 802 (D.C. Cir. 1981) ........................................................................... 7

*Tex. Oil & Gas Corp. v. Phillips Petroleum Co.*
277 F. Supp. 366 (W. D. Okla. 1967) (10th Cir. 1969)............................... 12, 14

## STATUTES

30 U.S.C. § 21a.................................................................................................. 2

30 U.S.C. § 187 ............................................................................................ 2, 12

30 U.S.C. § 209 ................................................................................................. 2

30 U.S.C. § 226 ............................................................................................. 2, 3

42 U.S.C. § 7401 ............................................................................................... 4

42 U.S.C. § 7408 ............................................................................................... 3

42 U.S.C. § 7410 ............................................................................................... 5

42 U.S.C. § 7411 ........................................................................................... 5, 9

42 U.S.C. § 7602 ............................................................................................... 7

42 U.S.C. § 7604 ........................................................................................... 4, 7

Wyo. Stat. Ann. § 30-5-109................................................................................. 13

**CODE OF FEDERAL REGULATIONS**

40 C.F.R § 60.5397a ............................................................................................ 6

**OTHER AUTHORITIES**

*California Passes France as World's 6th Largest Economy,* Fortune (June 17, 2016),
http://fortune.com/2016/06/17/california-france-6th-largest-economy/ .......................... 16

*EPA Activities for Cleaner Air*, https://www.epa.gov/sanjoaquinvalley/epa-activities-cleaner-air (last accessed Dec. 21, 2016) ("The San Joaquin Valley has some of the nation's worst air quality[.]"). ...................................................................................... 16

Roger A. Greenbaum & Anne S. Peterson, *The Clean Air Act Amendments of 1990: Citizen Suits and How They Work,* 2 Fordham Envtl. L. Rep. 79 (1991)…………………8

*Rules Wyo. Oil and Gas Conserv. Comm'n, ch. 4, § 39(c)(ii)* .......................................... 19

Source Determination for Certain Emission Units in the Oil and Natural Gas Sector,
81 Fed. Reg. 35622 (June 16, 2016).................................................................... 17

Waste Prevention, Production Subject to Royalties, and Resource Conservation (Venting and Flaring Rule), 81 Fed. Reg. 83008 (Nov. 18, 2016) .................................................. 16

**INTRODUCTION**

This case centers on whether the Bureau of Land Management (Bureau) may regulate air quality under the guise of conserving federal minerals. Wyoming and Montana assert that it may not. As the States showed in their Memorandum in Support, they are likely to succeed on the merits of this case because Congress has not given the Bureau authority to develop comprehensive air quality regulations for oil and gas production. (Dkt. No. 22 at 14 - 20; AR 366 (81 Fed. Reg. 83008 (Nov. 18, 2016)) (Venting and Flaring Rule)). In its response brief, the Bureau minimizes its Venting and Flaring Rule, describing the rule as merely the Agency's attempt to modernize its approach to waste minimization. (Dkt. No. 70 at 26, 65, 73). The Bureau describes any alleged environmental benefits of the Venting and Flaring Rule as only ancillary. (*Id.* at 33). But the scope and requirements of the Bureau's rule belie that argument. The Bureau has not been authorized by statute to take action to limit regional and international air pollution, and it may not twist the authority Congress has provided to do so. For the reasons already stated by Wyoming and Montana and for the reasons stated below, this Court should grant the requested relief.

I.      **The Venting and Flaring Rule is not a resource conservation rule.**

The Bureau seeks to transform its authority to regulate environmental degradation of leased surface areas into authority to control all air emissions from all federal oil and gas operations. This can be seen most clearly in the text of the Venting and Flaring Rule itself, which contains broadly applicable air quality requirements that are not consistent with site-specific requirements that protect leased surface areas.

### a. The Mineral Leasing Act authorizes the Bureau to limit environmental harm to leased surface areas, not to promulgate national air quality regulations.

