JEFFERY BOSSERT CLARK
Assistant Attorney General
MARISSA PIROPATO, Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC  20044-7611
Tel: (202) 305-0470/Fax: (202) 305-0506
marissa.piropato@usdoj.gov
CLARE BORONOW, Trial Attorney
999 18th Street
South Terrace, Suite 370
Denver, CO 80202
Tel.: (303) 844-1362/Fax: (303) 844-1350
clare.boronow@usdoj.gov

MARK A. KLAASSEN
United States Attorney
C. LEVI MARTIN (WY Bar # 6-3781)
Assistant United States Attorney
District of Wyoming
P.O. Box 668
Cheyenne, WY 82003-0668
(307) 772-2124
christopher.martin@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

|  |  |
|---|---|
| STATE OF WYOMING and STATE OF MONTANA, | No. 16-cv-00285-SWS |
| Petitioners, | [Consolidated with 16-cv-00280-SWS] |
| and | **FEDERAL RESPONDENTS' SUPPLEMENTAL MERITS RESPONSE BRIEF** |
| STATE OF NORTH DAKOTA and STATE OF TEXAS, |  |
| Intervenor-Petitioners, |  |
| v. |  |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, |  |
| Respondents, |  |
| and |  |
| WYOMING OUTDOOR COUNCIL, *et al.*, |  |
| Intervenor-Respondents. |  |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

   I.   The 2016 Waste Prevention Rule ............................................................................ 2

   II.  The 2018 Revision Rule ......................................................................................... 5

   III. The Current Posture of This Case ......................................................................... 8

LEGAL STANDARD FOR CONFESSION OF ERROR ............................................... 9

ARGUMENT .................................................................................................................... 10

   I.   BLM Did Not Adequately Explain or Justify the 2016 Rule ............................. 10

      A.   BLM Failed to Adequately Assess the Impact of the 2016 Rule on Marginal Wells. 11

      B.   BLM Failed to Separately Consider the Domestic Costs and Benefits of the 2016 Rule. ..................................................................................................... 14

      C.   BLM Failed to Explain and Support the Capture Requirements of the 2016 Rule. ... 16

   II.  BLM Erred in Its Interpretation of Its Statutory Authority in the 2016 Rule. ................. 18

   III. Vacatur is Appropriate. ....................................................................................... 23

CONCLUSION ................................................................................................................. 25

# **TABLE OF AUTHORITIES**

**Cases**

*Army Corps of Eng'rs v. N. Plains Res. Council*,
  No. 19A-1053 (U.S. July 6, 2020) ............................................................ 23

*Boesche v. Udall*,
  373 U.S. 472 (1963) ................................................................................. 21

*Bowen v. Georgetown Univ. Hosp.*,
  488 U.S. 204 (1988) ................................................................................. 18

*Brewster v. Lanyon Zinc Co.*,
  140 F. 801 (8th Cir. 1905) ....................................................................... 20

*Burrage v. United States*,
  571 U.S. 204 (2014) ................................................................................. 22

*California Co. v. Udall*,
  296 F.2d 384 (D.C. Cir. 1961) ................................................................ 21

*California v. Bernhardt*,
  No. 4:18-cv-5712-YGR, 2020 WL 4001480 (N.D. Cal. July 15, 2020) ................... 8, 14, 19, 23

*California v. BLM*,
  286 F. Supp. 3d 1054 (N.D. Cal. 2018) ............................................... 6, 15

*California v. U.S. BLM*,
  277 F. Supp. 3d 1106 (N.D. Cal. 2017) ..................................................... 6

*Carpenters Indus. Council v. Salazar*,
  734 F. Supp. 2d 126 (D.D.C. 2010) .......................................................... 9

*Chevron U.S.A. Inc. v. Nat. Res. Def Council, Inc.*,
  467 U.S. 837 (1984) ................................................................................. 18

*City of Arlington v. FCC*,
  569 U.S. 290 (2013) ................................................................................. 20

*Ctr. for Native Ecosystems v. Salazar*,
  795 F. Supp. 2d 1236 (D. Colo. 2011) ...................................................... 9

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2016) ................................................................................. 18

*Geosearch, Inc. v. Andrus*,
   508 F. Supp. 839 (D. Wyo. 1981) ............................................................ 21

*In re Cybernetic Servs., Inc.*,
   252 F.3d 1039 (9th Cir. 2001) ................................................................ 22

*Loving v. IRS*,
   742 F.3d 1013 (D.C. Cir. 2014) ............................................................. 22

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
   463 U.S. 29 (1983) ................................................................................. 10

*Nat'l Parks Conservation Ass'n v. Jewell*,
   62 F. Supp. 3d 7 (D.D.C. 2014) ............................................................... 9

*Olsen v. Sinclair Oil & Gas Co.*
   212 F. Supp. 332 (D. Wyo. 1963) ......................................................... 20

*Oregon ex rel. Div. of State Lands v. BLM*,
   876 F.2d 1419 (9th Cir. 1989) ............................................................... 22

*Sibron v. New York*,
   392 U.S. 40 (1968) ................................................................................... 9

*Virginia Soc'y for Human Life, Inc. v. FEC*,
   263 F.3d 379 (4th Cir. 2001) ................................................................ 23

*Wyoming v. U.S. Dep't of the Interior*,
   768 F. App'x 790 (10th Cir. 2019) .......................................................... 6

*Wyoming v. U.S. Dep't of the Interior*,
   No. 2:16-CV-0280-SWS, 2017 WL 161428 (D. Wyo. Jan. 16, 2017) .......... 4, 5, 14, 15, 16, 23

*Wyoming v. U.S. Dep't of the Interior*,
   No. 2:15-CV-041-SWS, 2016 WL 3509415 (D. Wyo. June 21, 2016) ................... 18

*Wyoming v. Zinke*,
   871 F.3d 1133 (10th Cir. 2017) ............................................................. 18

*Young v. United States*,
   315 U.S. 257 (1942) ................................................................................. 9

## Federal Statutes

30 U.S.C. § 225 .................................................................................. 10, 19, 20

30 U.S.C. § 187 .................................................................................................... 10, 19, 20

**Federal Rules**

81 Fed. Reg. 83,008-01 (Nov. 18, 2016) ..................................... 2, 3, 4, 11, 12, 13, 14, 16, 19, 22

82 Fed. Reg. 27,430-01 (June 15, 2017) ............................................................................ 6

82 Fed. Reg. 46,458 (Oct. 5, 2017)................................................................................... 5

82 Fed. Reg. 58,050 (Dec. 8, 2017) .............................................................................. 5, 6

83 Fed. Reg. 49,184 (Sept. 28, 2018) .......................................................... 5, 6, 7, 11, 15, 24, 25

**Federal Regulations**

43 C.F.R. § 3103.3-1.................................................................................................... 25

43 C.F.R. subpart 3178 ............................................................................................... 25

**Other Authorities**

Exec. Order No. 13,783, 82 Fed. Reg. 16,093, 16,096, § 7(b) (Mar. 28, 2017)............................ 5

