IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2020 OCT -8  PM 1: 04

MARGARET BOTKINS, CLERK
CASPER

| | | |
|---|---|---|
| STATE OF WYOMING and STATE OF MONTANA, | ) | |
| Petitioners, | ) | |
| STATE OF NORTH DAKOTA and STATE OF TEXAS, | ) | |
| Intervenor-Petitioners, | ) | |
| vs. | ) | Case No. 2:16-CV-0285-SWS **(Lead Case)** |
| UNITED STATES DEPARTMENT OF THE INTERIOR, et al. | ) | |
| Respondents, | ) | |
| WYOMING OUTDOOR COUNCIL, et al.; EARTHWORKS; STATE OF CALIFORNIA and STATE OF NEW MEXICO, | ) | |
| Intervenor-Respondents. | ) | |

| | | |
|---|---|---|
| WESTERN ENERGY ALLIANCE, and the INDEPENDENT PETROLEUM ASSOCIATION OF AMERICA, | ) | |
| Petitioners, | ) | |
| vs. | ) | Case No. 2:16-CV-0280-SWS |
| SALLY JEWELL, in her official capacity as Secretary of the United States Department of the Interior; and BUREAU OF LAND MANAGEMENT, | ) | |
| Respondents. | ) | |

## ORDER ON PETITIONS FOR REVIEW OF FINAL AGENCY ACTION

This matter is before the Court on the *Petitions for Review of Final Agency Action* filed separately in each of these consolidated actions, challenging the Bureau of Land Management's issuance of new regulations with the stated intent of reducing waste of natural gas during oil and gas production activities on Federal and Indian leases and clarifying when "lost" gas is subject to royalties. The Court, having considered the briefs and materials submitted in support of the petitions and the oppositions thereto, including the Administrative Record ("AR"), and being otherwise fully advised, FINDS that the Bureau of Land Management exceeded its statutory authority and acted arbitrarily in promulgating the new regulations.

## PROCEDURAL HISTORY

On November 18, 2016, the Department of the Interior ("DOI"), Bureau of Land Management ("BLM") issued its final rule "promulgating new regulations to reduce waste of natural gas from venting, flaring, and leaks during oil and natural gas production activities on onshore Federal and Indian (other than Osage Tribe) leases" and "clarify[ing] when produced gas lost through venting, flaring, or leaks is subject to royalties, and when oil and gas production may be used royalty-free on-site." *Waste Prevention, Production Subject to Royalties, and Resource Conservation*, 81 Fed. Reg. 83,008 (Nov. 18, 2016) (the "Waste Prevention Rule" or "Final Rule" or "Rule"). Petitioners contemporaneously initiated this litigation, contending the Rule represents unlawful agency action because it exceeds BLM's statutory authority and is otherwise arbitrary and capricious. Subsequently, the States of North Dakota and Texas intervened as additional petitioners challenging the legality of the Rule, and the California Attorney General's Office, the State of New Mexico, and several environmental organizations intervened to defend the Rule. The Rule's effective date was January 17, 2017. *Id.*

On January 16, 2017, following briefing and oral argument, this Court denied Petitioners' motions for preliminary injunction.  Because Congress has indisputably vested DOI with the authority to prescribe rules for the prevention of undue waste of mineral resources, the Court determined that, "at this stage and applying the deference as required under *Chevron*, this Court cannot conclude the Rule enacted exceeds the Secretary's authority or is arbitrary and capricious."  (Order on Mot. for Prelim. Inj. at 28, ECF No. 92.)  The Court further found Petitioners had not demonstrated irreparable harm was likely in the absence of an injunction.  *Id.* at 27.  Thus, Petitioners had not established a clear and unequivocal right to relief.  *Id.* at 28. The Court then established an expedited schedule for briefing on the merits, with opening briefs to be filed March 23, 2017.  And so began the roller coaster ride.

On February 3, 2017, the U.S. House of Representatives passed a Congressional Review Act resolution to disapprove the Waste Prevention Rule, which would have voided the Rule. H.R.J. Res. 36, 115th Cong. (2017-2018).[1]  On March 3, 2017, Petitioners requested an extension of the briefing schedule "to allow for review of the administrative record and preparation of a merits brief and for Congress to consider whether to exercise its authority under the Congressional Review Act."  (ECF No. 97 at 3.)  The Court granted the extension on March 6, 2017.  The U.S. Senate voted against consideration of the House's resolution on May 10, 2017, leaving the Rule in effect.  Then on June 15, 2017, in compliance with a directive from the President to review the Rule for consistency with the policies of the new administration,[2] the BLM announced it was postponing the January 17, 2018 compliance dates for certain phase-in provisions of the Rule, pending judicial review in this Court, pursuant to its authority under 5

---

[1] "Providing for congressional disapproval under chapter 8 of title 5, United States Code, of the final rule of the Bureau of Land Management relating to 'Waste Prevention, Production Subject to Royalties, and Resource Conservation,'" https://www.congress.gov/bill/115th-congress/house-joint-resolution/36.

[2] *See* Executive Order No. 13783, "Promoting Energy Independence and Economic Growth" (March 28, 2017).

U.S.C. § 705. *See* 82 Fed. Reg. 27,430 (June 15, 2017) ("Postponement Notice"). The BLM further stated its intention to conduct notice-and-comment rulemaking to suspend or extend the compliance dates of those sections affected.[3] *Id.* The Rule's provisions with compliance dates that had already passed were unaffected by the Postponement Notice.

Five days later, and in light of BLM's plan to propose revision or rescission of the Rule, the Federal Respondents requested another extension of the briefing deadlines (ECF No. 129) which this Court granted, making the opening merits briefs due October 2, 2017 and response briefs due November 6, 2017 (ECF No. 133). In granting the extension, this Court determined: "To move forward on the present schedule would be inefficient and a waste of both the judiciary's and the parties' resources in light of the shifting sands surrounding the Rule and certain of its provisions, making it impossible to set a foundation upon which the Court can base its review under the Administrative Procedures Act." *Id.* at 3. Then on July 5th and 10th, 2017, several of the Intervenor-Respondents in this case, along with the elected Attorney Generals from the States of California and New Mexico, challenged the BLM's Postponement Notice in a Federal District Court in the Northern District of California. *See California and New Mexico, et al. v. BLM*, No. 3:17-CV-03804-EDL (N.D. Cal.); *Sierra Club, et al. v. Zinke*, No. 3:17-CV-03885-EDL (N.D. Cal.). On October 4, 2017, the Northern District of California Court held unlawful and vacated the Postponement Notice, thereby reinstating the (by then) three-and-one-half-month away compliance dates for the phase-in provisions.

Meanwhile, back in this Court, Petitioners and Intervenor-Petitioners (collectively, "Petitioners") timely filed their opening briefs in support of their petitions for review. On October 20, 2017, the Federal Respondents requested yet another extension of the merits briefing

---

[3] "Given this legal uncertainty, operators should not be required to expend substantial time and resources to comply with regulatory requirements that may prove short-lived as a result of pending litigation or the administrative review that is already under way." *Id.*

deadlines (ECF No. 155), requesting the Court again extend the deadlines then in place, allowing time for the BLM to complete a rule ("Suspension Rule") which will suspend or delay the majority of the provisions of the Waste Prevention Rule, including the portions of the Rule that would otherwise become effective on January 17, 2018.[4]   At that time, BLM had also begun working on a rule to revise or rescind the Waste Prevention Rule ("Revision Rule").   The Court granted the additional extension, again stressing the inefficient use and likely waste of resources by proceeding to address the merits of challenges to a rule when the agency had begun the process for suspending and revising that same rule.  (ECF No. 163.)

On December 8, 2017, the BLM published the final Suspension Rule, temporarily suspending or delaying certain requirements of the Waste Prevention Rule being challenged in this litigation. *See* 82 Fed. Reg. 58,050.  "The 2017 final delay rule does not substantively change the 2016 final rule, but simply postpones implementation of the compliance requirements for certain provisions of the 2016 final rule for 1 year." *Id.*  "The BLM has concerns regarding the statutory authority, cost, complexity, feasibility, and other implications of the 2016 final rule, and therefore intends to avoid imposing likely considerable and immediate compliance costs on operators for requirements that may be rescinded or significantly revised in the near future." *Id.* The Suspension Rule's stated effective date was January 8, 2018.

The Federal Respondents, together with the Industry Petitioners and Petitioner States of Wyoming and Montana, then moved this Court to stay these cases on the basis that it would not be a wise use of the parties' or the Court's resources to adjudicate the merits in light of the Suspension Rule and the fact that the BLM was in the process of issuing a proposed Revision Rule.  Intervenor-Petitioner States of North Dakota and Texas opposed a stay, arguing that the

---

[4] On October 27, 2017, the Industry Petitioners again sought preliminary injunctive relief in light of the impending January 2018 compliance dates put back into effect after the California court's ruling.  (ECF No. 160.)

limited number of provisions that will remain in effect during the suspension period continue to harm those states by infringing upon the States' sovereignty, unlawfully expanding BLM's jurisdiction to State and private interests, and intruding upon the States' congressionally-granted authority to regulate air quality within their borders.   Intervenor-Respondents challenged the Suspension Rule by again filing separate actions in the Northern District of California. *See State of California et al. v. BLM et al.*, No. 3:17-CV-07186-WHO (N.D. Cal. Dec. 19, 2017); *Sierra Club et al. v. Zinke et al.*, No. 3:17-CV-07187-MMC (N.D. Cal. Dec. 19, 2017).   Requests to transfer the venue of those cases to this Court were denied.

On December 29, 2017, given the on-going rulemaking process that would materially impact the merits of the present challenges to the Waste Prevention Rule and prudential ripeness concerns relating to the issues before this Court, the requested stay was granted pending finalization of revisions to the Rule, or at least while the Suspension Rule was in effect. (*See* ECF No. 189.)   For a third time, this Court emphasized that moving forward to address the merits of the present challenges would be a waste of resources, as such an analysis is dependent upon which "rules" are in effect. *Id.* at 4 (citing *Wyoming v. Zinke*, 871 F.3d 1133, 1142 (10th Cir. 2017) ("proceeding to address whether the district court erred in invalidating the BLM's Fracking Regulation when the BLM has now commenced rescinding that same regulation appears to be a very wasteful use of limited judicial resources . . . [as] [i]t is clearly evident that the disputed matter that forms the basis for our jurisdiction has thus become a moving target")). This Court further determined prudential ripeness concerns weigh against interfering in the administrative process. *See id.* at 4-5 (citing *Farrell-Cooper Min. Co. v. U.S. Dep't of the Interior*, 728 F.3d 1229, 1234-35 (10th Cir. 2103) ("In order to determine the fitness of issues for review, we may consider whether judicial intervention would inappropriately interfere with

further administrative action and whether the courts would benefit from further factual development of the issues presented.")).

On February 22, 2018, the BLM published the proposed Revision Rule, "to revise the 2016 final rule in a manner that reduces unnecessary compliance burdens, is consistent with the BLM's existing statutory authorities, and re-establishes long-standing requirements that the 2016 final rule replaced." 83 Fed. Reg. 7924 (Feb. 22, 2018). Also on February 22, 2018, the District Court for the Northern District of California preliminarily enjoined enforcement of the Suspension Rule, arguably making the phase-in provisions immediately effective.[5] Accordingly, this Court lifted the stay in these cases and set a briefing schedule to resolve the following motions then-pending before this Court: (1) *Joint Motion by the States of North Dakota and Texas to Lift the Stay entered December 29, 2017 and to Establish Expedited Schedule for Further Proceedings* (ECF No. 194); (2) *Motion to Lift Stay and Suspend Implementation Deadlines* filed by Petitioner States of Wyoming and Montana (ECF No. 195); and Industry Petitioners' *Motion to Lift Litigation Stay and for Preliminary Injunction or Vacatur of Certain Provisions of the Rule Pending Administrative Review* (ECF No. 196).

The Federal Respondents urged the Court to stay this litigation and the Waste Prevention Rule's implementation deadlines to preserve the status and rights of the regulated parties and avoid entanglement with the administrative process. The Intervenor-Petitioners, North Dakota and Texas, urged the Court to move forward with the merits of these cases on an expedited basis. The Intervenor-Respondents, the States of California and New Mexico and the Environmental Groups, opposed the Industry Petitioners' motion for a preliminary injunction or vacatur, and

---

[5] The California court's decision also put back into effect certain provisions that were not part of the Rule's initial phase-in provisions but had been delayed by the Suspension Rule.

further opposed any stay of these cases or the existing implementation deadlines.[6]  Again, based on consideration of judicial economy and prudential ripeness and mootness concerns, this Court determined it appropriate to stay implementation of the Waste Prevention Rule's phase-in provisions and further stay these cases pending finalization of the Revision Rule.  (*See Order Staying Implementation of Rule Provisions and Staying Action Pending Finalization of Revision Rule* entered April 4, 2018, ECF No. 215) ("April 2018 Order").