The purpose of the Mineral Leasing Act is to promote mining on the public domain. 30 U.S.C. § 21a. Under this Act, the Bureau must ensure that producers of federal minerals do not waste those resources. *See, e.g., id.* § 187 (authorizing the Secretary to, among other things, "provid[e] proper rules and regulations to insure the fair and just weighing or measurement of the coal mined by each miner"). Now, the Bureau takes an expansive view of "waste" to mean any emission stream containing, or potentially containing, some identifiable federal minerals. (Dkt. No. 70). The Bureau therefore asserts that it may regulate air quality "in the interest of conservation." (Dkt. No. 70 at 36). But Congress did not grant this level of production oversight to the Bureau. In the provisions of the Mineral Leasing Act that the Bureau cites for its authority to regulate air quality, Congress actually directed the Bureau to: (1) ensure that producers of federal minerals did not leave too much in the ground and (2) ensure that the producers of federal minerals reclaimed surface areas after mining. (*Id.* (citing 30 U.S.C. §§ 209 and 226(g) for the proposition that the Bureau may regulate federal mineral production for environmental purposes)).

Section 209 of the Mineral Leasing Act authorizes the Secretary to waive, suspend, or reduce some or all of a tract's royalties "for the purpose of encouraging the greatest ultimate recovery of coal, oil, gas, oil shale, gilsonite (including all vein-type solid hydrocarbons), phosphate, sodium, potassium and sulfur." 30 U.S.C. § 209. And Section 226 authorizes the Secretary to regulate surface-disturbing activities, require bonds or other financial assurances, and refuse to issue leases or lease assignments to people who have

previously not adequately reclaimed mined lands. *Id.* § 226(g). Neither section allows the Bureau to expressly consider environmental harm, except environmental harm to the leased surface.

And the three cases the Bureau cites as authority for the Venting and Flaring Rule provide only catch phrases about environmental harm. *Hoyl v. Babbit* was a factually convoluted case involving one prospector, three tracts of land, two coal companies, and "a poor coal market." *Hoyl v. Babbitt*, 129 F.3d 1377, 1380 (10th Cir. 1997). In that case, the 10th Circuit upheld the Bureau's decision not to suspend a lease where the Bureau was not convinced that an operator would be capable of developing the coal mine and where the Bureau "concluded that the policies behind § 39 would not be thwarted by denying the suspension because no federal coal would be lost if the suspension were denied." *Id.* at 1382. Besides the general reference to environmental harm cited by the Bureau in its response brief, the only discussion of environmental harm in *Hoyl* refers to another case where the Bureau had placed stipulations in a permit to drill to protect "an area of Alaska that was particularly fragile and susceptible to environmental degradation during the summer thaw." *Id.* at 1384. That is precisely the type of harm that the Bureau can expressly consider – surface disturbances.

The Bureau stretches *Copper Valley Machine Works, Inc., v. Andrus* as well. (Dkt. No. 70 at 36 (citing *Copper Valley Mach. Works, Inc., v. Andrus*, 653 F.2d 595, 601 (D.C. Cir. 1981))). *Copper Valley* holds only that the Bureau may establish drilling restrictions to protect the surface environment. *Copper Valley,* 653 F.2d at 605.

Finally, the Bureau cites *Getty Oil Co. v. Clark.* (Dkt. No. 70 at 36). But *Getty* is just another case supporting the Bureau's authority to limit mining in order to protect leased surface land. *Getty Oil Co. v. Clark*, 614 F. Supp. 904, 915 (D. Wyo. 1985). And Judge Brimmer was very clear about the limits to *Getty's* precedential value:

> The Court must add this caveat: This decision is limited to the record before the Court and the very unusual circumstances of this case. While it is conceivable that under some circumstances a delay imposed by the Secretary could be so severe that a denial of a request for lease suspension would constitute an abuse of discretion, this is not that case. Also, the Court expresses no opinion as to whether or not operations should in fact be denied because of environmental concerns.

*Id.* at 921. The Bureau is wrong in its assertion that its authority to protect leased surface land allows it to also regulate air quality.

### b. Equipment maintenance and operations controls are air quality control techniques that may have the ancillary effect of capturing saleable gas.

The Clean Air Act creates a comprehensive regime of cooperative federalism to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). This air pollution prevention regime, strengthened and refined through multiple amendments, does not include a leading role for the Bureau. (Dkt. No. 22 at 10). The Clean Air Act places responsibility for controlling air pollution on states and local governments, with federal financial assistance and leadership. 42 U.S.C. § 7401(a)(3) and (4). The Act ensures that private citizens and other governmental agencies can hold those primary air pollution control agencies accountable through citizen suits. *Id.* § 7604 (providing for private enforcement of air quality laws). Under the Act, the EPA sets health-based

standards for certain criteria pollutants, including ozone. *Id.* § 7408. The states, and Tribes given "treatment as a State" status, must ensure local industrial activity will not threaten any of those health based standards through state or tribal implementation plans. *Id.* §§ 7410 and 7601(d).