*Exploration for and Disposition of Coal, Oil, Gas, Etc.*,
    H. Rep. No. 65-206, at 6 (Dec. 11, 1917) ................................................................... 22

*Hrg. Before S. Subcomm. Of the Comm. on Public Lands on S. 4898, A Bill to Encourage the
    Mining of Coal, Oil, Gas, Etc. on the Public Domain* (May 25, 1914) ................................... 21

*Leasing of Oil Lands, Hrg. Before S. Comm. on Public Lands on H.R. 406*
    (Feb. & Mar., 1916) ............................................................................................ 21

*Mineral Land Leasing Bill, Hrg. Before H. Comm. on Public Lands on S. 2775*
    (Oct. 6-8, 1919) ................................................................................................ 21

*Oil Leasing Lands, Hrg. Before H. Comm. on Public Lands on H.R. 3232 and S. 2812*
    (Feb. 5, 1918) .................................................................................................. 21

**Administrative Decisions**

*Ladd Petroleum Corp.*, 107 IBLA 5 (1989) ...................................................................... 22

*Nola Grace Ptasynski*, 63 IBLA 240 (1982) ................................................................... 20

*Rife Oil Properties, Inc.*, 131 IBLA 357 (1994) .............................................................. 22

## <u>INTRODUCTION</u>

Since its issuance in November 2016, the Waste Prevention, Production Subject to Royalties, and Resource Conservation Rule ("2016 Rule") has been subject to protracted litigation that has created significant uncertainty for the regulated community and the Bureau of Land Management ("BLM") itself that is now compounded by unprecedented economic stressors.  The agency's efforts to respond to criticisms of the rule, including the concerns of this Court, through rulemakings have been stymied by a series of lawsuits brought by Intervenor Respondents in the Northern District of California.  That litigation has, most recently, resulted in the vacatur[1] of BLM's final revision of the 2016 Rule, which was intended to better reflect the Mineral Leasing Act's ("MLA") core purpose of cost-effective mineral development on federally managed lands.  Having found, after a thorough reconsideration process, that the 2016 Rule contains several legal deficiencies, the government now concludes that the 2016 Rule should be vacated in this litigation.

Consistent with BLM's determinations in promulgating the Revision Rule, the government thus confesses error as to the 2016 Rule.  BLM now believes, on the basis of these determinations and after substantial additional analysis, that the 2016 Rule suffers from flaws that render the rule inconsistent with the rulemaking requirements of the Administrative Procedure Act ("APA") and with the MLA.  First, in the 2016 Rule, BLM failed to adequately explain and justify the capture requirements of the 2016 Rule; separately consider the domestic costs and benefits of the rule as required by Office of Management and Budget ("OMB") guidance; and adequately assess the impact of the 2016 Rule on marginal wells, despite the fact

---

[1] Any notice of appeal must be filed by September 14, 2020.  BLM will promptly notify the Court if and when an appeal is filed.

1

that the majority of wells on federal and Indian leases are marginal.  Second, and relatedly, the

2016 Rule exceeded BLM's statutory authority under the MLA by imposing uneconomical

"waste prevention" requirements that—as BLM has since reasonably concluded—do not

comport with the "prudent operator" standard applicable to operators of federal oil and gas

leases.  For these reasons, Federal Respondents believe the 2016 Rule is flawed as a matter of

law and should be vacated.

## BACKGROUND

**I.     The 2016 Waste Prevention Rule**

On November 18, 2016, BLM issued the 2016 Rule, which applied to the development of

federal and Indian minerals nationwide and was intended to update BLM's existing NTL-4A

regulations and "reduce the waste of natural gas from mineral leases administered by the BLM."

81 Fed. Reg. 83,008-01, 83,008-09 (Nov. 18, 2016) (VF 360-61).[2]  Among other things, the 2016

Rule required that operators capture a certain percentage of the gas they produce each month

with the percentage increasing from 85% to 98% over an eight-year period, implement leak

detection and repair ("LDAR") programs, and update equipment and practices that contribute to

the loss of natural gas during oil and gas production.  *Id.* at 83,011-12, 83,022-24 (VF 363-64,

374-76).

Although the 2016 Rule did not define the term "waste," it marked a departure from how

BLM had previously assessed waste under NTL-4A.  *Id.* at 83,038 (VF 390).  Under NTL-4A,

BLM "generally . . . engage[d] in case-by-case economic assessments before making

avoidable/unavoidable loss determinations" to determine if lost gas was subject to royalties.  *Id.*

---

[2] Citations to VF ## are to the administrative record for the 2016 Rule, the final version of which
was lodged with this Court on May 17, 2017.  ECF No. 127.

In the 2016 Rule, BLM determined that it was "not legally required" by the MLA or any other statute to make such case-by-case assessments, *id.*, and that it had authority "to regulate oil and gas development on the public lands, including to protect the public's interest in other natural resources and the quality of the environment."  *Id.* at 83,037 (VF 389).

BLM determined that the benefits of the 2016 Rule outweighed its costs.  In making those calculations, BLM utilized the global social cost of methane, *id.* at 83,068-69 (VF 420-21), which it estimated by using Interagency Working Group ("IWG") technical support documents. Regulatory Impact Analysis for the 2016 Rule ("2016 RIA") at 31-37 (VF 477-83).  BLM determined that the 2016 Rule would impose "costs ranging from $114–$279 million per year (using a 7 percent discount rate to annualize capital costs) or $110–$275 million per year (using a 3 percent discount rate to annualize capital costs) over the next 10 years."  81 Fed. Reg. at 83,013 (VF 365).  It determined that the 2016 Rule would result in "monetized benefits of $209–$403 million per year (using model averages of the social cost of methane with a 3 percent discount rate)," of which $189–$247 million would be due to reduced methane emissions monetized using the global social cost of methane metric.  *Id.* at 83,014 (VF 366).  BLM expected the 2016 Rule to result in "net benefits ranging from $46–199 million per year (capital costs annualized using a 7% discount rate) or $50–204 million per year (capital costs annualized using a 3% discount rate)."  *Id.* at 83,069 (VF 421).

Some commenters on the 2016 Rule expressed concern about the impact of the 2016 Rule on marginal wells (wells that produce less than 15 barrels of oil equivalent a day).  *Id.* at 83,029 (VF 381).  They noted that "these wells are only marginally profitable to begin with, and the costs of LDAR could make these wells uneconomical, leading to premature shut-in and a loss of mineral resources."  *Id.*  BLM acknowledged that 85% of wells on federal and Indian leases are

3

marginal but noted that the 2016 Rule gives operators the option to "request approval of an alternative leak detection program that is not as effective as the BLM's requirements, if the operator demonstrates that compliance with the BLM's LDAR requirements or an equally effective alternative would be so costly as to cause the operator to cease production and abandon significant recoverable oil or gas reserves under a lease." *Id.* at 83,030 (VF 382).