Intervenor-Respondents California, New Mexico and the various environmental groups appealed the April 2018 Order.  (ECF No. 216.)  The Tenth Circuit Court of Appeals denied motions to dismiss the appeals for lack of jurisdiction and to stay the April 2018 Order pending appeal.  *See State of Wyoming et al. v. U.S. Dept. of Interior, et al.,* No. 18-8027 (Order dated June 4, 2018).  After the Opening and Answer Briefs were filed in the Court of Appeals, BLM published its final Revision Rule.  *Id*. (Order and Judgment at 5, Apr. 9, 2019, ECF No. 247-1).  The Revision Rule became effective on November 27, 2018, rescinding many of the Waste Prevention Rule's requirements and altering others.  *Id*.  The Tenth Circuit ultimately issued an order finding the appeal of this Court's April 2018 Order moot after BLM's promulgation of the Revision Rule.  *Id*. at 5-7.  Accordingly, the Court of Appeals vacated the April 2018 Order which stayed portions of the 2016 Waste Prevention Rule.  However, the Tenth Circuit expressly declined requests to vacate the 2016 Waste Prevention Rule, noting that "because the Revision Rule did not eliminate <u>all</u> requirements of the Waste Prevention Rule, *see* Fed. Reg. at 49,204, vacatur of the entire Waste Prevention Rule is inappropriate."  *Id*. at 9.  The Tenth Circuit also expressly declined to remand with instructions to dismiss the entire case, noting it did "not see

---

[6] By March 23, 2018, all Petitioners and Petitioner-Intervenors had filed their reply briefs.  Thus, the merits of the 2016 Waste Prevention Rule were fully briefed before this Court, with the exception of a merits response brief from the Federal Respondents.

any harm in allowing the district court to decide in the first instance whether the entire case is moot given that the district court is more acquainted with the overall claims and issues." *Id.*

On September 18, 2018, while the appeal of this Court's April 2018 Order was pending, the States of California and New Mexico filed an action challenging BLM's Revision Rule in the Northern District of California, in which the State of Wyoming and the Industry Petitioners here successfully intervened. *See State of California et al. v. Zinke et al.*, No. 4:18-CV-05712-YGR (N.D. Cal.).[7] On June 7, 2019, two motions for summary judgment were filed in the California litigation, seeking to invalidate the Revision Rule. *Id.*, ECF Nos. 108, 109. On June 20, 2019, fifty-one members of Congress filed an *amicus curiae* brief in support of the summary judgment motions. *Id.*, ECF No. 110. The summary judgment movants asked the California court to vacate the Revision Rule, effectively reinstating those portions of the 2016 Waste Prevention Rule that were rescinded or modified by the Revision Rule. The Federal Defendants (DOI/BLM) and Intervenor-Defendants filed cross-motions for summary judgment (*id.*, ECF Nos. 123, 125, 126, 127), and a hearing on the cross-motions was held March 4, 2020 (*see id.*, ECF No. 165). This Court stayed the cases before it pending resolution of the litigation in the Northern District of California. (*See* ECF No. 261.)

On July 15, 2020, the California District Court issued an order vacating the Revision Rule but stayed that vacatur for 90 days, until October 13, 2020, to allow the parties time to revive the challenge to the 2016 Waste Prevention Rule in this Court. *See State of California, et al. v. Bernhardt, et al.*, --- F.Supp.3d ---, No. 4:18-CV-05712-YGR, 2020 WL 4001480, at \*44 (N.D. Cal. 2020). On July 21, 2020, this Court granted the State Petitioners' joint motion to lift the stay of these proceedings and directed the parties to propose an expedited merits briefing

---

[7] This case was consolidated with a second later-filed case, *Sierra Club et al. v. Zinke*, No. 18-CV-05984. (*See* No. 4:18-CV-5712-YGR, ECF Nos. 38, 45.)

schedule premised on the completion of all briefing no later than September 4, 2020. (ECF No. 274.) The parties submitted that schedule, which the Court adopted on July 29. (ECF No. 276.) The merits of the challenges before this Court are now fully briefed. So, three and a half years later, after several turns and loopty-loops, it seems the roller coaster has returned to the station, though the Court doubts any of the parties will be exiting the ride just yet, as it is likely this Court's decision will not end this ride but simply serve as a lift hill transporting it to another level.[8]

## BACKGROUND

During oil production, operators frequently dispose of the associated gas by venting or flaring, if the gas cannot be easily captured for sale or used on-site. Associated gas is the natural gas produced from an oil well during normal production operations that is either sold, re-injected, used for production purposes, vented (rarely) or flared, depending on whether the well is connected to a gathering line or other method of capture. AR at 457 (BLM Regulatory Impact Analysis for the Final Rule ("RIA") at 11). In addition, emergency flaring or venting may be necessary for safety reasons. *Id.* Venting is the release of gases into the atmosphere, such as opening a valve on a tank to relieve tank pressure. Flaring is the controlled burning of emission streams through devices called flares or combustors, releasing the byproducts of that combustion into the atmosphere. While venting or flaring is sometimes unavoidable, it is also sometimes done in the absence of infrastructure to transport the gas to market.

The DOI has regulated venting and flaring to prevent the waste of Federal and Indian natural gas since 1979 when it issued Notice to Lessees and Operators of Onshore Federal and Indian Oil and Gas Leases ("NTL-4A", AR at 3796-3801), which the Waste Prevention Rule

---

[8] On September 15, 2020, the Federal Respondents notified the Court that they and the Intervenor-Defendants in the California litigation filed notices of appeal, appealing the Northern District of California court's decision to the Ninth Circuit. (*See* ECF No. 283.)

purports to replace.  *See* 81 Fed. Reg. 83,008.  NTL-4A prohibits venting and flaring of gas produced by oil wells, except when the gas is "unavoidably lost" as defined in NTL-4A and when the operator has sought and received BLM's approval to vent or flare.  NTL-4A § IV.B. While unavoidably lost gas and gas vented or flared with BLM approval are exempted from royalty obligation, gas that is "avoidably lost" – that is, gas lost due to an operator's negligence or failure to comply with the law – is subject to royalties.  NTL-4A §§ I, II.A & C.  NTL-4A also requires operators to measure and report each month the volume of gas sold, avoidably or unavoidably lost, vented or flared, or used for beneficial purposes.  NTL-4A § V.

In the decade prior to issuance of the Rule, oil and natural gas production in the United States, and on BLM-administered leases, increased dramatically.  AR at 366 (81 Fed. Reg. at 83,014).  Domestic production from over 96,000 Federal oil and gas wells now accounts for 11 percent of the Nation's natural gas supply and 5 percent of its oil supply.  *Id*.  In FY 2015, Federal and Indian leases produced oil and gas valued at $20.9 billion, which generated over $2.3 billion in royalties.  *Id*.  BLM represents that this increase in oil production has been accompanied by "significant and growing quantities of wasted natural gas."  *Id*.  "There is no single definitive source for the total volume of natural gas losses from oil and gas production on Federal Lands."  AR at 367 (81 Fed. Reg. at 83,015).  While recognizing limitations of the various data sets which "informed BLM efforts to estimate the total volume" of losses,[9] BLM believed the estimates of losses used to support the Rule are conservative.  *Id*.  For purposes of the Rule, BLM considered data provided by the DOI's Office of Natural Resources Revenue

---

[9] "BLM efforts to estimate the total volume are informed by the Oil and Gas Operations Report Part B (OGOR-B) filed with the ONRR, the EPA Greenhouse Gas Inventory, data from the EPA Greenhouse Gas Reporting Program, and numerous studies discussed in the preamble to the proposed rule and provided by commenters. Each data set, however, has limitations. The ONRR data rely on self-reporting, and there is substantial variation in the types of losses that different operators report (and certain types of losses, such as most leaks, are not reported at all). The EPA data are based on emissions factors that are representative rather than actual.  Even though data in these programs have recently been updated, they are still incomplete, and recent studies suggest actual emissions may be somewhat, or even substantially, higher than the emissions factors suggest." AR at 367 (81 Fed. Reg. at 83,015).

("ONRR"), evidencing that over a 7-year period (from 2009 through 2015), operators reported venting or flaring about 2.7 percent of the natural gas produced from both oil and gas wells on BLM-administered leases – purportedly enough natural gas to supply over 6.2 million households for one year (*id.*),[10] assuming all of that gas was "avoidably lost" and the existence of infrastructure to transport the gas to market. According to the BLM, the growing problem of natural gas lost on BLM-administered leases is also evidenced by a 318 percent increase in reported volumes of flared oil-well gas and an increased number of operator applications to vent or flare royalty-free (between 2005, 2011, and 2014, the number of applications per year went from 50, to 622, to 1,248). *Id.*

While acknowledging that flaring is sometimes unavoidable, the BLM determined the majority of flaring on its leases results from the rate of new well construction outpacing the existing infrastructure capacity. AR at 5 (81 Fed. Reg. at 6619) (Proposed Rule). The other situation resulting in substantial flaring of associated gas on BLM-administered leases is when capture and processing infrastructure has not yet been built out. *Id.* Flaring in these circumstances may be due to insufficient information about how much gas will be produced or to an operator's decision to focus on near-term oil production rather than investing in the gas capture and transmission infrastructure necessary to realize a profit from the associated gas. *Id.*

In December 2007, the Royalty Policy Committee issued a report recommending the BLM update its rules and identified specific actions to improve production accountability. AR at 369 (81 Fed. Reg. at 83,017). In 2010, the DOI's Office of Inspector General and the U.S. Government Accountability Office ("GAO") recommended BLM's regulations regarding the royalty-free use of gas be updated to take advantage of new capture technologies. *Id.* The GAO

---

[10] "These data are reported by operators on BLM-administered leases, but the production is actually derived from lands with various ownership patterns" – of the reported vented and flared gas, 76.2 percent came from wells extracting minerals with mixed ownership (some combination of Federal, Indian, private and State minerals). *Id.*

estimated that the economically recoverable volume of natural gas being wasted through venting and flaring at oil and gas production sites on Federal and Indian lands represents about $23 million in lost royalties.  AR at 448 (RIA at 2).  The GAO determined that around 40 percent of the natural gas vented and flared on onshore Federal leases could be economically captured using currently available technologies.  AR at 362 (81 Fed. Reg. at 83,010).  In 2016, the GAO issued another report finding that BLM's regulations failed to provide operators clear guidance on accounting for and reporting lost gas.  AR at 369 (81 Fed. Reg. at 83,017).

Concluding there is a "compelling need to update [NTL-4A's] requirements to make them clearer, more effective, and reflective of modern technologies and practices" (*id.*), BLM published the Proposed Rule on February 8, 2016 (81 Fed. Reg. 6616).  The BLM accepted public comments, met with stakeholders and State regulators in states with significant federal oil and gas production, and discussed the Rule with personnel from the Environmental Protection Agency ("EPA") on over 40 conference calls between January 2015 and October 2016.  Nine months after publishing the Proposed Rule, BLM issued the Final Rule, with an effective date of January 17, 2017.

The Final Rule prohibits venting, except in certain limited situations such as emergencies or when flaring the gas is technically infeasible.  81 Fed. Reg. 83,082.  Unlike the Proposed Rule's monthly flaring limits, the Final Rule adopts a more flexible capture-percentage approach, modeled on North Dakota's regulations, that requires operators to capture a certain percentage of the gas they produce each month, excluding specified volumes of allowable flared gas.  81 Fed. Reg. at 83,023-24, 83,082.  Both the capture percentage and the flaring allowance were designed to phase in over a ten-year period.  *Id.* at 83,082.  The Final Rule allows operators to choose

whether to comply with the capture targets on a lease-by-lease, county-wide, or state-wide basis. *Id*. at 83,083.

The Final Rule retains NTL-4A's distinction between avoidably and unavoidably lost gas – with royalties owed on the former but not the latter – but eliminates BLM's discretion to make unavoidable loss determinations on a case-by-case basis and instead lists twelve categories in which a loss is always considered unavoidable. 81 Fed. Reg. at 83,082. Any gas flared in excess of the capture requirements is deemed an avoidable loss. *Id*. The Final Rule also requires operators to measure and report the amount of gas vented or flared above 50 million cubic feet per day. *Id*. at 83,083. For leaks, the Final Rule requires that all operators inspect equipment twice a year and timely repair any leaks found. *Id*. at 83,087-88. It also requires that operators update old and inefficient equipment that contributes to waste and minimize gas lost from storage vessels and during well maintenance, drilling, and completion. *Id*. at 83,085-87.

The BLM identified the costs of the Rule to "include engineering compliance costs and the social cost of minor additions of carbon dioxide to the atmosphere, resulting from the on-site or downstream use of gas that is newly captured." AR at 365 (81 Fed. Reg. at 83,013). BLM measured the Rule's benefits as "the cost savings that the industry would receive from the recovery and sale of natural gas and the environmental benefits of reducing the amount of methane (a potent GHG [greenhouse gas]) and other air pollutants released into the atmosphere." AR at 366 (81 Fed. Reg. at 83,014). BLM also identified "numerous ancillary benefits" – including improved quality of life for nearby residents "who note that flares are noisy and unsightly at night," reduced release of hazardous air pollutants, and reduced production of nitrogen oxides and particulate matter which can cause respiratory and heart problems – and estimated the Rule would produce additional royalties of $3-$14 million per year (depending on

the discount percentage used). *Id*. Overall, "the BLM estimates that the benefits of this rule outweigh its costs by a significant margin." *Id*.

Petitioners contend the Rule is an attempt by BLM, under the pretense of regulating mineral waste, to regulate air pollution associated with oil and gas production, a problem squarely within the EPA's scope of authority and expertise. Congress expressly delegated authority to the States and the EPA to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and productive capacity of its population." 42 U.S.C. § 7401(b)(1). The Clean Air Act ("CAA") provides that "[e]ach State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State[.]" *Id*. § 7407(a). Thus, in enacting the CAA, Congress established a comprehensive scheme for regulating air quality through "a cooperative-federalism approach" under which the EPA develops baseline air quality standards that the States implement and enforce. *Oklahoma v. U.S. E.P.A.*, 723 F.3d 1201, 1204 (10th Cir. 2013).

Petitioners challenge the Rule pursuant to the Administrative Procedure Act ("APA"), claiming the Rule should be set aside as arbitrary and capricious and in excess of the BLM's statutory authority. *See* 5 U.S.C. § 706(2)(A) & (C).[11]

## STANDARD OF REVIEW

---

[11] The APA's scope of review provisions relevant here are:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
> * * *
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> > * * *
> > (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> > * * *
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."