In addition, the Clean Air Act lays out a clear pathway for the EPA, supported by the states, to develop and enforce performance standards for specific types of industrial activity, with mandatory consideration of both the economics of site-specific production and any associated environmental costs of air pollution control. 42 U.S.C. § 7411. This pathway is a three-step process. The EPA first determines that a specific type of industrial activity must be regulated, then develops standards for new and reconstructed sources, and finally, **may** also create plans for states to apply standards to existing sources. *Id.* § 7411(b) and (d). That process involves extensive public participation and does not involve the Bureau except as a commenting agency. And, unlike the Venting and Flaring Rule, the EPA's regulatory pathway develops nationally applicable standards and "provid[es] a level playing field and ensur[es] consistency across state lines." (Dkt. No. 64-1 at 15).

The EPA has already developed performance standards to limit emissions of volatile organic compounds and methane from oil and gas production facilities. (Dkt. No. 22 at 5 – 8). Wyoming and Montana both support those standards and will enforce them without hesitation. (Vehr Rebuttal Aff. at ¶¶ 11, 12, 13, 14). These performance standards, referred to as Quad Oa for their location in the Code of Federal Regulations, overlap with the requirements in the Venting and Flaring Rule applicable to new sources. (Dkt. No. 22 at

8); also *compare, e.g.,* AR 363 (81 Fed. Reg. at 83011) *with* 40 C.F.R. § 60.5397a (leak detection and repair requirements). Similar to Quad Oa, the Venting and Flaring Rule regulates emissions from tanks or storage vessels, mandates leak inspections and timely repairs, and regulates emissions from pneumatic pumps. Despite this substantial overlap, the Bureau claims that its Venting and Flaring Rule is a resource conservation rule because some of its requirements will allow companies to capture additional quantities of saleable methane. (Dkt. No. 70 at 32). However, if a rule uses the same approach to get to the same outcome as an air quality rule, *i.e.,* lower air emissions, then it is an air quality rule.

If the Bureau's authority permits the Venting and Flaring Rule, why stop there? For example, it might subsequently issue a Coal Waste Rule with clear requirements to limit water pollution, so long as at least some of the pollution includes coal silt. Congress intended the executive branch agencies to have discrete roles, and Congress imposed requirements for public participation and state implementation in some, but not all, areas. The EPA was tasked with broad pollution control authority, and the Clean Air Act gives enforcement authority to the States. The Venting and Flaring Rule exceeds the Bureau's authority to limit waste and to conserve natural resources.

## II.    The Bureau's other specific arguments fail.

Wyoming and Montana are likely to succeed on the merits of this case because the Bureau may not mask air pollution-specific requirements as regulations aimed solely at conserving federal mineral resources. (Dkt. No. 22 at 17 – 20). The Bureau argues that the Venting and Flaring Rule does not conflict with the Clean Air Act and that it may regulate

state and private minerals in all spacing units that contain federal minerals or are beneath federal land. The Bureau is incorrect.

### a. The Clean Air Act bars the Bureau from enforcing Wyoming's or Montana's state implementation plans through its variance process.

The Bureau asserts that it may proceed with this rulemaking in tandem with similar regulatory pathways open only to the EPA. (Dkt. No. 70 at 39). Yet it ignores the fact that the variance provision of this rule is in direct conflict with the citizen suit provision of the Clean Air Act, under which the Bureau is already authorized to enforce state air quality regulations under certain circumstances. (Vehr Rebuttal Aff. at ¶ 32). Congress included the citizen suit provision in the Clean Air Act to authorize private attorneys general to enforce certain air quality standards and limitations when state and federal air pollution control agencies did not. This includes enforcing portions of state implementation plans. 42 U.S.C. § 7604(a)(1)(B); *Metro. Wash. Coal. for Clean Air v. District of Columbia,* 639 F.2d 802, 804 (D.C. Cir. 1981). Congress included the Bureau within the definition of "persons" entitled to bring such actions. 42 U.S.C. § 7602(e) ("person" includes "any agency, department, or instrumentality of the United States"). The private citizen suits, however, are limited in that no person may bring a citizen suit unless both the state and the EPA are not "diligently prosecuting" enforcement actions, and even then, no earlier than sixty days after notifying both authorities and the alleged violator. *Id.* § 7604(b). The EPA and the state can intervene in such enforcement as a matter of right. *Id.* § 7604(c).