Petitioners immediately challenged the 2016 Rule in these two consolidated cases and moved for a preliminary injunction. They argued that the 2016 Rule exceeded BLM's waste prevention authority, and impinged on the Environmental Protection Agency's ("EPA") authority, by establishing air quality regulations. ECF No. 22 at 12-17; ECF No. 40 at 21-22; Case No. 16-cv-280, ECF No. 13 at 9-27.[3] They also questioned BLM's use of the social cost of methane and consideration of air quality benefits in calculating the costs and benefits of the rule. ECF No. 40 at 23-25; Case No. 16-cv-280, ECF No. 13 at 46.

On January 16, 2017, the Court denied the motions for a preliminary injunction, in part because significant portions of the 2016 Rule were set to phase-in over time and would not become effective until January 17, 2018. *Wyoming v. U.S. Dep't of the Interior*, No. 2:16-CV-0280-SWS, 2017 WL 161428 at *12 (D. Wyo. Jan. 16, 2017) (ECF No. 92). Regarding BLM's authority to promulgate the 2016 Rule, the Court noted that "[p]ortions of BLM's stated rationale for the Rule undermine Respondents' insistence that the Rule is foremost a waste prevention regulation that simply has incidental benefits to air quality." *Id.* at *9. The Court also

---

[3] The docket numbers in this brief refer to the docket numbers in *Wyoming v. U.S. Department of the Interior*, No. 2:16-cv-285-SWS, except in situations in which the relevant document was filed only in the consolidated case, *Western Energy Alliance v. U.S. Department of the Interior*, 2:16-cv-280-SWS. In that situation, Federal Respondents preface the docket number with the 16-cv-280 case number.

"question[ed] whether the 'social cost of methane' is an appropriate factor for BLM to consider in promulgating a resource conservation rule pursuant to its MLA authority." *Id.* at *10. This Court further criticized the 2016 Rule because its calculated benefits arose from emission reductions and thus were "not attributable to the purported waste prevention purpose of the Rule." *Id.*

## II.     The 2018 Revision Rule

About two months after this Court's order denying Petitioners' motions for a preliminary injunction, on March 28, 2017, President Trump issued an Executive Order on March 28, 2017, requiring that the Secretary of the Interior "review" the Waste Prevention Rule and "if appropriate, . . . as soon as practicable, . . . publish for notice and comment proposed rules suspending, revising, or rescinding" it. Exec. Order No. 13,783, 82 Fed. Reg. 16,093, 16,096, § 7(b) (Mar. 28, 2017). As directed, BLM reviewed the 2016 Rule and determined that it did not align with the policy set forth in Executive Order 13,783, which states that it is "in the national interest to promote clean and safe development of our Nation's vast energy resources, while at the same time avoiding regulatory burdens that unnecessarily encumber energy production, constrain economic growth, and prevent job creation." 82 Fed. Reg. at 16,093; 82 Fed. Reg. 46,458, 46,459-60 (Oct. 5, 2017) (proposed Suspension Rule). In deciding to reexamine the 2016 Rule, BLM also took into account this Court's misgivings regarding the 2016 Rule as set forth in its order denying the motions for preliminary injunction. *See* 82 Fed. Reg. 58,050, 58,050 (Dec. 8, 2017) (final Suspension Rule); 83 Fed. Reg. 49,184, 49,186 (Sept. 28, 2018) (final Revision Rule).

After a series of efforts to postpone and suspend the most onerous provisions of the 2016 Rule, and after a stay of those provisions by this Court,[4] on September 28, 2018, BLM issued the final Waste Prevention, Production Subject to Royalties, and Resource Conservation; Rescission or Revision of Certain Requirements ("Revision Rule"), which rescinded and revised portions of the 2016 Rule and returned to "a regulatory framework similar to NTL–4A."  83 Fed. Reg. 49,184, 49,189 (Sept. 28, 2018).  The Revision Rule rescinded the requirements of the 2016 Rule that addressed waste minimization plans; capture requirements; well drilling and completions and related operations; pneumatic controllers, pneumatic diaphragm pumps, and storage vessels; and leak detection and repair.  It retained provisions that limit allowable, royalty-free venting and flaring during each stage of oil and gas development and production, and it prohibited venting in most circumstances.

In the Revision Rule, BLM determined that the 2016 Rule had exceeded its statutory authority under the MLA.  *Id.* at 49,185.  BLM said that the "concept of 'waste' underlying the 2016 rule constituted a drastic departure from the concept of 'waste' applied by the Department of the Interior over many decades of implementing the MLA" because it "was based on the

---

[4] This Court is well aware of BLM's efforts to temporarily postpone and suspend portions of the 2016 Rule while the agency completed its reconsideration process.  *See* 82 Fed. Reg. 27,430-01 (June 15, 2017); 82 Fed. Reg. 58,050 (Dec. 8, 2017).  In both instances, Intervenor Respondents in this case challenged the actions in the Northern District of California.  The California courts denied Defendants' motions to transfer the cases back to this Court and vacated the postponement and preliminarily enjoined the suspension.  *California v. U.S. BLM*, 277 F. Supp. 3d 1106 (N.D. Cal. 2017); *California v. BLM*, 286 F. Supp. 3d 1054 (N.D. Cal. 2018).  This Court then stayed the instant litigation as well as the phase-in provisions of the 2016 Rule in light of BLM's ongoing reconsideration of the 2016 Rule.  ECF No. 215.  Intervenor Respondents appealed that order, but the appeal was ultimately dismissed as moot after BLM issued the Revision Rule.  *Wyoming v. U.S. Dep't of the Interior*, 768 F. App'x 790 (10th Cir. 2019).  Shortly thereafter, this Court again stayed these cases pending resolution of the litigation in the Northern District of California challenging the Revision Rule.  ECF No. 261.

premise that essentially any losses of gas at the production site could be regulated as 'waste,' without regard to the economics of conserving that lost gas."  *Id.* at 49,186.

BLM also found that "many of the 2016 Rule's requirements placed a particular compliance burden on operators of marginal or low-producing wells, and there is a substantial risk that many of these wells would not be economical to operate with the additional compliance costs."  *Id.* at 49,187.  BLM explained that the while the 2016 Rule allowed for alternative LDAR programs in some circumstances, it did not allow for a "full exemption from the LDAR requirement[s]" and "it was not clear what would constitute significant recoverable reserves for purposes of determining whether an operator would qualify for an exemption or an alternative LDAR program."  *Id.* at 49,187.

BLM used the interim domestic social cost of methane to calculate the costs and benefits of the Revision Rule, and determined that the Revision Rule had net benefits based largely on the rescission of provisions of the 2016 Rule that imposed substantial costs.  Applying the interim domestic social cost of methane to the 2016 Rule, BLM determined that over a ten-year period, the 2016 Rule is estimated to result in negative net benefits of "-$736 million to -$1.01 billion (net present value (NPV) and interim domestic social cost of methane (SC–CH$_4$) using a 7 percent discount rate) or -$722 million to -$1.09 billion (NPV and interim domestic SC–CH$_4$ using a 3 percent discount rate)."  *Id.* at 49,186.  BLM explained that the 2016 Rule only had positive net benefits if one used the global social cost of methane to calculate costs and benefits, but the global metric was premised on technical support documents "that have since been rescinded."  *Id.* at 49,187.