5 U.S.C. § 706.

Judicial review of agency action is governed by the standards set forth in § 706 of the APA, requiring the reviewing court to engage in a "substantial inquiry." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1573-74 (10th Cir. 1994) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971)). While an agency's decision is entitled to a "presumption of regularity," the presumption does not shield the agency from a "thorough, probing, in-depth review." *Id.* at 1574. "[T]he essential function of judicial review is a determination of (1) whether the agency acted within the scope of its authority, (2) whether the agency complied with prescribed procedures, and (3) whether the action is otherwise arbitrary, capricious or an abuse of discretion." *Id.* "Determination of whether the agency acted within the scope of its authority requires a delineation of the scope of the agency's authority and discretion, and consideration of whether on the facts, the agency's action can reasonably be said to be within that range." *Id.*

Under the arbitrary and capricious standard, a court must ascertain "whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Id.* The agency must provide a reasoned basis for its action and the action must be supported by the facts in the record. *Id.* at 1575. Agency action is arbitrary if not supported by "substantial evidence" in the administrative record. *Olenhouse*, 42 F.3d at 1575; *Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147, 1156 (10th Cir. 2004). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pennaco Energy,* 377 F.3d at 1156 (quoting *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003)). "Because the arbitrary and capricious standard focuses on the rationality of an agency's decisionmaking process rather than on the rationality of the actual decision, '[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the

agency itself.'" *Olenhouse*, 42 F.3d at 1575 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 50 (1983)).

**DISCUSSION**

### A.   *BLM's Authority to Promulgate the Rule*

"It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). "Regardless of how serious the problem an administrative agency seeks to address, [] it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (quoting *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517 (1988)). Accordingly, an "essential function" of a court's review under the APA is to determine "whether an agency acted within the scope of its authority." *WildEarth Guardians v. U.S. Fish and Wildlife Serv.*, 784 F.3d 677, 683 (10th Cir. 2015).

Where a case involves an administrative agency's assertion of authority to regulate a particular activity pursuant to a statute that it administers, the court's analysis is governed by *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *See Brown & Williamson*, 529 U.S. at 132.

> Under *Chevron*, a reviewing court must first ask whether Congress has directly spoken to the precise question at issue. If Congress has done so, the inquiry is at an end; the court must give effect to the unambiguously expressed intent of Congress. But if Congress has not specifically addressed the question, a reviewing court must respect the agency's construction of the statute so long as it is permissible. Such deference is justified because the responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones, and because of the agency's greater familiarity with the ever-changing facts and circumstances surrounding the subjects regulated[.]

*Id.* (internal quotation marks and citations omitted). Thus, absent clear expression of Congressional intent, the Court must proceed to the second step of the *Chevron* abyss.[12] But "[e]ven under *Chevron's* deferential framework, agencies must operate within the bounds of reasonable interpretation. . . . [A]n agency interpretation that is inconsistent with the design and structure of the statute as a whole . . . does not merit deference." *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 321 (2014) (internal quotations and citations omitted).

The Mineral Leasing Act of 1920 ("MLA") creates a program for leasing mineral deposits on Federal lands.[13] Congress authorized the Secretary "to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish **the purposes of [the MLA].**" 30 U.S.C. § 189 (emphasis added). "The purpose of the Act is to promote the orderly development of oil and gas deposits in publicly owned lands of the United States through private enterprise," *Geosearch, Inc. v. Andrus*, 508 F. Supp. 839, 842 (D. Wyo. 1981) (citing *Harvey v. Udall*, 384 F.2d 883 (10th Cir. 1967)), and "to obtain for the public reasonable financial returns on assets belonging to the public," *Mountain States Legal Found. v. Andrus*, 499 F. Supp. 383, 392 (D. Wyo. 1980). *See also Arkla Exploration Co. v. Texas Oil & Gas Corp.*, 734 F.2d 347, 358 (8th Cir. 1984) ("broad purpose of the MLA was to provide incentives to explore new, unproven oil and gas areas through noncompetitive leasing, while

---

[12] As a sister federal district court has recently observed:

> *Chevron's* second step is the easier one to describe, because it is all but toothless: if the agency's decision makes it to step two, it is upheld almost without exception. *See* Ronald M. Levin, *The Anatomy of Chevron: Step Two Reconsidered*, 72 CHI. KENT L.REV. 1253, 1261 (1997) ("[T]he Court has never once struck down an agency's interpretation by relying squarely on the second *Chevron* step." (footnote omitted)); Jason J. Czarnezki, *An Empirical Investigation of Judicial Decisionmaking, Statutory Interpretation, and the Chevron Doctrine in Environmental Law*, 79 U. COLO. L.REV. 767, 775 (2008) ("Due to the difficulty in defining step two, courts rarely strike down agency action under step two, and the Supreme Court has done so arguably only twice."). Courts essentially never conclude that an agency's interpretation of an unclear statute is unreasonable.

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 140 F. Supp. 3d 1123, 1168-69 (D.N.M. 2015).

[13] The MLA applies to deposits of coal, phosphate, sodium, potassium, oil, oil shale, gilsonite, or gas, and virtually all lands containing such deposits owned by the United States. 30 U.S.C. § 181.

assuring through competitive bidding adequate compensation to the government for leasing in producing areas").[14]

Specifically, for oil and gas leasing, the MLA, *inter alia,* establishes terms of the lease and royalty and rental amounts (30 U.S.C. §§ 223, 226(d)&(e)), requires the lessee to **"use all reasonable precautions to prevent waste of oil or gas developed in the land"** (*id.* § 225) (emphasis added), authorizes the Secretary of Interior to lease all public lands subject to the Act for oil and gas development (*id.* § 226(a)), directs the Secretary to regulate *surface*-disturbing activities (*id.* § 226(g)), and allows for the establishment of cooperative development plans to conserve oil and gas resources (*id.* § 226(m)). Section 187 confirms the BLM's authority to issue regulations to carry out the MLA's waste prevention objectives: "Each lease shall contain provisions for the purpose of insuring the exercise of reasonable diligence, skill and care in the operation of said property" and "a provision that **such rules . . . for the prevention of undue waste** as may be prescribed by said Secretary shall be observed." (Emphasis added.)

The Federal Oil and Gas Royalty Management Act of 1982 ("FOGRMA"), 30 U.S.C. § 1751, creates a thorough system for collecting and accounting for Federal mineral royalties. FOGRMA reiterates Congress' concern about wasted oil and gas: "Any lessee is liable for royalty payments on oil or gas lost or wasted from a lease site when such loss or waste is due to negligence on the part of the operator of the lease, or due to the failure to comply with any rule or regulation, order or citation issued under this chapter or any mineral leasing law." 30 U.S.C. § 1756. Like the MLA, FOGRMA contains a broad grant of rulemaking authority to achieve its objectives. 30 U.S.C. § 1751 ("The Secretary shall prescribe such rules and regulations as he deems **reasonably necessary to carry out this chapter**.") (emphasis added).

---

[14] The Indian Mineral Leasing Act ("IMLA"), generally, grants the Secretary broad regulatory jurisdiction over oil and gas development and operations on Indian lands. 25 U.S.C. § 396d.

The terms of the MLA and FOGRMA make clear that Congress intended the Secretary, through the BLM, to exercise rulemaking authority to prevent the waste of Federal and Indian mineral resources and to ensure the proper payment of royalties to Federal, State, and Tribal governments.[15] "[T]he delegation of general authority to promulgate regulations extends to all matters 'within the agency's substantive field.' Because 'the whole includes all of its parts,' courts need not try to discern whether '*the particular issue* was committed to agency discretion.'" *Helfrich v. Blue Cross & Blue Shield Ass'n*, 804 F.3d 1090, 1109 (10th Cir. 2015) (quoting *City of Arlington v. F.C.C.*, 569 U.S. 290, 306 (2013)). The question here, then, is not whether the MLA and FOGRMA specifically grant BLM the authority to regulate venting, flaring, and equipment leaks, but rather whether these statutes unambiguously grant BLM authority to regulate oil and gas production activities *for the prevention of waste*. The answer to that question, largely undisputed by Petitioners, is "yes." "The [MLA] was intended to promote wise development of these natural resources and to obtain for the public a reasonable financial return on assets that 'belong' to the public." *California Co. v. Udall*, 296 F.2d 384, 388 (D.C. Cir. 1961).

The rub here, however, is whether the Rule, or at least certain provisions of the Rule, was promulgated *for the prevention of waste* or instead for the *protection of air quality*, which is expressly within the "substantive field" of the EPA and States pursuant to the Clean Air Act. The Intervenor-Respondents argue the Rule's ancillary benefits to air quality do not undermine its waste prevention purpose – to be sure, a regulation that prevents wasteful losses of natural gas from venting and flaring necessarily reduces emissions of that gas. The Court further agrees that the BLM is entitled to at least some level of deference in determining how best to minimize losses of gas due to venting, flaring, and leaks, and to incentivize the capture and use of

---

[15] Petitioners do not challenge BLM's authority to regulate waste and promulgate rules governing royalty payments.

produced gas.  In doing so, the Federal Land Policy and Management Act ("FLPMA") directs BLM to consider any impact to "the quality of . . . air and atmospheric . . . values." 43 U.S.C. § 1701(1)(8).[16]  While the statutory obligations of two separate agencies may overlap, the two agencies must administer their obligations to avoid inconsistencies or conflict.  *See Massachusetts v. E.P.A.*, 549 U.S. 497, 532 (2007).

As stated above, an administrative agency may not exercise its authority "in a manner that is inconsistent with administrative structure that Congress enacted into law." *Brown & Williamson Tobacco Corp.*, 529 U.S. at 125.  Further, "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *Id.* at 133.  When enacting the Clean Air Act in 1970, Congress directly addressed the issue of air pollution and created a *comprehensive* scheme for its prevention and control.

> The Clean Air Act, 42 U.S.C. § 7401 *et seq.*, enacted in 1970, is a comprehensive federal law that regulates air emissions under the auspices of the United States Environmental Protection Agency ("EPA"). Congress enacted the law in response to evidence of the increasing amount of air pollution created by the industrialization and urbanization of the United States and its threat to public health and welfare. 42 U.S.C. § 7401(a)(2). The Clean Air Act states that **air pollution prevention and control is the primary responsibility of individual**

---

[16] The Court does not agree with the suggestion that FLPMA grants BLM broad authority to promulgate its own regulations directed at air quality.  (*See* Intervenor-Resp'ts' Supp. Br. at 10-11, ECF No. 279 at 15-16.) FLPMA primarily establishes congressional policy that the Secretary manage the public lands under principles of multiple use and sustained yield.  At its core, FLPMA is a land use planning statute. *See* 43 U.S.C. § 1712; *Rocky Mtn. Oil and Gas Ass'n v. Watt*, 696 F.2d 734, 739 (10th Cir. 1982) ("FLPMA contains comprehensive inventorying and land use planning provisions to ensure that the 'proper multiple use mix of retained public lands' be achieved"); *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 57 (2004) (FLPMA establishes a dual regime of inventory and planning); *Klamath Siskiyou Wildlands Center v. Boody*, 468 F.3d 549, 555 (9th Cir. 2006) (FLPMA establishes requirements for land use planning on public land).  FLPMA provides that "[i]n the development and revision of **land use plans**, the Secretary shall . . . **provide for compliance** with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans." 43 U.S.C. § 1712(c)(8) (emphasis added). *See also* "Memorandum of Understanding Among the U.S. Dep't of Agric., U.S. Dep't of Interior, and U.S. Envtl. Prot. Agency, Regarding Air Quality Analyses and Mitigation for Federal Oil and Gas Decisions through the NEPA Process at 7 (June 23, 2011) (describing BLM's authority over air quality as limited to developing land use plans and providing for compliance with state and federal pollution control laws, including the CAA), https://www.doi.gov/sites/doi.gov/files/migrated/news/pressreleases/upload/29704-Joint-MOU-Air-Quality-FINAL.pdf.

> **states and local governments** but that federal financial assistance and leadership is essential to accomplish these goals. *Id.* § 7401(a)(3)-(4). Thus, it employs a **"cooperative federalism"** structure under which the federal government develops baseline standards that the **states individually implement and enforce**. *GenOn REMA, LLC v. EPA*, 722 F.3d 513, 516, No. 12–1022, 2013 WL 3481486, at *1 (3d Cir. July 12, 2013). In so doing, states are expressly allowed to employ standards more stringent than those specified by the federal requirements. 42 U.S.C. § 7416. The Clean Air Act makes the EPA responsible for developing acceptable national ambient air quality standards ("NAAQS"), which are meant to set a uniform level of air quality across the country in order to protect the populace and the environment. *Id.* § 7409(b)(1). Before such levels are adopted or modified by the EPA, "a reasonable time for interested persons to submit written comments" must be provided. *Id.* § 7409(a)(1)(B). The EPA itself does not typically regulate individual sources of emissions. Instead, **decisions regarding how to meet NAAQS are left to individual states**. *Id.* § 7410(a)(1). Pursuant to this goal, each state is required to create and submit to the EPA a State Implementation Plan ("SIP") which provides for implementation, maintenance, and enforcement of NAAQS within the state. *Id.* All SIPs must be submitted to the EPA for approval before they become final, and once a SIP is approved, "its requirements become federal law and are fully enforceable in federal court." *Her Majesty the Queen in Right of the Province of Ontario v. Detroit*, 874 F.2d 332, 335 (6th Cir. 1989) (citing 42 U.S.C. § 7604(a)). **States are tasked with enforcing the limitations they adopt** in their SIPs. They must regulate all stationary sources located within the areas covered by the SIPs, 42 U.S.C. § 7410(a)(2)(C), and implement a mandatory permit program that limits the amounts and types of emissions that each stationary source is allowed to discharge, *id.* §§ 7661a(d)(1), 7661c(a). "[E]ach permit is intended to be a source-specific bible for Clean Air Act compliance containing in a single, comprehensive set of documents, all [Clean Air Act] requirements relevant to the particular polluting source." *North Carolina, ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 300 (4th Cir. 2010) (internal quotation marks omitted).