Here, the Bureau has developed a variance provision that directly conflicts with the process in the Clean Air Act. Under the Venting and Flaring Rule, once the Bureau

determines that a portion of a state implementation plan is equivalent to some portion of the Venting and Flaring Rule, the Bureau has authorized itself to enforce that portion of the state implementation plan without the limits in the Clean Air Act. The Bureau may act even if the state is already diligently prosecuting specified violations of the plan, regardless of the EPA's enforcement position, and with no similar notice or mandatory intervention requirement. This flies in the face of the role Congress intended "private attorneys general" to play in environmental enforcement. Roger A. Greenbaum and Anne S. Peterson, *The Clean Air Act Amendments of 1990: Citizen Suits and How They Work,* 2 Fordham Envtl. L. Rep. 79, 123 (1991) "The citizen suit provisions of the Clean Air Act are designed as fail-safe mechanisms in the overall enforcement structure of the Act."). The Bureau's assertion that the Venting and Flaring Rule does not conflict with the Clean Air Act is incorrect.

b. **The variance process conflicts with the EPA's delegation of authority to enforce new source performance standards.**

Wyoming and Montana have already explained how the variance process is unlawful under the Clean Air Act. (Dkt. No. 22 at 25). The Bureau has concluded that there is no direct conflict between the Venting and Flaring Rule and the Clean Air Act. (Dkt. No. 70 at 39). It cites to the Venting and Flaring Rule's alternate compliance language as indicative of the Bureau's consideration of the EPA's role in regulating air emissions from oil and gas production. (*Id.* at 40). But this alternate compliance pathway only demonstrates the inherent absurdity of the variance process.

Under the Venting and Flaring Rule, the Bureau automatically recognizes compliance with the EPA's newly finalized oil and gas production facility performance standards as compliance with the Venting and Flaring Rule. AR 365 (81 Fed. Reg. at 83013). But no similar automatic compliance substitution process exists for those very same emissions standards if the EPA has delegated enforcement authority to a state. And if those federal standards do not survive litigation, the Bureau will not allow automatic compliance substitution for identical requirements that remain in state law. If the rationale for the Venting and Flaring Rule is resource conservation, as the Bureau asserts, this difference makes no sense.

Wyoming has incorporated the newly updated performance standards into the Wyoming Air Quality Standards and Regulations. (Vehr Rebuttal Aff. at ¶ 11, Exhibit C). Now that the standards are Wyoming law, the EPA can delegate enforcement authority to the Wyoming Department of Environmental Quality, Air Quality Division, (Division) under the Clean Air Act. 42 U.S.C. § 7411(c). As long as those federal standards survive litigation, Wyoming does not need to seek a variance from the Bureau because the Venting and Flaring Rule allows for automatic compliance substitution, so even though three agencies will have enforcement authority, they will at least be enforcing the same standards. But problems arise if the federal standards go away.

If the federal performance standards are struck down or otherwise altered through pending litigation, the state performance standards will remain Wyoming law. This is true even if the Division amends the Wyoming Air Quality Standards and Regulations to remove explicit reference to the federal performance standards because the underlying

requirements are substantially similar to Wyoming's pre-existing permitting requirements. (Vehr Rebuttal Aff. at ¶¶ 13, 14). But the Bureau would not automatically accept compliance with the state performance standards in lieu of its own requirements and would instead require Wyoming to apply for a variance so that the Bureau could enforce performance standards that a court has barred the federal air pollution control agency, the EPA, from enforcing. This absurdity demonstrates the problems inherent to the Bureau's variance process.

   c. *Massachusetts v. EPA* **does not stand for the proposition that one agency may do the work of another agency.**