The Revision Rule became effective on November 27, 2018.  *Id.* at 49,184.  Intervenor Respondents in this case—the States of California and New Mexico and the same coalition of

citizen and tribal groups—immediately challenged the Revision Rule in the Northern District of California.  *California v. Bernhardt*, No. 4:18-cv-5712-YGR (N.D. Cal. filed Sept. 18, 2018); *Sierra Club v. Bernhardt*, No. 4:18-cv-5984-YGR (N.D. Cal. filed Sept. 28, 2018). On July 15, 2020, the California court issued an order vacating the Revision Rule but stayed that vacatur by 90 days, until October 13, 2020, to allow the parties time to return to this Court to continue the litigation over the 2016 Rule.  *California v. Bernhardt*, No. 4:18-cv-5712-YGR, 2020 WL 4001480, at *44 (N.D. Cal. July 15, 2020).  The California court also ordered BLM to provide reports at 30, 60, and 90 days after the entry of its order "detailing the anticipated compliance process with" the 2016 Rule.  *Id.*

The California court analyzed BLM's interpretation of its statutory authority under the MLA under *Chevron* step 2, but held that BLM's interpretation was unreasonable under *Chevron*, as well as arbitrary and capricious under the APA.  *Id.* at *11-17.  The court also held that BLM's deference to state and tribal regulations in the Revision Rule was an improper delegation of its own MLA authority, *id.* at *17-19; BLM's change in position regarding marginal wells was insufficiently justified, *id.* at *19-23; BLM's use of the interim domestic social cost of methane was arbitrary and capricious, *id.* at *25-28; BLM failed to quantify the environmental benefits of the 2016 Rule that were foregone under the Revision Rule, *id.* at *28-30; BLM failed to adequately explain and justify its calculation of the 2016 Rule's administrative and compliance costs, *id.* at *30-31; and BLM failed to comply with the National Environmental Policy Act ("NEPA"), *id.* at *31-42.

## III.    The Current Posture of This Case

In 2017, prior to the stay in this case, Petitioners and Intervenor Petitioners filed opening merits briefs, and Intervenor Respondents filed merits response briefs.  ECF Nos. 141, 142, 143,

144, 174, 175.  Federal Respondents filed a motion to dismiss or in the alternative to stay the case in light of the forthcoming Revision Rule in lieu of a merits response brief.  ECF No. 176.

Five days after the California court issued its decision, on July 20, 2020, the State Petitioners and Intervenor Petitioners moved the Court to lift the stay in this case and implement a schedule to complete merits briefing.  ECF No. 273.  On July 21, this Court ordered the parties to submit a proposed expedited merits briefing schedule that would have all briefing complete by September 4, 2020.  ECF No. 274.  The parties submitted that schedule on July 28, ECF No. 275, and the Court adopted it on July 29.  ECF No. 276.  Pursuant to that schedule, Federal Respondents submit this supplemental merits response brief.

## LEGAL STANDARD FOR CONFESSION OF ERROR

"Confessions of error are, of course, entitled to and given great weight, but they do not 'relieve this Court of the performance of the judicial function.'"  *Sibron v. New York*, 392 U.S. 40, 58 (1968) (quoting *Young v. United States*, 315 U.S. 257, 258 (1942)).  Courts may take the government's confession of error into account when evaluating the fully-briefed merits of the case and may vacate an agency action if the court finds the action flawed.  *See Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7 (D.D.C. 2014) (after government confessed error, considering merits of rulemaking in light of administrative record and fully-briefed summary judgment motions and vacating rule); *cf. Carpenters Indus. Council v. Salazar*, 734 F. Supp. 2d 126, 135-36 (D.D.C. 2010) (refusing to vacate despite confession of error without a determination of the merits); *Ctr. for Native Ecosystems v. Salazar*, 795 F. Supp. 2d 1236, 1240-43 (D. Colo. 2011) (vacating agency action where agency confessed error without a merits determination due to "serious deficiencies" demonstrated by agency's decision to disavow prior legal position).

9

## ARGUMENT

Because the California court has effectively vacated the Revision Rule, BLM is now left to either defend the 2016 Rule, which the agency has already determined is flawed, or confess error in this Court.  BLM chooses the latter course and hereby acknowledges that it failed to adequately explain and support certain key aspects of the 2016 Rule, and that this Court could properly find that the agency did not comply with the APA for these reasons, especially in combination.  BLM has also determined that the 2016 Rule is premised on an interpretation of its own authority that is inconsistent with the MLA.  Under the particular circumstances of this case, it is appropriate for the Court to vacate the 2016 Rule.

## I.     BLM Did Not Adequately Explain or Justify the 2016 Rule.

The APA requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).  An agency rule is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.*

The MLA requires federal onshore oil and gas lessees to "use all reasonable precautions to prevent waste of oil or gas developed in the land," requires "the exercise of all reasonable diligence, skill, and care in the operation of [the lease]," and authorizes the Secretary to prescribe rules "for the prevention of undue waste."  30 U.S.C. §§ 187, 225.  In issuing the 2016 Rule, BLM failed to (1) assess the impact of the 2016 Rule on marginal wells, (2) separately consider

the domestic costs and benefits of the 2016 Rule, and (3) explain and identify support for the rule's capture requirements.[5]

A.      **BLM Failed to Adequately Assess the Impact of the 2016 Rule on Marginal Wells.**

BLM's failure to assess how and to what extent the 2016 Rule would affect marginal wells was a significant error.  In the 2016 Rule, BLM acknowledged that approximately 85% of wells on federal and Indian leases are "marginal," meaning they produce 15 barrels of oil equivalent per day or less.  81 Fed. Reg. at 83,029 (VF 381).  Commenters on the proposed rule expressed concern about the impact of the 2016 Rule on marginal wells, asserting that "the costs of LDAR for a marginal well far outweigh any benefits in terms of recovery of lost gas."  *Id.*  They also noted that marginal wells are "only marginally profitable to begin with, and the costs of LDAR could make these wells uneconomical, leading to premature shut-in and a loss of mineral resources."  *Id.*; *see also, e.g.*, Response to Comments ("RTC") at 293 (VF 1032-33) (commenter estimating "$30,000-$40,000 to purchase and install emission control equipment" which will "turn many marginal wells uneconomical"); RTC at 431 (VF 1170) (commenter noting that plunger lifts "cost $20,000 - $30,000 per well, which is more than the remaining net present value of many of these marginal wells"); RTC at 481 (VF 1220) (commenter estimating that "cost burden of semi-annual FLIR surveys would add approximately $1,600 a year to the operating cost of very marginal wells and would equate to a 15% increase in operating cost").  BLM itself confirmed these concerns.  *See* 2016 RIA at 123 (VF 569) (noting that while BLM

---

[5] BLM determined that the agency had erred in its approach to these three aspects of the 2016 Rule as part of its rulemaking process for the Revision Rule, and these three issues formed part of the basis for the agency's rescission of much of the 2016 Rule.  *See, e.g.*, 83 Fed. Reg. at 49,186-87, 49,190, 49,192-93, 49,196.