*Bell v. Cheswick Generating Station*, 734 F.3d 188, 190 (3d Cir. 2013) (emphasis added). *See also Texas v. U.S. EPA*, 690 F.3d 670, 674-75 (5th Cir. 2012) (discussing the CAA's regulatory structure in which States "play a central role" in administering the CAA; "[t]he federal government through the EPA determines the ends—the standards of air quality—but Congress has given the states the initiative and a broad responsibility regarding the means to achieve those ends through state implementation plans and timetables for compliance") (internal quotation marks and citation omitted).

Although the Rule's overlapping regulations themselves appear consistent with EPA regulations,[17] the Rule has potential conflict and inconsistency with the implementation and enforcement provisions of the CAA.  The Rule upends the CAA's cooperative federalism framework and usurps the authority to regulate air emissions Congress expressly delegated to the EPA and States.  *See* 42 U.S.C. § 7401(a)(3) ("air pollution prevention . . . and air pollution control at its source is the *primary responsibility of States and local governments*") (emphasis added); 42 U.S.C. § 7407(a) ("Each *State shall have the primary responsibility* for assuring air quality within the entire geographic area comprising such State . . . .") (emphasis added).  For example, the Rule recognizes compliance with the EPA's oil and gas production facility performance standards as compliance with the Rule; but no similar automatic compliance recognition exists for State, local, or tribal standards approved by the EPA.  *See* AR at 365 (81 Fed. Reg. at 83,013).  Instead, the Rule requires States and Tribes to request a variance from a particular BLM regulation, placing the burden on the States and Tribes to prove its already EPA-approved rules "would perform at least as well as the BLM provision to which the variance would apply, in terms of reducing waste of oil and gas, reducing environmental impacts from venting and/or flaring of gas, and ensuring the safe and responsible production of oil and gas." *Id*.  In doing so, the BLM disregards the States' "wide discretion in formulating [their] [implementation] plan[s]" under the CAA.  *Union Elec. Co. v. EPA,* 427 U.S. 246, 250 (1976). "The Clean Air Act and the EPA supply 'the goals and basic requirements of state implementation plans, but the states have broad authority to determine the methods and particular control strategies they will use to achieve the statutory requirements.'" *Texas v. EPA*, 690 F.3d at 675 (quoting *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 822 (5th Cir. 2003)).  *See*

---

[17] Indeed, the BLM harmonized the definitions of certain terms with the overlapping EPA definitions in response to public comments, *see* 81 Fed. Reg. at 83,047, and certain other provisions of the Rule are taken directly from EPA air control requirements under 40 C.F.R. subparts OOOO or OOOOa.

*also Luminant Generation Co., LLC v. U.S. EPA*, 675 F.3d 917, 921 (5th Cir. 2012) ("[S]o long

as the ultimate effect of a State's choice of emission limitations is compliance with the national

standards for ambient air, the State is at liberty to adopt whatever mix of emission limitations it

deems best suited to its particular situation.") (quoting *Train v. Natural Res. Def. Council, Inc.*

421 U.S. 60, 79 (1975)).  The Rule further empowers the BLM to enforce the State or tribal rules

if the variance is granted (AR at 365), creating the potential for inconsistent or conflicting

enforcement.  *See Luminant Generation Co.*, 675 F.3d at 921 (states bear the "primary

responsibility" for implementing air quality standards established by the EPA); *Texas v. EPA*,

690 F.3d at 674 (CAA contemplates a "distinct role of the states, which is congressionally called

for in the design and enforcement of State Implementation Plans").

The Rule also conflicts with the statutory scheme under the CAA for regulating air

emissions from oil and natural gas sources, particularly by extending its application of

overlapping air quality provisions to *existing* facilities, which the EPA itself has not yet done.

*See* 42 U.S.C. § 7411(d) ("[t]he Administrator shall prescribe regulations which shall establish a

procedure . . . under which each State shall submit to the Administrator a plan which (A)

establishes standards of performance for any existing source for any air pollutant . . . and (B)

provides for the implementation and enforcement of such standards of performance").  At the

time of the Rule's promulgation, the EPA had begun the rulemaking process for regulation of

existing sources under the CAA; however, dissatisfied with the length and uncertainty of the

EPA's progress, the BLM decided to hijack the EPA's authority under the guise of waste

management.[18]  *See* AR at 371 (81 Fed. Reg. at 83,019).  "The Clean Air Act is an experiment in

---

[18] The BLM hubristically justified the Rule's application of overlapping air quality regulations to existing sources by expressing its dissatisfaction with the length of the CAA process and the uncertainty of the resulting outcome. *See* 81 Fed. Reg. 83,019 ("Given the length of this [CAA] process and the uncertainty regarding the final outcomes, and in light of the BLM's independent statutory mandate to prevent waste from Federal and Indian oil and gas leases

federalism, and the EPA may not run roughshod over the procedural prerogatives that the Act

has reserved to the states . . . ." *Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028, 1036 (7th Cir.

1984). If the EPA is prohibited from disregarding the "partnership between the states and the

federal government" created by the CAA for regulation of air quality (*id.*), certainly the BLM

may not do so by styling rules regulating air pollution as waste prevention measures.

Of course, BLM has authority to promulgate and impose regulations which may have

ancillary air quality benefits and even overlap with CAA regulations *if* such rules are

independently justified as waste prevention measures pursuant to its MLA authority.[19]

"Although agency determinations within the scope of delegated authority are entitled to

deference, it is fundamental 'that an agency may not bootstrap itself into an area in which it has

no jurisdiction.'" *Adams Fruit Co., Inc. v. Barrett*, 494 U.S. 638, 650 (1990) (quoting *Federal

Maritime Comm'n v. Seatrain Lines, Inc.*, 411 U.S. 726, 745 (1973)). In other words, the BLM

cannot use overlap to justify overreach. Moreover, it is not a reasonable interpretation of BLM's

general authority under the MLA to "safeguard[] the public welfare" as empowering the agency

to regulate air emissions, particularly when Congress expressly delegated such authority to the

EPA under the CAA. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468, (2001)

("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague

---

based on information currently available, the BLM has determined that it is necessary and prudent to update and finalize this regulation at this time.").

[19] Intervenor-Respondents argue this case is analogous to *Massachusetts v. E.P.A.*, where the EPA argued it did not have authority to "regulate carbon dioxide emissions from motor vehicles because doing so would require it to tighten mileage standards, a job (according to EPA) that Congress has assigned to DOT [Department of Transportation]." 549 U.S. 497, 531-32 (2007). The Supreme Court disagreed, stating:

> But that DOT sets mileage standards in no way licenses EPA to shirk its environmental responsibilities. EPA has been charged with protecting the public's "health" and "welfare," . . . a statutory obligation wholly independent of DOT's mandate to promote energy efficiency. . . .The two obligations may overlap, but there is no reason to think the two agencies cannot both administer their obligations and yet avoid inconsistency.

*Id.* at 532. Importantly, the CAA expressly grants EPA the authority to regulate "the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines[.]" 42 U.S.C. § 7521(a)(1). Thus, consistent with this Court's determination here, overlap is not improper where an agency is acting principally within its express statutory authority.

terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.");
*Brown & Williamson Tobacco Corp.*, 529 U.S. at 143 ("implications of a statute may be altered
by the implications of a later statute," particularly "where the scope of the earlier statute is broad
but the subsequent statute[] more specifically address[es] the topic at hand").

Portions of BLM's stated rationale for the Rule undermine Intervenor-Respondents'
insistence that the Rule is foremost a waste prevention regulation that simply has ancillary
benefits to air quality:[20] "wasted gas . . . contribute[s] to regional and global air pollution
problems of smog, particulate matter, and toxics, [and] vented or leaked gas contributes to
climate change, because the primary constituent of natural gas is methane, an especially
powerful greenhouse gas (GHG), with climate impacts roughly 25 times those of carbon dioxide
($CO_2$), if measured over a 100-year period, or 86 times those of $CO_2$, if measured over a 20-year
period" (AR at 361, 81 Fed. Reg. at 83,009); *primary* benefits of the Rule measured as cost
savings to industry and "the environmental benefits of reducing the amount of methane [] and
other air pollutants released into the atmosphere" (*id.* at 366, 83,014); "the waste of natural gas
also imposes public health and environmental costs, in the form of air pollution, such as . . .
emissions of methane, a powerful contributor to global warming and a primary target for
reduction under the President's Climate Action Plan" (*id.*); "**[a]bsent stronger provisions to
reduce natural gas waste on Federal lands, the avoidable loss of gas will continue to
threaten climate stability and undermine respiratory and cardiovascular health**" (*id.* at 366-
67, 83,014-15) (emphasis added).

---

[20] *See also* "FACT SHEET: Administration Takes Steps Forward on Climate Action Plan by Announcing Actions to
Cut Methane Emissions (Jan. 14, 2015) ("steps announced today are also a sound economic and public health
strategy because reducing methane emissions means capturing valuable fuel that is otherwise wasted and reducing
other    harmful    pollutants"),    https://obamawhitehouse.archives.gov/the-press-office/2015/01/14/fact-sheet-
administration-takes-steps-forward-climate-action-plan-anno-1.

Furthermore, although the stated purpose of the Rule is waste prevention, significant aspects of the Rule evidence its primary purpose being driven by an effort to regulate air emissions, particularly greenhouse gases. First is the Rule's apparent preference for flaring over venting. For waste minimization and resource conservation purposes, no difference exists between eliminating excess methane by venting it or flaring it – the same amount is wasted in either event. *See* AR at 34,344 (Comments on Proposed Rule from Wyoming Department of Environmental Quality – Air Quality Division). There is, however, a difference for air quality purposes. *Id*. Emissions that occur through leaking and venting are transformed into different emissions when flared. *Id*. For air quality agencies, the choice between venting or flaring is an opportunity to choose between different general sets of pollutants, based on comparative local and regional air quality concerns. *Id*. Flaring methane changes it from a potent greenhouse gas with global impacts into nitrogen oxides, which can trigger localized air pollution concerns. *Id*. at 34,345. Thus, the Rule's venting prohibition prioritizes global climate change over regional ozone control,[21] without changing the amount of natural gas that is wasted. Regulation of "a broad array of air pollutants without inadvertently causing additional air quality concerns" is not a matter within the BLM's substantive field of expertise. *Id*.

Second is the Rule's incorporation of EPA's air quality regulations (subparts OOOO and OOOOa) and the application of those rules to sources not otherwise subject to them. The Rule imposes a host of equipment-specific requirements applicable to all oil and gas wells, including existing wells producing gas from a Federal or Indian lease, or from a unit or communitized area that includes a Federal or Indian lease. *See* 81 Fed. Reg. at 83,085-86. These requirements apply to pneumatic controllers, pneumatic diaphragm pumps, and storage tanks. *Id*. Each

---

[21] "[V]ented or leaked gas contributes to climate change, because the primary constituent of natural gas is methane, an especially powerful greenhouse gas[.]" AR at 361.

section requires operators to either replace older models of the specified equipment, flare, or otherwise eliminate associated emissions, whether by capture, reinjection, or productive use on-site. *Id.* The Rule clarifies that each section is only applicable to wells not already subject to EPA's new source performance standards, but would be subject to those standards if it were a new, modified, or reconstructed source – i.e., these sections apply 40 CFR part 60, subparts OOOO and OOOOa to *existing* sources not otherwise covered by those EPA rules. This is similarly the case for the Rule's leak detection and repair requirements for all well-sites. *Id.* at 83,087.

The BLM intentionally cross-referenced both new source performance standards developed by the EPA and then nascent existing source regulatory process to avoid conflict with EPA requirements. *See id.* at 83,010. But, because the EPA has not developed standards for existing sources, the Rule includes air pollution control requirements covering existing sources that will be enforced only by the BLM. Instead of developing and enforcing those standards uniformly nationwide, as envisioned by the Clean Air Act, the BLM usurped EPA's authority to do so for all oil and gas production facilities that either produce at least a modicum of Federal minerals or are combined, for accounting purposes, with facilities that do. Moreover, those same provisions referencing the EPA's regulations also overlap with State Petitioners' oil and gas requirements. But instead of automatically accepting those State requirements like the Rule does for the corresponding EPA standards, States must apply for variances from the BLM, which would then give the BLM authority to enforce those State provisions. In these respects, the Rule's promulgation is – when considering the comprehensive scheme enacted by Congress for regulation of air emissions under the CAA – unquestionably "inconsistent with the

administrative structure that Congress enacted into law." *See Brown & Williamson Tobacco Corp.*, 529 U.S. at 125.