Respondents place too much weight on *Massachusetts v. EPA* as proof that one agency may do the work of another. (Dkt. No. 70 at 40). The case stands for the unremarkable position that two agencies with parallel authorities may both exercise their authorities, even if one agency's work tangentially impacts the work of the other. *Massachusetts v. EPA*, 549 U.S 497, 532 (2007) ("[The EPA's obligation to protect the public's health and welfare and the Department of Transportation's obligation to promote energy efficiency] may overlap, but there is no reason to think that the two agencies cannot administer their obligations and yet avoid inconsistency."). The EPA is not barred from developing emission standards that have the effect of requiring better fuel economy in vehicles, although the establishment of fuel economy standards falls squarely within the authority of the Department of Transportation (DOT). *Id.* The EPA is, however, not allowed to directly promulgate rules that the Department of Transportation alone may promulgate. To more precisely state the holding of the case, the EPA is barred from

denying a petition for rulemaking on the basis that initiating the rulemaking **could** result in regulations that **might** conflict with another agency's statutory authority. *Id.* ("But that DOT sets mileage standards in no way licenses EPA to shirk its environmental responsibilities.").

Here, the Bureau is not acting like the *Massachusetts v. EPA*-era EPA. The Bureau has not denied a petition for rulemaking to address "the most pressing environmental challenge of our time." *Id.* at 1446.[1] The Bureau has not "offered a laundry list of reasons not to regulate" and "refused to comply with [a] clear statutory command." *Id.* Quite the opposite, the Bureau is seeking to promulgate environmental regulations for existing oil and gas sources because the agency does not believe that the EPA will promulgate its own regulations. AR 371 (81 Fed. Reg. at 83019) ("Given the length of [the EPA's regulatory] process and the uncertainty regarding the final outcomes, and in light of the BLM's independent statutory mandate to prevent waste from Federal and Indian oil and gas leases based on information currently available, the BLM has determined that it is necessary and prudent to update and finalize this regulation at this time.").

*Massachusetts v. EPA* does not hold that one agency may do the work of another. The case holds that one agency may not use another agency's parallel authority as an **excuse** not to exercise its own clear authority, particularly in a politically important context. The case is inapposite and the Bureau is wrong to rely on it to support the Venting and Flaring Rule.

---

[1] Neither Wyoming nor Montana were party to that litigation.

**d. The Mineral Leasing Act does not grant exclusive control to the United States Government over state and private minerals communitized with federal minerals.**

Wyoming and Montana explained in an earlier brief that communitization agreements exist for royalty accounting and nothing more. (Dkt. No. 22 at 9). The Bureau and its supporters assert that communitization agreements grant prospective consent to all future federal oversight and regulation of all operations associated with federal minerals. (Dkt. No. 70 at 82 - 83; Dkt. No. 69 at 56). This is not accurate.

The Property Clause of the U.S. Constitution does not "place the exclusive control of the federal public domain in the United States Government." *Tex. Oil & Gas Corp. v. Phillips Petroleum Co.,* 277 F. Supp. 366, 368 (W.D. Okla. 1967), *aff'ed by* 406 F. 2d 1303, 1306 (10th Cir. 1969). Rather, it "leaves to Congress the determination of when and where and to what extent this power will be exercised. *Id.* In the case of the Mineral Leasing Act, "Congress has [not] undertaken to reserve to itself exclusive control over federal lands leased for oil and gas development to the exclusion of the States." *Id.* The text of sections 187 and 189 of the Mineral Leasing Act shows that the Act does not give the Bureau broad authority to displace state police powers to conserve state minerals and protect state air quality. 30 U.S.C. § 187 ("None of such provisions shall be in conflict with the laws of the State in which the leased property is situated."); *Id.* § 189 ("Nothing in this chapter shall be construed or held to affect the rights of the States or other local authority to exercise any rights which they may have[.]").

Moreover, some leases subject to communitization agreements contain **no** federal minerals. (Watson Rebuttal Aff. at ¶ 3). This is a function of Wyoming law, which allows

for the creation of spacing units that are on top of federal minerals but include wellbores that do not reach federal minerals. (*Id.*)*; see also* Wyo. Stat. Ann. § 30-5-109. Even assuming *arguendo* that operators of wells containing federal minerals consent to potential and future overbroad federal regulations by entering into communitization agreements, surely operators of wells with no federal minerals do not. The Bureau fails to demonstrate that the Mineral Leasing Act allows it to develop air quality requirements for operators subject to communization agreements.

### III. Wyoming and Montana will be irreparably harmed if the Venting and Flaring Rule goes into effect on January 17, 2017.