"generally believe[s] that the cost savings available to operators would exceed the compliance costs[6] or that the compliance costs would not be as significant as to force the operator to prematurely abandon the well," "some existing leases might not support the investments" and "specific requirements," such as those requiring equipment replacement and LDAR programs, "are likely to impact existing wells that are classified as marginal"); RTC at 483 (VF 1222) (same).

In response to these comments and concerns, BLM added a provision allowing operators to request an alternative LDAR program that is "not as effective as the BLM's requirements, if the operator demonstrates that compliance with the BLM's LDAR requirements or an equally effective alternative would be so costly as to cause the operator to cease production and abandon significant recoverable oil or gas reserves under a lease."  81 Fed. Reg. at 83,030 (VF 382).[7]  But BLM did not evaluate the technical feasibility of this option or whether it would, in fact, prevent an operator from shutting in a marginal well that becomes unprofitable in light the 2016 Rule's

---

[6] This belief is contrary to the data in the 2016 Rule RIA that demonstrate that compliance costs will exceed cost savings (i.e., the value of the gas conserved) for the 2016 Rule's requirements regarding capture targets, pneumatic controllers, pneumatic pumps, storage tanks, and LDAR. *Compare* 2016 RIA at 5, 106 (VF 451, 552) *with* 2016 RIA at 6, 109 (VF 452, 555).  In the 2016 Rule RIA, the only requirement for which the cost savings *may* exceed compliance costs is liquids unloading, for which total annual costs range from $5-6 million and cost savings range from $5-8 million.  These numbers do not account for other additional costs that do not generate cost savings, such as flare measurement and administrative costs.  2016 RIA at 5, 106 (VF 451, 552).

[7] The 2016 Rule included various exemptions for circumstances in which compliance would "cause the operator to cease production and abandon significant recoverable oil or gas reserves under a lease."  VF 435, 437-38, 440.  This exemption standard is a departure from that contained in NTL-4A, which focused on energy economics.  Specifically, NTL-4A authorized BLM to approve venting or flaring where the expenditures necessary to market or use the gas are not "economically justified" and "conservation of the gas would lead to premature abandonment of recoverable oil reserves *and ultimately to a greater loss of equivalent energy than would be recovered if the venting or flaring were permitted to continue*."  VF 3799 (emphasis added).

compliance costs. Rather, the agency added this provision at the last minute as a fail-safe—in recognition of its own concerns and the concerns of commenters that the 2016 Rule's LDAR requirements could potentially cause marginal wells to shut-in, thereby stranding mineral resources—but did not conduct any analysis to make sure it would function as the fail-safe it was intended to be. *See* 2016 RIA at 83-95 (VF 529-541) (analyzing LDAR requirements but not addressing marginal wells or less effective alternative option). For example, BLM did not consider what would constitute a minimally effective LDAR program or calculate the cost of a such a program to determine if a less effective program would sufficiently reduce compliance costs to render a marginal well sustainable. It also did not explain how it would define "significant recoverable oil or gas reserves" for purposes of approving a less effective LDAR program, or analyze how many wells might meet that standard.[8]

BLM also failed to account for the administrative costs on the agency and operators of seeking approval of an alternative LDAR program, or the risk that BLM and the operator could not reach agreement on an alternative program. Confusingly and without explanation, BLM estimated it would only receive 20 applications per year from operators seeking alternative LDAR programs, 2016 RIA at 98 (VF 544), despite the fact that 85% of 96,000 BLM-administered wells are marginal, 81 Fed. Reg. at 83,029 (VF 381), and its own analysis showed

---

[8] Although BLM did provide a bit more guidance as to the meaning of the phrase "cease production and abandon significant recoverable oil reserves" in the context of the 2016 Rule's capture requirements, that guidance is nevertheless vague. *See* 81 Fed. Reg. at 83,052 (VF 404). For example, BLM's explanation of the standard stated that, "depending on the specific economic circumstances of the lease, it *may* be sufficient for an operator to show that it would have to shut in the wells on a lease for a time period on the order of a year or two." *Id.* (emphasis added). It remains unclear how the "specific economic circumstances" of any individual lease will affect BLM's determination, whether a shut-in of one year or two years is necessary, and whether a two-year shut-in would even be sufficient to meet the standard.

that the LDAR requirements in particular would cost substantially more than the value of the gas they would conserve and could be justified only by reliance on social benefits. *Compare* 2016 RIA at 5 (VF 451) (total annual costs of $83 million) *with* 2016 RIA at 6 (VF 452) (total annual cost savings of $12-21 million).

In the 2016 Rule, BLM chided commenters for failing to support their emissions estimates for marginal wells with data and evidence, 81 Fed. Reg. at 83,009, 83,029 (VF 361, 381), but then itself assumed that marginal wells could take on the costs of a less effective LDAR program with no analysis whatsoever. *Id.* at 83,030 (VF 382). BLM does not defend that approach under the APA on the record here.[9]

**B.**  **BLM Failed to Separately Consider the Domestic Costs and Benefits of the 2016 Rule.**

BLM's cost-benefit analysis for the 2016 Rule was also flawed. A large percentage of the calculated benefits—as much as 90%—was attributable to reduced methane emissions. 2016 RIA 5-7 (VF 451-53). As this Court noted, "the Rule only results in a 'net benefit' if the 'social cost of methane' is allowed to be factored into the analysis." *Wyoming*, 2017 WL 161428 at *9. BLM calculated those net benefits using the *global* social cost of methane, while failing to separately analyze the United States' *domestic* share of those benefits as required by OMB Circular A-4. Specifically, OMB Circular A-4 requires agencies also to consider and to "report[] separately" the "benefits and costs that accrue to citizens and residents of the United States." VF

---

[9] The California court rejected BLM's concerns about marginal wells as a justification for the Revision Rule, not based on the substance of the agency's concerns about the viability of marginal wells in light of the 2016 Rule's compliance costs, but rather because BLM's analysis was not "properly disclosed and subject to public comment." *California*, 2020 WL 4001480, at *20-22.

7661; *see California*, 286 F. Supp. 3d at 1069 (finding OMB Circular A-4 does not require consideration of global impacts).[10]  Although BLM previously defended its use of a global, rather than domestic, measure of the social cost of greenhouse gases on the ground that "suitable methodologies for estimating domestic damages do not currently exist," RTC at 455 (VF 1194),[11] BLM subsequently did make this very calculation in the 2018 Revision Rule notwithstanding any methodological limitations.[12]  83 Fed. Reg. at 49,190.  But regardless of whether a "suitable" methodology for quantification of benefits existed, BLM failed to assess qualitatively such benefits, and to account for them in its decision making.