Finally, the BLM's cost-benefit analysis is, perhaps, the most telling in revealing that the Rule is not independently justified as waste prevention measures pursuant to BLM's statutory authority. The BLM acknowledged the Rule "will require operators to incur costs to reduce flaring, replace outdated equipment, implement or contract for leak detection and repair programs, install measurement equipment, and administer these programs." AR at 450 (RIA). BLM estimates the Rule would impose costs of about $114 - 279 million per year or $110 - 275 million per year, depending on the discount rate. *Id.* It then considered the monetized benefits of the Rule, determining the "cost savings" to industry would be $20 - 157 million per year. *Id.* at 451. But BLM valued the environmental benefits from reduced methane emissions to be $189-247 million per year. *Id.* The BLM arrived at this value using estimates for the "social cost of methane" on a global scale. *Id.* at 477-78. Thus, the Rule only results in a net benefit if the ancillary benefits to global climate change are factored in – without these "indirect" benefits, the costs of the Rule likely more than double the benefits every year.[22]

The Intervenor-Respondents offer two examples purportedly reflecting the Rule's independent justification as a waste prevention measure. (*See* Citizen Group's Resp. Br. at 22-23, ECF No. 175.) First, they reference the Rule's capture targets, which require lessees to capture increasingly higher percentages of the gas that they produce (*see* 81 Fed. Reg. at 83,011); and second, they reference the Rule's exemptions and "off-ramps" where its provisions would lead to the abandonment of significant resources (*see id.* at 83,011-12). Intervenor-Respondents explain that the EPA's current regulation of new oil and gas sources has no analogues to these

---

[22] Intervenor-State Respondents characterize the reduced methane emissions as "indirect benefits" resulting from the Rule's stated purpose of reducing waste, but also fall within the agency's authority to protect the public welfare and the environment. (*See* State Resp'ts' Opp'n Br. at 8, ECF No. 174.)

features that are targeted at preventing waste. Yet, BLM justified the capture targets in part on air quality grounds. *See, e.g.,* AR at 615-16 (discussing the resulting "benefits from reductions in methane and CO2 emissions" from the various gas capture/flaring alternatives). BLM may have arrived at different gas capture percentages or an entirely different framework if it examined them foremost through a "waste prevention" lens rather than one focused on "climate and air quality benefits." *Id.* at 616. Moreover, the exemptions will not prevent waste from stranded production (due to shut-in of marginal wells) because the Rule provides no exemption when the *cumulative* impact of the Rule's requirements render a well uneconomic; rather, the Rule only provides exemptions where an *individual* requirement would itself cause an operator to cease production and abandon significant recoverable reserves. *See* AR at 393 ("An operator could not simply add up the costs of compliance with multiple requirements of the rule to show that the cumulative costs of the requirements would cause the operator to cease production and abandon significant recoverable reserves under the lease, and thereby obtain an exemption from all of those requirements[,]" though "the operator could take into account as part of the baseline costs any requirements of the rule for which an exemption is not being requested."). BLM acknowledges the Rule will reduce crude oil production from Federal and Indian leases by up to 3.2 million barrels per year – an amount BLM finds unconcerning. *See* AR at 561. Though the Rule contains some arguably waste-specific components, the Rule overall is transparently driven by air quality requirements.

The record as a whole evinces a principle purpose and intent to curb air emissions from existing oil and gas sources. *See* AR at 616-17 (identifying, first, the problem that "all of the net growth in methane emissions would occur in the oil sector, largely from venting and flaring of associated gas" from existing sources; and, secondarily, "concerns about waste and royalty free

use of gas from Federal and Indian oil and gas lease operations"). BLM used its waste prevention authority as a more expedient means to accomplish the primary end goal of regulating methane emissions from *existing* oil and gas sources – outside of, and inconsistent with, the comprehensive scheme established by Congress under the CAA.[23] *See* 81 Fed. Reg. at 83,019. The stark disconnect between the stated rationale (MLA waste prevention) and the facts in the record (significant portions of Rule largely driven by intent to reduce methane emissions not covered by CAA air quality requirements) is precisely the type of "bootstrapping" prohibited under the APA. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) ("We are presented . . . with an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking process. . . . [The Court] cannot ignore the disconnect between the decision made and the explanation given."); *Adams Fruit Co.*, 494

---

[23] The Obama administration's Climate Action Plan and methane strategy goal of 40 to 45 percent reduction in methane emissions by 2025 from the oil and gas sector was only possible by regulating existing wells. *See* AR at 205,318-19, 205,327 ("Fully attaining the Administration's goal will require additional action, particularly with respect to existing sources of methane emissions."). Thus, BLM's trepidation regarding "the length of [the CAA] process and the uncertainty regarding the final outcomes" becomes evident. AR at 371.

The CAA requires a two-step process to regulate existing sources where the States play an outsized role. *Compare* 42 U.S.C. § 7411(b)(1)(B) *with* § 7411(d)(1). The first step requires EPA to issue "emission guidelines" to guide the States as to what emission reductions may be achievable. In these guidelines, the EPA must make a separate determination for existing sources regarding costs, environmental effects, time for compliance, and the potential need for differentiation based on size, types, and classes of facilities. 40 C.F.R. § 60.22(b)(3), (5). The second step requires States, based on EPA's guidelines, to submit plans to EPA "establish[ing] standards of performance for any existing source." 42 U.S.C. § 7411(d)(1). In their plan, States may "take into consideration, among other factors, the remaining useful life of the existing source to which such standard applies." *Id.* The EPA may only impose a plan for a State if the State fails to submit a satisfactory plan. *Id.* § 7411(d)(2)(A). In addition, States must notify the public and hold one or more hearings within the State prior to the adoption of any plan. 40 C.F.R. § 60.23(c), (d).

Important to the discussion here is the CAA requirement that EPA consider the costs of regulating existing sources independently of the cost considerations for new and modified sources. The EPA has long recognized the policy reasons behind this independent requirement:

> Although section 111(d) does not explicitly provide for variances, it does require consideration of the cost of applying standards to existing facilities. Such a consideration is inherently different than for new sources, because controls cannot be included in the design of an existing facility and because physical limitations may make installation of particular control systems impossible or unreasonably expensive in some cases.

40 Fed. Reg. 53,340, at 53,344 (Nov. 17, 1975). The Waste Prevention Rule circumvented independent consideration of these factors, simply grafting EPA's standards for new and modified wells onto approximately 81,600 existing, low-producing wells developing Federal and Indian leases. *See* AR at 361, 381 (BLM estimates that 96,000 wells will be subject to the Rule, 85 percent of which are low production).

U.S. at 649-50 (deference to agency's interpretation of statutes not warranted where regulations promulgated beyond the scope of its congressional authority). Minimizing greenhouse gas emissions to combat global climate change, no matter how noble, is not a reasonable interpretation of BLM's statutory authority.

Federal Respondents now concede the 2016 Waste Prevention Rule is premised on an assertion of authority that exceeds the authority delegated to BLM by Congress in the MLA.[24] (Fed. Resp'ts' Supp. Br. at 19.) "In 2016, the BLM interpreted its waste prevention authority to encompass regulations intended to benefit the environment and improve air quality, regardless of whether those regulations would reflect the behavior of a reasonable, prudent oil and gas operator." *Id.* (citing 81 Fed. Reg. at 83,021) (in dismissing comments suggesting the Rule exceeded BLM's statutory authority, BLM insisted it "has the authority to manage public and tribal oil and gas resources to reduce waste and ensure environmentally responsible development"). As discussed above, the Rule was expected to impose $110-$275 million in annual compliance costs to conserve $20-$157 million worth of gas per year; thus, the aggregate

---

[24] Intervenor-Respondents urge the Court to disregard the Federal Respondents' confession of error because "judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020). *Post hoc* rationalizations for agency action are "impermissible." *Id.* at 1909. Intervenor-Respondents further cite *Mexichem Specialty Resins, Inc. v. E.P.A.*, wherein the court stated, "[t]he court is not bound to accept, and indeed generally should not uncritically accept, an agency's concession of a significant merits issue." 787 F.3d 544, 557 (D.C. Cir. 2015). However, this case involves some distinctions from the circumstances in those cases. First, the Federal Respondents' recognition of errors in its rulemaking does not constitute a *post hoc* rationalization – *i.e.*, they are not offering facts or rationale outside of the administrative record to *justify or defend* the Rule. *See, e.g., Population Inst. V. McPherson*, 797 F.2d 1062, 1072 (D.C. Cir. 1986) (discussing *post hoc* rationalization). Instead, the Federal Respondents are confessing that the administrative record does not support its position as required by the APA. Moreover, while a court may not be bound by an agency's confession of error, the court may appropriately consider the confession in determining whether the agency's interpretation of its statutory authority warrants *Chevron* deference. *See Global Tel*Link v. F.C.C.*, 866 F.3d 397, 407-08 (D.C. Cir. 2017).

While at the same time as reminding the Court it must base its decision on the 2016 Rule's rationale and administrative record, the Intervenor-Respondents attach nearly 100 pages of extra-record materials to their supplemental response brief (ECF No. 279) – addressing mostly air quality and climate change concerns – and repeatedly cite the 2018 Revision Rule and the *California* court's order vacating that rule in support of their arguments. Regardless, this Court limited its review of the 2016 Waste Prevention Rule to the administrative record and grounds that the agency invoked when it took the action, and independently evaluated the Federal Respondents' asserted deficiencies in its rulemaking.

costs were only offset if the agency included the social benefits of the Rule as calculated using the global social cost of methane.  AR at 450-52.

Oil and gas leases -- including those between the federal government and its lessees – are intended to ensure *mutually profitable* development of the lease's mineral resources; accordingly, lessees have an obligation of reasonable diligence in the development and marketing of oil and gas from the lease, with due regard for the interest of both the lessee and the lessor.  *See Brewster v. Lanyon Zinc Co.*, 140 F. 801, 814 (8th Cir. 1905) ("It is only to the end that the oil and gas shall be extracted with benefit or profit to both [lessor and lessee] that reasonable diligence is required."); *Gerson v. Anderson-Prichard Prod. Corp.*, 149 F.2d 444, 446 (10th Cir. 1945) ("reasonable diligence in the development and protection of the premises means the doing of that which an experienced operator of ordinary prudence should do in the circumstances, bearing in mind that the purpose of the contract is the mutual benefit of the lessor and the lessee"); *Nola Grace Ptasynski*, 63 IBLA 240, 247-48 (1982) ("conceptual basis of the prudent operator rule lies in the fact that oil and gas leases are business arrangements entered into with an expectation of financial gain on both sides").  Congress enacted the MLA against this backdrop of consideration for operator economics.  *See California Co. v. Udall*, 296 F.2d 384, 388 (D.C. Cir. 1961) (MLA intended "to promote wise development of these natural resources and to obtain for the public a reasonable financial return on assets that 'belong' to the public[,]" but "[t]he public does not benefit from resources that remain undeveloped, and the Secretary must administer the Act so as to provide some incentive for development").

The MLA incorporates the "prudent operator" standard through the provisions requiring lessees to exercise "*reasonable* diligence, skill, and care" in the operation of the lease and subjecting Federal leases to the condition that lessees will use "all *reasonable* precautions to

prevent waste of oil or gas developed in the land." 30 U.S.C. §§ 187, 225 (emphasis added). The exercise of "reasonable diligence" and employment of "reasonable precautions" under the MLA do not require an operator to render its operations uneconomical by capturing and marketing uneconomic gas. *See Olsen v. Sinclair Oil & Gas Co.*, 212 F.Supp. 332, 333 (D. Wyo. 1963) ("Under the usual statement of the standard for prudent operation there is no obligation upon the lessee to drill offset wells unless there is a sufficient quantity of oil or gas to pay a reasonable profit to the lessee over and above the cost of drilling and operating the well."). To require operators to do so, especially based on an externality like the global social cost of methane, ignores the longstanding concept of "waste" in oil and gas law and is inconsistent with the prudent-operator standard incorporated in the MLA and as historically applied by the BLM.

The MLA does not expressly define "waste," but BLM's oil and gas lease form and regulations further formalize the historical concept that "waste" is assessed in light of the operator's diligence.[25] Section 2 of BLM's lease form 3100-11 requires the lessee to pay royalty on oil or gas "lost or wasted . . . when such loss or waste is due to negligence on the part of the operator, or due to the failure to comply with any rule, regulation, order, or citation issued under FOGRMA or the [MLA]."[26] Section 4 of the lease form, which addresses issues of development, unitization, and drainage, similarly requires the lessee to exercise "reasonable diligence in developing and producing, and must prevent unnecessary damage to, loss of, or waste of lease resources." The Rule at issue here did not substantively change BLM's regulatory definition of "waste:"

---

[25] *See CASA de Maryland, Inc. v. Trump*, 971 F.3d 220, 242 (4th Cir. 2020) ("When phrases used in a statute are undefined, 'we look to the ordinary meaning of the term . . . at the time Congress enacted the statute.'") (quoting *Perrin v. U.S.*, 444 U.S. 37, 42 (1979)).
[26] *See* https://www.blm.gov/sites/blm.gov/files/uploads/Services_National-Operations-Center_Eforms_Fluid-and-Solid-Minerals_3100-011.pdf.

> any act or failure to act by the operator that is not sanctioned by the authorized officer as necessary for *proper* development and production *and* which results in: (1) A reduction in the quantity or quality of oil and gas ultimately producible from a reservoir under *prudent and proper operations*; or (2) *avoidable surface loss* of oil or gas.

43 C.F.R. § 3160.0-5 (2015) (emphasis added). The Rule did change, however, the definition of "avoidably lost" which had previously related back to the prudent operation of the lease:

> Avoidably lost means the venting or flaring of produced gas without the prior authorization, approval, ratification or acceptance of the authorized officer and the loss of produced oil or gas when the authorized officer determines that such loss occurred as a result of: (1) *Negligence* on the part of the operator; or (2) The failure of the operator to take all *reasonable* measures to prevent and/or control the loss; or (3) The failure of the operator to comply fully with the applicable lease terms and regulations, applicable orders and notices, or the written orders of the authorized officer; or (4) Any combination of the foregoing.