Wyoming and Montana have demonstrated that they will be irreparably harmed if the Venting and Flaring Rule goes into effect. (Dkt. No. 22 at 22 – 25). The Bureau asserts that the States cannot demonstrate irreparable harm because, among other things, the rule's variance provision ameliorates sovereignty concerns. (Dkt. No. 70 at 81). The Bureau is incorrect, and Wyoming and Montana are entitled to a preliminary injunction.

### a. Wyoming and Montana's sovereign rights will be harmed as soon as the Venting and Flaring Rule goes into effect.

Wyoming and Montana demonstrated that they will endure significant harm to their individual sovereignties should the Venting and Flaring Rule go into effect. (Dkt. No. 22 at 22 – 25). The Venting and Flaring Rule will harm Wyoming and Montana's sovereign rights to regulate state minerals, including state minerals that are intermingled with federal minerals and state minerals that are located in spacing units that are on top of, but do not drill into, federal minerals. (*Id.* at 24 – 25). Similarly, the rule will harm Wyoming and Montana's sovereign rights to control and limit pollution in the states' airsheds, including

the right to develop regionally specific permitting. (*Id.* at 24). It is perhaps no surprise that the Bureau and its supporters dismiss these arguments, just as they seem to dismiss the concept of state sovereignty. (Dkt. No. 70 at 83; Dkt. No. 69 at 56 – 57). But federal chauvinism in and of itself is no justification for disregarding the rights that accrued to the states on entry to the Union, and which Congress has never abridged. The Mineral Leasing Act does not allow the Bureau to override states' sovereign interests in regulation of oil and gas production. *Tex. Oil & Gas Corp.* 277 F. Supp. at 369. ("Contrary to the position of the Plaintiffs, the Federal Mineral Leasing Act of 1920, as amended, seems to leave to the States the power to exercise State police power over Federal oil and gas leases.").

### b. The variance process does not alleviate the harms resulting from the Venting and Flaring Rule.

The Bureau and its supporters return to the variance process as the sovereignty cure-all, ignoring that the variance process, at best, empowers the Bureau to enforce state laws instead of its own federal regulations. It remains unclear how the Bureau intends to exercise this authority in Wyoming, where the state air pollution control agency creates requirements for leaking, venting, and equipment operations and maintenance through site-specific permitting actions. Does the Bureau intend to administratively amend minor source permits? Does the Bureau intend to pursue enforcement actions against oil and gas operators that do not comply with state-issued permits? Will the Bureau seek any state's input prior to enforcing that state's law, or will it rely on its own judgment? These questions highlight the problems with the variance approach—instead of allowing compliance with

state regulations in lieu of its own regulations, the Bureau may selectively choose to enforce state regulations, directly harming the state's own efforts.

When the Bureau grants itself authority to enforce state air quality permits, this necessarily harms the states' permitting programs. Three-way settlement negotiations are more complex than two-way negotiations, more so if one of the three sides has no prior experience in such settlements. (Vehr Rebuttal Aff. at ¶ 30). There is also no reason to believe that the Bureau and states will take similar approaches to developing cases prior to initiating enforcement. There is nothing to stop the Bureau from initiating an enforcement action against a potential violator before state air quality agencies or the EPA have sufficiently investigated and developed their own cases. This unpredictability will make it much harder for Wyoming and Montana to enforce their air quality laws for violations that occur on or after January 17, 2017. (Vehr Rebuttal Aff. at ¶¶ 27 – 30, 33).

c. **Even if the variance provision eliminated redundant regulation, there is no guarantee that the Bureau will grant variances to Wyoming and Montana or agree to an appropriate memoranda of understanding with the States.**

The Bureau challenges Wyoming's and Montana's harms as speculative, but the Bureau and its supporters are more than willing to speculate that the variance provision will minimize any actual harms that could otherwise accrue on the basis of dual, inconsistent state and federal requirements. (Dkt. No. 70 at 81; Dkt. No. 64-1 at 16). California's assessment of the ease with which that state expects to negotiate a memorandum of understanding and ensure its own regulatory supremacy over state minerals and state air pollution is not an assurance that easily transfers to the other states.

(Dkt. No. 64-1 at 16). California is the world's sixth largest economy.[2] And it has the nation's worst ozone problems.[3] Federal agencies, including the EPA, are unlikely to do anything that would interfere with California's ability to control ozone precursors from oil and gas production facilities. The Bureau will be no different. Wyoming and Montana, with a combined population of well under two million people, do not expect similar treatment.