Nor did BLM properly explain whether the "social cost of methane" was even the proper metric for calculating the 2016 Rule's ostensible benefits.  *Wyoming*, 2017 WL 161428 at *10. The 2016 Rule operates under an unexplained presumption that including the social benefits of

---

[10] OMB Circular A-4 also directs agencies to report effects "beyond the borders of the United States" separately, VF 7661, but again BLM's error was in *only* reporting the effects "beyond the borders of the United States."  *Id.*

[11] The 2016 National Academies of Science ("NAS") report noted that the social cost of methane "depends on a number of inputs that are uncertain," ranging from uncertainty arising from the natural world, human behavior, and modeling challenges, rendering the cost-benefit analysis itself uncertain.  The NAS report continued that "[i]t is also important to model uncertainty in order to provide a range of plausible estimates for cost-benefit analysis."  VF 19867.  Mindful of these limitations, there is no reason to think that a domestic analysis cannot also be performed, so long as the uncertainty is modeled and disclosed as it must also be with the global metric.  Nor is the lack of a peer reviewed metric an obstacle to considering the domestic impacts of the Rule. *See Lands Council v. Martin*, 529 F.3d 1219, 1226 (9th Cir. 2008) ("We find no legal requirement that a methodology be 'peer-reviewed or published in a credible source.'").

[12] Although the California district court criticized BLM's use of the domestic model, that criticism appears to be based on the court's assessment of what it believes to be the "best available scientific data" rather than deferring to agency's expertise as required by controlling precedent.  *California*, 2020 WL 4001480, at *26; *see Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012) ("A court generally must be 'at its most deferential' when reviewing scientific judgments and technical analyses within the agency's expertise under NEPA." (citing *N. Plains Res. Council v. Surface Transp. Bd.,* 668 F.3d 1067, 1075 (9th Cir. 2011))).

the rule is the proper means of calculating its costs and benefits, and that the social cost of methane is the best means of capturing those benefits.  This Court previously questioned whether the "social cost of methane" as opposed to compliance costs "is an appropriate factor for BLM to consider in promulgating a resource conservation rule pursuant to its MLA authority.  *Id.*  The Court also criticized the 2016 Rule because its calculated benefits arose from emission reductions and thus were "not attributable to the purported waste prevention purpose of the Rule."  *Id.*  Furthermore, while commenters expressed concerns that the social cost of methane failed to provide the "'scientifically and economically defensible' estimates that are required by OMB for conducting meaningful benefit–cost analysis," RTC at 439 (VF 1178), BLM proceeded to employ the social cost of methane in furthering its novel interpretation of its waste authority under the MLA, which, as discussed *infra*, is itself unreasonable.  RTC at 448-49 (VF 1187-88).  BLM therefore failed to adequately explain why it used a global emissions metric to quantify the benefits arising from a rule designed to curb domestic waste under the MLA.

## C. BLM Failed to Explain and Support the Capture Requirements of the 2016 Rule.

Finally, BLM failed to provide sufficient analysis and justification for the 2016 Rule's gas capture percentage requirement.  Specifically, the 2016 Rule attempted to "clarify[] the criteria for determining when incidental and necessary disposal of gas accompanying oil production crosses the line into unreasonable waste of public gas resources" and expressed "these criteria in the form of a gas capture target."  81 Fed. Reg. 83,048.  As a practical matter, operators that exceed the applicable gas capture targets would have to pay royalties for the excess flared gas.  *Id.*  Section 3179.7 established targets ranging from 85% to 98% that were to be incrementally phased in during the first nine years.  *Id.* at 83,082; RIA at 24, 42 (VF 470, 488).  The 2016 Rule allowed operators to calculate capture percentages across a state, county, or

lease-by-lease basis. *Id.* And if operators demonstrated that any particular gas capture target would lead to premature well shut-in by causing the operator to "abandon significant recoverable oil reserves under the lease," BLM had discretion to approve an alternative capture percentage. RIA at 24 (VF 470).

Despite the importance of the gas capture's putative requirement to prevent "unreasonable waste," neither the RIA nor the 2016 Rule itself provided any explanation why BLM established gas capture targets between 85% to 98% over a nine-year period. RIA at 42 (VF 488). Indeed, BLM offered no evidence that this new requirement was consistent with historical practice or that it had conducted any quantitative analysis to ensure that the gas capture target percentages were themselves reasonable. RIA at 41-49 (VF 487-495). Rather, BLM recognized that operators may elect to curtail production to avoid additional penalties from the gas capture requirements, reasoning that deferring production is "not lost" gas, but without any elaboration on what the precise impact might be. RIA at 44 (VF 490). Nor did BLM explain why the nine-year phase-in period was reasonable as opposed to a longer timeframe given the RIA's acknowledged reliance on new alternative capture technologies to satisfy the gas capture requirements. *Id.* BLM also left significant uncertainty concerning the approval criteria for alternative capture percentages for operators on the brink of premature shut-in; there was no clear explanation as to what constituted "significant recoverable oil reserves" so as to merit the alternative capture targets. RIA at 24 (VF 470); *contra* VF 3799 (NTL-4A standard for approving venting or flaring of oil-well gas). Finally, the RIA not only failed to show that the capture percentage requirements would create net benefits, but also acknowledged that it could result in a net loss of up to $217 or $278 million depending on the discount rate employed. RIA at 49 (VF 495). BLM's failure to assess fully a requirement that could impose such significant

costs on operators was a substantial omission in its explanation and justification of the 2016 Rule.

## II.     BLM Erred in Its Interpretation of Its Statutory Authority in the 2016 Rule.

Because the flaws in BLM's issuance of the 2016 Rule, discussed above, render the 2016 Rule procedurally incorrect, the Court need not reach the agency's statutory authority under the MLA to resolve this case.  However, BLM's overbroad interpretation of its authority in the context of this case provides another ground for a finding that the agency committed error.

As this Court has recognized, "[i]t is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."  *Wyoming v. U.S. Dep't of the Interior*, No. 2:15-CV-041-SWS, 2016 WL 3509415, at *3 (D. Wyo. June 21, 2016), *vacated on other grounds by Wyoming v. Zinke*, 871 F.3d 1133 (10th Cir. 2017) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)).  "Regardless of how serious the problem an administrative agency seeks to address, . . . it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'"  *Id.* (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2016)).  "Where a case involves an administrative agency's assertion of authority to regulate a particular activity pursuant to a statute that it administers, the court's analysis is governed by *Chevron U.S.A. Inc. v. Nat. Res. Def Council, Inc.*, 467 U.S. 837 (1984)."  *Id.*  Under step 1 of *Chevron*, "a reviewing court must first ask whether Congress has directly spoken to the precise question at issue.  If Congress has done so, the inquiry is at an end; the court 'must give effect to the unambiguously expressed intent of Congress.'"  *Brown & Williamson*, 529 U.S. at 132.  If Congress's intent is not unambiguous, the court must proceed to step two.  Under step two, "if Congress has not specifically addressed the question, a reviewing court must respect the agency's construction of

the statute so long as it is permissible." *Id.* Here, the 2016 Rule is premised on an assertion of authority that exceeds the authority delegated to BLM by Congress in the MLA, and is therefore unlawful.