*Id.* (emphasis added).[27] Thus, pursuant to DOI's longstanding interpretation and implementation of its MLA authority, whether a loss is deemed "avoidable" (and therefore constitutes impermissible "waste") has turned on "whether it would have been economic [for the lessee] to market the gas from the well at issue." *Rife Oil Properties, Inc.*, 131 IBLA 357, 373-75 (1994) (interpreting the waste standard under NTL-4A); *see also Ladd Petroleum Corp.*, 107 IBLA 5 (1989) (remanding BLM decision that flared gas was avoidably lost for determination of "whether in fact it was economically feasible to market the gas" and explaining that interpretation of NTL-4A giving operator opportunity to show gas was not marketable "is consistent with the intent of the underlying statutory and regulatory authority"). In contrast, the 2016 Rule deems losses of gas "avoidable" (virtually all venting and flaring unless falling within one of twelve categories considered "unavoidable" losses) without determining whether a reasonable and prudent operator would, given the circumstances, capture and market the gas.

---

[27] The 2016 Rule removed this definition of "avoidably lost", and redefined that term to mean: "Lost oil or gas that is not 'unavoidably lost,' as defined in paragraph (a) of this section; waste oil that became waste oil through operator negligence; and, any 'excess flared gas,' as defined in § 3179.7." 81 Fed. Reg. at 83,082.

In the Rule, BLM acknowledged its decades-long practice of factoring in operator economics on a case-by-case basis when determining whether a loss was avoidable, but simply claimed it is "not legally required to do so" and its "past practice does not prohibit it from revising its interpretation of that term." 81 Fed. Reg. at 83,038. However, "when [a court] must interpret an archaic statute, the historic practice of the agency that was created to help implement that statute can shed light on its meaning." *In re Cybernetic Servs., Inc.*, 252 F.3d 1039, 1057 (9th Cir. 2001). While agencies generally reserve the discretion to change their interpretations of statutory terms via notice and comment rulemaking, *see Chevron*, 467 U.S. at 863-64, courts are skeptical when an agency adopts a novel interpretation that conflicts with an earlier, contemporaneous interpretation that was applied consistently for decades, *see United States v. Moss*, 872 F.3d 304, 314-15 (5th Cir. 2017). "'[P]ersuasive weight' is due to an agency's contemporaneous construction of applicable law and subsequent consistent interpretation, whereas a 'current interpretation, being in conflict with its initial position, is entitled to considerably less deference.'" *Id.* at 315 (quoting *Watt v. Alaska*, 451 U.S. 259, 272-73 (1981)). A significant change in an agency's interpretation of its statutory authority deserves a *reasoned* explanation, which is lacking here.[28]

Though the MLA's waste provisions leave room for interpretation, the interpretation on which the Waste Prevention Rule is based is not "a permissible construction" of the MLA and is therefore unreasonable under *Chevron. City of Arlington*, 569 U.S. at 296. The BLM exceeded its waste prevention authority in promulgating regulations primarily intended to benefit the

---

[28] Intervenor-Respondents contend the BLM "provided ample justification" for its decision to update and replace NTL-4A. (*See* Intervenor-Resp'ts' Supp. Br. at 13, ECF No. 279.)   Indeed, the Rule references BLM's determinations that NTL-4A did "not reflect modern technologies, practices, and understanding of the harms caused by venting, flaring, and leaks of gas," was not "particularly effective in minimizing waste," and was "subject to inconsistent application." 81 Fed. Reg. at 83,015, 83,017, 83,038. While these findings on their face are legitimate considerations and entitled to deference, they still do not adequately explain BLM's disregard of operator economics as an important factor in determining when oil or gas is "avoidably lost."

environment and improve air quality, without regard for its longstanding interpretation of "waste" and in a manner that is inconsistent with the administrative structure Congress enacted into law. The ancillary benefits of a rule cannot provide the primary justification for the rule, particularly where those ancillary benefits fall outside the scope of the agency's statutory authority. Otherwise, there is simply no limit on agency authority and any colorable tie to an agency's authority would permit the agency to act on a problem Congress never intended the agency to solve and would allow agencies to impose unreasonable regulations on citizens and industries to achieve outcomes unrelated to the reason the regulation was purportedly adopted. *See Merck & Co., Inc. v. U.S. Dep't of Health and Human Servs.*, 385 F. Supp. 3d 81, 84 (D.D.C. 2019) (HHS rule invalid where "[n]either the [Social Security] Act's text, structure, nor context evince an intent by Congress to empower [the agency]" to adopt a rule in the "specific area" at issue); *Citizens to Save Spencer Cty. v. U.S. EPA,* 600 F.2d 844, 873 (D.C. Cir. 1979) (an agency's general rulemaking authority does not provide "carte blanche authority to promulgate any rules, on any matter relating to [its enabling statute]").

**B.      *Whether the Rule is Arbitrary and Capricious***

Because the process by which an agency reaches a result must be "logical and rational," agency action must rest "on a consideration of the relevant factors." *Michigan v. E.P.A.*, 576 U.S. 743, 750 (2015). Agency action may be arbitrary and capricious where it

> has relied on factors which *Congress* had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (emphasis added).

For the same reasons the Waste Prevention Rule exceeds BLM's statutory authority, including the agency's failure to consider the longstanding prudent operator standard and the agency's reliance on ancillary air quality benefits to justify extensive costs, the Rule is also arbitrary and capricious. The Rule departs from BLM's historical interpretation of waste by conflating "waste" with "loss" of gas, rejecting economic considerations in determining waste, and disregarding the waste that would occur if oil and natural gas is left in the ground because wells are prematurely abandoned. Additionally, and more specifically, the Court agrees with Petitioners, and the Federal Respondents' concession, that in promulgating the Rule, the BLM acted arbitrarily and capriciously in failing to (1) fully assess the impact of the Rule on marginal wells, (2) explain and identify support for the Rule's capture requirements, and (3) separately consider the domestic costs and benefits of the Rule.

1.    <u>BLM failed to adequately assess the impact of the Rule on marginal wells.</u>

In the Rule, BLM acknowledged that approximately 85% of wells on Federal and Indian leases are "marginal," meaning they produce 15 barrels of oil equivalent per day or less. AR at 381 (81 Fed. Reg. at 83,029). Commenters on the proposed rule expressed concern about the impact on marginal wells, asserting "the costs of LDAR for a marginal well far outweigh any benefits in terms of recovery of lost gas." *Id.* Commenters also noted that marginal wells are "only marginally profitable to begin with, and the costs of LDAR could make these wells uneconomical, leading to premature shut-in and a loss of mineral resources." *Id.*; *see also, e.g.,* Response to Comments ("RTC") at 293-94 (AR at 1032-33) (commenter estimating "$30,000-

$40,000 to purchase and install emission control equipment . . . will turn many marginal wells uneconomical, forcing operators to plug and abandon such wells"); RTC at 431 (AR at 1170) (commenter noting that plunger lifts "cost $20,000-$30,000 per well, which is more than the remaining net present value of many of these marginal wells"); RTC at 481 (AR at 1220) (commenter estimating "cost burden of semi-annual FLIR surveys would add approximately $1,600 a year to the operating cost of very marginal wells and would equate to a 15% increase in operating costs, which would result in earlier well abandonment"). BLM itself confirmed these concerns. *See* AR at 569 ("we recognize that some existing leases might not support the investments" and "specific requirements," such as those requiring equipment replacement and LDAR programs, "are likely to impact existing wells that are classified as marginal"). Nevertheless, contrary to the record evidence, BLM "*generally* believe[s] that the cost savings available to operators would exceed the compliance costs or that the compliance costs would not be as significant as to force the operator to prematurely abandon the well."[29]  *Id.* (emphasis added).  Also, without reasoned explanation supported by substantial evidence, the BLM relies on the Rule's various exemptions to alleviate these concerns, but only in circumstances where compliance would "cause the operator to cease production and abandon significant recoverable oil and gas reserves under a lease." *See* AR at 435, 437-38, 440; *see also* 569 (because "some existing leases might not support the investments [the Rule includes] exemption clauses for requirements if compliance would force the operator to prematurely abandon the well"). In addition to the deficiency of the exemptions discussed above, this exemption standard is a

---

[29] This general "belief" is contrary to the data in the Rule's RIA demonstrating that compliance costs will exceed cost savings (i.e., the value of the gas conserved) for the Rule's requirements regarding capture targets, pneumatic controllers, pneumatic pumps, storage tanks, and LDAR. *Compare* RIA at 5, 106 (AR at 451, 552) *with* RIA at 6, 109 (AR at 452, 555). The only requirement for which the costs savings *may* exceed compliance costs is liquids unloading, for which total annual costs range from $5-6 million and costs savings range from $5-8 million. And these numbers do not account for other additional costs that do not generate costs savings, such as flare measurement and administrative costs. RIA at 5 (AR at 451).

departure from BLM's historical practice of considering operator and energy economics. *See* AR at 3799 (NTL-4A) (BLM authorized to approve venting or flaring where the expenditures necessary to market or use the gas are not "economically justified" and "conservation of the gas would lead to the premature abandonment of recoverable oil reserves *and ultimately to a greater loss of equivalent energy than would be recovered if the venting or flaring were permitted to continue*") (emphasis added).

With respect to LDAR (Leak Detection and Repair), the estimated annual costs are four to six times the estimated annual cost savings. *See* AR at 451-52 (total costs of $83-84 million and total cost savings of $12-21 million). In the final Rule, BLM added a provision allowing operators to request an alternative LDAR program that is "not as effective as the BLM's requirements, if the operator demonstrates that compliance with the BLM's LDAR requirements or an equally effective alternative would be so costly as to cause the operator to cease production and abandon significant recoverable oil or gas reserves under a lease." AR at 382 (81 Fed. Reg. at 83,030). But the BLM did not evaluate the technical feasibility of this option or whether it would, in fact, prevent an operator from shutting in a marginal well that becomes uneconomical in light of the Rule's compliance costs. *See* AR at 529-41 (analyzing LDAR requirements but not addressing marginal wells or less effective alternative option); AR at 381-82 (citing lack of data as rationale for not excluding low production wells from the LDAR program). For example, the BLM did not explain what would constitute a minimally effective LDAR program or calculate the cost of such a program to determine if a less effective program would sufficiently reduce compliance costs to render a marginal well sustainable. The agency also did not adequately explain how it would define "significant recoverable oil and gas reserves" for

purposes of this or any other exemption.[30]  (*See* Federal Resp'ts' Supp. Br. at 13.)  The BLM

chided commenters for failing to support their emissions estimates for marginal wells with data

and evidence (*see* AR at 381), but then itself assumed marginal wells could take on the costs of a

less effective LDAR program with no analysis whatsoever (*see* AR at 382).

The BLM also failed to reasonably account for the administrative costs on the agency and

operators in seeking approval of an alternative LDAR program, or the potential that BLM and

the operator could not reach agreement on an alternative program.   Again without reasoned

explanation supported by substantial evidence, the BLM estimated it would only receive 20

applications per year from operators seeking alternative LDAR programs (AR at 544), despite

the fact that 85% of 96,000 BLM-administered wells are marginal (AR at 381), and its own

analysis showed that the LDAR requirements in particular would cost substantially more than the

value of the gas they would conserve, justified only by reliance on global social benefits.

With respect to the Rule's impact on marginal wells, BLM failed to fully examine

relevant data and articulate a rational connection between the facts found and the decision made;

therefore, the Rule is arbitrary and capricious.

2.     <u>BLM failed to adequately explain and support the capture requirements.</u>

The Rule attempts to "clarify[] the criteria for determining when incidental and necessary

disposal of gas accompanying oil production crosses the line into unreasonable waste of public

gas resources, and the final rule expresses these criteria in the form of a gas capture target."  AR

---

[30] Although BLM did provide a bit more guidance as to the meaning of the phrase "cease production and abandon significant recoverable oil reserves" in the context of the Rule's capture requirements, that guidance is nevertheless vague. *See* AR at 404 (81 Fed. Reg. at 83,052). For example, BLM attempted to clarify the standard by stating that, "depending on the specific economic circumstances of the lease, it *may* be sufficient for an operator to show that it would have to shut in the wells on a lease for a time period on the order of *a year or two*." *Id.* (emphasis added). Left unexplained is what amount of abandoned recoverable resources BLM would consider "significant" waste to warrant the granting of an exemption.  The BLM's failure to define this phrase with some level of certainty is inconsistent with its purported effort to eliminate uncertainty in other pre-existing provisions, *i.e.*, by "more clearly and specifically defin[ing]" when a loss of gas is considered "avoidable" and "unavoidable." *See* AR at 365.

at 400 (81 Fed. Reg. at 83,048). The BLM acknowledged operators' concerns that the flaring limits and the time frame for meeting those limits in the proposed rule were "prohibitively expensive and, in some areas of the country, technically impossible," yet the final Rule's gas capture targets and flaring limits operate essentially the same way but phase in over a "somewhat longer timeframe." AR at 376. As a practical matter, operators that fail to meet the applicable gas capture targets would have to pay royalties for the excess flared gas. AR at 400. Section 3179.7 establishes targets ranging from 85% to 98% to be incrementally phased in during the first nine years. AR at 434. The Rule allows operators to calculate capture percentages across a state, county, or lease-by-lease basis. *Id.* at 434-35. And if operators demonstrated that any particular gas capture target would lead to premature well shut-in by causing the operator to "cease production and abandon significant recoverable oil reserves under the lease," BLM had discretion to approve an alternative capture percentage. *Id.* at 435.