For example, the EPA recently proposed a new method to determine when to combine emissions from minor oil and gas production facilities for calculating whether the combined emissions trigger additional regulatory oversight under the Clean Air Act. *Source Determination for Certain Emission Units in the Oil and Natural Gas Sector; Proposed Rule*, 80 Fed. Reg. 56579 (Sept. 18, 2015); (Vehr Rebuttal Aff., Exhibit A-001 – Exhibit A-014). The originally proposed approach would have significantly impacted stringent state minor source permitting programs. Both California and Wyoming urged the EPA to rescind the proposal for similar reasons. (Vehr Rebuttal Aff. at ¶¶ 18, 19, Exhibit A-028 – Exhibit A-042).The EPA ultimately finalized a new regulatory definition that was optional for states, expressly noting that "[T]hose local programs in California that have a long history of permitting oil and natural gas operations on contiguous leases as single sources under their approved programs will be able to continue to do so, without having to

---

[2] *California Passes France as World's 6th-Largest Economy,* Fortune (June 17, 2016), http://fortune.com/2016/06/17/california-france-6th-largest-economy/ (last accessed Dec. 20, 2016).

[3] *EPA Activities for Cleaner Air*, https://www.epa.gov/sanjoaquinvalley/epa-activities-cleaner-air (last accessed Dec. 21, 2016) ("The San Joaquin Valley has some of the nation's worst air quality[.]").

submit an equivalency demonstration showing that their programs are at least as stringent as the program adopted by the EPA." Source Determination for Certain Emission Units in the Oil and Natural Gas Sector; Final Rule, 81 Fed. Reg. 35622, 35630 (June 7, 2016) (Vehr Rebuttal Aff., Exhibit A-022). The EPA did not single out any other state's permitting program in the preamble to the final rule. *Id.*

California is likely correct that **California** will receive similar treatment from the Bureau. But this is not necessarily true for low-population states like Montana and Wyoming. The States' air quality permitting programs will be harmed by the Venting and Flaring Rule. The variance process will not eliminate those harms. The Bureau's variance process is an unaccountable determination, not subject to judicial review, that the Bureau may amend at any time. Wyoming's very real concern is underscored by the fact that the Bureau has thus far refused to acknowledge Wyoming's existing minor source permitting program and only briefly references a recent rule specific to oil and gas production in Wyoming's Upper Green River Basin. (Dkt. No. 70 at 73; Dkt. No. 69 at 44 – 45); *see also Prelimin. Admin. Record* (Dkt. No. 53).

IV.    **A preliminary injunction is in the public interest.**

A preliminary injunction is in the public interest because it will save taxpayer dollars, protect the environment, ensure efficient production of natural resources, and continue to conserve waste. (Dkt. No. 22 at 27 – 28). The Bureau, unsurprisingly, argues the opposite: a preliminary injunction will forestall resource conservation measures, force the Bureau to delay a program the agency believes is legally defensible, and will delay any ancillary air quality impacts. (Dkt. No. 70 at 73 – 76). The Bureau's arguments ignore the

reality that the public benefits from consistent, predictable regulatory programs and from continued site-specific air quality permitting. If the Venting and Flaring Rule goes into effect, the public will experience inconsistent regulatory programs.

Predictable government is in the public interest. Citizens are harmed when agencies act so far out of ordinary practices that they cannot determine which agency does what. Nor is this a speculative risk; it is reality. Shortly after the Venting and Flaring Rule was published in the Federal Register, during an Ozone Season Open House event in Pinedale hosted by the Wyoming Department of Environmental Quality, a Wyomingite expressed confusion regarding which agency regulates air emissions in Wyoming, and how. (Potter Rebuttal Aff at ¶ 8). Citizens need to know which governmental agency, and at which level, can speak to their specific concerns, whether they are related to regulating local air quality or to controlling the pace of oil and gas development on public lands.