The MLA states that all federal onshore oil and gas leases "shall be subject to the condition that the lessee will, in conducting his explorations and mining operations, use all reasonable precautions to prevent waste of oil or gas developed in the land . . . ." 30 U.S.C. § 225. The MLA further provides that "[e]ach lease shall contain provisions for the purpose of insuring the exercise of all reasonable diligence, skill, and care in the operation of [the lease]," as well as "a provision that such rules . . . for the prevention of undue waste as may be prescribed by [the Secretary] shall be observed . . . ." 30 U.S.C. § 187.

In the 2016 Rule, BLM interpreted its waste prevention authority to encompass regulations intended to benefit the environment and improve air quality, regardless of whether those regulations would reflect the behavior of a reasonable, prudent oil and gas operator. *See, e.g.*, 81 Fed. Reg. at 83,021 (VF 373) ("[T]he BLM has the authority to manage public and tribal oil and gas resources to reduce waste and ensure environmentally responsible development."). Indeed, the 2016 Rule was expected to impose $110-$275 million in annual compliance costs to conserve $20-$157 million worth of gas each year. 2016 RIA at 5-6 (VF 451-52) (using 3% discount rate). The aggregate costs were only offset if the agency included the social benefits of the rule as calculated using the global social cost of methane. *Id; see supra* § I.B.

While the MLA's waste provisions are ambiguous under *Chevron* step 1, allowing BLM discretion to interpret them, *see Wyoming*, 2017 WL 161428 at *5; *California*, 2020 WL 4001480, at *10-11, the interpretation in the 2016 Rule is not "a permissible construction of the" MLA and is therefore unreasonable under *Chevron* step 2. *City of Arlington v. FCC*, 569 U.S.

19

290, 296 (2013). In enacting the MLA, Congress incorporated a "prudent operator" standard

through the provisions requiring lessees to exercise "*reasonable* diligence, skill, and care" in the

operation of the lease, and subjecting federal leases to the condition that lessees will use "all

*reasonable* precautions to prevent waste of oil or gas developed in the land." 30 U.S.C. §§ 187,

225 (emphasis added); *see also Nola Grace Ptasynski*, 63 IBLA 240, 247-48 (1982) (holding

prudent operator standard applies to federal leases governed by MLA). Under the "prudent

operator" standard, which was part of oil and gas law well before the MLA was enacted in 1920,

lessees have an obligation of reasonable diligence in the developing and marketing of oil and gas

from the lease, with due regard for the interest of both the lessee and the lessor. *See Brewster v.

Lanyon Zinc Co.*, 140 F. 801, 814 (8th Cir. 1905) ("It is only to the end that the oil and gas shall

be extracted with benefit or profit to both [lessee and lessor] that reasonable diligence is

required."). The prudent operator standard does not require a lessee to lose money extracting oil

or gas. *E.g., id.*; *Olsen v. Sinclair Oil & Gas Co.* 212 F. Supp. 332, 333 (D. Wyo. 1963) ("Under

the usual statement of the standard for prudent operation there is no obligation upon the lessee to

drill offset wells unless there is a sufficient quantity of oil or gas to pay a reasonable profit to the

lessee over and above the cost of drilling and operating the well."). The exercise of "reasonable

diligence" and employment of "reasonable precautions" under the MLA do not require an

operator to render its operations uneconomical by capturing and marketing uneconomic gas. To

require that operators do so, especially based on an externality like the social cost of methane, as

the 2016 Rule did for many marginal wells, ignores the longstanding concept of "waste" in oil

and gas law, is inconsistent with the prudent-operator standard incorporated in the MLA, and

exceeds the BLM's waste-prevention authority.

This reading comports with Congress's intent in enacting the MLA. The MLA was intended to "promote wise development of these natural resources and to obtain for the public a reasonable financial return on assets that 'belong' to the public." *California Co. v. Udall*, 296 F.2d 384, 388 (D.C. Cir. 1961); *see also Geosearch, Inc. v. Andrus*, 508 F. Supp. 839, 842 (D. Wyo. 1981); *Boesche v. Udall*, 373 U.S. 472, 481-82 (1963). The legislative history makes clear that Congress wanted to protect the investment of prospectors and operators to encourage production, and was concerned about protecting the "public interest" in industry competition. *Mineral Land Leasing Bill, Hrg. Before H. Comm. on Public Lands on S. 2775*, at 42 (Oct. 6-8, 1919); *Leasing of Oil Lands, Hrg. Before S. Comm. on Public Lands on H.R. 406*, at 32 (Feb. & Mar., 1916). In fact, in multiple locations, the legislative history refers to expenditure in excess of the value of the resource conserved as a "loss" or "waste," *Mineral Land Leasing Bill, Hrg. Before H. Comm. on Public Lands on S. 2775*, at 67 (Oct. 6-8, 1919) ("[T]hey wasted that $8,000,000 to get about $3,000,000 worth of oil . . . ."); *Hrg. Before S. Subcomm. Of the Comm. on Public Lands on S. 4898, A Bill to Encourage the Mining of Coal, Oil, Gas, Etc. on the Public Domain*, at 26 (May 25, 1914) ("[I]f there is more wealth being used in the production of new wealth than the new wealth amounts to, it represents a loss to society and not a gain, and it does not make any difference what is the magnitude of the wealth production in that case; it is an absolute loss if there is not something left above the cost of production, of the labor and capital required to produce that wealth . . . ."), and makes clear that Congress saw leaving oil or gas in the ground that could have otherwise been extracted *as waste*. *Oil Leasing Lands, Hrg. Before H. Comm. on Public Lands on H.R. 3232 and S. 2812*, at 220 (Feb. 5, 1918).

The 2016 Rule's interpretation of BLM's authority as permitting the imposition of uneconomical conservation obligations, especially on the basis of broader considerations of the

social cost of methane, "work[s] too great a hardship on the developer," contrary to Congress's clear intent. *Exploration for and Disposition of Coal, Oil, Gas, Etc.*, H. Rep. No. 65-206, at 6 (Dec. 11, 1917) ("[P]rovisions relative to continued development to prevent waste and speculation are inserted in the bill that will not work too great a hardship on the developer and that will at the same time practice conservation of this resource").  It also improperly elevates modern concerns about air quality and the environment above Congress's intent. *Burrage v. United States*, 571 U.S. 204, 218 (2014) ("The role of this Court is to apply the statute as it is written—even if we think some other approach might 'accor[d] with good policy.'"); *Oregon ex rel. Div. of State Lands v. BLM*, 876 F.2d 1419, 1427 (9th Cir. 1989) (rejecting agency's interpretation of statute as "anachronistic and inconsistent with contemporaneous interpretations"); *Loving v. IRS*, 742 F.3d 1013, 1022 (D.C. Cir. 2014) (rejecting "ahistorical" interpretation of statute).