Despite the putative importance of the gas capture requirement to prevent waste (*see* RIA at 42, AR at 488), neither the RIA nor the Rule itself provided any explanation why BLM established gas capture targets between 85% to 98% over a nine-year period. Indeed, BLM offered no evidence that this new requirement was consistent with historical practice or that it had conducted any quantitative analysis to ensure the gas capture target percentages were themselves reasonable, economically feasible, or technically possible. *See* AR at 487-95 (RIA at 41-49). Rather, the BLM recognized that operators may elect to curtail production to avoid additional penalties from the gas capture requirements, reasoning that deferring production is "not lost" gas, but without any elaboration on what the impact might be. *Id.* at 490. Nor did BLM explain why the nine-year phase-in period was reasonable as opposed to a longer timeframe given the RIA's acknowledged reliance on new alternative capture technologies to

satisfy the gas capture requirements. *Id.* BLM also left significant uncertainty concerning the approval criteria for alternative capture percentages for operators facing premature shut-in; as discussed above, there is no clear explanation as to what will constitute "significant recoverable oil reserves" so as to merit the alternative capture targets. *Id.* at 470. Finally, the RIA not only failed to show the capture percentage requirements would create net benefits, but also acknowledged they could result in a net loss of up to $217 or $278 million depending on the discount rate used. *Id.* at 495.

BLM's failure to fully assess and adequately support gas capture requirements that could impose such significant costs renders those provisions arbitrary and capricious.

3.    BLM arbitrarily relied on the global social cost of methane to justify the Rule.

As it did when this roller coaster ride began, the Court questions whether the "social cost of methane"[31] – particularly on a global scale – is a factor *Congress* intended BLM to consider in promulgating a resource conservation rule pursuant to its MLA authority. It seems an unreasonable stretch to interpret BLM's authority under the MLA to require lease provisions "for the safeguarding of the public welfare" (30 U.S.C. § 187) as congressional intent that the BLM consider this ancillary air quality benefit. To be sure, "Congress need not, and likely cannot, anticipate all circumstances in which a general policy must be given specific effect." *United States v. Haggar Apparel Co.*, 526 U.S. 380, 392 (1999). But, taking at face value BLM's assertion that the Rule aims "to reduce waste of natural gas," the cost-benefit analysis should

---

[31] The "social cost of methane" is a variation on the "social cost of carbon" methodology which attempts to estimate "the economic damages associated with a small increase in carbon dioxide emissions." AR at 9654; *and see* AR at 18,736. The 2016 National Academies of Science ("NAS") report noted that the social cost of carbon "depends on a number of inputs that are uncertain," ranging from aspects of the natural world and human behavior to modeling challenges, rendering the cost-benefit analysis itself uncertain. *See* AR at 18,968.

have been considered primarily in terms of waste prevention and not greenhouse gas emissions.[32] *See* AR at 360, 367 (81 Fed. Reg. at 83,008, 83,015).   Instead, the BLM is buttressing the benefits of the Rule in global air quality terms.  The BLM estimates the net benefits of the Rule outweigh its costs by "a significant margin," producing net benefits widely ranging from $46 million to $204 million per year depending on the discount rate used.  AR at 365 (81 Fed. Reg. at 83,013).   BLM estimates costs (largely for engineering compliance) will range from $110 million to $279 million per year, resulting in monetized benefits of $209-$403 million per year. *Id.* at 365-66.  Of the total benefits, however, $189-$247 million is attributable to the global environmental benefit of reducing the amount of methane released into the atmosphere, and the remainder of $20-$157 million to the costs savings that industry will receive from the recovery and sale of natural gas.  AR at 366 (81 Fed. Reg. at 83,014); *see also* RIA at 5 (AR at 451).  And, in what seems almost an afterthought, BLM estimates the Rule will produce additional royalties of $3-$14 million per year.[33]  *Id.*  Thus, the Rule only results in a "net benefit" if the "social cost of methane" is factored into the analysis.  AR at 451-52 (RIA at 5-6).  BLM cannot rationally claim the Rule's objective is waste prevention while justifying its considerable costs almost entirely on climate change benefits.

The question then becomes whether an agency can primarily justify and rely on ancillary benefits when promulgating a regulation.  In *Michigan v. E.P.A.*, the Supreme Court considered a challenge to regulations governing the emission of hazardous air pollutants by power plants under the Clean Air Act.  576 U.S. 743, 747 (2015).  Under the CAA, the EPA is authorized to regulate power plant emissions if the regulation is "appropriate and necessary."  42 U.S.C. §

---

[32] "[W]hen an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable."  *Nat'l Ass'n of Home Builders v. E.P.A.*, 682 F.3d 1032, 1040 (D.C. Cir. 2012).

[33] This amount is *de minimis* considering the total production of oil and gas in FY 2015 from Federal and Tribal leases generated over $2.3 billion in royalties.  *See* AR at 361 (81 Fed. Reg. at 83,009).

7412(n)(1)(A).  The EPA estimated the regulation would result in $9.6 billion per year in regulatory costs, yet the EPA "refused to consider whether the costs of its decision outweighed the benefits."  576 U.S. at 749-50.  The Court invalidated EPA's rule because the EPA unreasonably interpreted its obligation to consider cost under the statute:  "The Agency must consider cost – including, most importantly, cost of compliance – before deciding whether regulation is appropriate and necessary."  *Id*. at 759.

> Agencies have long treated cost as a centrally relevant factor when deciding whether to regulate. Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions. It also reflects the reality that "too much wasteful expenditure devoted to one problem may well mean considerably fewer resources available to deal effectively with other (perhaps more serious) problems." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 233, 129 S.Ct. 1498, 173 L.Ed.2d 369 (2009) (BREYER, J., concurring in part and dissenting in part). Against the backdrop of this established administrative practice, it is unreasonable to read an instruction to an administrative agency to determine whether "regulation is appropriate and necessary" as an invitation to ignore cost.

*Id*. at 752-53.

After reaching this conclusion, the Supreme Court noted that some parties urged the Court to uphold the rule because, "once the rule's ancillary benefits are considered, benefits plainly outweigh costs."  *Id*. at 759.  These ancillary benefits included reductions in power plant emissions of particulate matter and sulfur dioxide, substances that are not covered by the hazardous air pollutants program under which the rule was promulgated.  *Id*. at 749.  The majority viewed this position with skepticism.  *Id*. at 760.  However, because the EPA insisted it had not relied on ancillary benefits, the Court declined to decide whether the agency could have considered ancillary benefits when deciding whether regulation is appropriate and necessary.  *Id*.

While the BLM can consider environmental impacts to the public lands when it chooses to regulate, there is nothing in any of the statutes empowering the agency to consider or work to

address *global* climate change in the process.  Absent the ancillary benefits monetized by the BLM, the Waste Prevention Rule is arbitrary and capricious, as it will cost likely more than double what it saves annually.

Intervenor-Respondents assert BLM's consideration and reliance on a global social cost of methane approach is reasonable and consistent with direction from the Office of Management and Budget ("OMB") Circular A-4 and Executive Order 12,866.  These orders direct agencies to consider "all costs and benefits" of regulatory actions, including environmental and health effects.  *See* E.O. 12,866, §§ 1(a), 1(b)(6), 6(a)(3)(C)(ii) (58 Fed. Reg. 51,735) (Sept. 30, 1993); OMB Circular A-4 (Sept. 17, 2003) (AR at 7661, 7668) (agency should consider "all the important benefits and costs likely to result from the rule," including "any important ancillary benefits"[34]).  Intervenor-Respondents point out that Circular A-4 specifically anticipates the consideration and reporting of "effects beyond the borders of the United States."  AR at 7661. However, even accepting that such *executive* guidance is an appropriate consideration in the exercise of an agency's discretion, the Rule's cost-benefit analysis is not consistent with this guidance.  OMB Circular A-4 directs an agency to focus its analysis "on **benefits and costs that accrue to citizens and residents of the United States**;" and where an agency chooses to evaluate a regulation that is "likely to have effects beyond the borders of the United States, these effects should be **reported separately**." *Id.* (emphasis added).  Here, they were not.

A large percentage of the calculated benefits – as much as 90% -- is attributable to reduced methane emissions.[35]  Furthermore, BLM calculated these benefits using the *global* social cost of methane, without separately analyzing and reporting the United States' *domestic*

---

[34] The OMB Circular A-4 defines "ancillary benefit" as "a favorable impact of the rule that is typically unrelated or secondary to the statutory purpose of the rulemaking." AR at 7668.

[35] It is worth noting that methane emissions from natural gas systems decreased slightly from 1990 to 2014, despite the "dramatic" increase in oil and natural gas production in the United States during that time. *See* AR at 16,867 ("Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990-2014," U.S. Envtl. Prot. Agency, Apr. 15, 2016).

share of those benefits. Although the BLM previously defended its use of a global, rather than domestic, measure of the social cost of greenhouse gases on the ground that "suitable methodologies for estimating domestic damages do not currently exist" (AR at 1194), there is no reason to think that a domestic analysis cannot also be performed as directed by Circular A-4. *See Lands Council v. Martin*, 529 F.3d 1219, 1226 (9th Cir. 2008) ("We find no legal requirement that a methodology be 'peer-reviewed or published in a credible source.'"). BLM failed to adequately explain or support with substantial evidence why it was reasonable to use a global emissions metric to quantify the benefits arising from a rule designed to curb domestic waste under the MLA. It is one thing for ancillary benefits to be part of the calculus but quite another for them to be the fundamental driver of the calculus.

## C.   *The Rule's application to State and private mineral interests is unlawful.*

Intervenor-Petitioners North Dakota and Texas further challenge the Rule to the extent its air quality regulations are imposed on not only Federal and Tribal lands, but also on all private or State tracts where the Federal mineral interests have been pooled (or "communitized"), however minimal the Federal interests. *See* 81 Fed. Reg. at 83,039, 83,081 (§ 3179.2(a)(4)). Because of North Dakota's and Texas's "split estate" regimes that pool significant mineral interests, a significant portion of the Rule's obligations in these States falls on private, not public, mineral interests.[36] North Dakota and Texas argue the Rule would displace their role as the primary regulator over State, private, and (by agreement) Tribal mineral interests that are pooled with any Federal mineral interests, and instead place that authority with the BLM.

Both States have comprehensive oil and gas regulations with a central purpose of preventing "waste" of these resources. *See* N.D. CENT. CODE § 38-08-01 ("It is hereby declared

---

[36] In North Dakota, more than 30% of the potential development on private surface involving Federal minerals would be subject to the Rule. *See* AR at 33,630.

to be in the public interest to foster, to encourage, and to promote the development, production, and utilization of natural resources of oil and gas in the state in such a manner as will prevent waste[.]"); TEX. NAT. RES. CODE § 102.011 (upon application of an owner, communitization or pooling shall be established "for the purpose of avoiding the drilling of unnecessary wells, protecting correlative rights, or preventing waste"). As part of its laws and regulations governing oil and gas production, North Dakota imposes stringent flaring restrictions on oil and gas production operators. *See* N.D. CENT. CODE § 38-08-06.4. Texas has similarly adopted detailed regulations regarding the minimization, safe release, and flaring of gases. *See* 16 TEX. ADMIN. CODE § 3.32. Pursuant to the Rule, States would have to seek a variance from the BLM – a determination that is within BLM's discretion to grant – in order to avoid the situation of operators being required to comply with overlapping requirements. *See* AR at 388 (81 Fed. Reg. at 83,036). The BLM acknowledged that "applying two sets of [differing] requirements is burdensome for operators and would not generate additional benefits." *Id.* BLM dismissed such concerns, assuming the Rule's "variance process avoids the potential duplication and inefficiencies that could otherwise occur in this situation." *Id.* However, even if a State is granted a variance, BLM still claims the responsibility "for ensuring that operators comply with . . . State . . . requirements that the BLM deems to be an acceptable substitute for the Federal requirements." *Id.*

The BLM's authority under the MLA with respect to pooled or communitized units derives from section 226:

> For the purpose of more *properly conserving* the natural resources of any oil or gas pool, field, or like area, or any part thereof (whether or not any part of said oil or gas pool, field, or like area, is then subject to any cooperative or unit plan of development or operation), lessees thereof and their representatives may unite with each other, or jointly or separately with others, in collectively adopting and operating under a cooperative or unit plan of development or operation of such

- 48 -

pool, field, or like area, or any part thereof, whenever determined and certified by the Secretary of the Interior to be *necessary or advisable in the public interest.* The *Secretary is thereunto authorized,* in his discretion, *with the consent of the holders of leases involved,* to establish, alter, change, or revoke drilling, producing, rental, minimum royalty, and royalty requirements of such leases and to make such regulations with reference to such leases, *with like consent on the part of the lessees,* in connection with the institution and operation of any such cooperative or unit plan as he may deem *necessary or proper to secure the proper protection of the public interest.* The Secretary may provide that oil and gas leases hereafter issued under this chapter shall contain a provision requiring the lessee to operate under such a reasonable cooperative or unit plan, and he may prescribe such a plan under which such lessee shall operate, which shall *adequately protect the rights of all parties in interest,* including the United States.

30 U.S.C. § 226(m) (emphasis added). Thus, federal law authorizes the communitization of

Federal mineral resources with resources of different ownership when it is determined to be in

the public interest. Of the vented and flared gas reported to the ONRR, 76.2 percent comes from

wells extracting minerals with mixed ownership (some combination of Federal, Indian, private

and State minerals), while less than 25 percent comes from wells extracting only Federal or

Indian minerals. AR at 367 (81 Fed. Reg. at 83,015).