Wyoming has a rigorous approach to limit air pollution associated with oil and gas development. (Dkt. No. 22 at 10 – 11). None of the fifteen environmental organizations, including the Wyoming Outdoor Council, have put forward any affidavit that suggests that Wyoming's successful and rigorous permitting program is anything else. (*See, e.g.,* Dkt. Nos. 69-3 and 69-4 (Colorado), Dkt. No. 69-5 (North Dakota), Dkt. No. 69-6 (New Mexico and four corners region)).[4] This was not an oversight. Wyoming's minor source permitting program achieves greater statewide emission reductions from new and modified sources than the Venting and Flaring Rule. (Potter Rebuttal Aff. at ¶ 10); (Vehr Rebuttal Aff. at

_____

[4] Similarly, no affidavits contained any assertions about Montana's air quality program or about that state's air quality.

¶¶ 13, 14) (Testimony from Environmental Defense Fund during rulemaking hearing that "Such things as controls on tanks, this Wyoming requirements are already better than what EPA is proposing to do in the NSPS update, and we would encourage the state, as they've done in the past just allow those areas where the Wyoming requirements are already better than EPA's to remain in effect.").. Wyoming's associated permitting guidance is regularly updated, with participation from both industry and environmental groups, including the Wyoming Outdoor Council and the Environmental Defense Fund. Moreover, when the Division discovers companies are operating out of compliance with this permitting regime, the Department often negotiates stringent injunctive relief. (Vehr Rebuttal Aff. at ¶ 34). And because of the Division's holistic approach to permitting oil and gas production facilities, the Venting and Flaring Rule's new federal requirements will, by their very nature, limit the Division's flexibility to provide a comprehensive regulatory regime for any wells and compressors that extract or process at least a modicum of federal minerals or are located in spacing areas that contain federal minerals.

Further, Wyoming's Oil and Gas Conservation Commission strictly regulates flaring, including comprehensive pre-drilling resource conservation plans. *Rules Wyo. Oil and Gas Cons. Comm'n,* ch. 4, § 39(c)(ii); (Watson Rebuttal Aff. at ¶ 5). This approach was and remains effective. According to the Regulatory Impact Analysis, Wyoming was responsible for only 3% of flared oil-well gas in 2013. AR 647 (Regulatory Impact Analysis for the Final Rule at 201). Flaring in Montana is similar. *Id.* The Bureau's assertions that the public interest in a clean environment weighs against a preliminary injunction ignores the low levels of flaring in Wyoming and Montana.

## V.    Conclusion

The Court should not allow the Bureau to regulate air quality under the guise of resource conservation. None of the land management or mineral leasing statutes empower the Bureau to regulate air emissions from oil and gas operations for the purpose of environmental protection. Congress has given this responsibility to another agency, under a different statute. The Bureau may not give that power to itself just because it disapproves of the timeliness of the regulatory pathway Congress laid out for the EPA—the federal agency that may and must regulate air quality.

Submitted this 23rd day of December, 2016.

FOR THE STATE OF WYOMING

/s Elizabeth Morrisseau
Erik Petersen, Wyo. Bar No. 7-5608
Senior Assistant Attorney General
Elizabeth Morrisseau, Wyo. Bar No. 7-5307
Assistant Attorney General
Wyoming Attorney General's Office
2320 Capitol Ave.
Cheyenne, Wyoming 82002
(307) 777-6946
erik.petersen@wyo.gov
elizabeth.morrisseau@wyo.gov

*Attorneys for Petitioner State of Wyoming*

FOR THE STATE OF MONTANA

/s Brandon L. Jensen
Brandon L. Jensen (Wyo. Bar No. 6-3464)
Budd-Falen Law Offices, LLC
300 East 18th Street
Post Office Box 346
Cheyenne, Wyoming 82003-0346
(307) 632-5105 Telephone
(307) 637-3891 Facsimile
brandon@buddfalen.com

Timothy C. Fox, Montana Attorney General
Alan L. Joscelyn, Chief Deputy Attorney General
Tommy H. Butler, Deputy Attorney General
Montana Dept. of Justice
215 North Sanders
Post Office Box 201401
Helena, Montana 59620-1401
(406) 444-0662 Telephone
timothyfox@mt.gov
alanjoscelyn@mt.gov
tommybutler@mt.gov

*Attorneys for Petitioner State of Montana*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 23rd day of December, 2016, the foregoing **PETITIONER WYOMING AND PETITIONER MONTANA'S REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** was filed electronically with the Court, using the CM/ECF system, which caused the foregoing to be served electronically upon counsel of record.

<u>/s Elizabeth Morrisseau</u>
Assistant Attorney General
Wyoming Attorney General's Office