The 2016 Rule's interpretation of BLM's statutory authority is also contrary to the longstanding practice of BLM itself.  *See In re Cybernetic Servs., Inc.*, 252 F.3d 1039, 1057 (9th Cir. 2001) ("[W]hen we must interpret an archaic statute, the historic practice of the agency that was created to help implement that statute can shed light on its meaning.").  In the 2016 Rule, BLM acknowledged that, for the past 30+ years, it had generally taken operator economics into account in determining whether a loss was "waste" and therefore royalty-bearing.  81 Fed. Reg. at 83,038; *see also, e.g.*, *Rife Oil Properties, Inc.*, 131 IBLA 357, 376 (1994); *Ladd Petroleum Corp.*, 107 IBLA 5, 7-9 (1989).

If this Court reaches the issue of BLM's authority, the question before it is not whether the Revision Rule's definition of waste and interpretation of BLM's authority was reasonable or better than the 2016 Rule's interpretation, but simply whether the 2016 Rule's interpretation is

permissible as a matter of law.[13]  While Federal Respondents continue to maintain that "waste" in the MLA and the extent of BLM's authority to regulate waste under the MLA are ambiguous under *Chevron* step 1, they now conclude, on the basis of the foregoing analysis, that the 2016 Rule's interpretation of the agency's authority is broader than the 1920 statute can bear and therefore impermissible under *Chevron* step 2.[14]

## III.    Vacatur is Appropriate.

When a court concludes that an agency action is arbitrary and capricious, the proper course is to enjoin or vacate the action only as to the plaintiffs in the litigation.  Order in Pending Case, *Army Corps of Eng'rs v. N. Plains Res. Council*, No. 19A-1053 (U.S. July 6, 2020) (staying district court's nationwide vacatur and injunction except as to challenged Keystone XL pipeline project); *Virginia Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 394 (4th Cir. 2001) ("Nothing in the language of the APA" requires an unlawful regulation to be enjoined or vacated "for the entire country.").  Here, given that the Petitioners and Intervenor Petitioners collectively

---

[13] While Federal Respondents recognize that the California court found BLM's interpretation of its statutory authority in the Revision Rule unreasonable under *Chevron* step 2, that court did not reach the question of whether BLM's interpretation of its authority in the 2016 Rule was reasonable because the 2016 Rule was not before it.  *California*, 2020 WL 4001480, at *1 ("This suit only focuses on the adequacy of the Rescission, and not the 2016 Rule.); *id.* at *14 ("Nor is the Court tasked with determining whether the Waste Prevention Rule adequately addressed economic issues or resulted from an excess of jurisdiction.").  Moreover, the California court's decision is not binding on this Court, and Federal Respondents respectfully disagree with the California court's reasoning.

[14] For the same reasons that the 2016 Rule exceeds BLM's statutory authority, including the agency's failure to consider the longstanding prudent operator standard and the agency's reliance on air quality benefits to justify extensive costs, the rule is also arbitrary and capricious under the APA.  *See Wyoming*, 2017 WL 161428, at *10 (questioning under APA arbitrary and capricious standard "whether the 'social cost of methane' is an appropriate factor for BLM to consider in promulgating a resource conservation rule pursuant to its MLA authority").

embrace the BLM lands subject to the 2016 Rule, an injunction as to those parties would effectively enjoin the Rule across the board and, in the agency's judgment, warrant a corresponding vacatur of the Rule.[15]

That outcome will promote an equitable disposition of this case. Such a vacatur of the 2016 Rule will not have any disruptive or harmful consequences because the 2016 Rule has never been fully phased in and fully in effect. Rather, it will put a stop to the regulatory seesawing that has made it extremely difficult for operators to prepare for and comply with BLM's waste regulations. Vacatur of the 2016 Rule, when taken together with the California court's vacatur of the Revision Rule, will return the regulatory landscape to NTL-4A, which was previously in effect for over 30 years. Here, because virtually all producers on BLM-administered leases are before the Court in these cases, vacatur is permissible under the particular circumstances of this litigation and will have the benefit of resolving the confusion and disruption for the regulated community that has resulted from BLM's efforts to modernize and, in the case of the 2016 Rule, transform its waste regulations over the past four years.

While Respondent Intervenors will surely claim harm because that course will prevent the potential air quality benefits of the 2016 Rule from taking effect, those provisions have never been fully phased in. Thus, vacatur will not harm air quality by taking away fully implemented

---

[15] Here, Petitioners (Wyoming, Montana, the Independent Petroleum Association of America, and the Western Energy Alliance) and Intervenor Petitioners (North Dakota and Texas) represent operators in the "10 States constituting the top eight producers of Federal oil and the top eight producers of Federal gas"—New Mexico, Wyoming, Colorado, North Dakota, Utah, California, Montana, Texas, Alaska, and Oklahoma—which "collectively produce more than 99 percent of Federal oil and more than 98 percent of Federal gas." 83 Fed. Reg. at 49,202; *see also* Case No. 16-cv-280, ECF No. 13-5 (WEA's membership "is comprised of over 300 companies" throughout the "western United States"); No. 16-cv-280, ECF No. 13-6 (IPAA represents "thousands of independent oil and natural gas producers and service companies across the country"; its members develop 95% of domestic oil and gas wells).

air enhancing provisions; it will preserve the status quo by preventing the costly phase-in of those provisions, while the validity of the 2016 Rule may still hang in the balance if the litigation uncertainty were to continue.  Moreover, reliance on the 2016 Rule's air quality benefits to avoid the disposition that is otherwise appropriate in the circumstances of these cases would be unjustified when one of the flaws of the rule is BLM's overbroad interpretation of its statutory authority to support cost-prohibitive requirements based on their environmental benefits.

Federal Respondents note that certain severable provisions of the 2016 Rule have not been challenged in this litigation, were not rescinded or revised in the Revision Rule, were not promulgated pursuant to any legal error, and should not be enjoined or vacated.  *See* 83 Fed. Reg. at 49,191.  Specifically, these are: (1) 43 C.F.R. subpart 3178, which pertains to the royalty-free use of production (VF 395-98, 430-32); and, (2) the amendment of 43 C.F.R. § 3103.3-1, which aligned the prior regulation text with the terms of the MLA (VF 393-394, 429-430). These provisions will continue to function independently if the remainder of the 2016 Rule (i.e., the provisions pertaining to venting, flaring, and leaks) are vacated.

## CONCLUSION

BLM's efforts over the past four years to revise its waste prevention regulations have resulted in four sets of lawsuits and a series of stays, injunctions, and vacaturs that have generated significant uncertainty for the regulated community and the agency itself.  Because BLM has identified major flaws in the 2016 Rule that render it inconsistent with the APA and MLA, the appropriate course in this remaining litigation over the original rule is vacatur of the 2016 Rule.

Respectfully submitted this 18th day of August, 2020.

JEFFREY BOSSERT CLARK
Assistant Attorney General
Environment and Natural Resources Division

*/s/ Clare Boronow*
MARISSA PIROPATO
CLARE BORONOW

*/s/ C. Levi Martin*
C. Levi Martin
Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 18, 2020, a copy of the foregoing was served by filing a copy of that document with the Court's CM/ECF system, which will send notice of electronic filing to counsel of record.

*/s/ Clare Boronow*
Clare Boronow
Trial Attorney