However, section 226(m) does not provide broad authorization for the BLM to impose

comprehensive federal regulations similar to those applicable to operations on Federal lands on

State or privately-owned tracts or interests: "Any plan authorized by the preceding paragraph

which includes lands owned by the United States may, in the discretion of the Secretary, contain

a provision whereby authority is vested in the Secretary of the Interior . . . to alter or modify

from time to time the rate of prospecting and development and the quantity and rate of

production under such plan." 30 U.S.C. § 226(m). Accordingly, BLM's authority in pooled

arrangements is limited to rates of development and production for purposes of avoiding the

"waste" of Federal mineral interests, similar to the rights of any participant in communitized

arrangements, and is not a grant of general regulatory authority over the State and private

- 49 -

mineral interests in the communitized units. *See Entek GRB, LLC v. Stull Ranches, LLC*, 763 F.3d 1252, 1254 (10th Cir. 2014) (the purpose of communitization was not to enable federal control of non-public lands, but rather to address the problem "that mineral deposits don't always follow plat lines," and that uncoordinated development "often yielded frantic, duplicative, and crazy-quilt exploration activities in what amounted to a single oil and gas field").

BLM's implementing regulations have historically maintained this distinction between its general regulatory authority over Federal leases and its more limited authority with respect to the private and State leases that may be pooled with Federal interests. Prior to 2017, the jurisdictional provision relating to onshore oil and gas operations (Part 3160) stated: "All operations conducted on a Federal or Indian oil and gas lease by the operator are subject to the regulations in this part." 43 C.F.R. § 3161.1(a) (2016). Operations "on State or privately-owned mineral lands committed to a unit or communitization agreement which affects Federal or Indian interests," by contrast, have been subject only to "[r]egulations in this part relating to site security, measurement, reporting of production and operations, and assessments or penalties for noncompliance with such requirements[.]" *Id.* § 3161.1(b) (2016). Similarly, BLM's regulations governing onshore oil and gas unit agreements (Part 3180) provides: "All unit agreements on Federal leases are subject to the regulations contained in part 3160 of this title, Onshore Oil and Gas Operations[;]" but "[a]ll unit operations on non-Federal lands included within Federal unit plans are *subject to the reporting requirements* of part 3160 of this title." 43 C.F.R. § 3180.0-1 (1983)(emphasis added). In developing its regulations for implementing FOGRMA, BLM recognized its authority was limited to that authorized by the unitization agreement, or to the extent that such authority is directly relevant to its proprietary interests in the Federal minerals. *See* Onshore Oil and Gas Operations – Implementation of the Federal Oil

and Gas Royalty Management Act of 1982, 49 Fed. Reg. 37,356, 37,357 (Sept. 21, 1984) (43

C.F.R. Part 3160) ("the Bureau of Land Management's authority is limited to Federal and Indian

lands, except as authorized by a unit or communitization agreement");  Onshore Oil and Gas

Operations – Federal and Indian Oil and Gas Leases – Onshore Oil and Gas Order Number 1,

Approval of Operations, 72 Fed. Reg. 10,308 (Mar. 7, 2007).   In the preamble to its 1984

FOGRMA implementation regulations, BLM wrote:

> Since all committed leases within a communitized area or unit participating area
> share in the total production from the communitized tract or participating area
> regardless of the ownership of the mineral estate where the wells are located, the
> [BLM] must have **some limited authority** to obtain needed data and to inspect
> non-Federal and non-Indian sites to assure that the Federal and Indian interests are
> protected. This limited authority is spelled out in the formal agreement, i.e., unit,
> communitization or gas storage. **If the agreement fails to provide such limited
> authority to the Bureau . . . these regulations do not apply to operations on
> private or State lands**.

49 Fed. Reg. at 37,357 (emphasis added).  The BLM reiterated its position and understanding of

its limited authority as recently as 2007, when it revised Order No. 1.  The original draft had

applied the order to communitized leases as well as Federal leases, but in response to public

comments, the BLM determined this was not "appropriate":

> One commenter did not think it appropriate for the Order to apply to operations
> within a unit or communitized area on private minerals or private surface. **We
> agree**. While the site security, measurement, and production reporting regulations
> apply to unitized wells drilled on private minerals (43 CFR 3161.1), **it is not
> appropriate for the BLM or the FS to exercise authority over surface
> operations conducted on privately owned lands just because those lands are
> contained within a unit or communitized area**. The BLM only requires a copy
> of the permit to be provided for non-Federal wells within a unit or communitized
> area and wording in the "Scope" section of the Order is revised to make this clear.

72 Fed. Reg. at 10,312-13 (emphasis added).

Thus, BLM has, until promulgation of the Waste Prevention Rule, recognized its limited

authority over oil and gas operations on non-Federal lands.   BLM attempts to dismiss this

precedent by claiming "the cited passage from the preamble to Order 1 did not address the scope of the BLM's regulatory authority with respect to non-Federal tracts in Federally-approved units and communitized areas; rather, the passage addressed what was 'appropriate' in light of the jurisdictional limitations contained in 43 CFR § 3161.1." AR at 391 (81 Fed. Reg. 83,039). However, the most natural reading of the language is in keeping with previous interpretations that BLM had limited authority over operations on State or private lands. The BLM offers no reasoned explanation for why it was inappropriate to modify the jurisdictional reach prescribed in 43 C.F.R. § 3161.1 for Order No. 1, but appropriate for the Waste Prevention Rule.

Without meaningful explanation, the BLM changed its long-held position that it lacked authority to generally regulate State and private mineral interests in pooled or communitized units. "Unexplained inconsistency" can be "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act." *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125, 195 L. Ed. 2d 382 (2016). The Supreme Court addressed application of the APA to agency policy changes in *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009). In *Fox*, the Court held that an agency provides a reasoned explanation for a policy change where it (1) displays "awareness that it is changing position," (2) shows the new policy is "permissible under the statute," (3) shows there are "good reasons for the new policy," and (4) shows "the agency *believes* [the new policy] to be better." *Id.* at 515. When an agency's new policy "rests upon factual findings that contradict those which underlay its prior policy[,] or when its prior policy has engendered serious reliance interests that must be taken into account," the agency must

"provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Id.* "In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 515-16; *see also Encino Motorcars, LLC*, 136 S. Ct. at 2125-26.

The BLM hardly acknowledges its change of policy, much less explains how the change is "permissible under the statute" or that there are "good reasons" for the change. Moreover, as discussed previously, BLM's purported justification of preventing waste is belied by the record, and BLM failed to take into account the facts and circumstances underlying its long-held position that it has only limited regulatory authority over private minerals, even when they have been communitized with Federal minerals. Instead, the BLM now characterizes such intrusion as "incidental" (*see* 81 Fed. Reg. at 83,039), ignoring how its longstanding policy may have "engendered serious reliance interests." Most apparent, North Dakota and Texas have enacted statutes that either require, or authorize, State and private interests to be pooled or communitized with Federal mineral interests. *See* N.D. CENT. CODE §§ 38-08-07, -08; *Continental Res., Inc. v. Farrar Oil Co.*, 559 N.W.2d 841, 845 (N.D. 1997) ("The Commission has power to compulsorily pool all interests in the spacing unit for development and operations."). *See also* TEX. NAT. RES. CODE § 102, *et seq.* Under the Rule's expansion of BLM's jurisdiction, the implementation of these State pooling statutes effectively results in the forfeiture by private and State mineral interests of their rights and obligations under State law.[37] In response, the BLM callously disregarded these serious concerns. *See* AR at 391 (81 Fed. Reg. at 83,039) ("The fact that States and private parties have chosen to enter into unitization or communitization

---

[37] The Supreme Court has recognized that "regulation of land use is perhaps the quintessential state activity." *F.E.R.C. v. Mississippi*, 456 U.S. 742, 767 n.30 (1982); *accord City of Edmonds v. Oxford House*, 514 U.S. 725, 744 (1995) (Thomas, J., dissenting) ("land use regulation is one of the historic powers of the States").

agreements whereby State or private oil or gas is commingled with Federal or Indian oil or gas, and produced concurrently with Federal or Indian oil or gas, does not deprive the BLM of its authority to impose reasonable waste prevention requirements on operators producing Federal or Indian oil or gas."). However, the BLM cannot leverage its limited authority to manage and collect royalties from the Federal portion of pooled Federal, State and private mineral interests operating under long-standing communitization agreements to impose comprehensive regulations on State and private land and mineral interests, particularly where only a fraction of the benefits claimed by BLM as supporting the Rule have anything to do with the prevention of waste or increased royalty revenues. *See* Discussion, *supra* at B.3. The BLM has given no good reasons for the change in its prior policy limiting those regulations applicable to State and privately-owned mineral interests pooled with Federal mineral interests. Therefore, BLM's unexplained and unsupported change of policy and resulting effort to exercise jurisdiction over State and private mineral interests is not due any deference and is a violation of the APA.

**D.**     *Vacatur is the appropriate remedy.*

Pursuant to the APA, a reviewing court "shall . . . hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law [or] in excess of statutory jurisdiction, authority, or limitations[.]" 5 U.S.C. § 706(2)(A), (C). Except in limited circumstances, vacatur is the typical and appropriate remedy under the APA for unlawful agency action. *See American Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518 (D.C. Cir. 2020); *see also High Country Conservation Advocates v. U.S. Forest Serv.*, 951 F.3d 1217, 1228 (10th Cir. 2020) ("Vacatur of agency action is a common, and often appropriate form of injunctive relief granted by district courts."). Having determined the 2016 Waste Prevention Rule  (81 Fed. Reg. 83,008) exceeded BLM's statutory authority and was

otherwise arbitrary and capricious as discussed herein, the Court finds vacatur of the unlawful provisions, including subpart 3179 in its entirety, is the appropriate remedy.

None of the parties here suggests circumstances warranting remand without vacatur. However, the parties do offer varying positions on the severability of the Rule's provisions. The Federal Respondents point out, and the Industry Petitioners and Petitioners Wyoming and Montana agree, that certain provisions of the Rule have not been challenged in this litigation and are severable, so should not be enjoined or vacated. *See High Country Conservation Advocates*, 951 F.3d at 1228-29 ("a court may partially set aside a regulation if the invalid portion is severable, that is, if the severed parts operate entirely independently of one another, and the circumstances indicate the agency would have adopted the regulation even without the faulty provision") (internal quotations and citation omitted). Specifically, these severable provisions are: (1) 43 C.F.R. subpart 3178, which pertains to the royalty-free use of production (AR at 395-98, 430-32); and (2) the amendment of 43 C.F.R. § 3103.3-1, which aligned the prior regulation text with the terms of the MLA (AR at 393-94, 429-30). The Federal Respondents represent these provisions will continue to function independently if the remainder of the Rule's provisions (*i.e.*, pertaining to venting, flaring, and leaks) are vacated.

Intervenor-Respondents agree that the unchallenged provisions identified by the Federal Respondents are severable. They further argue, however, that if this Court finds there was impermissible overlap with EPA's regulations, such a ruling would not apply to the capture requirements because EPA does not regulate flaring of associated gas from oil wells. Intervenor-Respondents also argue that, even if this Court accepts BLM's confession of error in how it defined waste under the Rule, such a ruling would not affect the pneumatic controller requirements, for which the value of the gas conserved is more than the cost of replacing the

devices.  The Court disagrees. Intervenor-Respondents' arguments ignore that the permeating flaw in subpart 3179 – that it is an air quality regulation enacted without regard to economic feasibility – infect it in its entirety.  In other words, the entirety of subpart 3179 cannot be divorced from BLM's principle motivation of regulating greenhouse gas emissions.

And finally, North Dakota and Texas argue the provisions of the Rule are not severable, requiring vacatur of the entire Rule.  However, the State Intervenor-Petitioners have not convinced the Court the provisions identified by the Federal Respondents cannot operate independently of the vacated provisions, and the agency would not have adopted those provisions even without the faulty provisions. Therefore, the Court finds the unlawful provisions of the Rule are severable from the unchallenged provisions.

CONCLUSION

Under the MLA, Congress has vested the Secretary with the authority to prescribe rules for the prevention of undue waste of mineral resources.  However, that delegation of authority does not allow and was not intended to authorize the enactment of rules justified primarily upon the ancillary benefit of a reduction in air pollution, particularly when considered in light of historical context and the comprehensive regulatory structure under the Clean Air Act. Additionally, the BLM acted arbitrarily and capriciously in failing to fully assess the impacts of the Rule on marginal wells, failing to adequately explain and support the Rule's capture requirements, and failing to separately consider the domestic costs and benefits of the Rule. Finally, BLM's unexplained and unsupported change in its long-standing policy regarding application of its regulations on State and private mineral interests further renders the Rule arbitrary and capricious.

This roller coaster ride is illustrative of a growing concern.  As observed by Justice Thomas in his concurrence in *Michigan v. E.P.A.*, 576 U.S. 743 (2015), "[s]tatutory ambiguity thus becomes an implicit delegation of rule-making authority, and that authority is used not to find the best meaning of the text, but to formulate legally binding rules to fill in gaps based on policy judgments made by the agency rather than Congress."  *Id.* at 762.  The reality is that in an age of Congressional gridlock, expansive authority and policy are being carried out often through administrative agencies.  Adding further concern to this problem is the constant change in policy, from one administration to the next, which in turn has embroiled the courts, involving issues ranging from immigration to environmental policy.  Certainly this Court has and will continue to apply the law in determining the legal appropriateness of agency actions challenged before it, but the roller coaster is better kept in an amusement park.

For the foregoing reasons, IT IS THEREFORE

ORDERED that the Waste Prevention Rule, 81 Fed. Reg. 83,008 (Nov. 18, 2016), is hereby **VACATED**, *except* as to the following severable provisions:  (1) 43 C.F.R. subpart 3178; and (2) the amendment of 43 C.F.R. § 3103.3-1.

DATED this _____8^Th_____ day of October, 2020.

Scott W. Skavdahl
United States District Judge